UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DAVID WRIGHT,<br><br>           Defendant. | CRIMINAL ACTION<br>NO. 15-10153-WGY |

YOUNG, D.J.                                              December 28, 2016

**ORDER AND MEMORANDUM**

After a comprehensive and thorough review of the classified materials filed in this case, this Court rejects each of the contentions raised by the defendant Wright and denies each of his motions (ECF Nos. 87, 103, 104, 105, 106) challenging such investigatory procedures. This action thus confirms the denial of the motions to suppress (ECF Nos. 103, 104, 105, 106) already provisionally denied after hearing.

In reaching this result, the Court has followed the better practice and conducted its own de novo review, according no weight to the prior actions of the FISA judge(s). Although some courts have noted that "FISA warrant applications are subject to 'minimal scrutiny by the courts,' . . . upon . . . challenge," United States v. Abu-Jihaad, 630 F.3d 102, 130 (2d Cir. 2010)

(quoting United States v. Duggan, 743 F.2d 59, 77 (2d Cir. 1984)), others have applied a heightened scrutiny -- reviewing the FISA Court's probable cause determinations de novo, see, e.g., United States v. Turner, 840 F.3d 336, 340 (7th Cir. 2016); United States v. Rosen, 447 F. Supp. 2d 538, 545 (E.D. Va. 2006). The reasoning for applying a more stringent standard is persuasive, "especially given that the review [of a FISA warrant application] is ex parte and thus unaided by the adversarial process." Rosen, 447 F. Supp. 2d at 545 (collecting Fourth Circuit precedents applying de novo review to FISA materials). The certifications in the FISA application(s), however, are presumed valid. See id.

It is appropriate to remark that this de novo review reveals that the government attorneys here have throughout acted with scrupulous regard for the rights of the defendant Wright and have conducted themselves with utmost fidelity within the limited powers accorded them under the Foreign Intelligence Surveillance Act, 50 U.S.C. §§ 1801-85.[1] It is equally appropriate to observe that almost no one will believe me.

---

[1] Conferring this encomium does not mean I agree with each of the government's characterizations, especially their perception of the imminence of the threat posed by the defendant Wright and his co-conspirators. I do not. What is important, however, is the scrupulous care with which government attorneys have followed the established procedures. There is here no basis to consider the suppression of evidence.

[2]

Why this sad state of affairs?  It is an amalgam of the government's seemingly obsessive over classification coupled with the media's shallow reporting and an equally shallow public awareness of or interest in what is actually happening.

First over classification -- no one disputes the government's appropriate interest in the classification of actual intelligence data.  Here, however, the government has thrown a cloak of secrecy over the most basic procedures of the FISA Court.  The result has not been to enhance the authority of that court but rather to call its judgments into question and to treat its important functions with a certain disdain.  See, e.g., Mystica M. Alexander & William P. Wiggins, A Domestic Consequence of the Government Spying on Its Citizens: The Guilty Go Free, 81 Brook. L. Rev. 627 (2016); Scott A. Boykin, The Foreign Intelligence Surveillance Act and the Separation of Powers, 38 U. Ark. Little Rock L. Rev. 33 (2015); Maxwell Palmer, Does the Chief Justice Make Partisan Appointments to Special Courts and Panels?, 13 J. Empirical Legal Stud. 153 (2016); Karly Jo Dixon, Note, The Special Needs Doctrine, Terrorism, and Reasonableness, 21 Tex. J. C.L. & C.R. 35, 47-57 (2015).  Reducing the classification of procedural safeguards imposed by the FISA Court would go a long way toward restoring confidence in its decisions.

Some months ago, I heard on the radio that the FISA Court had never turned down a government warrant application. "This can't be true," I thought, since over the past three years I had never once granted a single Title III wiretap application in the form sought by the government. "If it is," I thought, "that court is in the bag with the executive branch."

Now, having exercised judicial authority within FISA's precincts, I am prepared to acknowledge how shallow was my reaction. Here, in relevant part, is the actual report made by the Department of Justice pursuant to sections 107 and 502 of FISA:

> During calendar year 2015, the Government made 1,499 applications[2] to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The 1,499 applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,457 applications included requests for authority to conduct electronic surveillance.
> One of these 1,457 applications was withdrawn by the Government. The FISC did not deny any applications in

---

[2] In keeping with the Department's historical reporting practice, the number of applications listed in this report refers to applications that were filed in signed, final form pursuant to Rule 9(b) of the Foreign Intelligence Surveillance Court Rules of Procedure. A "denial" refers to a judge's formal denial of any such an application; it does not include a proposed application submitted pursuant to Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure for which the government did not subsequently submit a signed, final application pursuant to Rule 9(b).

[4]

whole, or in part.  The FISC made modifications[3] to the proposed orders in 80[4] applications.  Thus, the FISC approved collection activity in a total of 1,456 of the applications that included requests for authority to conduct electronic surveillance.

2016 Att'y Gen. Ann. Rep. 1-2.  The government appears to refrain from formally submitting to the FISA Court applications it doubts that court will accept and, even then, 80 such formal submissions were substantially modified (probably narrowed).  This is not so different from my own practice of reviewing draft warrant applications and sending them back to be narrowed where appropriate -- all before formal application is made (and counted).

Not surprisingly, the press reports simplified things.  Here is a representative sample: "US spy court rejected zero surveillance orders in 2015."  Dustin Volz, U.S. spy court rejected zero surveillance orders in 2015, Reuters News, May 2, 2016, http://www.reuters.com/article/us-usa-cybersecurity-surveillance-idUSKCN0XR009.  In fairness, the seventh paragraph

---

[3] A "modification" includes any substantive disparity between the authority requested by the Government in a final application filed pursuant to Rule 9(b) and the authority granted by the FISC.  It does not include changes made by the government after the submission of a proposed application submitted pursuant to Rule 9(a).

[4] In addition to the 80 orders modified with respect to applications made during the reporting period, the FISC modified one order for an application after first granting authorization.  The FISC also modified one order for an application made in a prior reporting period during the current reporting period.

[5]

of this story stated "The court modified 80 applications in 2015, a more than fourfold increase from the 19 modifications made in 2014." Id.  This crucial seventh paragraph, however, appears not to have made it onto the airwaves, thus eliminating the important nuance.

Reporting for the same year, the Administrative Office of the United States Courts says simply, "[Nationwide] [n]o wiretap applications were reported as denied in 2015."  Admin. Office U.S. Courts, Wiretap Rep. 2015, Dec. 31, 2015, http://www.uscourts.gov/statistics-reports/wiretap-report-2015. It is only when one looks at the accompanying tables that it is revealed, for example, that of the 25 wiretap warrants authorized in 2015 in the District of Massachusetts, a full 40% were amended, i.e. almost certainly narrowed by the presiding judge.  See id. at Wire 2.

While respecting privacy and national security concerns, the obligation appears to devolve upon the courts themselves to explain -- both case by case and in the aggregate -- how daily they patrol the boundaries of the Fourth Amendment to our Constitution.  The press will not publish, broadcast, or analyze the fine print.  To continue as we are is to deny our citizens an understanding of the doctrine of separation of powers and sap the vitality of fundamental constitutional values.

[6]

By the Court,

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE