UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES ) | |
| ) | No.  15-CR-10153-WGY |
| v. ) | |
| ) | |
| DAVID WRIGHT ) | |
| Defendant. ) | |
| ) | |

**DEFENDANT DAVID WRIGHT'S OPPOSITION TO THE GOVERNMENT'S MOTION FOR COURTROOM CLOSURE AND PROTECTIVE SECURITY MEASURES DURING TESTIMONY OF FBI'S CONFIDENTIAL HUMAN SOURCE**

On August 22, 2017, the Government filed a filed a motion seeking courtroom closure and protective security measures during the testimony of the FBI's confidential human source.  On August 26, 2017, the Court denied the Government's motion, which was entered on the docket on August 31. The defense, which was preparing an opposition, acknowledges and appreciates the Courts ruling. Because the Court's Order suggests that it will, notwithstanding its order "devise security measures", the defense files its opposition, out of an abundance of caution, to frame Defendant's position relative to the severity of the supposed threats, the confrontation issues and fair trial rights at stake, and to suggest – in Part III – measures that would not impede on against these rights, or th rights of the general public.

The Government offered two justifications for the closure and the attendant restrictions upon the general public's access during the Defendant's trial. The first was a speculative, likely overstated, threat to the paid informant's safety in the event that ISIS or its sympathizers were to learn his identity. The second concerned the supposed risk Mr. Wright poses, based on a threatening pronouncement allegedly made to the witness – a statement which is uncorroborated and based entirely on the witness' recollection – and on remarks Mr. Wright supposedly made to a prison informant who is of exceedingly dubious reliability. Neither risk to the FBI's paid

1

source is sufficiently substantial to justify the dramatic relief of partial closure, particularly where more reasonable alternatives exist.

> **I.    COURTROOM CLOSURE IS RARELY TO BE USED, AS IT IMPLICATES CONSTITUTIONAL CONCERNS FOR THE DEFENDANT AND THE GENERAL PUBLIC. EVEN PARTIAL CLOSURE REQUIRES DEMONSTRATING A SUBSTANTIAL INTEREST.**

The Government sought an exceptional relief in moving to partially close the courtroom during trial, and enact a host of security measures that – had it been allowed – would unavoidably impinge upon the Defendant's Sixth Amendment rights, and curtail the rights of the public at large. *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910, 198 L. Ed. 2d 420 (2017) ("the right to an open courtroom protects the rights of the public at large, and the press, as well as the rights of the accused."). Under the standard for a partial court closure established by the Supreme Court, the Government bears the burden of demonstrating a substantial interest served by the closure. The facts of this case do not clear that hurdle.

> **II.   THE HYPOTHETICAL THREAT TO THE CONFIDENTIAL SOURCE DOES NOT RISE TO A SUBSTANTIAL LEVEL. THE GENERAL THREAT ARTICULATED IS SPECULATIVE, AND NO GREATER THAN THAT FACED BY ANY COOPERATING WITNESS IN A CRIMINAL CASE.**

The gravity of alleged threats to the FBI's source, and the likelihood of the risk posed ISIS in general, and Mr. Wright in particular, to the CHS do not justify the extensive security measures, beyond those ordinarily in place in the federal court.

The fact that informants are generally at some risk when they testify against a criminal defendant is not a novel proposition. Many criminal matters involve a cooperating witness or eye-witness, and often these individuals testify in the face of hostility or risk from other inmates or community members who hold "snitches" in disdain. This Court has precautions already in place to safeguard those individuals – ranging from restrictions on who may bring cellular

phones into a courtroom, rules regarding the press and camera crews, and restrictions against wearing clothing with slogans that deter witnesses from testifying – that suffice with respect to ensuring the CHS' security. That this is a terrorism case, rather than a drug conspiracy or racketeering case, does not automatically elevate the risk in the way the government suggests or merit the security measures proposed by the Government.

    **a. The ISIS Cyber Threat Is Overstated, and Allowing A Closure Rewards That Group's Online Activities**

To support the proposition of a significant threat, the Government points to instances of ISIS identifying and publicly threatening individuals on-line, based on their statements or occupations. *Gov't.'s mot.* at 5. Indeed, the Government suggests that, over the last several years, ISIS has employed its social-media arm to disseminate information and threats against thousands of Americans and UK citizens. *Id.* But, notably, the Government does not point to a single instance of one of these *thousands* of individuals actually being harmed as a result of the informational postings. *Id.* In fact, there is substantial reason to view much of ISIS' online activity in this arena as an effort favoring quantity, rather than quality, and the numbers the government cites may give a misleading impression of the actual threat posed by these online efforts.

