UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | No. 15-CR-10153-WGY |
| v. | ) | **FILED UNDER SEAL** |
| | ) | |
| DAVID WRIGHT | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT DAVID WRIGHT'S
MOTION FOR A JUDGMENT OF ACQUITTAL**

Defendant David Wright respectfully moves this Honorable Court, pursuant to Fed. R. Crim. P. 29, to enter a judgment of acquittal on all counts. The Government has failed to satisfy its burden of proof, as a matter of law, with respect to each element of the charges. While still contesting each and every element, the Defendant submits this memorandum of law on only the limited issues discussed below.

**ARGUMENT**

Under Federal Rule of Criminal Procedure 29, a defendant may move for judgment of acquittal at the close of the government's case or at the close of evidence. Here, the Defendant moved orally when the Government rested and will renew its motion at the end of the evidence.

When evaluating a Rule 29 motion, a court must review the evidence, direct and circumstantial, "in the light most favorable to the prosecution" and determine "whether this body of proof…has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond a reasonable doubt." *United States v. Lara*, 181 F.3d 183, 200 (1st Cir. 1999). Under this standard, the court must resolve all evidentiary and credibility questions in favor of the government and must accept all "reasonable inferences from the evidence (whether or not inevitable) that support the government's view of the case." *Id.* Yet

1

in doing so, the court may consider only evidence that was admissible at trial. *United States v. Aviles–Colon*, 536 F.3d 1, 13–14 (1st Cir. 2008). According to the "prevailing criterion for judging motions for acquittal[,]" if reasonable jurors would have a reasonable doubt as to guilt, "the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration." *Curley v. United States*, 160 F.2d 229, 232–33 (D.C.Cir. 1947); *Jackson v. Virginia*, 443 U.S. 307, 319 n. 10 (1979).

In this case, the Government has failed to prove, with admissible evidence, that the Defendant conspired to commit an act of terrorism transcending national boundaries. The Government also failed to prove that the Defendant conspired to provide service or personnel to a designated terrorist organization within the bounds of the indictment.

I. **THE GOVERNMENT HAS FAILED TO SHOW THAT THE DEFENDANT CONSPIRED TO COMMIT AN ACT OF TERRORISM TRANSCENDING NATIONAL BOUNDARIES**

The Government has failed to prove, with admissible evidence, that the Defendant conspired to commit an act of terrorism transcending national boundaries. Various statements made by identified "co-conspirators," which were admitted de bene, must be stricken. The declarations are inadmissible hearsay because the Government has failed to prove the existence of the conspiracy with independent evidence and has not shown that the statements were made during and in furtherance it.

The evidence that remains failed to prove that Mr. Wright agreed with someone else to commit an act of terrorism in the United States and failed to prove that he knew and intended each non-jurisdictional element of the offense, specifically that substantial conduct related to the offense would transcend national boundaries. Therefore, he is entitled to a judgment of acquittal on this Count.

**A.  The Court should not consider any statements of the various "abuhussains," "abu3antar," or Hohxa in the Rule 29 calculation because the Government has failed to show that the were made by a co-conspirator of Mr. Wright during and in furtherance of the conspiracy**

Federal Rule of Evidence 801(d)(2)(E) provides that statements are not hearsay when "made by the party's coconspirator during and in furtherance of the conspiracy." *Id*. Whether the proponent has met this exemption is a preliminary question for the Court under Federal Rule of Evidence 104(a). As such, the Government must establish by a preponderance of the evidence that the exemption has been satisfied. In determining whether it has met its burden, "[t]he statement must be considered but does not by itself establish…the existence of the conspiracy or [the defendant's] participation in it…" Fed. R. Evid. 801(d)(2); *United States v. Sepulveda*, 15 F.3d 1161, 1182 (1st Cir. 1993) (same).[1]

In this case, the Government has failed to meet its burden under Rule 801(d)(2)(E) for several reasons. First, it has failed to show the existence of a conspiracy between the Defendant and the various declarants through independent, non-hearsay evidence. The only mention of "abu3antar" was in the chats entered as Exhibits 356 and 357 between him and Rahim. At most, that might show that Rahim was in a separate conspiracy with this person. But the Government failed to offer any admissible evidence that the Defendant himself was in a conspiracy with someone named "abu3antar."

