UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Crim. No. 15-10153-WGY |
| DAVID WRIGHT, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

After months of planning a martyrdom operation in the United States on behalf of the Islamic State of Iraq and Syria ("ISIS"), during the early morning hours of June 2, 2015, Usaamah Abdullah Rahim ("Rahim"), with the agreement and at the direction of the defendant David Wright ("Wright"), accelerated their plans to commit violent jihad by attacking the "boys in blue" that day. Although Wright was not the one who lunged at law enforcement with a knife that morning, he is responsible for this terrorist attack, which gravely threatened lives of police officers and civilians. This terrorist attack was done in coordination with ISIS. The defendant's group or cell was in direct communication with Junaid Hussain, an ISIS recruiter located in Syria who was killed by an airstrike on August 24, 2015.

Wright and his conspirators (and similar ISIS inspired jihadists were planning attacks in the summer of 2015 -- some of which were tied to the Fourth of July holiday) posed a grave threat to the United States in June 2015. As described below, Wright was not content in planning a single attack against our Homeland. Rather, he wanted to conduct attacks in ten states because in his words the harm caused by the Boston Marathon bombings were not "sufficient." Ex. 51 at 3. He intended to "strike fear" in the "hearts" of Americans. *See* Ex. 51 at 1-2. Further, Wright put his words into action. As demonstrated at trial, Wright heeded the call of ISIS to carry out attacks in the United States and kill civilians as well as members of the military

and law enforcement.  He took numerous steps in furtherance of his plan to wage war on the United States.  In so doing, he became a soldier of ISIS who disavowed his own country and pledged his allegiance to Abu Bakr al-Baghdadi.  For the reasons set forth herein, and the facts demonstrated at trial and contained in the government's statement of offense and relevant conduct in the defendant's Pre-Sentence Report, the United States urges this Court to sentence the defendant to a term of life imprisonment.

## I.   FACTUAL BACKGROUND

### A.  Convictions

On October 18, 2017, after a 16-day trial, the jury convicted Wright on all five counts in the Second Superseding Indictment: (1) conspiracy to provide material support to ISIS, a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1) (Count One); (2) conspiracy to obstruct justice by instructing Rahim to destroy a laptop computer and mobile phone, in violation of 18 U.S.C. § 1519 (Count Two); (3) obstruction of justice by causing Rahim to destroy his computer, in violation of 18 U.S.C. § 1519 (Count Three); (4) conspiracy to commit acts of terrorism transcending national boundaries, in violation of 18 U.S.C. § 2332b(a)(2) & (c) (Count Four); and (5) obstruction of justice by deleting data from his own computer minutes after learning that his uncle and co-conspirator (Rahim) had been killed by law enforcement after he attempted to attack police officers with a knife in Roslindale, Massachusetts on June 2, 2015, in violation of 18 U.S.C. § 1519 (Count Five).

### B.  ISIS

As the parties stipulated at trial (Ex. 1), the United States Government designated ISIS as a Foreign Terrorist Organization ("FTO") and to date, it remains a designated FTO.  ISIS has committed systematic abuses of human rights and violations of international law, including

indiscriminate killing and deliberate targeting of civilians, mass executions and extrajudicial killings, persecution of individuals and communities on the basis of their identity, kidnapping of civilians, forced displacement of Shia communities and minority groups, killing and maiming of children, rape, and other forms of sexual violence.  In addition, ISIS has recruited thousands of foreign fighters to Iraq and Syria from across the globe and has used technology to spread its violent extremist ideology and to incite others to commit terrorist acts.

Beginning in 2014, using social media, ISIS has called for attacks against citizens—civilian and military—of the countries participating in the United States-led coalition against ISIS.  For instance, on September 21, 2014, ISIS released a speech of Abu Muhammed Al-Adnani, a former senior leader and official spokesman of ISIS.[1]  In this speech, entitled "Indeed Your Lord is Ever Watchful," Al-Adnani called on Muslims who support ISIS from around the world to "defend the Islamic State" and exhorted them to "rise and defend your state from your place wherever you may be."  In this speech, Adnani also instructed ISIS's supporters to:

> strike the soldiers, patrons, and troops of the tawāghīt [the unbelievers]. Strike their police, security, and intelligence members, as well as their treacherous agents.  Destroy their beds.  Embitter their lives for them and busy them with themselves.  If you can kill a disbelieving American or European – especially the spiteful and filthy French – or an Australian, or a Canadian, or any other disbeliever from the disbelievers waging war, including the citizens of the countries that entered into a coalition against the Islamic State, then rely upon Allah, and kill him in any manner or way however it may be.  Do not ask for anyone's advice and do not seek anyone's verdict.  Kill the disbeliever whether he is civilian or military, for they have the same ruling.  Both of them are disbelievers…
>
> If you are not able to find an I.E.D. or a bullet, then single out the disbelieving American, Frenchman, or any of their allies.  Smash his head with a rock, or slaughter him with a knife, or run him over with your car, or throw him down from a high place, or choke him, or poison him.

---

[1]On August 30, 2016, Adnani was killed by an airstrike in Syria.

Wright had copies of this speech on his thumb-drive and laptop computer and quoted extensively to Al-Adnani in his electronic communications.  *See, e.g.*, Ex. 310 (written excerpt of Al-Adnani's speech in ISIS book entitled, Lone Wolves); Exs. 246-247 (discs containing excerpt and entirety of Al-Adnani's speech entitled "Indeed Your Lord is Ever Watchful" urging ISIS supporters to commit attacks in the United States); Ex. 51 at 4 (chats with cooperating witness discussing Adnani's view that United States waged war on Islam and that civilians are legitimate targets); Ex. 122 at 10 (Facebook conversation with Yusha Abdullah quoting Al-Adnani regarding the killing of soldiers and civilians).  Further, like Al-Adnani, Wright advised Yusha Abdullah that the "killing of women, children, and elderly of America" was justified in retaliation for America's military operations.  *See* Ex. 122 at 66.