Anonymous threats, "doxing"[1], and calls to target individuals on the internet are behaviors almost as old as the internet itself. They are a virtually-costless means of harassing individuals, evoking fear, and draining law enforcement resources. The benefits of the strategy, particularly when writ-large, is not lost on ISIS' *soi-disant* cyber-warriors, who generate "kill lists" from online resources like business spreadsheets and publicly accessible databases. A short

---

[1] Doxing is a technique of tracing someone or gathering information about an individual using sources on the internet. *See* http://www.urbandictionary.com/define.php?term=doxing

3

review of recent lists published by the "United Cyber Caliphate" demonstrates the point: past "kill lists" have included details concerning thousands of Canadian citizens[2], thousands of residents of New York City and Brooklyn[3], and a list of twenty-thousand employees of U.S. real estate companies.[4]

A SITE Intelligence Group report noted that these data-dump lists seem primarily intended as a means of spreading fear, generating media attention, and demonstrating the loyalty and hacking prowess of ISIS supporters: "Past kill lists have focused more on prominent political and economic targets, as well as recognized "blasphemers" of Islam. This shift in target selection shows a new method in serving a long-standing function of IS and other jihadi groups: instill widespread fear into governments and the public. The seemingly random selection of these lists, combined with their sizes (multiple of which exceeding 1,000 names), can be seen as a new and effective way of instilling such fear and perpetuating IS' terrorist methodology."[5] While the lists cannot be scoffed at entirely, the Wall Street Journal noted that "Among veteran counterterrorism officials, there is disagreement about how seriously the U.S. government should respond to such lists, officials said. Within the NYPD, many officials believed the list didn't call for notifications of individuals because there was no credible threat to their safety, while at the FBI a number of officials argued that they should be notified out of an abundance of caution, the officials said."[6]

---

[2] https://ent.siteintelgroup.com/Dark-Web-and-Cyber-Security/united-cyber-caliphate-posts-kill-list-targeting-thousands-of-canadian-citizens.htmlhttps://ent.siteintelgroup.com/Dark-Web-and-Cyber-Security/united-cyber-caliphate-posts-kill-list-targeting-thousands-of-canadian-citizens.html

[3] https://ent.siteintelgroup.com/Dark-Web-and-Cyber-Security/ucc-posts-names-and-addresses-of-3-600-purported-ny-citizens-we-want-them-dead.html

[4] https://ent.siteintelgroup.com/Dark-Web-and-Cyber-Security/cca-releases-kill-list-of-over-22-000-u-s-based-real-estate-company-employees.html.

[5] http://sitemultimedia.org/docs/SITE_Analysis_of_Islamic_State_Kill_Lists.pdf at 18.

[6] Pervaiz Shallwani and Devlin Barrett, *Islamic State 'Kill Lists' Grow in Length, Targeting Ordinary Americans*, Wall St. J., May 10, 2016.

Certainly, being included on such a list is an unattractive prospect, and the threat posed by ISIS-aligned social-media combatants should not be entirely discounted. But it should be weighed soberly. It is true that, by identifying the previously-anonymous CHS, the level of risk could increase. But the actual level of risk is presently speculative, and the government does not present compelling reason to believe that it is any greater than that faced by *any* witness in a criminal case. Allowing the general specter of ISIS and its online activities to dictate how the Court conducts trials, and what rights of the Defendant and the public the Court is proactively willing to curtail, risks handing ISIS a cheaply-won victory with little demonstrated benefit.

    b. **The specific threat posed by David Wright is based upon dubious foundations, and the risk would not be ameliorated by closure or security enhancements**

At the outset, the proposition that Mr. Wright poses a demonstrated threat against the CHS stands on questionable footing. The Government's support for this is a threatening pronouncement that Mr. Wright allegedly made to the CHS during an online chat, and later remarks made to a jailhouse informant that he hoped to "neutralize" witnesses against him. The former is uncorroborated by anyone other than the CHS himself, and the latter is the product of a source whose credentials hardly inspire confidence. While threats against a witness have been upheld as a basis for enhanced security, the credibility of the sources matters.