---

[1] Throughout the course of the trial, the Government has sought to benefit from a preliminary "*Petrozziello*" ruling, which it claims allows them to present, de bene, the co-conspirator statements, before it has proved the necessary foundational elements. See *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977). That appears to be the practice in the Circuit, as many cases cite to *Petrozziello* in support of this procedure. See e.g. *United States v. George*, 761 F.3d 42, 55 (1st Cir. 2014).

Yet *Petroziello* itself, which was decided two years after the Federal Rules were codified, does not appear to support this position. In *Petroziello*, the Court noted that, "The judge insisted that the government present all its non-hearsay evidence first. He then decided whether that evidence permitted reliance on the co-conspirator exception." *Id*. at 24 n.3. The Court described this order of operations as "meticulous" and noted that "[n]othing in the new rules or this opinion requires that [this] approach be abandoned. Although time-consuming, it avoids the danger that hearsay will be admitted in anticipation of a later showing of conspiracy that never materializes." *Id*.

3

Likewise, the evidence that the "abuhussains" were co-conspirators with the Defendant came only from their brief written conversations with Rahim. To be sure, Rahim also mentioned that he had been in contact with a "Mr. Hussain" in a May 26 phone call with Mr. Wright, who replied "Who is that?" See Exhibit 57. But Rahim's statement, also hearsay, does not serve as sufficient corroboration to render the other "abuhussain" statements admissible against the Defendant, who by all accounts did not know and never spoke to any "abuhussain".

As to the statements of Hoxha, those likewise went uncorroborated, save, perhaps, the statement of the Defendant which suggests that he showed him how to sell his laptop on Craigslist. Yet even that non-hearsay evidence, combined with Hoxha's statements, failed to show that the Defendant and Hoxha were in a conspiracy. At best, they show that Hoxha, who by all accounts was interested in ISIS before Mr. Wright, wanted to, and perhaps did, provide himself as personnel to ISIS. There is no evidence that the Defendant conspired with Hoxha to do this. On the contrary, the evidence shows only that Hoxha's plan was entirely independent of Wright.

Many of the statements at issue are also unrelated to the case. For example, Hoxha's statements, at Exhibit 379, discuss his arrival in Turkey. Likewise, the statements of "abu3antar'" and "abuhussain", from Exhibits 110, 377 and 378, purport to offer Rahim advice about how to travel to Syria. This hearsay is not covered by the Rule 801(d)(2)(E) exemption because it is untethered from the charged conspiracies. The Government has alleged that the Defendant conspired with Rahim and Rovinski to provide service and personnel to ISIS by committing a murder that the group had supposedly commanded. Nothing in the indictment relates to travel. Yet the communications from Hoxha and "abu3antar" are about Rahim's entirely separate plan to travel to Syria and. In the case of "abuhussain", the conversations relate

to travel as well as that person's independent advocacy on behalf of ISIS, both of which are unrelated to the charges.

The case of *United States v. Piper*, 298 F.3d 47, 54–55 (1st Cir. 2002), demonstrates the limits on co-conspirator hearsay based on an agreement separate and apart from that which was charged. In *Piper*, the indictment alleged that the defendant had conspired with a man named "Stilkey" and other persons known and unknown to the grand jury. *Id*. Yet the trial focused solely on the conspiracy between the two. In determining that the hearsay of other potential co-conspirators should not have been admitted, the Court noted that "although the rigors of Rule 801(d)(2)(E) may be satisfied by showing that both the declarant and the defendant belonged to some conspiracy other than the substantive conspiracy charged in the indictment,…the government has chosen to argue in this case that the Rule 801(d)(2)(E) conspiracy was functionally equivalent to the charged conspiracy…rather than some charged conspiracy involving both Stilkey and the appellant." *Id*.

In this case, the Government has likewise only suggested the existence of one conspiracy, a conspiracy to kill Pamela Geller (or perhaps law enforcement) in support of ISIS. The Government has offered no evidence of any conspiracy beyond this, nor has it suggested in arguments at sidebar, or in opening, that any other conspiracy existed. Thus, it should not be entitled to introduce hearsay statements from an unrelated venture.

Additionally, none of the statements offered by the Government were made during the conspiracy. The agreement to advocate for ISIS, according to the indictment, began in February of 2015. Yet the crime of material support to ISIS requires acting in coordination with or at the direction of the terrorist organization. See Section II, *infra*. The order to kill Pamela Geller, which the Defendant is said to have followed, allegedly came (from ISIS by way of Foxnews) on

May 6, 2015. This is when the conspiracy began for purposes of Rule 801, on the Government's evidence. It ended, by operation of law, when the Defendant was arrested and gave his statement to the FBI on June 2. See *Piper*, 298 F.3d at 53 (withdrawal from a conspiracy is accomplished by "a full confession to authorities…"). The statements offered by the Government all occurred outside of this short window.