Since in or about June 2014, ISIS has been distributing beheading videos to demonstrate, among other things, an acceptable method of killing people who are believed to be non-believers, or infidels.  For instance, in August 2014, ISIS released the video of the beheading of U.S. journalist James Foley.  In February 2015, ISIS released a video showing the mass beheading of 21 Egyptian Christians on a beach in Libya.  This five-minute video was found on Wright's thumb-drive.[2]

Additionally, since late 2014, using social media, members of ISIS have encouraged its supporters to kill specific persons or groups of persons such as members of the military and law enforcement within the United States.  For example, in March 2015, ISIS posted the names and

---

[2]As Special Agent Michael Laurence testified, Wright had 92 ISIS-related videos on this thumb-drive, the majority of which showed brutal, cold-blooded executions by ISIS members. *See* 9/29/17 Tr., Vol. 1 at 65-66; *see also* 10/11/17 Tr., Vol. 2 at 125-128 (Wright admitted that he had 92 ISIS videos; "almost all of them showing killings;" and one of them showed "U.S. soldiers singing 'Amazing Grace' before they were killed by ISIS.").

addresses of 100 U.S. military service members on the internet and instructed their supporters to "kill them in their own lands, behead them in their own homes, stab them to death as they walk their streets thinking they are safe …"  Wright had a copy of this kill list (with photographs of U.S. military members with their addresses and contact information) published by ISIS's Hacking Division on his laptop computer.  *See* Ex. 343.

In May 2015, ISIS had issued a fatwa, or religious decree, to its supporters to kill Pamela Geller ("Geller"), a New York woman.  As described below, Geller had organized a Muhammad Art Exhibit and Contest at the Curtis Culwell Center in Garland, Texas on May 3, 2015, which included cartoons depicting the Prophet Mohammad.

As demonstrated at trial and highlighted below, after Wright had studied ISIS's statements and videos, he determined that they were legitimate and decided to support them.  He convinced his own uncle to also support them.  With full knowledge of ISIS's brutal activities, Wright pledged his allegiance to ISIS.  He decided to wage war against the United States on ISIS's behalf, and plotted to behead people in the United States to support ISIS, an organization that has called for the overthrow of the United States government and the imposition of worldwide sharia law.

### C.  The Plot to Support ISIS

As detailed in the PSR, in or about June 2014, Wright introduced his uncle Rahim to ISIS.  According to Wright's own admissions, Rahim was apprehensive of supporting ISIS at first.  Using ISIS videos, however, Wright convinced Rahim that they should support ISIS. 9/25/17 Tr., Vol. 1 at 13-14 (Chief James Bailey, CBP, summarizing statements made by Wright during the law enforcement interview on June 2, 2015); 10/11/17 Tr., Vol. 2 at 104 (Wright). Approximately six months later, in December 2014, Wright met Rovinski on Facebook and they

began communicating online.  In December 2014, Wright and Rovinski began discussing their mutual support of ISIS.  Wright, Rovinski, and Rahim shared a common goal to support ISIS.  *See generally* testimony of Rovinski at transcripts of 9/20/17-9/22/17.

By at least February 2015, Wright and Rahim had heeded the call of ISIS to attack non-believers in the United States and began plotting and recruiting members for their "martyrdom" operation.  For this initiative, in March 2015, Wright obtained and studied a jihadist manual, entitled "How to Survive in the West," which details "how to become a Sleeper-cell" in the West until ordered to attack.  On March 19, 2015, Wright forwarded a link to this document to Rahim and advised Rahim to study it as it was "perfect for the initiative."  *See* Ex. 105.

By April 2015, Wright, Rahim, and Rovinski had agreed to commit attacks and kill persons inside the United States, which they believed would support ISIS's objectives.  Wright was the leader of this group and cell and took steps to recruit other members to assist them in conducting attacks in the United States.  *See* 9/21/17 Tr., Vol. 2 at 117-22 (Rovinski); 9/22/17 Tr., Vol. 1 at 29, 32-34 (Rovinski); Exs. 5A and 57A.  For instance, on March 17, 2015, Wright and Rahim discussed recruiting a person named "Sidiqi" for their operation.  *See* Ex. 103.

Wright's cell had ISIS contacts overseas.  Indeed, Wright confided to the FBI Cooperator that his group had been in contact with "Mujahideen in Syria."  *See* Ex. 51 at 2.  Rahim had numerous conversations with ISIS members located overseas beginning in at least February 2015 and continuing until his death in June 2015.  *See, e.g*., Exs. 356, 377-79.  One of the ISIS members with whom he communicated was Hussain, a British born and English speaking ISIS member who used the *nom de guerre* or *kunya* Abu Hussain al-Britani.  Hussain used Twitter to encourage terrorist attacks in the United States and Europe against persons whom ISIS believed should be targeted for execution, including Pamela Geller.  On August 24, 2015, Hussain was

killed in an airstrike in Raqqah, Syria, a city in which ISIS considered to be its capital until recently.  Prior to his death, Hussain was a central figure in ISIS's online recruitment campaign and hacking activities.

On May 3, 2015, two armed men, Elton Simpson and Nadir Soofi, attacked the Muhammad Art Exhibit and Contest in Garland, Texas, which Gellar had organized and was attending.  During this attack, Simpson and Soofi wounded a security guard before law enforcement shot and killed them.  Shortly before the attack, Simpson issued a tweet in which he proclaimed his allegiance to Abu Bakr al-Baghdadi, the leader of ISIS, and asked that "Allah accept us [Simpson and Soofi] as mujahideen [those engaged in violent jihad]."  This tweet was reproduced in Issue 9 of ISIS's Dabiq magazine, which was in Wright's possession and he admitted that he read.  *See* Ex. 303; 10/12/17 Tr., Vol. 1 at 41-42 (Wright).

Minutes after the thwarted Garland attack on May 3, 2015, Junaid Hussain, using Twitter, stated that "2 of our brothers just opened fire at the Prophet Mohammad … art exhibition in texas!" and instructed ISIS's supporters to "Kill Those That Insult the Prophet - #GarlandShooting."  After the Garland attack, in May 2015, Wright identified Pamela Geller as the first beheading target for his group, which consisted of himself, Rahim, and Rovinski. Wright believed that his group could do a better job than the Garland attackers in fulfilling ISIS's order to kill her.  9/20/17, Vol. 2 at 116-17, 122-24.  Wright, Rahim, and Rovinski each took steps in furtherance of this plan.  *See* PSR at ¶¶ 33-37.

### D.  Attack on the Boys in Blue on June 2, 2015

During a telephone conversation on the morning of June 2, 2015, Rahim sought the guidance and advice of Wright because he could not wait until July 4th to go after their target and wanted to "go after" the "boys in blue" (a slang term used to describe police officers) in

Massachusetts.  *See* Ex. 5A.  In response, Wright encouraged Rahim's plan to attack the police

and die as a martyr.  Wright instructed Rahim to pursue martyrdom, remain firm, and not to let

anything deter him.  10/11/17 Tr., Vol. 2 at 134-136 (Wright).  Wright also instructed Rahim to

destroy his phone and wipe all the data off his laptop computer by restoring it to its original

factory settings.  Ex. 5A.