Concerning the threatening pronouncement made directly to CHS, the presentation is somewhat misleading, insofar as it is styled as a direct quote. *Gov't.'s mot.* at 4. In fact, the threats are paraphrased by the CHS, from a conversation to which only he and Mr. Wright were privy. Unlike earlier chats and online conversations between Mr. Wright and the CHS, where the contents are independently corroborated by records from Facebook, the threat reported by the CHS allegedly took place in an encrypted chat service. The conversations were not recorded or preserved by a third party, and the conversations are self-reported by the CHS.

It is possible that the CHS accurately recounted a statement made by Mr. Wright. It is also possible that the CHS fabricated the conversation entirely, or embellished aspects in the hope of setting the groundwork for preferential treatment.[7] It is undeniable that the CHS was a paid informant, and was seeking other advantages in return for his assistance in this investigation. Adding an element of personal risk, as well as increasing the perception of Wright as an increasingly radicalized and dangerous individual would increase the value of the CHS' personal stock with his law enforcement handlers.

Further, the request for special security measures on behalf of a paid informant merits consideration in and of itself. Courts considering the plight of witnesses, when weighing whether to close a proceeding (or whether the trial judge made the correct decision in ordering a closure), are often sympathetic to the accidental eyewitnesses or crime victim. Those individuals are thrust into the case by dumb luck and fate, often to their considerable detriment. The CHS is neither, and stands in a markedly different posture; he is a person who made a business decision that the rewards for assisting the Government outweighed the hazards.[8] The Government's assertion that he is now in an "unenviable position" of either testifying and putting himself and his family at risk, or refusing and chancing a contempt of court, therefore rings a bit hollow. The CHS elected to follow the path that put him in that position and has, thus far, benefitted significantly from it. He is now balking[9] at satisfying the full measure of his side of the bargain, and hoping that the government can convince this Court to cover the balance by deducting it from the rights of Mr. Wright and the general public.

---

[7] Counsel can expand, factually, upon issues concerning the CHS' credibility, but would request an opportunity to provide materials for *in camera* review, to avoid violating the protective order in this case, and disclosing defense work product or trial strategy.

[8] One assumes that the FBI informed him of the risks and responsibilities that attended being a confidential source.

[9] The Government's motion is silent as to whether the CHS has actually expressed any trepidation or concern about testifying in an open courtroom and, if so, the depth of his concern.

6

That conscious choice puts CHS in a different posture from the police officers in this case involved in the fatal shooting of Usamah Rahim. The Defendant, recognizing that they were simply attempting to do their job, has agreed to measures that will protect their identities.[10] The CHS is also distinguishable from undercover officers or other assets who are actively investigating cases, and are presently at risk, and whose value as investigative sources would be forfeited, absent precautions to preserve them.[11]

The Government's motion in this matter makes no mention of the CHS' personal fear, nor is there indication that the CHS is still actively involved in investigations, or in other cases that might be put in jeopardy if he was publicly identified as a result of this matter. The CHS' testimony may be lengthy – the Defense certainly anticipates an extended cross-examination – and would appear to bear directly on the activity at the heart of this prosecution. The CHS is not a victim or an accidental witness. He is not a minor, or otherwise vulnerable as witness. There is no evidence before this Court that he *personally* feels any measure of reluctance at testifying in open court. He is a grown man who consciously chose to assist the government for personal and financial gain. Buyer's remorse is not a justifiable basis for court closure.

Regarding alleged statements to the Plymouth inmate, their reliability is extremely questionable and any checklist of possible grounds for suspecting bias or motive to lie, the Government's source is checking almost every box.[12] In addition to his long criminal history, the

---

[10] Namely, to not mention the officers' names. Also, these individuals are unlikely to testify, so all of the issues regarding juror prejudice and confrontation are not present.

[11] Defense counsel has a good faith basis, based on their own investigation, to believe that CHS' identity is *already* compromised based on his own activities. Due to public filing, counsel will not expand on that in this, but if the court intends to consider, as part of the factual analysis, what risk of exposure CHS may face as a result of public testimony, Counsel requests the opportunity to provide materials for *in camera* review that are relevant to the issue of how confidential CHS' identity remains.

[12] Again, counsel can expand, factually, upon issues concerning the this witness' credibility, but would request an opportunity to provide materials for *in camera* review, to avoid violating the protective order in this case, and disclosing defense work product or trial strategy.

7

multiple, serious factors against his credibility, and his strong and immediate motivation to ingratiate himself with law enforcement, any assertions from this source should viewed with considerable skepticism. The Government's suggestion that their source's credibility is buttressed by his knowledge of information that is not publicly available is hardly compelling. Bluntly, the Government's source is a veteran jailhouse snitch, whereas Mr. Wright is inexperienced, isolated, and prone to loquaciousness – in other words, easy pickin's. The Government's source is a practiced enough informant to appreciate that the best lies carry an element of truth.