For example, the "tweets" of "abuhussain" issued several days after both Rahim's death and the Defendant's confession can hardly be said to have been made during the conspiracy. See Exhibit 119, 120. Similarly, the various chats with Hoxha that occurred in 2014 and early 2015 were also outside the applicable window. So too were the various Tweets of "abuhussain" entered as Exhibit 400, which were captured by British law enforcement in January of 2015.

Finally, none of the various hearsay statements were in furtherance of the conspiracy. Exhibit 400, for example, contains statements of "abuhussain" in which he references a CyberCaliphate, a rumor of drone strike, and says "I'm back again Obama." It also includes two "retweets;" one where he quotes someone complimenting him for having so many suspended accounts and another where someone claiming to be his wife promotes his new account. This does nothing to advance the objectives of the conspiracy. Likewise, exhibit 119, in which "abuhussain" comments on Rahim's death, does nothing to further the objectives the plan to kill Pamela Geller. Unless the Court is prepared to declare that the entirety of ISIS is in one grand conspiracy and that the Defendant is responsible for everything every ISIS member ever said, then the Government has failed to show how these statements are admissible under Rule 801(d)(2)(E). Therefore, the Court should not consider them when determining whether to grant the Rule 29 motion.

**B. The Government has failed to show that any conduct occurred overseas and that the Defendant knew and intended that the agreed-upon act of terrorism would transcend national boundaries**

The Government has failed to show that anyone overseas participated in the offense. The relevant statute, 18 U.S.C. §2332B(g), provides a general definition of what type of overseas involvement is required: **"Conduct** transcending national boundaries means **conduct** occurring outside of the United States in addition to the **conduct** occurring in the United States." *Id* (emphasis added). Therefore, it is not enough for the Defendant or a coconspirator to have communicated with someone overseas, but rather someone overseas must have engaged in "conduct." The only fair reading of the statute is that the conduct must be, in some way, criminal. In other words, the conduct must be significant enough that it would subject the actor to accomplice or co-conspirator liability if he were in the United States.

Further, because it is charged as a conspiracy, the Government has an additional hurdle to overcome. To prove this offense, the Government must show beyond a reasonable doubt: 1) that the Defendant is guilty of conspiracy by knowingly entering into an agreement with others, with the intent to carry out the objective of that agreement 2) that the objective of the conspiracy was to kill someone within the United States and that the agreed-upon killing would involve conduct transcending national boundaries.

### 1. The Government failed to prove overseas "conduct"

The evidence of overseas "conduct" in this case was non-existent. To be sure, the Government attempted, and failed, to prove that Twitter user "abuhussain" and all his various aliases, was in fact ISIS recruiter Junaid Hussain. First, the Government offered proof that Rahim communicated with someone who used the alias "abuhussain." To that end, it presented records of communication between Rahim and a "Surespot" user named "abuhussain3" on May

21, 2015, with no content. It also offered evidence that Rahim was "Twitter friends" with an "abuhussain911" and an "abuhussain010" and had a few of their publicly-available Tweets on his devices. See Exhibits 367, 368, 382, 383. It also produced "Kik" messages, exhibits 377-379, in which Rahim communicates with an "abuhussain" about his desire to travel to Syria and with an "abu3antar" about his chats with "abuhussain." Finally, the Government produced a recording in which Rahim tells Wright that he received a document from Mr. Hussain regarding Pamela Geller. See Exhibit 57.

To prove that the "Mr. Hussain"/"abuhussain" was overseas, the Government attempted, and failed, to show that he was in fact ISIS recruiter Junaid Hussain. In fact, the Government was so confident in its proof that it used a visual in its opening promising to make the crucial connection. Although it established that someone with the last name Hussain, who also had a hacking conviction, traveled to Turkey in 2013, it never proved that he entered Syria, joined ISIS, or became "abuhussain."

Moreover, the Government offered no proof that the "abuhussain" was overseas. It did present a Twitter page and chats which suggested an interest in ISIS and travel to Syria. Yet surely the same can be said for the chats and social media pages of Wright, Rahim and Rovinski. Nothing about an interest in ISIS or Syrian travel shows that the writer is actually overseas. Thus, having failed to identify the owner of the moniker, the Government likewise failed to establish his or her location.