      After speaking with Wright, Rahim did exactly as Wright had instructed and restored his

(Rahim's) computer to its original factory settings.  As a result, all of the user data on Rahim's

computer was destroyed and completely overwritten.  The FBI was unable to recover any

information -- not even a single line of text -- from Rahim's computer.  *See* Testimony of retired

SA James Scripture, 9/25/17 Tr., Vol. 1 at 49-62.

      Less than 2 hours after Wright encouraged and directed Rahim to attack police officers in

Massachusetts, Rahim was killed when he lunged towards police officers and FBI special agents

with a large fighting knife in a parking lot in Roslindale and refused to drop his weapon despite

numerous requests to do so.  *See* Testimony of SA Patrick Maloney, 9/22/17 Tr., Vol. 1 at 62-64

& 9/22/17 Tr., Vol. 2 at 70-73; Exs. 6A and 12.  Wright's actions caused this terrorist attack and

endangered the lives of numerous law enforcement members and the public.

      Shortly after Rahim attacked law enforcement, a family member informed Wright that

Rahim had been shot.  Ex. 62A.  After being informed that Rahim had attacked law enforcement,

Wright deleted data on his own computer by restoring his laptop to its original factory settings.

9/29/17 Tr., Vol. 2 at 138-142 (Computer Scientist Nicholas Nathans).

## II.      ADVISORY SENTENCING GUIDELINES

      The government agrees with the Probation Office's Guideline calculations except

regarding the calculation of the guidelines applicable to Count 4.  As described below, the Government contends that the adjusted offense level for that count is 43, which would be the highest offense of the all the counts of conviction.  Because the government agrees that all of the counts are grouped pursuant to USSG § 3D1.2(b), this difference in how to calculate the guidelines for Count 4 would increase the defendant's total offense level from 42 to 43.  *See* USSG § 3D1.3.   Below are the guideline calculations for each count and a description of applicable enhancements.

A.  Count One – Conspiracy to Provide Material Support to ISIS in violation of 18 U.S.C. § 2339B

As the Probation office properly determined, pursuant to USSG §2M5.3, the base offense level for providing material support to a foreign terrorist organization is 26.  This level is increased by two levels here because the material support or resources were provided by the defendant and his conspirators "with the intent, knowledge, or reason to believe they were to be used to commit or assist in the commission of a violent act."  U.S.S.G. §2M5.3(b)(1).  Thus, the adjusted offense level for violation of §2339B under U.S.S.G. §2M5.3 would be 28.  The terrorism enhancement, USSG § 3A1.4, would then increase the offense level to level 40 and the defendant's criminal history category to Category VI resulting in a guideline range of 360 months to life.

B.  Count Four – Conspiracy to Commit Acts of Terrorism Transcending National Boundaries in violation of 18 U.S.C. § 2332b

The government has objected to the Probation Office's calculation of the guidelines for Count 4.  The government believes that the applicable guideline for a "conspiracy to kill persons" in violation of 18 U.S.C. § 2332b(a)(2) is USSG § 2A1.5 (Conspiracy or Solicitation to Commit Murder), not § 2A6.1, which only pertains to "Threatening or Harassing

Communications; Hoaxes; False Liens."  Section 2332b(a)(2) criminalizes three types of

offenses -- "threats, attempts, and conspiracies."  While the Guidelines do list 2A6.1 as the

statutory reference for Section 2332b(a)(2), that guideline provision appears only to refer to

"threats" and not to conspiracies or attempts to kill, assault, kidnap, or damage real or personal

property.  *See* USSG § 2A6.1 (repeated use of term "threats" but no references to conspiracies or

attempts to kill or commit serious assault).  Indeed, the very last sentence of Section 2A6.1

makes clear that it is designed only to cover conduct related to threats; it states that the

seriousness of the offense "depends upon the defendant's intent and the likelihood that the

defendant would carry out the threat."  *See* § 2A6.1 (Background paragraph).  Nowhere in the

discussion of the punishment is there any discussion about the harm caused by a conspiracy or

attempt to kill a person.

The defendant was not convicted of making threats or communicating threats to an

intended victim.  Thus, the government requests that the Court apply the guideline that best fits

the conviction, which charged the defendant with conspiracy "to kill and maim persons within

the United States in violation of the laws of Massachusetts and New York."  *See United States v.*

*Almeida*, 710 F.3d 437, 441 (1st Cir. 2013) (applicable guideline should be based "on conduct

charged in the indictment.").  The most analogous guideline is Section 2A1.5 (Conspiracy or

Solicitation to Commit Murder). [3]   In accordance with USSG § 2A1.5 the base offense level is

33.  There are no specific enhancements in Section 2A1.5 but the terrorism enhancement would

then increase the offense level to 45 and defendant's criminal history category to category VI

resulting in a guideline range of life.

---

[3]This is the same position the government took in the plea agreement with Wright's co-
defendant Rovinski.

Alternatively, because Wright is charged with conspiring to kill persons and 18 U.S.C. § 2332b indicates that the punishment for conspiracies shall be the same as the amount of imprisonment that would have applied had the offense been completed, Section 2X1.1 could also be used.  Indeed, the Guidelines appear to require this in cases like these where the offenses involved a conspiracy.  USSG § 1B1.2(a) ("If the offense involved a conspiracy, attempt, or solicitation, refer to § 2X1.1 (Attempt, Solicitation, or Conspiracy) as well as the guideline referenced in the Statutory Index for the substantive offense.").  Section 2X1.1 provides that the base offense for Count 4 shall be the same as the base offense level from the guideline for the substantive offense (first degree murder guideline - USSG § 2A1.1) where violations of 18 U.S.C. § 2332b are charged.  If Section 2A1.1 is used, the defendant's base offense level would be 43 and the terrorism enhancement would increase his offense level by twelve levels.  Accordingly, defendant's maximum sentence under Section 2A1.1 would also be life.  Thus, regardless of which guideline section of the USSG is used, the defendant faces a maximum sentence of life imprisonment if convicted of Count Four.

> C.  Counts Two, Three, and Five – Conspiracy to Obstruct Justice and Obstruction of <u>Justice in violation of 18 U.S.C. §§ 371 and 1519</u>

As described by the Probation Office at PSR ¶ 56, under U.S.S.G § 2J1.2, Guideline § 2X1.3 (Accessory After the Fact) applies to cases involving obstruction of an investigation or prosecution for a criminal offense.  Pursuant to Section 2X3.1, the base offense level is 6 levels lower than the offense level for the underlying offense.  Here, there are two underlying offenses - conspiracy to provide material support, which has a base offense level of 26, and conspiracy to kill and maim persons in the United States, which has a base offense level of 33.  Thus, the base offense level for the obstruction counts will be 27, the higher of the two potential offense levels if the defendant is convicted of both Counts One and Four.  The terrorism enhancement, USSG

§ 3A1.4, would then increase the offense level by 12 levels resulting in a total offense level of

39.  Wright's criminal history category would also be increased to Category VI resulting in a

guideline range of 360 months to life.