Finally, even assuming, *arguendo*, that Mr. Wright did issue the threats attributed to him, whatever threat he poses will simply not be mitigated by the Government's proposed security measures. All of the measures requested by the Government are focused on preserving their sources anonymity. But as the Government acknowledges – in a footnote – the defendant *already knows* the CHS' identity, both because the Government disclosed the information and through the defense's investigation. *Gov't.'s mot.* at 8 n.2. The ship in question has already sailed. None of the measures that the government has proposed will ameliorate that supposed risk in the slightest, after the fact. But all of them will disrupt the smooth and open operation of the trial, and unavoidably effect the rights of the defendant and the general public.

    **III.**    **EVEN IF THE GOVERNMENT HAS DEMONSTRATED A SUBSTANTIAL INTEREST, THE REQUESTED MEASURES ARE OVERBROAD, PREJUDICE THE DEFENDANT AND THE GENERAL PUBLIC, AND THE COURT HAS REASONABLE, MORE NARROLWY TAILORED ALTERNATIVES TO PARTIAL CLOSURE.**

The security measures proposed by the government are broader and more burdensome than necessary to safeguard the CHS from the supposed risks he may face. Contrary to the Government's suggestion that enacting these measures only during the CHS' testimony

somehow makes them a minor inconvenience, their singular nature is likely to highlight the measures in the mind of the jury. In a trial with "approximately 40 [government] witnesses over a period of four weeks", *Gov't.'s mot.* at 8, which witness is likely to stand out in a juror's memory? The witness who walked through the courtroom doors, testified, and exited in the ordinary course, or the one who entered through a special door, employed an alias, and provided some portion of his testimony in hand-written answers?

The government may not be requesting an empty gallery, but the requests are by no means insignificant. The first proposed option entails closing the main courtroom, and has been denied by the Court. Option two, however, is only slightly less baroque. In that version, the CHS will write down any answer that might expose his identity or personal information. The responses will be silently displayed to the parties and jury, and then kept under seal, by the Government, for the remainder of the defendant's appeal, whereupon it will be destroyed. Also, any press sketch artist will be prohibited from drawing the CHS' likeness. *Id*.

The Government's proposed measures make a spectacle of the CHS' portion of the trial. Whatever measures are adopted by this Court, it should avoid a spectacle which would not be lost on the jury, and which would undoubtedly prejudice the Defendant. Jurors who see special precautions being taken for the safety of a witness will naturally assume that the necessity is due to danger posed by the Defendant. Further, at some level, jurors are likely to treat these special measures as indication that the CHS is a witness befitting such consideration – which is a short step to assuming these measures reflect positively on his credibility or reliability.

Finally, that it is the Court that has authorized these special steps risk appearing to be a ratification of the witness, lending the Court's imprimatur to CHS' testimony. The judge is the governor of the trial, and has broad discretion maintain the pace of the trial and ensure its proper

conduct. *See United States v. Lanza-Vazquez*, 799 F.3d 134, 143-44 (1st Cir. 2015). Nonetheless, judges may not misemploy these powers, as by favoring one party or appearing partial. *See United States v. Rivera-Rodríguez*, 761 F.3d 105, 111 (1st Cir. 2014); *United States v. Ayala-Vazquez*, 751 F.3d 1, 24 (1st Cir. 2014). They should be most cautious in front of the jury, which may be vulnerable to judges' "lightest word or intimation." *Ayala-Vazquez*, 751 F.3d at 28. Permitting a host of highly-visible security measures risks the appearance of impartiality: a juror who sees the courtroom cleared prior to the CHS' testimony may reasonably infer that, since the judge controls the courtroom, and is going to a great deal of trouble for this witness, the judge must afford an extra measure of regard to the CHS.

Further, as to the "written responses" proposal the government offers, this technique falls short of satisfying the confrontation guarantees of the Sixth Amendment. The purpose of testimony is not simply to elicit information, but to provide the jury an opportunity to scrutinize and assess the witness as he or she offers their testimony. As the Supreme Court declared in *California v. Green*, the right to confront a witness not only insures that the witness' testimony will be under oath and subject to cross-examination – "the greatest legal engine ever invented for the discovery of truth" – but also it "permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." *California v. Green*, 399 U.S. 149, 158 (1970). Under the proposed alternative, the jury's opportunity to observe the CHS' demeanor is reduced; instead, they would only have the opportunity to scrutinize the CHS' ability to jot down responses on a piece of paper, which is a rather pale shadow of spoken testimony. The Government might respond that the written-portion of CHS' testimony only concerns biographical details, comparable to filling out a job application, and not areas where the CHS is likely to fabricate. The Court should consider,

however, that fabrications in job applications are hardly unheard of, and the Supreme Court's admonishment that "[d]ispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." *Crawford v. Washington*, 541 U.S. 36, 62 (2004).