### 2. Even if it has been shown that Rahim had overseas contact, the Government failed to establish that the Defendant knew and intended that the conspiracy involved conduct transcending national boundaries

To obtain a conviction on Count Four, the Government must prove that the Defendant entered into a conspiracy to commit an act of terrorism transcending national boundaries. As the

Court knows, a conspiracy includes both an agreement to commit a crime and the intent that the crime occur. In this case, the object of the alleged conspiracy is "an act of terrorism transcending national boundaries." Thus, the Government must prove that the Defendant knew and intended that the plan to kill Pamela Geller would involve conduct transcending national boundaries.

The Government claims that the transcending national boundaries element is jurisdictional, and thus the Defendant need not be aware of it, or intend it, to be held liable. Yet the plain language of the statute belies that argument. Title 18 U.S.C. §2332(b) contains one section on "prohibited acts," which includes a murder "involving conduct transcending national boundaries." The statute further requires that one of the "jurisdictional bases" in part "b" is also met. Part "d," which outlines proof requirements, states that: "The prosecution is not required to prove knowledge by any defendant of a jurisdictional base alleged in the indictment." *Id*.

Thus, the plain language of the statute shows that the defendant need not know that, for example, "the mail or any facility of interstate or foreign commerce is used in furtherance of the offense." *Id*. But nothing in the statute suggests that the other traditional elements of conspiracy law should be set aside under these circumstances.

The Government cites no case law for its rewriting of the statute, but rather relies on "The Conference Report on the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)" to argue that the element is jurisdictional. Yet if Congress wanted to make it so, it could have included the overseas element in section "b" rather than "a." One off-hand remark in a piece of legislative history should not be sufficient to redefine the Government's burden.

Therefore, the Government must show that the Defendant himself knew and intended that the murder would involve conduct transcending national boundaries. Yet the only evidence in the case of potential overseas conduct involves Rahim. When the Defendant was first told of a Mr.

9

Hussain on May 26, six days before his arrest, he responded "who is that?" See Exhibit 57. There is no evidence that he agreed that any plan to kill Pamela Geller would be conducted, in significant part, by someone overseas, and thus is not guilty of Count Four.

II.     **THE GOVERNMENT CANNOT SHOW THAT THE DEFENDANT AGREED TO PROVIDE SERVICE OR PERSONNEL WITHIN THE CONFINES OF THE INDICTMENT BECAUSE THE GOVERNMENT PRESENTED NO EVIDENCE OF DIRECTION AND CONTROL OR COORDINATION OVER THE ALLEGED PLOT TO KILL PAMELA GELLER AND LAW ENFORCEMENT**

The Government has failed to prove that the plot to kill Pamela Geller or law enforcement ("the plan') was under the direction and control of, or was in coordination with, ISIS. At best, the Government has shown that the plan was inspired by, but independent of, ISIS. Because this agreement was the only conspiracy to provide material support alleged in the indictment, the Defendant is entitled to a judgment of acquittal on Count One.

The Defendant stands charged with conspiring to provide material support to ISIS by the provision of service and personnel.[2] The statute defines personnel, and states that a defendant is guilty if he "knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control…Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control. See 18 U.S.C.A. § 2339B.

The relevant statute does not define service. Thus, the Court must give the word "service" its ordinary, everyday meaning. Webster's Dictionary defines "service" as "the performance of

---

[2] The statute defines personnel as an example of a service. See 18 U.S.C. §2339A ("property…or service including…personnel"). Thus, while the indictment alleges material support by means of service and personnel, the word service appears to be surplusage.

work commanded or paid for by another or "an act done for the benefit or at the command of another." Moreover, to prove that the Defendant provided "service to" ISIS, the Government must prove beyond a reasonable doubt that the defendant acted "in coordination with" ISIS. "In coordination" means "in tandem or in concert" with. "In coordination with" does not mean "in association with." Mere association with ISIS is not sufficient to prove "service to" ISIS. *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2721 (2010); *United States v. Lindh*, 212 F.Supp.2d 541, 572 (E.D.Va. 2002); *United States v. Marzook*, 383 F.Supp.2d 1056, 1065-1066 (N.D. Illinois 2005); *United States v. Taleb-Jedi*, 566 F.Supp. 2d 157, 182 (E.D.N.Y. 2008).