    D.  <u>Terrorism Enhancement under Section 3A1.4 Properly Applied by Probation</u>.

    District courts may impose sentencing enhancements based upon facts it determines are

proven by a preponderance of the evidence.  *See, e.g., United States v. George*, 761 F.3d 42, 60

(1st Cir. 2014) ("Our caselaw clearly holds that the preponderance standard applies" to

Guidelines issues, not the beyond-a-reasonable doubt or clear-and-convincing standard.).  The

Supreme Court has "long recognized that broad sentencing discretion, informed by judicial

factfinding does not violate the Sixth Amendment."  *United States v. Alleyne*, 133 S.Ct. 2151,

2163 (U.S. 2013).  In *United States v. Ramirez-Negron*, 751 F.3d 42, 48 (1st Cir. 2014), the First

Circuit concluded that:

> factual findings made for purposes of applying the Guidelines, which influence
> the sentencing judge's discretion in imposing an advisory Guidelines sentencing
> and do not result in imposition of a mandatory minimum sentence, do not violate
> the rule in *Alleyne*.

(citing holdings in seven circuit courts of appeal).  Because the application of the terrorism

enhancement does not result in an imposition of a mandatory minimum sentence, the judge may

impose this enhancement based upon its own evaluation of facts if it believes the convictions

alone do not establish the requisite elements of USSG § 3A1.4.

    Section 3A1.4(a) states that if "the offense is a felony that involved, or was intended to

promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is

less than 32, increase to level 32."  Additionally, under the terrorism enhancement, the

defendant's criminal history category is also increased to Category VI.  *Id.* at § 3A1.4(b).

Both conspiring to provide material support to ISIS (charged in Count One) and conspiring to commit acts of terrorism transcending national boundaries (charged in Count Four) constitute federal crimes of terrorism and are so identified in 18 U.S.C. § 2332b(g)(5) (defining federal crimes of terrorism).   A federal crime of terrorism is defined as an offense that "(A) is calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct;" and "(B) is a violation of … sections 2332b (relating to acts of terrorism transcending national boundaries) … [and] 2339B (relating to providing material support to terrorist organizations) …"  18 U.S.C. § 2332b(g)(5).   Therefore, this Court may apply the Section 3A1.4 enhancement here as the defendant's offenses involved federal crimes of terrorism.  *See United States v. Ali*, 799 F.3d 1008, 1030-31 (8th Cir. 2015) (concluding that Section 3A1.4 terrorism enhancement may be imposed on a defendant convicted of providing material support to a designated FTO and such an enhancement does not violate a defendant's due process rights because Congress has concluded "that terrorists and their supporters should be incapacitated for a longer period of time" due to the "dangerousness of the crime and the difficulty of deterring and rehabilitating" these types of criminals).

Similarly, the terrorism enhancement also applies to the obstruction counts -- Counts Two, Three, and Five.  As described in Application Note 2 to the USSG 3A1.4, "an offense that involved . . . obstructing an investigation of a federal crime of terrorism . . . shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism."   USSG 3A1.4 at App. Note 2; *see United States v. Benkahla*, 530 F.3d 300, 313 (4th Cir. 2008) (upholding application of § 3A1.4 enhancement where evidence established defendant actually obstructed a terrorism investigation); *United States v. Fidse*, 862 F.3d 516, 524-26 (5th Cir. 2017) (finding terrorism enhancement applied where defendant made false statements to federal agents

who were conducting an investigation of the defendant for conspiring to provide material support to a designated foreign terrorist organization and requested the assistance of others in destroying evidence); *United States v. Ashqar*, 582 F.3d 819, 825-26 (7th Cir. 2009) (affirming application of enhancement based on defendant's refusal to testify because defendant intended to obstruct an investigation into a federal crime of terrorism).

The defendant claims in its objections to the PSR that the Court cannot apply the terrorism enhancement because the jury was not asked to find beyond a reasonable doubt that the defendant's offenses were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." The defendant cannot now raise this argument when it failed to request such a finding. Indeed, more than a week before the charging conference, the government filed its memorandum regarding its Sentencing Guideline Calculations and the application of the terrorism enhancement to each of the counts contained in the Second Superseding Indictment. *See* Government's Clarification Memorandum Regarding Sentencing Guideline Calculations, filed Oct. 6, 2017, at 2-3 (describing in detail terrorism enhancement and definition of federal crime of terrorism under § 2332b(g)(5)). At no time did the defendant request in its proposed jury instructions, at the charging conference, or after the Court had instructed the jury that the jury be required to find any elements of any sentencing enhancements, including the terrorism enhancement. Nor did the defense object to the instructions on this basis. Accordingly, this argument has been waived or, at a minimum, forfeited. *See United States v. Hansen*, 434 F.3d 92, 101 (1st Cir. 2006) (defendant waived objection to issue where it failed to timely object and indicated it was "content" after court had instructed jury); *United States v. Corbett*, 870 F.3d 21, 30-31 (1st Cir. 2017) (distinguishing

waiver and forfeiture).  Further, as described above, this issue is not one for the jury but rather for this Court to conclude using a preponderance of the evidence standard.

Even if this Court were to conclude that this issue was one for the jury, the jury has already made such a finding by virtue of the convictions.  Implicit in the conviction of the defendant for conspiring to provide material support to ISIS by engaging in acts of violence and beheadings within the United States is the fact that the defendant and his conspirators' actions were calculated to influence or affect the conduct of the U.S. government and retaliate against the U.S. government for its actions in the Middle East.  As Aaron Zelin testified: the objective of ISIS (the FTO to which the defendant pledged his allegiance and was convicted of illegally agreeing to provide material support) is "to create a worldwide caliphate where they conquer all territory and, therefore, then implement their version or interpretations of Islamic law."  9/28/17 Tr., Vol. 2 at 171.  In other words, ISIS intends to "control all territory all over the world" and require "everybody" to "submit to their will."  *Id.*  Indeed, the ISIS speeches that the defendant admitted to possessing declare war on the United States and call for attacks in our homeland. 10/12/17 Tr., Vol. 1 at 19-24; *see* 9/22/17 Tr., Vol. 2 at 124-126 (Chief James Bailey, CBP, testified that during the June 2, 2015 interview Wright told him that "he agreed with ISIS and that they were justified in what they were doing;" "the terror they used was justified;" ISIS's spokesman, Abu Muhamad al-Adnani, had issued different fatwas directing its supporters to "carry out attacks in the homeland, meaning in the United States;" "the fatwa indicated it was justified to attack law enforcement in the U.S." because law enforcement in the United States supported the U.S. Government [and] the U.S. Government had soldiers overseas fighting."). Wright swore allegiance to the leader of ISIS (*see* Ex. 51 at 9; 9/21/17 Tr. at 22, 32; Ex. 65 (Wright wrote to Rovinski "None should know of these plans unless they are proven trustworthy

and have given bayah [allegiance] to the khilafah") and the jury concluded he was acting in coordination with its orders and statements.