As the has Court decided that security measures are warranted, the Defendant proposes a narrower, less restrictive protocol that avoids the need for ostentatious security measures. Defense counsel had no intention of asking the CHS his address or present place of business. If necessary, a stipulation to that effect would be agreeable. Similarly, Defense counsel had no intention of going into specifics regarding the location of the CHS' family in Yemen. Some inquiry about this may be necessary, in a general sense, insofar as it might reflect upon the CHS' desire to strike a deal to bring his family to the United States. Again, a stipulation is the appropriate vehicle for sculpting the contours of that line of cross-examination.

The defense is also not opposed to restricting cameras and recording equipment in courtroom – a restriction consistent with policies already in place in the federal court. Restricting the presence of sketch artists during the CHS' testimony will, however, highlight an irregularity in the trial to accommodate a "special" witness. Further, it seems unlikely that ISIS is capable of identifying a hitherto-unknown individual based upon the representation in a courtroom sketch.

Similarly, the Defendant would not object to the CHS using a non-public entrance and exit, so long as the accommodation does not occur within the jury's presence. Depending on the timing and length of the CHS' testimony, it is likely possible to ensure that he is present in the courtroom before the jury enters, and leaves after they have exited. The Defendant's concern is primarily that the proposed security measure, without additional precautions, would unavoidably lend to the theater of CHS' testimony. Again, a jury would likely notice, on some level, if the

CHS comes and goes from a different door in courtroom, and the discrepancy increases the likelihood of prejudice.

The Defendant, however, opposes the request to permit the CHS to testify under a pseudonym. This may be a practice that other courts have allowed in the context of undercover police or intelligence officers, but there has been no indication that the CHS is still working as an undercover asset for the FBI. If the Court is inclined to allow the CHS to testify under an assumed name, a name which does not stand out as utterly implausible (e.g., "John Doe") would be less likely to draw the jury's attention to the presence of a security measure.

Finally, if the Government, Defense and this Court cannot fashion a solution that adequately safeguards not only the witness but also the rights of the Defendant and the general public, then perhaps the CHS' value as a witness should be reconsidered. While the cloak-and-dagger dramatic value of calling a "confidential human source" during a terrorism trial cannot be gainsaid, the informational value the CHS brings to the table is considerably more debatable. As the Government notes, it intends to call 40-plus people during the course of this trial, *Gov't.'s mot.* at 8, so the CHS is hardly the sole witness in the Government's case. At least one of those witnesses, the Defendant's alleged former co-conspirator, Nicholas Rovisnki, is better poised to paint a picture of Mr. Wright than is the CHS, whose communications with Mr. Wright were very limited. And the communications themselves, save the handful that were allegedly made on the encrypted chat application are admissible via other avenues than the CHS. In other words, the Government is seeking considerable accommodations for a witness whose presence is – in may ways – redundant. The Government certainly has the right to conduct, within reason, the prosecution as it judges best, but this Court should be reluctant to allow a degree of latitude that abridges the rights of the Defendant and the general public without substantial cause: "While the

benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance, the Framers plainly thought them nonetheless real." Waller, 467 U.S. at 49-50 n. 9.

## CONCLUSION

For the reasons stated above, Mr. Wright respectfully requests that this Honorable Court, having denied the Government's partial court closure motion, consider the Defendant's proposals for less intrusive security measures during the testimony of the CHS.

> Respectfully submitted,
> David Wright
> By his attorneys,
>
> /s/ Jessica Hedges
> Jessica Hedges
> BBO No. 645847
> Michael Tumposky
> BBO No. 660618
> Hedges & Tumposky, LLP
> 50 Congress Street, Suite 600
> Boston, MA 02109
> T) (617) 722-8220
> F) (617) 507-8116

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that on this the 1st day of September, 2017, she has caused to be served a copy of this document by first-class mail, where unable to do so electronically, on the Assistant United States Attorney of record in this matter.

> /s/ Jessica Hedges
> Jessica Hedges