In this case, the Government has failed to show direction and control, as well as coordination. It has failed to present any evidence of communication between the Defendant and any ISIS member regarding the plan. Instead, the Government has suggested that the possession of videos containing ISIS' commands to kill people in the United States qualifies as "direction and control" or "coordination." Yet if the statute permits independent advocacy on behalf of a terrorist organization, then it must permit that person to have some sense of what he should be advocating for, so long as he has not received targeted personal direction from an ISIS member and does not coordinate his efforts with members of the group.

Thus, the speech of the ISIS leaders calling for attacks in the U.S. is not direction, control or coordination as that term is commonly understood. Cases in which defendants were found to have coordinated with a terrorist group involved far more evidence of contact. In *United States v. Mehanna*, 735 F.3d 32, 41 (1st Cir. 2013), for example, the defendant traveled to Yemen in search of a terrorist training camp. In *United States v. Farhane*, 634 F.3d 127, 133 (2d Cir. 2011), the defendants agreed to provide medical services to wounded Al Qaeda fighters, martial arts training, and swore on oath to an FBI agent posing as an Al Qaeda recruiter from overseas.

11

In *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 120 (D.C. Cir. 2011), the defendant received in-person direction from a terrorist leader to look the other way while he planted a bomb. In *United States v. Mustafa*, 406 F. App'x 526, 528 (2d Cir. 2011), the defendant "attended and attempted to attend jihad training camps in other countries, and admitted to killing people while engaged in jihad."

None of this type of evidence is present here. The Defendant downloaded videos and documents from the internet, read or watched them, and then discussed with others his desire to do some of the things that he had read and watched. He never actually completed any of these tasks, he never met someone from ISIS and he never travelled to an area where ISIS was located. The Government's argument is akin to a claim that someone who buys a soda after sing an advertisement is acting under the direction and control of Coca Cola.

To allow videos of speeches and other propaganda, widely distributed through social media and the internet, to qualify as direction, control or coordination, would eviscerate the "independent advocacy" carve-out in the statute. For example, a group may wish to advocate for the independence of the Basque region from Spain or may be against the reunification of England and Northern Ireland.[3] According to the Government, it would be permitted to work towards the designated organization's political goals, so long as the group never saw, heard, or read any speeches or documents from the designated organization outlining what its political goals were. This cannot be the law.

As it turns out, in its brief in the case of *Holder v. Humanitarian Law Project*, the Government admitted that it was not the law. Instead, material support, according to the then-Solicitor General Elena Kagan, involves "a direct relationship with the foreign terrorist

---

[3] A Basque independence group and two IRA offshoots are Designated Terrorist Organizations
<https://www.state.gov/j/ct/rls/other/des/123085.htm>

organization." See Government's Brief, page 39; see also page 41 ("The statute's text plainly requires that a "service" be rendered "to" a foreign terrorist organization (which requires a direct relationship)." The Government further conceded that "Congress did not prohibit individuals from joining terrorist groups, expressing solidarity with them, or even inciting others to engage in terrorist conduct." Id., page 54.

In this case, at most the Government proved that the Defendant was inspired by widely-released ISIS propaganda and encouraged others to be inspired by it as well. The Government has failed to prove that he acted under the direction and control of, or in coordination with, ISIS in any of his endeavors. Thus, the Defendant is entitled to a judgment of acquittal on Count One.

**CONCLUSION**

The Government has failed to show that a significant part of the planning for the murder of Pamela Geller occurred overseas and failed to show that the Defendant knew and intended the murder would transcend national boundaries. The Government also failed to show that the Defendant acted under the direction and control of, or in coordination with, ISIS. Therefore, the Court should enter a judgment of acquittal on all counts.

Respectfully submitted,
David Wright
By his attorneys,


/s/ Michael Tumposky
Jessica Hedges
BBO No. 645847
Michael Tumposky
BBO No. 660618
Hedges & Tumposky, LLP
50 Congress Street, Suite 600
Boston, MA 02109
T) (617) 722-8220
F) (617) 507-8116

13

**CERTIFICATE OF SERVICE**

Undersigned counsel certifies that on this the 13th day of October, 2017, he has caused to be served a copy of this document by first-class mail, where unable to do so electronically, on the Assistant United States Attorney of record in this matter.

<u>/s/ Michael Tumposky</u><br>
Michael Tumposky