There is overwhelming evidence in the record that Wright's motive in conspiring to provide material support to ISIS was to influence, or retaliate against the conduct of, the United States government.  All of the ISIS materials that Wright collected show this to be true, including the anti-U.S. "Flames of War" video that Wright himself distributing in an attempt to recruit others to assist him in his martyrdom operation efforts.  *See, e.g.*, Exs. 246-b (Flames of War), 247-b (Excerpt of Flames of War), 183 ("Message to America"); 297 (ISIS's Dabiq Magazine Issue 3 containing images of beheading of James Foley); 303 (ISIS's Dabiq Magazine Issue 9); 308 ("How to Survive in the West"); 310 (Lone Wolves).  Indeed, Wright told the FBI cooperator during a chat conversation on April 14, 2015, that his "desire was to obey the Khilafah [Islamic State] and fight against the Taghut [Devil] here."  *See* Ex. 51 & 51A and 9/26/17 Tr. at 44-63.  The defendant also described himself as one of ISIS's fighters in the United States who was awaiting his orders from ISIS.  (*see* Exs. 51 & 51A and 9/26/17 Tr. at 44-63: in chats with FBI cooperator, defendant stated on May 17, 2015, "2 Mujahids were martyred in Texas for attempting to kill everyone at the 'Draw Muhammad' cartoon contest held by the New Yorkian Jew, Pamela Geller, the Islamic State confirmed and approved of them and said that they have 71 more trained Mujahid fighters in 15 other states ready to act as soon as the order is given[.]  I don't know who they are and they don't know about me for security reasons.").

What makes this conclusion -- that Wright's offenses were calculated to influence, or retaliate against, the United States -- indisputable is the document Wright admitted to posting on the internet, "Internal Conquest."  *See* Ex. 336.  Wright conceded during cross-examination that

through this document, he sought to increase support for the Islamic State and encouraged

violent attacks against the United States.  *See* 10/12/17 Tr., Vol. 2 at 90; 10/11/17 Tr., Vol. 2 at

112-113, 115.  In pertinent part, Wright stated the following in his "Internal Conquest"

manifesto:

> O America!  Indeed the Lions of Allah have awoken and heard the words of our
> Khilafah Amir Ul Mu'minin Abu Bakr al-Baghdadi.  We rejoice in the prospect
> of living under an Islamic State which is governed completely by the Shari'ah of
> Allah Almighty….
>
> O America!  We have remained dormant and have watched the atrocities
> committed by the U.S. led coalition against the Islamic State….
>
> O America! Your sins are countless but Your days are numbered.  We shall
> resonate the roars of our brothers in the Islamic State of Iraq & Syria and Nigeria.
> We will bring your deepest lies ("Terrorism") and darkest fears ("Terrorist") to
> fruition.  We have began plotting and working and there is no forewarning which
> can prepare you for this reality.  We live among you, travel with you on public
> transit, walk beside you on the streets, shop with you in the supermarkets and
> clothing stores, we eat with you at local restaurants, and some of us even attend
> your movie theaters….
>
> O America…This is the time which you feared, the time you would witness true
> 'Terrorism,' the time you would witness true 'Terrorist,' the day the American
> people will never forget… This will be your final crusade.  We fear none but
> Allah Almighty.  You cannot defeat the Lions of Allah.  If we overcome you and
> are successful then it is due to Allah Almighty and we will be rewarded by His
> permission in this life and the hereafter.  If we lose our lives then we die as
> martyrs by His Permission and Paradise awaits us. We seek victory or martyrdom
> …

In this document, Wright also instructed "Moderate Muslims" to support ISIS and Al-Baghdadi

rather than the United States and its President or risk retribution from ISIS supporters.

Similarly, in his chat conversations with the FBI cooperating witness, Wright makes clear

that his attack plans and conspiratorial activities were calculated to retaliate against the conduct

of the United States Government.  For instance, he states that he intends "to wage war on these

kuffar here in America" because he had "seen the statements of our brothers in the Islamic State

and they say that we are in the heart of the kuffar who are bombing the Muslims and leading the coalition against the Islamic State …"  Ex. 51 at 1.  Wright concluded that "[h]ere in America there are no borders, no drones, apart from the Police and National Guard and stationed military there is no serious threat which can't be stopped."  *Id.*  As a result, Wright believed his attack plans against the United States, which he referred to as the "Taghut," an Arabic word meaning the devil, were wise and could succeed.  *Id.*  His objective in carrying out these attacks was to "strike fear in the … hearts" of Americans.  *Id.* at 2.

Moreover, the Court may conclude from the defendant's creation of a Twitter page on April 21, 2015[4] directed to the "Lions of America" that his offenses were calculated to retaliate against the United States Government.  *See* Ex. 282 (Screen shot of Assad Qudamah Twitter Page showing masked jihadist next to the American flag).  Using this Twitter page, the defendant tweeted the following statements, among others, that advocated violence against the United States to his 12 followers:

- A lion is most fierce when hiding before he strikes.  Therefore we are and shall do the same until the roar of assault is given.  #LionMind

- The flames of war have only been rekindled … we shall set the tawagheet [democracy] a blaze until they die in their rage against al-Islam.

- I use this social media outlet as a means to connect with the true lions of this Ummah [Nation].  Security cannot and will not be breached by this.

- I have complacency and complete solidarity to the Khilafah [Caliphate], Mujahideen [fighters] and the Islamic State …

- It is through sacrifice and determination of purpose that achievement is granted by the permission of Allah.  #JoinTheMission.

---

[4]This is the same day Wright posted the "Internal Conquest" document on the internet and began drafting his "Martyrdom Operation" documents entitled, "Tor Secret" and "Tor Secret 2."  *See* Exs. 262 and 263.

- None are safe in the Lions Den except for the Lions of Allah.  Sheep get devoured, Wolves get ravished and Kuffar [disbelievers] get slayed b'inthnillah [God's permission].

- I just got word from another reliable brother that NEW detailed documents will be released for the American Mujahideen [fighters] on survival.

Accordingly, there is a sufficient and compelling factual basis to find that the defendant's counts of conviction involved a federal crime of terrorism.  USSG § 3A1.4.  First, two of the defendant's counts of conviction are listed in 18 U.S.C. § 2332b(g)(5)(B), namely, conspiring to provide material support to a FTO in violation of 18 U.S.C. § 2339B and conspiring to commit acts of terrorism transcending national boundaries in violation of 18 U.S.C. § 2332b.  Second, the offenses, which here involved plots to murder U.S. citizens, were calculated to influence, or retaliate against the United States government.  *See United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) ("commission of crimes listed § 2332b(g)(5)(B) satisfies the "involved" prong of the terrorism enhancement so long as the government shows by a preponderance of the evidence that the [defendant] had the 'specific intent,' to commit an offense that was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'") (citations omitted).

E.   Adjustment for Obstruction of Justice also Applies.

Because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offenses of conviction and the obstructive conduct related to the defendant's offenses of conviction, the Probation Office properly added two levels to the defendant's adjusted offense level pursuant to USSG § 3C1.1 (Obstructing or Impeding the Administration of Justice).  This adjustment is based upon the defendant's instructions to Rahim to destroy his phone and computer as well as the defendant's deletion of data on his own computer.  It is also based upon

19

the defendant's perjury at trial.  When Wright testified at trial on October 11-12, 2017, he

repeatedly lied to the Court and jury and committed perjury.  For example, he lied about at least

four separate subjects.  During his testimony, Wright repeatedly claimed that he did not support

ISIS in 2014-2015 despite having made numerous statements that demonstrated his support for

the terrorist group in communications with Rovinski, Rahim, the FBI Cooperator, Janee

Williams, Yusha Abdullah a/k/a Joshua Whitmore, Jacob Perez, David Andrews, and even his

own mother (Shahidah Muhammad).  In finding the defendant guilty, the jury must have

concluded that Wright lied regarding his intent to support ISIS.  Among other things, Wright also

falsely claimed that: (1) he did not know that Zulfi Hoxha had traveled to Syria to join ISIS (*see*

*supra* at 24-25); (2) he did not believe Rahim was indeed going to attack law enforcement; and

(3) he believed the document Rahim obtained from Mr. Hussain was not a real document.

Because Wright instructed Rahim to wipe his computer and destroy the document that

Rahim had received from Hussain during their conversation on June 2, 2015 at 5:18 a.m., Rahim

restored his computer to its original factory settings.  *See* PSR at ¶¶ 30-31; Ex. 5A at 10 (Wright

instructed Rahim to destroy the document he obtained from ISIS because "CSI" would be

looking for it); Ex. 57A at 3-4 (Rahim tells Wright he had received a document from Hussain

with all of the details regarding Pamela Geller).  As a result, all of the user data on Rahim's

computer was destroyed and completely overwritten by the factory re-setting process.[5]

Consequently, the FBI was unable to obtain any of Rahim's communications with Hussain or the

document Hussain had sent Rahim.  This severely hampered the FBI's investigation.  When the

---

[5]It is unclear why the factory resetting process completely erased all of the data on
Rahim's computer while the FBI was able to obtain some data from Wright's computer.  One of
the possible reasons for this difference is that Rahim was running a newer Windows Operating
System so the factory resetting process may have been more thorough.

FBI seized Rahim's electronic devices, Hussain was still operating in Syria and posed a grave threat to the United States as he was actively recruiting people to commit attacks in the United States and in Europe.

**Total Offense Level**:  Accordingly, the defendant's adjusted offense level is 43 (BOL of 33 + 12 under § 3A1.4 + 2 for obstruction = 47, which is capped at level 43) and criminal history category is VI.

### III.   SECTION 3553(a) FACTORS

After calculating the appropriate Guidelines range and determining whether to apply any departures, the court must consider the factors set forth in Section 3553(a) so as to impose a sentence that is "sufficient, but not greater than necessary."  *United States v. Dixon*, 449 F.3d 194, 203-04 (1st Cir. 2006); *see United States v. Villanueva Lorenzo*, 802 F.3d 182, 184-85 (1st Cir. 2015).  The most salient Section 3553(a) factors here are: "the nature and circumstances of the offense and the history and characteristics of the defendant;" and "the need for the sentence imposed (A) to reflect the seriousness of the offense, . . .; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant."  18 U.S.C. §§ 3553(a)(1) and 3553(a)(2).  These factors demonstrate the need for a lengthy sentence of imprisonment.

A.  Seriousness of offense

At the time of the defendant's offenses, ISIS posed a grave threat to the United States. Even the defendant had conducted research regarding the threat posed by ISIS.  On May 31, 2015, the defendant viewed an article entitled, "FBI Warns Something Big About ISIS That Has U.S. Military Bases on High Alert" that warned of a "potential attack on U.S. military bases and other strategic locations in the near future" and "a large number of social media postings by

supporters of the ISIS terror group." *See* Ex. 317 at 88; 10/12/17 Tr., Vol. 1 at 51-53 (cross-examination of Wright regarding this article and knowledge of threat posed by ISIS).

Indeed, at the time of the defendant's arrest the FBI had thwarted "attacks tied to the July Fourth holiday," including that of Rahim and "arrested more than 10 people inspired by online recruiting by the Islamic State of Iraq and Syria (ISIS)." *See* July 9, 2015 testimony of FBI Director James Comey testimony before Senate Judiciary Committee summarized in www.cbsnews.com/news/fbi-director-we-disrupted -efforts-to-kill-people-around-july-4-holiday/.

As demonstrated by the recent attacks committed within the United States, the threat posed by ISIS has not abated. As FBI Director Christopher Wray testified on September 27, 2017, ISIS and homegrown violent extremists (like the defendant) continue to be the main terrorism threats to the Homeland. Statement of FBI Director Christopher Wray before the Senate Homeland Security and Government Affairs Committee on Sept. 27, 2017, available at www.fbi.gov/news/testimony/current-threats-to-the-homeland/. "ISIS is relentless and ruthless in its campaign of violence and has aggressively promoted its hateful message, attracting like-minded extremists." *Id.* As a result, ISIS and homegrown violent extremists remain "the highest priority and create the most serious challenges for the FBI, the U.S. Intelligence Community, and our foreign, state, and local partners." *Id.*

In addition to causing the death of Rahim, Wright's actions have assisted ISIS. ISIS has used Rahim's death, precipitated by Wright's instructions to seek martyrdom, to inspire other ISIS supporters to commit terrorist attacks against the United States. Indeed, within days of Rahim's death, on June 12, 2015, Hussain publicly and openly described "Usaamah Rahim" as a martyr in Boston who was involved in a plan "to behead pamela gellar" on Twitter. Ex. 119.

Hussain further acknowledged that he had spoken to Rahim and during their last conversation, Hussain had instructed Rahim to carry a knife in case the "feds" tried to arrest him. *Id.* "[B]ecause of that knife," Hussain explained on Twitter, Rahim became a martyr rather than being arrested. *Id.* On June 12, 2015, Hussain also instructed his followers using Twitter to "#Go Forth" and kill Ms. Geller. *See* Ex. 120.

Rahim's photograph and name have appeared in ISIS's Dabiq magazine in calls to engage in violent jihad. In Issue Number 10 of Dabiq, which was published in July 2015, Rahim's photograph appeared in a photographic array with other ISIS supporters who were killed conducting attacks in the United States and Europe (including Elton Simpson and Nadir Soofi, the two attackers who unsuccessfully attempted to kill Ms. Geller in Garland, Texas) in a solicitation to join the Islamic State and commit attacks in "the land of the crusaders." *See* Ex. A attached (excerpt of Issue 10). ISIS uses the word "crusaders" to describe the United States and the governments of Western Europe. In Issue 13 of Dabiq, which was published in January 2016, ISIS again referred to Rahim as a martyr in an attempt to inspire others to follow his

example.  The following passage appeared at page 46 of that magazine:

## IN THE WORDS OF THE ENEMY

In an issue of "TIME" magazine released shortly after the blessed attacks in Paris, Michael Morell – former deputy director of the CIA who also served twice as its acting director – wrote an article titled "What Comes Next, And How Do We Handle It? – ISIS Will Strike America." Despite a fatal flaw in its title – as Islamic State knights have struck in America on numerous occasions before the magazine's release including the attacks executed by the martyrs Usaama Rahim, Zale Thompson, Elton Simpson, Nadir Soofi, and others, may Allah accept them all – we present this article below. Morell's preposition was emphasized swiftly by two brave heroes of the Khilāfah: the martyred husband and wife, Syed Rizwan Farook and Tashfeen Malik, may Allah accept them both. Yes indeed, the Islamic State had struck once again in the American homeland.

*See* Ex. B attached (excerpt of Issue 13).

In addition, between December 2014 and April 2015, Wright encouraged Zulfi Hoxha to fight for ISIS overseas.  *See* Ex. 317 at 6.  Wright and Rahim also assisted Hoxha in traveling overseas.  *See* Ex. 57A; 10/12/17 Tr., Vol. 1 at 32-33.[6]  In April 2015, Hoxha joined ISIS and has become a senior ISIS commander.  *See* Exs. 48 and 112.  Indeed, he appears in a video that was released by ISIS in May 2017 entitled "We Will Surely Guide Them to Our Ways."

---

[6]Despite the defendant's claims to the contrary, it is clear that the defendant knew Hoxha traveled overseas to fight for ISIS.  *See* Ex. 51 at 5; Ex. 50 at 24-26; Ex. 112; 9/25/17 Tr., Vol. 1 at 6.  Indeed, he encouraged him to do so.

In this video, Hoxha, using the name Abu Hamza al-Amriki, urges lone wolf attacks against the United States.[7]

While it is true that Wright had not purchased any weapons himself, he was nonetheless operating as a soldier of ISIS. Prior to his arrest, he was organizing violent attacks in the United States and had recruited others to assist him in terrorizing this country. He identified Pamela Geller as his group's first beheading victim. His actions have tormented Ms. Geller and her family.[8]

As demonstrated at trial, Wright was committed to ISIS and wanted to cause more harm to the United States than the Boston Marathon bombings. Wright conducted extensive research regarding ISIS and weapons. He conducted searches regarding knives, machetes, guns, swords, flammable chemicals, bomb making components (including tannerite), the dark web, tranquilizers, police and military training, and serial killers. For instance, he conducted google searches on "how to create a secret militia in the United States" and "what tranquilizer puts humans to sleep instantly."

On the morning of June 2, 2015, after Wright knew Rahim had purchased three knives for the group to decapitate Ms. Geller, Wright encouraged Rahim to attack the police and die as a martyr. Wright instructed Rahim to pursue martyrdom, to prepare for victory or martyrdom, remain firm, and not to let anything deter him. *See* Ex. 5A. His actions threatened the lives of the police and innocent civilians. Wright also obstructed justice, which impaired law

---

[7]The government is prepared to present testimony about this video and Issues 10 and 13 of Dabiq, which were published after the defendant's arrest, at the sentencing hearing.

[8]As indicated in the PSR, Ms. Geller has requested the opportunity to make a victim impact statement at the sentencing.

enforcement's ability to investigate a terrorism network operating on U.S. soil with direct connections to an ISIS recruiter in Syria.

B. Characteristics of the Defendant

More than two years after causing the death of his own uncle and endangering lives of innocent Americans, the defendant still has not accepted responsibility for his own actions. Even now, after the jury rejected his claims, Wright still incredibly maintains that he was only playing some kind of terrorist role playing game with his uncle. Wright is seeking to deceive this court into believing that he never actually supported ISIS and did not intend to cause any harm. Yet, the truth is clear. Wright is a terrorist.

The defendant urged Rahim to become a martyr on June 2, 2015. *See* Ex. 5A. Wright could not hide his excitement at the prospect of Rahim attaining "martyrdom" in support of ISIS. During his conversation with Rahim, Wright repeatedly referred to that morning as a "beautiful moment" and rejoiced at the thought of the "juicy necks" of beheaded police officers. *See* Ex. 5A at 5 ("Dang those juicy necks is intense [sic]! Dang … Dang it, I feel, I feel so – I feel so left out."). Wright further instructed Rahim that "he must pursue … this reality" and complete this attack as this was something that they had been talking about and planning for "almost a year." *Id.* at 7-8.

Although Wright had planned to conduct numerous terrorist attacks in the United States, once he heard the news that Rahim had been killed, Wright did his best to conceal his connections to Rahim's terrorist attack. He deleted data on his computer in precisely the same way as he had instructed Rahim to do – by re-setting his computer to its original factory settings. He lied to his family about his knowledge of Rahim's plan. He lied to the FBI on June 2, 2015. He also lied to the jury and this Court when he testified on October 11 and 12, 2017.

26

Additionally, the defendant has sought to diminish his culpability by claiming he suffers from an unspecified personality disorder.  This claim is specious.  His own psychologist, Dr. Robert Mendoza, Psy.D, did not make such a diagnosis until he testified in Court on October 13, 2017, more than 11 months since he started meeting with him.  10/12/17 Tr., Vol. 2 at 124-25; *but s*ee 10/16/17 Tr., Vol. 1 at 88-89 (as late as July 2017, Dr. Mendoza had not diagnosed Wright with a personality order and didn't know "precisely when [he] had formulated and arrived at a diagnosis."); 10/16/17 Tr., Vol. 1 at 48 (in report July 25, 2017, Dr. Mendoza did not state that he diagnosed the defendant with an "unspecified personality disorder."  Nor do those words appear in that report.); *see also* 10/16/17 Tr., Vol. 1 at 64 (in his first undated report, Dr. Mendoza wrote the defendant was "well-adapted and he didn't suffer from any mental disorder."); 10/16/17 Tr., Vol. 1 at 32 (in undated report that must have been done after his last interview of the defendant on July 15, 2017, Dr. Mendoza stated "there are no clinical indications of a major mental disorder, no indication of affective behavioral or cognitive instability.").  To the contrary, Dr. Martin Kelly, M.D., concluded Wright does not suffer from a personality disorder and "gamed" the test (Personality Assessment Inventory) upon which Dr. Mendoza's diagnosis was based.  *See* 10/16/17 Tr., Vol. 2, at 108-112.   There is, however, one aspect of the defendant's personality on which the government and the defense both agree, that is, Wright manipulated others.  *See* 10/16/17 Tr., Vol. 1 at 51 (During cross-examination, Dr. Mendoza acknowledged there was evidence that Wright manipulated others.).  Wright manipulated Rahim into believing ISIS was a legitimate Islamic group, which they were obligated to support by engaging in violent jihad.

C.   Need for Specific and General Deterrence

The defendant has failed to recognize the gravity of his offenses or accept

responsibility for his actions.  He was the mastermind behind the plot to behead Pamela Geller

pursuant to ISIS's fatwa to kill her.  As demonstrated by his statements during recorded

telephone conversations and electronic communications, the defendant approved of beheadings

to kill enemies of ISIS.  He was committed to causing serious harm to the United States and, in

coordination with ISIS, he posted a document on the Internet intended to cause others to kill

Americans.  Wright motivated Rahim to become a martyr and thereby caused Rahim to attack

police officers on the morning of June 2, 2015, resulting in Rahim's death.  Wright also

obstructed justice.

The defendant claims that he now believes ISIS is "disgusting." PSR ¶ 92.  The

defendant, however, cannot be trusted.  It is unclear what he intends to do in the future or

whether he is de-radicalized as the defense claims.  The defendant may simply be doing what he

learned from ISIS's jihadist handbook, "How to Survive in the West."  This book, which the

defendant studied (*see* Ex. 360 at 7), provides tips on how to conceal one's true extremist views

from people in the West until completing an attack.  10/11/17 Tr., Vol. 2 at 110-12.  Further,

Wright lied to his own family about his knowledge of Rahim's activities and then sought to

deceive the jury about his role in this offense.  *See* 10/12/17 Tr., Vol. 1 at 57-59 (Wright

admitted that he had lied to his family).

 Individuals like the defendant "are unique among criminals in the likelihood of

recidivism, the difficulty of rehabilitation, and the need for incapacitation."  *See United States v.*

*Meskini*, 319 F.3d 88, 92 (2d Cir. 2003).  Those who commit crimes of terrorism are more likely

to re-offend.  The terrorism sentencing enhancement, USSG § 3A1.4, recognizes the particularly

grave threat posed by terrorists as well as the requirement that courts impose sentences that both

deter future terrorism offenses and incapacitate those who seek to cause harm to our country.

Additionally, the defendant's actions obstructed a terrorism investigation. Rahim's computer may have revealed the names of other ISIS supporters plotting attacks in the United States or the names of other ISIS recruiters. Thus, among the most important functions served by sentencing this defendant is the deterrent message the sentence will convey to those who might consider impeding a law enforcement investigation into ongoing conduct that presents a public danger. *See United States v. Flores-Machicote*, 706 F.3d 16, 23 (1st Cir. 2013) ("Deterrence is widely recognized as an important factor in the sentencing calculus.") (*citing* 18 U.S.C. § 3553(a)(2)(B)). Through its sentence, the Court has the ability to demonstrate that there is no tolerance for the obstruction of terrorism investigations and that such conduct will be severely punished.

Few cases better illustrate the importance of deterrence than this one. A group of homegrown violent extremists who supported ISIS were in communication with an ISIS recruiter in Syria. At the urging of the defendant, this group was planning to kill Americans and purchased weapons to carry out their attack. Rahim, manipulated by the words of the defendant, attacked the police and was killed. But for the actions of the FBI and the Boston Joint Terrorism Task Force, innocent lives would likely have been lost on June 2, 2015.

Homegrown violent extremists represent one of the most serious threats to America. Indeed, ISIS inspired attacks against the United States are increasing. For instance, since the defendant was convicted on October 18, 2017, two ISIS attacks were committed in New York. On October 31, 2017, after pledging his allegiance to Abu Bakr al-Baghdadi, Sayfullo Saipov plowed a rented truck into people walking and cycling on a New York City bike path. Eight people died. Like Wright, Saipov had been radicalized over the internet by watching ISIS videos and heeded ISIS's calls to retaliate against the United States and kill disbelievers. Just two days

ago, an ISIS supporter, Akayed Ullah, detonated a homemade pipe bomb in the New York City

subway in retaliation for America's bomb strikes against ISIS.  Thus, the sentence imposed by

the Court should send a clear and unequivocal message:  if you plot to kill Americans and

provide material support to ISIS, you will receive the maximum sentence available under the

law.

### Conclusion

For the foregoing reasons, the Court should sentence the defendant to term of life

imprisonment.

Respectfully submitted,

WILLIAM D. WEINREB
Acting United States Attorney


By:      */s/ B. Stephanie Siegmann*
B. STEPHANIE SIEGMANN
Assistant U.S. Attorney


Gregory R. Gonzalez, Trial Attorney
U.S. Department of Justice, National Security Div.


Certificate of Service

I do hereby certify that a copy of foregoing was served upon the counsel of record for the
defendant by electronic notice on this 13th day of December 2017.

*/s/ B. Stephanie Siegmann*
B. Stephanie Siegmann