UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

UNITED STATES OF AMERICA

v.

DAVID WRIGHT
Defendant.

---

Crim. No. 15-cr-10153-WGY

---

SENTENCING MEMORANDUM OF DAVID WRIGHT

By his attorneys:


Jessica D. Hedges, BBO #645847
Michael Tumposky BBO #660618
Forest O'Neill-Greenberg BBO #674760
Hedges & Tumposky, LLP
50 Congress St., Suite 600
Boston, MA 02109
T) 617/722-8220

# Table of Contents

Introduction.................................................................................. 1

Procedural Background.................................................................... 2

Argument...................................................................................... 2

    I.    The right to trial is a bedrock principle of the criminal justice system. Imposing a lengthier sentence – or "trial tax" – because the defendant did not plead guilty would unfairly penalize Mr. Wright for exercising his rights, and perpetuate the disturbing trend of discouraging trial in favor of pleas at any cost......... 4

    II.    This Court should not impose the terrorism enhancement.....9

    III.    The requested sixteen-year sentence is sufficient and appropriate under the factors identified in 18 U.S.C § 3553(a)................... 19

        A.  Mr. Wright's history and characteristics and the circumstances of the offense render the requested sentence sufficient and appropriate under § 3553(a)(1)........................................... 20

        B.  The requested sentence is sufficient to meet the § 3553(a)(2) purposes of punishment in this case..................................28

Conclusion................................................................................... 60

## Introduction

A little more than a year after September 11, 2001, Robert Mueller – then Director of the FBI – spoke at Stanford Law School on the subject of terrorism in a post-9/11 world. The attacks, he noted, had significantly altered how law enforcement approached the investigation of suspected terror, and the Bureau was still wrestling with how to use many of its new, expanded powers. He noted that, in its zeal to prevent another attack, law enforcement must always be mindful not to undermine the very civic virtues they sought to protect. "I know we will be judged by history, not just on how we disrupt and deter terrorism, but also on how we protect the civil liberties and the constitutional rights of all Americans, including those Americans who wish us ill," Mueller said, concluding the speech. "We must do both of these things, and we must do them exceptionally well."[1]

A similar balancing act is before this Court in sentencing Mr. Wright, and it must also strive to strike the appropriate balance exceptionally well. On one hand, David Wright stands convicted of several serious crimes and the Court must consider the consequences of Mr. Wright's conduct, and the need for deterrence. On the other, it must consider Mr. Wright not simply as a terrorist, with all the fraught connotations of that term, but rather as the person he was, the person he has become, and the person he might yet be. This Court should strive for proportionality; a sentence of lengthy incarceration is appropriate, but the government's requested sentence of life is draconian, subverts the purposes of

---

[1] https://archives.fbi.gov/archives/news/speeches/terrorism-in-a-post-9-11-world

sentencing, and would interminably warehouse a person who is capable of, and committed to redeeming himself given the opportunity. A sentence of sixteen years, with a lifetime of supervised release, is appropriate and just.

## Procedural Background

On October 18, 2017, David Wright was convicted, after a five-week trial, of Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B(a)(1), Conspiracy to Obstruct Justice, in violation of 18 U.S.C. § 371, Aiding and Abetting Obstruction of Justice, in violation of 18 U.S.C. § 1519 and 18 U.S.C. § 2, Conspiracy to Commit Acts of Terrorism Transcending National Boundaries, in violation of 18 U.S.C. § 2332b(a)(2) & (c)[2], and Obstruction of Justice, in violation of 18 U.S.C. § 1519. Sentencing is set for December 19, 2017.

## Argument

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 51(2007). This Court must, therefore, base its sentence on the history and characteristics of this defendant, and the nature and circumstances of the offense of conviction, along with all of the other 18 U.S.C. § 3553 factors. Above all, a court's final determination of a sentence must reflect "§ 3553(a)'s overarching instruction to

---

[2] Because this count must run consecutive to all other counts, the Court could sentence Mr, Wright to, for example, ten years on Count 1, followed by 6 years on Count 4.

'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals advanced in 3553(a)(2)," namely, retribution, deterrence, incapacitation, and rehabilitation. *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007). This is known as the parsimony clause.

The parsimony clause is "an overarching provision," which represents a cap above which a District Court is statutorily prohibited from sentencing above, even when a greater sentence is recommended by the advisory Sentencing Guidelines. *Kimbrough*, 552 U.S. at 101. Accordingly, pursuant to 18 U.S.C. § 3553(a) the Guidelines are statutorily subordinate to the parsimony clause. See *Kimbrough*, 552 U.S. at 101-102. After properly determining the Guidelines range as an "initial benchmark," District Courts must then consider each of the § 3553(a) factors to impose a sentence sufficient, but not greater than necessary to fulfill the purposes of sentencing. See *Gall,* 552 U.S. at 596-597. Accordingly, in this context, Courts must not presume the advisory Guidelines to be reasonable, and may not afford the Guidelines any greater weight than the other § 3553 factors.

Here, the advisory guidelines suggest a sentence of 30 years to life for a man in his mid-twenties who has never before spent a day in jail. That is wholly out of line with the goals of sentencing outlined in 18 U.S.C. §3553(a)(1) and with the standards of decency in an enlightened democracy.

I.    **The right to trial is a bedrock principle of the criminal justice system. Imposing a lengthier sentence – or "trial tax" – because the defendant did not plead guilty would unfairly penalize Mr. Wright for exercising his rights, and perpetuate the disturbing trend of discouraging trial in favor of pleas at any cost.**

This Court must not penalize Mr. Wright for electing to go to trial. Even if the outcome of Mr. Wright's case seemed a foregone conclusion from the outset, even if pleading guilty might have been quicker, less contentious, and less expensive, Mr. Wright's decision to hold the Government to its burden should not be weighed against him in fashioning his sentence. While an individual certainly "may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right. *United States v. Goodwin*, 457 U.S. 368, 372 (1982). Punishing a person because he has "done what the law plainly allows him to do is a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). Punishing the decision to go to trial would also contribute to the larger, worrying trend of defendants foregoing trial in favor of plea bargains out of fear of a "trial tax."

A trial tax, or "trial penalty" occurs where a judge "impos[es] a more severe sentence on a defendant, in whole or in part, because the accused, who elected to reject the prosecution's plea agreement and go to trial, wasted judicial and prosecutorial resources involved in a trial. J. Vincent Aprile II, *Judicial Imposition of the Trial Tax*, 29 Crim. Just., Spring 2014, at 30. Many scholars argue that trial penalties in America have become so severe that defendants have no real choice but to accept whatever sentence the prosecutor chooses to offer for pleading

4

guilty. See, e.g., Máximo Langer, *Rethinking Plea Bargaining: The Practice and Reform of Prosecutorial Adjudication in American Criminal Procedure*, 33 AM. J. Crim. L. 223, at 225, 248-56 (2006) (arguing that "prosecutors have become some of the main de facto adjudicators of U.S. criminal procedure"); Gerard E. Lynch, *Our Administrative System of Criminal Justice*, 66 Fordham L. Rev. 2117 (1998) (arguing that our criminal justice system more closely resembles administrative justice presided over by the prosecutor than an adversarial justice system); Jeffrey Standen, *Plea Bargaining in the Shadow of the Guidelines*, 81 Calif. L. Rev. 1471, 1513 (1993) (arguing that charge bargaining under the guidelines makes the prosecutor "no longer the price taker but the price setter").

The "trial penalty" is severe. According to one study, "Overall, controlling for all other factors, the sentence following a jury trial conviction is 44.5 months more severe than the sentence imposed after a guilty plea." Candace McCoy, *Plea Bargaining as Coercion: The Trial Penalty and Plea Bargaining Reform*, 50 Crim. L.Q. 67 (2005). Another study suggested that the "trial tax" in Federal courts imposed "a significant 15% sentence length difference [which] still remains after accounting for Guideline-approved factors that are connected to pleading guilty, and after controlling for upward departures and downward departures that are not related to substantial assistance to law enforcement." Ulmer, Jeffery Todd et al., *Trial Penalties in Federal Sentencing: Extra-Guidelines Factors and District Variation*, Justice Quarterly, Vol. 27, No. 4, 2010, at 16. More recent research on the federal trial penalty– again, accounting for the effect of acceptance of

5

responsibility, and excluding the effects of charge or fact bargaining – calculated that "federal defendants convicted at trial receive sentences that are sixty-four percent longer than similar defendants who plead guilty." Andrew Chongseh Kim, *Underestimating the Trial Penalty: An Empirical Analysis of the Federal Trial Penalty and Critique of the Abrams Study*, 84 Miss. L.J. 1195, 1201-02 (2015). Given such findings, the author reasoned, it is little wonder that fewer and fewer defendants are pursuing their trial rights, and that defense attorneys are inclined to counsel plea bargaining: "the Sixth Amendment right to trial by a jury of one's peers is protected and sacrosanct. This study, however, demonstrates that the criminal justice system is structured in such a way that extremely few rational defendants would ever stand up and exercise that right. In such a system, trial by jury becomes less of a right, and more of a trap for fools." Id. at 1250.

If the point of the criminal justice system was to shunt defendants from arraignment to sentencing as efficiently as possible, then the trial tax makes perfect sense. Assuming, however, that the object is to discover the truth of the allegations against the defendant, then the trial tax counterproductive, tilts the playing field in favor of the state, and discourages defendants from pursing their Sixth Amendment rights. In that last respect, it is undeniably working. According to the most recent Sentencing Commission statistics, only 2.7 percent of defendants in federal cases nationally went to trial in 2016, with 4.8 percent doing so in this District. *United States Sentencing Commission 2016 Sourcebook of Federal Sentencing Statistics*,

Table 10 "Guilty Pleas and Trials In Each Circuit and District: Fiscal Year 2016"[3].

Generally, the trial rate has collapsed in recent years in the federal courts.

"[W]hereas in 1980, 19 percent of all federal defendants went to trial, by 2000 the

number had decreased to less than 6 percent and by 2010 to less than 3 percent,

where it has remained ever since." Hon. Jed S. Rakoff, *Why Innocent People Plead

Guilty*, N.Y.Rev. of Books, November 20, 2014. The numbers imply that the right to

trial is endangered nationally, with this District among the few climbing modestly

above 5 percent in recent years.[4]

The decline in trials is linked to the acceptance of responsibility reduction,

which operates as a 3-point tax on the exercise of a constitutional right. See,

Michael M. O'Hear, *Remorse, Cooperation, and "Acceptance of Responsibility": The

Structure, Implementation, and Reform of Section 3E1.1 of the Federal Sentencing

Guidelines*, 91 NW. U. L. Rev. 1507, 1534 (1997) (concluding that acceptance of

responsibility is "a more-or-less automatic plea discount").[5] The decline is further

entrenched by the disparity in treatment of defendants who plead, and thus benefit

from the government's frequent willingness to offer plea concessions, in contrast

---

[3] Available online at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2016/Table10.pdf
[4] Reviewing USSC sentencing statistics between 2010 and 2016, the average rate of cases going to trial in this district was 7.1 percent, with a high of 8.9 percent in 2012, and a low of 4.8 in 2016. *See, generally*, https://www.ussc.gov/research/sourcebook/archive
[5] The Guidelines permit that the acceptance of responsibility discount may be appropriate after trial, noting that "[c]onviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction." §3E1.1 (App. Note 2). Any other position would effectively concede the discount is a de facto trial penalty. Moreover, the mere fact of the acceptance discount's post-trial availability is less telling than the frequency of its application. One study showed that, nationally, "3% of trial defendants received the two-point acceptance of responsibility reduction and 2% of them received the full three-point reduction." Jeffery T. Ulmer, James Eisenstein and Brian D. Johnson, *Trial Penalties in Federal Sentencing: Extra-Guidelines Factors and District Variation*, Justice Quarterly, 2009.

with the treatment of defendants who exercise the trial right, who face tougher measures which can include, as happened here, superseding indictments exposing defendants to additional, often more severe, charges and more difficult trial postures.

As Thomas Jefferson said, "I consider [trial by jury] as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution." Trials serve as a check on prosecutorial power, assure active judicial oversight of criminal proceedings, and guarantee the full exercise of due process for federal defendants. These benefits disappear if the exercise of the trial right comes burdened with harsher penalties. It is no answer to this to say that a guilty plea reflects contrition when most defendants plead, not due to contrition, but because "[sentencing] guidelines … provide prosecutors with weapons to bludgeon defendants into effectively coerced plea bargains." Rakoff, *supra*. If the courts become mere plea-mills with justice being done only at the whim and will of an obliging government and then only when its ends are served, the claim of justice under law will be empty words.

Reform in this aspect of the Federal criminal justice system must come primarily from judges. Although the problem derives in part from the Sentencing Guidelines and the government's ability to wield charging decisions as a bludgeon to coerce a plea to a lesser offense, it is the judge that imposes the trial tax at sentencing. Nothing compels this Court to collect the tax on defendants who lose at trial – exercising the trial right is not a waste of time or resources, it is what

is *supposed* to be happening, at least much more frequently than it is currently, in a constitutional democracy.

## II. This Court should not impose the terrorism enhancement.

This Court should not impose the terrorism enhancement. First, it requires the Court to determine, at sentencing, whether Mr. Wright's crimes were intended to "affect the conduct of government…" or "to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5). This determination should have been made by the jury. *Booker*, 543 U.S. at 232.

Second, the enhancement is not worthy of judicial deference because it was created by Congressional fiat rather than empirical research. Thus, it must give way to the overarching concerns of § 3553 that the Defendant's sentence be "just." Finally, even if the Court determines that the enhancement should apply, it results in a dramatic overstatement of the Defendant's criminal history. Therefore, the Court should treat Mr. Wright as a Category I, rather than VI.

### A. The enhancement requires judicial fact-finding in violation of the Sixth Amendment

Application of the twelve-point terrorism enhancement requires judicial factfinding before the Court can increase both the Criminal History Category and the Offense Level. This enhancement provides for substantial increases in both Guideline axes if "(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism…" U.S.S.G. § 3A1.4(a). A federal crime of terrorism as that is specifically defined in 18 U.S.C. § 2332b(g)(5) as one that "(A) is calculated to influence or affect the conduct of government by intimidation or

coercion, or to retaliate against government conduct; and (B) is a violation of [the material support and conspiracy to kill statutes as in this case.]" While the jury's verdict necessarily satisfies element "B," the government did not ask the jury to find element "A" beyond a reasonable doubt.[6] *United States v. Assi*, 586 F. Supp. 2d 841, 847 (E.D. Mich. 2008) (Government bears the burden of showing that the elements of the § 3A1.4 enhancement are satisfied); *United States v. Thurston*, No. CR 06-60069-01-AA, 2007 WL 1500176, at *19 (D. Or. May 21, 2007), *aff'd sub nom. United States v. Tubbs*, 290 F. App'x 66 (9th Cir. 2008) (Government's burden under § 3A1.4 is clear and convincing evidence).

In this case, the Government did not ask the jury to determine whether the Defendant intended to affect the conduct of government or retaliate against it. The jury could have found that his intent was to retaliate against Ms. Geller, a private citizen, and not the government. The mere fact of conviction does not answer this important question. Instead, it would be up to the Court to find, at sentencing, that the Government met its burden. Yet this undertaking would violate the Defendant's Sixth Amendment right to have all facts that increase a sentence found by the jury beyond a reasonable doubt. See *Booker*, 543 U.S. at 232.

---

[6] The Government suggests that the defense waived this argument by failing to request a jury charge. Since the burden is on the Government to prove this to the jury, this argument is specious at best.

10

B.   **The terrorism enhancement is based on a misguided Congressional directive, not empirical data; it must give way to the tenets of § 3553.**

Just as this Court is no longer required to comply with the sentencing range recommended under the Guidelines, the mere applicability of Guideline enhancements does not end this Court's analysis or dictate what sentence must be imposed. Instead, the § 3553(a) factors represent an overall statutory framework to which any Guideline provision must give way. Understanding that the Guidelines remain inferior to the tenets of § 3553 is particularly important when an enhancement, such as § 3A1.4, is of questionable utility and validity.

The terrorism enhancement took shape in 1994, when Congress enacted the Violent Crime Control and Law Enforcement Act. Section 120004 of that Act "direct[ed] the [Sentencing] Commission to provide an appropriate enhancement for any felony that involves or is intended to promote international terrorism." Guidelines Manual, Appendix C, Amendment 526. Specifically, the act directed the Commission as follows:

> **SENTENCING GUIDELINES INCREASE FOR TERRORIST CRIMES**
> The United States Sentencing Commission is directed to amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime.

Public Law No. 103-322 (emphasis added).

In response, the Sentencing Commission promptly deleted the previous upward departure provision in U.S.S.G. § 5K2.15 (which allowed district court's discretion to depart upward if the defendant committed the offense in furtherance of

11

a terrorist action) and replaced it with U.S.S.G. § 3A1.4. This new enhancement not only created an upward adjustment, it created a minimum offense level of 32 if the offense involved or was intended to promote international terrorism, and required a criminal history category of VI regardless of the defendant's actual criminal history. The next year, the Sentencing Commission amended the enhancement again, also by congressional directive, to apply it more broadly to include any "federal crime of terrorism" as defined in 18 U.S.C. § 2332b(g). *See* Guidelines Manual, Appendix C, Amendment 539.

The Sentencing Commission did not give any reason for selecting these particular offense levels or for imposing a criminal history category of VI in every case. The Commission also did not mention how, or even if, this adjustment addressed Congress' express limitation that the Commission was to provide for an enhancement in such cases "unless such involvement or intent is itself and element of the crime." Public Law No. 103-322. Instead, the Commission purports to apply it to offenses in which the terrorism component had already been considered in setting the Base Offense Level. See e.g. U.S.S.G. § 2M5.3.

Yet this Court's ability to draw any useful advice from a guideline depends first upon whether the Sentencing Commission, in promulgating or amending that guideline, did so in "exercise of its characteristic institutional role." *Kimbrough*, 128 S.Ct. at 575. Section 3A1.4 simply does not warrant any deference because this enhancement was not enacted based upon reliance on empirical evidence of pre-Guidelines sentencing practice, and was not enacted in light of judicial decisions,

12

sentencing data, and comments from participants and experts in the field. See *Rita*, 127 S.Ct. at 2464-65. Instead, the enhancement was mandated by Congress. *United States v. Grober*, 624 F.3d 592, 608 (3d Cir. 2010) (criticizing another Guideline which "was not developed pursuant to the Commission's institutional role and based on empirical data and national experience, but instead was developed largely pursuant to congressional directives."); *Kimbrough*, 552 U.S. at 109 (citing the crack cocaine Guidelines as an example of Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional role"). Thus, the Court should not impose it.

In addition, Mr. Wright urges this Court to exercise its discretion to conclude that this enhancement "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes" in this case and either find it inapplicable or apply a downward variance to eliminate its effect upon the advisory guidelines calculations. On this point, the Second Circuit's decision in *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010), is pertinent.

*Dorvee* addressed the automatic, or essentially automatic, Guideline enhancements present in child pornography cases, similar to the terrorism enhancement, which increase sentencing ranges to at or near the statutory maximums. The court noted that "the district court was working with a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *Dorvee*, 616 F.3d at 184 (discussing U.S.S.G. § 2G2.2); The Court noted

13

the high frequency with which U.S.S.G. § 2G2.2's component enhancements applied in nearly all child pornography cases "resulting in a typical total offense level of 35[,]," which in turn led to Guidelines ranges at or beyond the statutory maximum even in routine cases. *Dorvee*, 616 F.3d at 186; *see also United States v. Bonilla*, 618 F.3d 102, 110 (2d Cir. 2010) (extending *Dorvee* to the 16-point enhancement related to illegal reentry convictions).

Similarly, the scope of the terrorism enhancement is broad and its effect draconian. Had Mr. Wright been convicted of just one count of obstruction of justice, application of the enhancement would have increased his initial range from 33-41 months (Base Offense Level 20, CHC I) to a range of 210-262 months (Offense Level 32, CHC VI), for an offense with a twenty-year maximum. For the charge of material support, it increases the Guideline range from 63-78 months (Base Offense Level 26, CHC I) to a range of 360-life (Offense Level 38, CHC VI), again for a charge with a twenty-year maximum. As to the material support charge, imposition of the enhancement is virtually assured.[7]

In evaluating § 2G2.2, the *Dorvee* Court identified specific problems with automatic, draconian enhancements. For example, the Court found it troublesome that an ordinary first-time offender would likely qualify for a sentence rapidly approaching the statutory maximum, based solely on sentencing enhancements that

---

[7] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2016/Ch3_Offender_Based.pdf (in 2016, out of eighteen defendants sentenced for material support, all received the enhancement); see also https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2015/Ch3_Offender_Based.pdf (in 2015 all but one out of sixteen received it)

are all but inherent to the crime of conviction. *Dorvee*, 616 F.3d at 186. As a result, the court recognized that under such circumstances "adherence to the Guidelines results in virtually no distinction between the sentences for defendants like *Dorvee*, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories." *Id*. at 187.

Confronted with that situation, the Court concluded that "[t]his result is fundamentally incompatible with § 3553(a)[,]" because "[b]y concentrating all offenders at or near the statutory maximum, § 2G2.2 eviscerates the fundamental statutory requirement in § 3553(a) that district courts consider 'the nature and circumstances of the offense and the history and characteristics of the defendant[.]'" *Dorvee*, 616 F.3d at 187; *see also Gall*, 552 U.S. at 55 (affirming a sentence where "it is perfectly clear that the District Judge considered the need to avoid unwarranted disparities, but also considered the need to avoid unwarranted similarities among other co-conspirators who were not similarly situated.").

Ultimately, the Second Circuit reminded the District Court judges that they are encouraged to take seriously the broad discretion they possess in fashioning sentences under § 2G2.2 – ones that can range from non-custodial sentences to the statutory maximum-bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results. *Dorvee*, 616 F.3d at 188. That "broad discretion"

15

exists here as well, even when the specter of terrorism is present. Thus, this Court should use its authority and decline to impose this enhancement.

### C. To the extent that this Court imposes the enhancement at all, it should not increase Mr. Wright's Criminal History Category.

If this Court decides to apply the enhancement, it should find that Criminal History Category VI overstates Mr. Wright's prior record and his risk of re-offense. Instead, the Court should treat him as a Criminal History Category I, based on his one criminal history point.

This Court has the discretion to find that the terrorism enhancement, U.S.S.G. § 3A1.4(b), results in an overstatement of Mr. Wright's criminal history. *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003); *United States v. Benkahla*, 501 F. Supp. 2d 748, 758–59 (E.D. Va. 2007) (nothing within the language of the terrorism enhancement prohibits a CHC departure); U.S.S.G. § 4A1.3.[8] Guideline § 4A1.3 provides that a court may depart downward "if reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3. In this case, both rationales for departure are applicable.

---

[8] Several guidelines other than § 3A1.4 prescribe specific criminal history categories such as: § 4B1.1 ("career offenders" are category VI); § 4B1.4("armed career criminals" are at least category IV); and § 4B1.5("repeat and dangerous sex offenders" are at least category V). Notably, § 4A1.3 explicitly restricts or prohibits its application in the event that one of these other guidelines apply. Specifically, § 4A1.3 prohibits a downward departure in the cases of armed career criminals under § 4B1.4 and repeat sex offenders under § 4B1.5, and limits downward departures to one category at most in the case of a career offender.

Mr. Wright has one criminal history point. He receives this point for a conviction on a motor vehicle offense which occurred when he was 18 years old. For that crime, he received a sentence of probation. Mr. Wright completed his probation more than five years prior to committing the instant offense. He has no other juvenile or adult arrests on his record.

Further, a Criminal History Category VI overstates the likelihood that he will reoffend. He will be at least forty when he is released, has substantial family and community support, has been determined to have a low risk of violence, and has and will continue to address the psychological conditions that allowed for his behavior to manifest. See Section III, *infra*.

At least two courts have departed downward in CHC after application of the terrorism enhancement. In *United States v. Aref*, 2007 U.S. Dist. LEXIS 17926, *3 (N.D.N.Y. 2007), for example, the defendant was convicted of twenty-seven crimes, including one count of conspiracy to provide material support to a terrorist organization, and seven counts of attempting to provide material support to a terrorist organization, all in violation of 18 U.S.C. § 2339B. These convictions arose from a protracted conspiracy to fund terrorist organizations overseas and to import surface to air missiles into the United States to carry out domestic terrorism. *United States v. Aref*, 2007 U.S. Dist. LEXIS 12228, at *6-11 (N.D.N.Y. 2007). Despite the elaborate nature of the conspiracy, the potential for violence, the large number of convictions, the extensive planning involved to carry out the crimes, and its domestic aims, the court determined "that a criminal history

17

category of VI does substantially over-represent the seriousness of [the defendant's] criminal history." *Id.* at *7. Thus, the Court found that a CHC of I was more appropriate: "Based upon [the defendant's] lack of prior criminal history, and his personal characteristics, the Court finds his circumstances to be extraordinary and that a downward departure is warranted to a criminal history category of I." *Id.*

In *United States v. Benkahla*, 501 F.Supp.2d 748 (E.D. Va. 2007), a jury convicted the defendant of two counts of making false declarations to a grand jury, obstruction of justice, and making false statements to an FBI agent. The prosecution arose from the defendant's repeated denials – including in front of two grand juries - of having traveled to Pakistan and possibly Afghanistan to participate in terrorism training including handling and discharging firearms or explosive devices to prepare for violent jihad. *Id.* at 750-51. At sentencing, the trial court applied the § 3A1.4 enhancement to increase Benkahla's offense level from 20 to 32, and his guideline range to 210-262 months. *Id.* at 757.

After determining § 4A1.3 allowed for a downward departure, the court in *Benkahla* addressed the disproportionate effect the terrorism enhancement had on the defendant's criminal history category: "For an individual with no criminal record and no evidence of ever having committed an illegal act in his life outside the conduct for which he is convicted, this clearly over-represents the seriousness of his criminal history." 501 F.Supp.2d at 759.

As to the second factor, the court found that increasing Benkahla's criminal history category to VI also over-represented the likelihood he would commit other

18

crimes. *Id*. Consequently, due to Benkahla's history and characteristics, and the fact that he had no criminal record, the Court found that he was "the quintessential candidate for a downward departure under § 4A1.3." *Id.* Describing the disparity created by § 3A1.4 as "staggering", the court reduced Benkahla's suggested guideline range from a category VI to a category I and his sentencing range from 210-262 months to 121-151 months. The court then imposed a sentence of 121 months.

Based on the Defendant's prior record and his personal history and characteristics, including his risk of re-offense, a CHC of VI over-states his record. Instead, a CHC of I is more appropriate.

## III.   The requested sixteen-year sentence is sufficient and appropriate under the factors identified in 18 U.S.C § 3553(a).

Pursuant to 18 U.S.C. § 3553(a), this Court, in determining what sentence to impose, shall consider several factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) [the guidelines range]
> (5) any pertinent policy statement ... issued by the Sentencing Commission ...
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

As discussed below, the factors weigh in favor of the requested sixteen year sentence, although it is concededly below the guidelines range.

**A.     Mr. Wright's history and characteristics and the circumstances of the offense render the requested sentence sufficient and appropriate under § 3553(a)(1).**

It hard to understand how David Wright – by all accounts compassionate, articulate and non-violent throughout his life - could have expressed an interest in ISIS. It is harder still to understand how he could have said the things he said on-line and in person. It is hardest to understand how, when he received the call from his uncle on June 2, 2015, he didn't comfort him, stop him, or otherwise meaningfully intervene. This is not the moment for excuses, or perhaps even explanations. Yet the "nature and circumstances of the offense and history and characteristics of the defendant" are one of the statutory factors that this Court must consider in fashioning a sentence that is "sufficient, but not greater than necessary" to accomplish the sentencing statutory goals advanced in 3553(a)(2). *See* 18 U.S.C. § 3553(a)(1). This Court has heard much about Mr. Wright through the testimony at trial and the facts outlined in the Pre-sentence Report, and those facts will not be re-hashed here. But, a bit more should be said about Mr. Wright, to aid this Court in understanding the full picture of the young man who stands before it if only to ensure that the purposes of punishment are satisfied.

David Wright is a young man of many contradictions. On the one hand he is bright and engaging; on the other hand he had a hard time making it through

middle-school and high school.[9] On the one hand, he appears confident and articulate; on the other hand ,he never had a girlfriend, had a very limited social circle and spent most of his time on-line, hiding from the vulnerability of actual human connection.[10] On the one hand he had big ambitions: "after High School David wanted to become a heart surgeon, sports medical doctor, a federal parole officer, an owner of a Security Company (Big Men incorporated), [and] a religious Scholar to name a few." [11] On the other hand, he jumped from interest to interest; and after immersing himself in a topic and plan, he would move to the next one.[12]

Most young people have exploratory phases and competing interests in their late teens and early twenties, but Mr. Wright's explorations are notable in both the intensity of his focus on a particular topic and the unreasonable - verging on fantastical - nature of his flights of ambition.[13] His life has been marked by a constant, frenetic search for acceptance and meaning, jumping from phase to phase, becoming consumed - obsessed even - and then quickly and completely moving on to the next phase. He has been more impressionable than most, and used feigned mastery, coupled with full immersion, in each phase throughout his life as a coping mechanism to disguise the insecurity about the actual challenges of his life - his problem with weight, living on the edge of poverty, and the historical struggles of being a black man in America. This was exacerbated by the burden of being born a

---

[9] *See* PSR, at ¶ 95.
[10] *See* PSR, at ¶ 22, 86.
[11] *See* Letter from S. Muhammed, attached as Exhibit A.
[12] *See* Violence Risk Assessment, attached as Exhibit B.
[13] For instance, a more grounded person may ask while they are struggling to get through high school whether becoming a heart surgeon is realistic.

member of an often-maligned religion, effectively fatherless, and of very limited means.

The jury found that he meant what he said when he spoke of ISIS - yet this would mark a departure from all other phases and plans. However, necessarily deferring to this determination for purposes of sentencing – what Mr. Wright's background tells us is that even if he did mean what he said for the moment, he would have soon moved on to the next topic with the same zeal. Certainly, had someone with authority engaged him intelligently, forcefully, and constructively around his ISIS-related ranting, given his impressionability, and his otherwise non-violent disposition, it would certainly not have been difficult to help him move to less destructive pursuits.

In some ways the *pattern* of interest, immersion, obsession, and un-tethered grandiosity is consistent with what Mr. Wright's biography reveals about his history and vulnerabilities. However, the *substance* of the obsession is wholly divergent with everything Mr. Wright believed until sometime in mid-2014, with everything his family taught him, and with everything revealed by objective measures of his psychological profile.[14]

Mr. Wright's early biography is a story framed by exceptionally strong, hard-working, and dignified women – namely his mother and his grandmother - struggling to keep their children safe and settled on the one hand, and with abusive and absent men on the other.[15] While Mr. Wright never went without, his family

---

[14] *See* Exhibit B.
[15] *See* PSR, at ¶ 78. *See also* Exhibit A.

always lived on the financial edge, and would have succumbed entirely had it not been for his mother working multiple jobs throughout his entire childhood. Still, the family had to move repeatedly, not just living in different homes, but different towns (East Boston, Revere, Quincy, Chelsea, Everett, etc.). This was partially due to financial instability, but also due in part, at least in his early life, to avoid Mr. Wright's abusive father.

When Mr. Wright was 11 years old, his mother had a brain aneurism and was hospitalized for three weeks during which time the defendant and his sister stayed with relatives or family friends for part of the time.[16] The rest of the time, Mr. Wright began caring for his mother and the family home. His mother states that during this period he would cook meals for the whole family. When his younger siblings were born, he kept up this pattern, acting as one of their caretakers – cooking for them, cleaning, and escorting them to school while their mother worked multiple jobs.[17] It should not be controversial to suggest that the early instability, the abuse of his father, and his early "parentification" due to his mother's illness and need to work all the time, cast a long shadow into his adult life. Certainly, there is a wealth of research on child development that supports the assertion "that adverse childhood experiences have a profound, proportionate, and long-lasting effect on emotional state, whether measured by depression or suicide attempts, by

---

[16] *See* PSR, at ----. *See also* Exhibit A.
[17] *See* Exhibit A.

protective unconscious devices like somatization and dissociation, or by self-help attempts that are misguidedly addressed solely as long-term health risks."[18]

In his teens, when he was not caring for his siblings, Mr. Wright began retreating into a world of over-eating and video-gaming. This was a vicious cycle – the more he retreated, the more weight he gained. The more lost in a fog of video gaming and on-line activity he became, the more difficult it became to engage in the normative rituals of coming of age – things like a first love and close social friends eluded him. However, in his actual life, he remained kind and "a gentle giant" as his family called him.

The one person close to him was his uncle Ussamah Rahim, and the two of them – only six months apart in age – shared interests, activities, obsessions. The pair also shared the complicated marginalization by the dominant culture inherent in being an African-American Muslim in the United States, and the common experience of lacking strong male role models in their home. As Mr. Wright's trial testimony suggested, the fascination with ISIS for him was as much about myths of masculinity as it was about ideology. Mr. Wright now knows that Rahim was suffering, and that it was not only his moral obligation, but also within his power, to talk some sense into Rahim when he decided to take a suicidal turn. Now Mr.

---

[18] Vincent J. Felitti & Robert F. Anda, The Relationship of Adverse Childhood Experiences to Adult Medical Disease, Psychiatric Disorders, and Sexual Behavior: Implications for Healthcare 7, in The Hidden Epidemic: The Impact of Early Life Trauma (2009) (R. Lanius and E. Vermetten, eds.), available at http://www.acestudy.org/yahoo_site_admin/assets/docs/LaniusVermetten_FINAL_8-26-09.12892303.pdf.

Wright will live with the consequences of his foray into ISIS ideology for the rest of his life. Not only did he lose his uncle, but he lost his best and only friend.

The things Mr. Wright said, wrote, and repeated, in support of ISIS were thoroughly explored at trial. So too was the nature of the propaganda he had on his computer. The factual evidence regarding these words was mostly un-contested. What Mr. Wright said, and who he said it to, was clear. "Terrorism" related charges can encompass a wide spectrum of conduct, from advanced planning of a wide-scale bombing, to sending a text message trying to get a friend to endorse ISIS's beliefs. Therefore, it is important to highlight what he **did not** say, and what he **did not** do; for it is those things that differentiate Mr. Wright from many of the individuals convicted of similar charges.

Mr. Wright did not travel overseas or engage in actual planning to travel overseas for the purposes of fighting with ISIS. He did not engage in any actual training, or seek to do so. He did not purchase weapons, or have weapons in his home. He did not engage in any well-developed planning to harm anyone, and expressed genuine surprise when Rahim suddenly expressed an immediate intention to do so. Mr. Wright did not personally communicate with any ISIS member overseas – not Junaid Hussain, nor anyone else. While the Government portrayed him as a leader, and the evidence certainly supported the notion that he was the talker – it was Mr. Rahim and Mr. Rovinski who had independently cultivated and independently managed contacts with overseas recruiters; not Mr. Wright. The Government sought to portray him as a sophisticated "mastermind" in

25

the advanced stages of planning an attack. Yet this characterization is wholly inconsistent with the testimony of law enforcement, who knew exactly what he was up to as a result of their surveillance and intercepted communications, and who testified that they did not even have plans to arrest Mr. Wright until Rahim's June 2nd call. (Trial Tr. 128:1-5, Vol. 2, Oct. 10, 2017).

Moreover, from the moment he was confronted by police, Mr. Wright has been nothing but respectful to law enforcement and corrections staff. On the morning of the incident – even as he must have certainly concluded that his own arrest was imminent - Mr. Wright made no attempt to flee, to barricade himself into his family's apartment, or to resist officers in any fashion. That he attempted, largely unsuccessfully, to erase data from his phone and computer are undisputed, but this represented the sum of the steps he took in the immediate wake of his uncle's shooting. His prompt cooperation should not be swiftly discounted. By the time law enforcement battered down the door of his family's home, hurled in "flash-bang" stun grenades, and physically subdued him, Mr. Wright was well aware that his uncle had been shot by police. He had every reason to fear a similar fate awaited him. Despite this, he put up no resistance and proved very cooperative with the officers who interviewed him without the benefit of counsel for the ensuing ten hours. His cooperation, arguably to his considerable legal detriment, spared the arresting officers the necessity of further use of force, and provided ample grist for the preparation of the government's search warrants and the eventual prosecution at trial.

Moreover, despite the fact that he has been in solitary confinement for nearly two-and-a-half years, he has not received a single disciplinary report.[19] To the contrary, the staff of the segregation unit, also known as the G Unit, have reported to counsel that it is very unusual for someone to be in the solitary unit for that long without a single disciplinary slip, and that they have found him to be nothing but respectful; in fact, they say he has been "a complete gentleman."[20]

Since his arrest, Mr. Wright has had a great deal of time to reflect about what caused him to be in the tragic place in which he finds himself. For the first time, through his meetings with counsel and Dr. Mendoza, he has gained insight into why he engaged in speech and espoused beliefs that are so contrary to the man he was raised to be. The main reason driving Mr. Wright's desire to exercise his constitutional right to go to trial was that he did not want to live the rest of his life as an admitted terrorist, because in his heart, he rejects this identity. At considerable risk,[21] he wanted to tell the story of a foolish young man, caught up in the egocentricity of his own words, who failed to register the possible tragic consequences thereof. And unlike so many individuals who are genuine believers of the ISIS propaganda, he wanted to publicly and unequivocally renounce this organization. That renunciation also came at considerable personal risk – on the one hand the criminal conviction stigmatizes him as a terrorist, and on the other –

---

[19] *PSR*, at ¶ 93.
[20] Counsel asked for letters confirming these conversations from staff. While they expressed a willingness to do so, they were prohibited from the Plymouth County House of Correction Legal Department from doing so.
[21] A risk that was real, in light of the Government's markedly different sentencing requests before and after trial.

in the eyes of the organization he his words supported, he is now deemed to be a "apostate" of the highest order.

Mr. Wright's history and characteristics reveal a flawed, isolated, immature man. The cost he incurred as a result of his failings is unimaginably steep, and unlikely ones that he will ever fully repay. A sentence of sixteen years reconciles the seriousness of the offense with Mr. Wright's history and characteristics, and the progress he has made, and will continue to make, since his arrest.

**B.     The requested sentence is sufficient to meet the § 3553(a)(2) purposes of punishment in this case**

Considering the consequences Mr. Wright has already experienced, his extremely low risk of recidivism, the circumstances of his confinement, and his likelihood of rehabilitation a sentence of sixteen years is "sufficient but no greater than necessary" to meet the §3553(a) goals of protection of the public, incapacitation, deterrence, just punishment, and treatment.

**1.     The requested sentence is sufficient to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment pursuant to § 3553(a)(2)(A)**

Mr. Wright's crime is very serious. However, a sentence of sixteen years is "sufficient" within the meaning of § 3553(a). Mr. Wright is requesting a sentence that will enable him to leave prison with enough time to reconnect with his family, and to have a chance at having a productive and, most importantly, a redemptive life.

Further, a sentence of sixteen years would promote respect for the law pursuant to § 3553(a)(2)(A) since "[t]he unique facts of [Mr. Wright's] situation" support the conclusion that "a sentence of [excessive] imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 128 S.Ct. at 599 (citations omitted). This is particularly true in Mr. Wright's case as he has already experienced deep personal "punishment" for his and his uncle's foray into ISIS ideology – the loss of his closest family member/best friend.

Additionally, the punishment that he has already received, and will likely continue to receive, is far harsher than the typical jail term. For the past two years, six months, and twelve days, Mr. Wright has been held in solitary confinement[22] within unit G, the "jail within a jail" at Plymouth County Correctional Facility.[23] For twenty-three hours a day, Mr. Wright has lived locked in an 8-by-12-foot concrete cell, a space that is smaller than a standard parking spot. He is held in this cell alone, a camera monitoring his every move. With only a small interior window and the twenty-four-hour glare of overhead florescent lights, time is measured by the three meals pushed through a metal slot in his cell door. During the one hour that he is allowed to exit his cell, he is strip-searched, shackled, and escorted by

---

[22] Mr. Wright has been held in pre-trial solitary confinement for the past two and a half years because of his status as a protective custody inmate, but not as the result of any poor institutional behavior. On the contrary, as explained in other sections of this brief, Mr. Wright has been an exemplary inmate while detained for the past two and a half years at Plymouth County Correctional Center.

[23] *Behind the Walls of Unit G at the Plymouth Jail*, Patriot Ledger, May 17, 2009, available at http://www.patriotledger.com/x1655274832/Behind-the-walls-of-Unit-G-at-the-Plymouth-jail

guards. Within this hour, his outside world is restricted to recreation inside a small metal cage, where he is locked in, alone, and permitted to walk in small circles until such time that his hands and feet are once again shackled, and he is led back to his cell. Visits with his mother and family are separated by plexiglass, their words to each other passed through phones on either side of the thick plastic. David's hours, void of human contact and socialization, are now filled with the cold reverberations of echoing voices and locking metal doors.

The tremendously negative effects of isolation on individuals in solitary confinement are well documented. *See generally* Laura Rovner and Jeanne Theoharis*, Preferring Order to Justice*, 61 AM.U.L.Rev. 1331, 1358-1371 (June 2012) (summarizing the literature and cases concerning effects of pre-trial isolation and solitary confinement, including harmful effects on physical and mental health, the coercive impact of those effects, and deterioration of the individual's ability to assist in his own defense); Atul Gawande, *Hellhole*, The New Yorker, Mar. 30, 2009 (same). Extensive scientific research has consistently shown that solitary confinement is painful, stressful, and psychologically harmful, and that years on end of near-total isolation can exact a terrible price. See Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325 (2006) (common side-effects of solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors).

The overwhelming evidence that solitary confinement harms humans[24] has led Supreme Court Justice Anthony Kennedy to condemn its use in American prisons, stating that the practice "literally drives men mad," *Justice Kennedy's Plea to Congress*, Editorial, N.Y. TIMES, Apr. 5, 2015, at SR10. He has also criticized the practice of placing inmates in "near-total isolation." See *Davis v. Ayala*, 135 S. Ct. 2187, 2208-10 (2015) (Kennedy, J., concurring).

On a global level, the United Nations has declared that long-term solitary confinement is a form of torture, and that indefinite and prolonged solitary confinement in excess of fifteen days should be subject to an absolute prohibition. *See* Human Rights Committee, Juan E. Mendez, *Interim Report of the United Nations Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading treatment or punishment*, August 5, 2011. Nationally, the United States Justice Department, acknowledging the harmful effects of solitary confinement, has recently published a report aiming to reduce this practice in United States federal and state institutions. *See U.S. Department of Justice Report and Recommendations Governing the Use of Restrictive Housing*, Final Report, January 2016.

---

[24] S*ee, e.g.*, Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 AMERICAN JOURNAL OF PSYCHIATRY 1450 (1983); R. Korn, *The Effects of Confinement in the High Security Unit at Lexington*, 15 SOCIAL JUSTICE 8 (1988); S.L. Brodsky and F.R. Scogin, *Inmates in Protective Custody: First Data on Emotional Effects*, 1 FORENSIC REPORTS 267 (1988); Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQUENCY 124 (2003); H. Miller and G. Young, *supra* note 16; H. TOCH, *Mosaic of Despair: Human Breakdown in Prison*, Washington DC: American Psychological Association (1992); Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQUENCY 124 (2003).

For Mr. Wright, the past two-and-a-half years that he has spent in solitary confinement has been - and continues to be - a dehumanizing form of torture. The extreme restrictions of his pre-trial solitary confinement will most likely not end once his criminal sentence commences. Instead, he will likely be transferred to a Supermax prison or a Communication Management Unit (C.M.U.).[25] These units operate at federal prisons in Terre Haute, Indiana and Marion, Illinois. The units hold approximately 80 inmates. Visitors have no physical contact with inmates and there is a strict monitoring of mail, email and telephone calls. "Since 2006, the Bureau of Prisons has moved many of those convicted in terrorism cases to two special units that severely restrict visits and phone calls." Shane, Scott, "Beyond Guantanamo, a Web of Prisons for Terrorism Inmates," *New York Times,* (December 10, 2011). The alternative is the extremely harsh and isolating conditions at Supermax facilities such as the one in Florence, Colorado. These facilities have been the source of concern for human rights activists and media. *See, e.g., "Out of Sight,*

---

[25] The conditions in the Supermax facility have been described by one commentator as follows:
> Supermax conditions are harsher in maximum-security facilities. While conditions in different facilities vary, several features remain constant. In general, inmates live in cells eight feet by ten feet in area. Stark concrete cells are equipped with a metal sink and toilet, but no shower. Food is passed to the inmate through a small, locked slot in the solid door. Metal flaps may be placed around the door to complete the sense of isolation. If there is a window, it is small and often placed high in the cell so that it is difficult for the inmate to peer out. The light is always on, although it may be dimmed. Cells are monitored constantly. Inmates are usually permitted to leave the cell for up to one hour, three times a week, for a shower and exercise. Guards chain an inmates' hands to their waists and shackle their feet through the slot in the door before opening the cell door. Once the inmate leaves the cell, he is constantly guarded by two or three officers and has no contact with other inmates. These brief encounters, while shackled, are the only physical human contact the inmate is afforded. Exercise usually occurs alone in a small locked cages or cement bunkers; exercise areas contain no equipment.

Bishop, Maximilenne, "*Supermax Prisons: Increasing Security of Permitting Persecution?*" Arizona Law Review, Vol. 47:461, at 467-468 (internal citations omitted).

*HRW Briefing on Supermaximum Prisons*" (hereinafter *"HRW Briefing"),* at p. 1, available at *http://www.hrw.org/reports/2000/supermax/.*

The harsh conditions of administrative detention facilities have been cited by several courts in determining sentences. *See Bell v. Wolfish,* 441 U.S. 520 (1979); *United States v. Gallo,* 653 F. Supp. 320, 336 (E.D.N.Y. 1986); *United States v. Behr,* 2006 WL 1586563 (S.D.N.Y 2006). The Supreme Court has stated that conditions of confinement in a supermax facility "impose atypical significant hardship under any plausible baseline." *Wilkinson v. Austin,* 545 U.S. 209, 223 (2005). Human Rights Watch has observed that in Supermax facilities, "[t]he conditions of confinement are unduly severe and disproportionate to legitimate security and inmate management objectives; impose pointless suffering and humiliation; and reflect a stunning disregard of the fact that all prisoners - even those deemed the 'worst of the worst' - are members of the human community." *See HRW Briefing* at p. 1.

Although the damaging effects of such extreme social isolation can never be erased, Mr. Wright's time in solitary confinement and the harsh restrictions of his impending prison sentence must be factored into his current sentence calculation. The isolation, deprivation, and dehumanization resulting from such restrictive conditions of incarceration are compelling factors in determining the length of a sentence that is "sufficient, but not greater than necessary" to accomplish the goal of sentencing, including punishment and recognition of the seriousness of the offense.

Even prior to *United States v. Booker*, courts have held that pre-sentence confinement conditions could in appropriate cases constitute a permissible basis for a downward departure. *See United States v. McCarty,* 264 F.3d 191 (2d Cir. 2001); *United States v. Farouil,* 124 F.3d 838, 847 (7th Cir. 1997) (harsh conditions of confinement are valid grounds for departure); *United States v. Hernandez-Santiago,* 92 F.3d 97, 101 n.2 (2d Cir. 1996). *See also United States v Brinton,* 139 F.3d 718, 725 (9th Cir. 1998); *United States v. Mateo,* 299 F.Supp.2d 201 (S.D.N.Y. 2004); and *United States v. Francis,* 129 F. Supp. 2d 612, 616 (S.D.N.Y. 2001), *citing United States v. Sutton,* 973 F. Supp. 488, 491-495 (D. N.J. 1997) (same).

In *United States v. Stewart*, 590 F.3d 93, 144 (2d Cir. 2009), the Court upheld the district court's consideration of the defendant's solitary confinement and its conclusion that "the severity of the conditions of confinement would increase the severity of the punishment and the amount of deterrence associated with a given term of imprisonment in light of the particular conditions of confinement under which [the defendant] is incarcerated." Similarly, in *United States v. Noriega*, 40 F. Supp.2d 1378, 1379-80 (S.D. Fla. 1999), the sentencing judge reduced the defendant's sentence from forty to thirty years, in large part because of the harsh nature of incarceration Noriega had endured. The court stated that "[t]here is little question that [segregated confinement] is a more difficult ('harder') type of confinement than in general population. For some, the consequences of such deprivation can be serious." *Noriega*, 40 F.Supp.2d at 1379-80, citing *McClary v.*

34

*Kelly*, 4 F.Supp.2d 195 (W.D.N.Y. 1998) (discussing the effect of "social isolation" on a prisoner and stating "a conclusion however, that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this court as rocket science. Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances."

Mr. Wright's two-and-a-half years of solitary confinement have unquestionably made his incarceration "significantly more onerous that the conditions faced by the ordinary pretrial detainee." *United States v. Warsame*, 651 F.Supp.2d 978, 982 (D. Minn. 2009). As the court did in *Warsame*, this Court should also treat David's "difficult time in [jail] as comparable to a longer period of time served in federal prison." *Id.*

A sentence of sixteen years imprisonment will sufficiently reflect the seriousness of Mr. Wright's offense conduct, promote respect for the law, and provide just punishment for his offense, while accounting for the incredibly restrictive conditions of solitary confinement - restrictions that are likely to continue throughout the duration of his criminal sentence.[26]

---

[26]     It is true that thoughtfully restrained sentencing, based on reflection about what is both empirically effective and humane is often considered conflated with being "soft on crime" or excessively lenient in the United States. The frequent refrain is, "what else are we supposed to do?" Especially too, when the context is the sentencing of a "convicted terrorist". However, countries in Europe, due to their closer geographic proximity to the terrorist groups (from Nazi Germany to modern day ISIS), have been forced to innovate more effective ways of combating terrorism and terrorist-related radicalization. These innovations have included creating creative (and arguably more effective) ways to deal with men and women convicted of terrorism-related crimes.

_____

The hard truth these countries have learned is that harsh sentences for young "radicalized" men and women is not always the answer. At the heart of the ISIS-playbook is the seduction and glamorizing of "ISIS- freedom fighting" as a recruitment tool. It is a powerful narrative, and nations cannot imprison or kill their way out of why this narrative is attractive to young people. Faced with this reality, countries like Germany, Denmark, Canada, Belgium, the Netherlands, the United Kingdom, and France have developed programs for convicted terrorists that first assesses their degree of "radicalization" and then construct programs that includes counseling, mentoring, job training and assistance and continuing education. See National Security Law Brief, Deradicalization programs, lessons learned from Europe, March 15, 2015, available at:
http://nationalsecuritylawbrief.com/2015/03/15/deradicalization-programs-lessons-learned-from-europe; Washington Post, *Will a European de-radicalization approach work in at-risk U.S. cities?* September 18, 2016*,* available at:
https://www.washingtonpost.com/news/worldviews/wp/2016/09/18/will-a-european-de-radicalization-approach-work-in-at-risk-u-s-cities/?utm_term=.ced38f14d63b; Hedayah Center, *Countering Violent Extremism: Developing an evidence-base for police and practice*, 2015: available at:
http://www.hedayahcenter.org/Admin/Content/File-23201691817.pdf; Frontline, *"Deradicalization" Is Coming To America. Does It Work?* Public Broadcasting System (PBS), March18, 2016, available at: https://www.pbs.org/wgbh/frontline/article/deradicalization-is-coming-to-america-does-it-work; International Peace Institute, *Beyond Terrorism: Deradicalization and Disengagement from Violent Extremism*, October 2008;
Pettinger, T. *De-radicalization and Counter-radicalization: Valuable Tools Combating Violent Extremism, or Harmful Methods of Subjugation?* Journal for Deradicalization, September 29, 2017

Recently, U.S. District Court Judge Michel Davis has implemented such a program in Minnesota, hiring German terror and de-radicalization expert Daniel Koehler to create the District of Minnesota's Terrorism Disengagement and De-Radicalization Program, the first government initiative of its kind in the U.S. The program's aim is to first assess each individual in order to determine their level of "radicalization", determine whether they would be good candidates for "de-radicalization", and then provide a detailed report with recommendations for sentencing including providing specific de-radicalization strategies for each defendant and providing recommendations for experts in the US who could help implement these strategies. See Boston Globe, *A Radical Idea for Sentencing Terrorism Suspects*, September 1, 2016, available at:
https://www.bostonglobe.com/metro/2016/08/31/radical-idea-for-sentencing-terrorism-suspects/Cp66MytGG6FdmWZTo2cMmM/story.html; The New Yorker, *Minnesota's Radical Experiment in Jihadi Rehab*, May 15, 2015, available at: https://www.newyorker.com/news/news-desk/minnesotas-radical-experiment-in-jihadi-rehab; Koerner, B. *Can You Turn a Terrorist Back to a Citizen?* Wired Magazine, January 24, 2017, available at: https://www.wired.com/2017/01/can-you-turn-terrorist-back-into-citizen/;
Davis, M. (2016), *De-radicalization Expert Finishes Testimony in ISIS Case,*
https://www.mprnews.org/story/2016/09/21/de-radicalization-expert-finishestestimony-minnesota-isis-case, MPR News, published 21/09/16, accessed 12/14/17.

2.   **The requested sentence will afford adequate deterrence
to future criminal conduct and protect the public
pursuant to §§ 3553(a)(2)(b) and 3553(a)(2)(c)**

a.   **Mr. Wright Mr. Wright poses a low statistical risk of
re-offense and violence.**

Mr. Wright is 28 years old, and his only criminal history point comes from a
motor vehicle offense. Before this case, he had never spent a day in jail. The years
he has spent in solitary confinement, subjected to some the harshest conditions
available within the United States, stripped him of all the comforts and connections
of his previous, ordinary life. The only thing he has had, in abundance, has been
time. He has not squandered this time. Instead, he used this time for self-reflection
and self-critique. Although severe, this punishment has had its natural and
intended effect, and today, he is a fundamentally different person than the one who
was arrested on June 2, 2015.

Mr. Wright has done extensive work untangling himself from the tentacles of
the ISIS propaganda machine. Today, he unequivocally rejects the jingoistic ISIS
rhetoric that once fueled his own typing and talk. He sees ISIS for the hateful
terrorist organization that they are, and condemns the evil they spread and the way
they use their highly developed propaganda to prey upon vulnerable young men and
women. He is deeply remorseful for the choices he has made, for the role he played
in his Uncle's death, and for the irreparable pain and grief he brought on his family.
He will live the rest of his days heavy with this shame and regret.

Mr. Wright's potential to re-integrate back into the community as a
successful member of society is further strengthened by his low statistical risk of re-

offense. His age and minimal criminal history, along with the recidivism findings of
the United States Sentencing Commission, and the risk assessment conducted by
Dr. Robert Mendoza, demonstrate that David is unlikely to recidivate and poses
very little risk of harm to the public in the future.

In *United States v. Nellum*, 2005 WL 300073 at *3 (N.D. Ind. Feb 3, 2005),
the district court acknowledged that 18 U.S.C. § 3552(a)(2) required it to consider
at sentencing the likelihood that a particular defendant might offend again. In that
case, the defendant fell within criminal history category III, but was 65 years old at
the time of sentencing. *Nellum*, 2005 WL 300073, at *3. To determine the likelihood
of his recidivism, the district court consulted *Measuring Recidivism: The Criminal
History Computation of the Federal Sentencing Guidelines*," a report issued by the
United States Sentencing Commission. Id. (available at
http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivis
m_C riminal_History.pdf). In its report, the Sentencing Commission concluded that
the chance of recidivism for a middle-aged person with a criminal history category
III to be 19.8%. Id. The court ultimately found it appropriate to consider this
relatively low risk of recidivism when crafting Nellum's sentence. Id. at 3, 5.

In addition to the Sentencing Commission's recidivism report referenced
in *Nellum*, the Sentencing Commission has issued a report entitled "*Recidivism and
the First Offender*" available at: http://www.ussc.gov/Research_
Publications/Recidivism/200405 Recidivism First Offender.pdf. In that report,
the Sentencing Commission determined that for offenders like Mr. Wright, with

38

only one criminal history point, 94.5% did not recidivate. *Id.* Therefore, a defendant's minimal criminal history, like Mr. Wright's, should be an even more significant factor that a court takes into account at sentencing. Mr. Wright, like all defendants with only one criminal history point, should be assigned to criminal history category I. However, U.S.S.G. § 3A1.4(b) directs that he automatically be placed in criminal history category VI without taking into account his minimal criminal history. This particular enhancement is inappropriate.

David's actual criminal history point and corresponding criminal history level reflect his truly low likelihood of recidivism of 5.5%. This recidivism percentage, where 94.5 % of individuals do not recidivate, is based upon his actual, and not unfairly enhanced, criminal history category.

The risk assessment conducted by neuropsychologist Dr. Robert Mendoza, Psy.D, supports the same conclusions as the sentencing commission, that Mr. Wright is at a low risk for future violent behavior. In his assessment of Mr. Wright, Dr. Mendoza administered both the Personality Assessment Inventory (PAI)[27] and the Rorschach Inkblot Method – (R-PAS scoring system)[28]. The results of both tests

---

[27] The PAI is a self-report questionnaire that compares an individual's pattern of responses to those collected from a normative sample. The measure consists of 344 items, which is comprised of 22 scales: 4 validity scales, 11 clinical scales, 5 treatment scales, and 2 interpersonal scales. The results of the PAI indicate whether, among other things, the individual presents as having a statistically significant risk for violence.

[28] The Rorschach Inkblot Method is an empirically validated test that draws on a large normative database that involves asking a person to respond to a standardized series of nondescript drawings, the responses to which derive a specific algorithm that is analyzed. This data provides insight into the person's emotion processes, coping and defense mechanisms, interpersonal functioning and overall efficient of thinking. The test provides results as to whether the individual taking the test has an elevated risk for violence.

Case 1:15-cr-10153-WGY  Document 401  Filed 12/14/17  Page 42 of 63

indicated that, for Mr. Wright, there was no statistical indication of an elevated risk for violence or future violent behaviors. On the HCR-20 v3, a test that addresses factors empirically associated with an individual's risk for violence, he was classified with the "low range" for violence risk.

Further, Dr. Mendoza administered the Hare Psychopathy Checklist-2-Revised (PCL-R), a well-validated instrument for assessing characteristics associated with psychopathy that is, additionally, highly correlated to increases in violence behaviors. On this test, Mr. Wright received a total score of 6, which corresponds to a T score of 30 and places him in what the PCL-R guidelines classify as in "Very Low" range. The "Very Low" range is the lowest possible range, for the presence of psychopathic personality characteristics.

In light of these factors, Mr. Wright is not a human that should be thrown away. He is not only a person capable of rehabilitation, he has already walked meaningfully down that path on his own. He has the ability to live a productive and law-abiding life if he is given that chance. It is a chance he is deserving of, and one that is appropriate, even for the very serious crimes of which he has been convicted.

> **b.  A lengthy period of imprisonment is not required to deter a defendant not previously subject to lengthy incarceration**

For Mr. Wright, a sentence of sixteen years does not lose the full weight of its punishment simply because it humanely enables him the chance to return to society. The two-and-a half years of solitary confinement and the years of prison he

must now serve constitute a heavy and substantial punishment for a young man who, before June 2, 2015, had never set foot inside a jail.

Prison time is more significant for a "first offender" than it is upon an offender who has previously spent significant time in prison. In *United States v. Baker*, 445 F.3d 987 (7th Cir. 2006), the Court held that a 78-month prison term would mean more to Baker, convicted of child pornography, than to a defendant who had been previously imprisoned. *Id.* The Seventh Circuit also noted this factor is consistent with 18 U.S.C. § 3553's directive that this sentence reflects the need for "just punishment" and "adequate deterrence." *Id.*

In *United States v. Willis*, 479 F.Supp.2d 927 (E.D.Wis. 2007), the district court sentenced the defendant to a year and a day of imprisonment, rather than the 120 months recommended by the sentencing guidelines, in part, on a finding that the "sentence provided a substantial punishment for someone like [Willis], who had never before been to jail and who engaged in no violence." *Willis*, 479 F. Supp. 2d at 937. Likewise, in *United States v. McGee*, 479 F. Supp. 2d 910 (E.D. Wis. 2007), the district court imposed a sentence for heroin distribution below the advisory Guidelines range, in part, because McGee "had never before been to prison and '[g]enerally a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than it is necessary to deter the defendant who has already served serious time yet continues to re-offend.'" *McGee*, 479 F. Supp. 2d at 912 (quoting *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005)).

41

Put simply, the court gets more bang for its buck, in terms of the deterrent effect of incarceration, when sentencing a first-time offender like Mr. Wright. The Court should account for this potency to avoid an inadvertently heavy-handed judgment that exceeds what is necessary to serve the purposes of sentencing.

> **3.    The Court should not sentence Mr. Wright more severely as a means to deter the general public from committing acts of terrorism**

While Section 3553 counsels the Court to consider how a sentence will "promote respect for the law" and adequately deter other criminal conduct, increasing the Defendant's sentence will do nothing to accomplish this objective. First, it is the certainty of punishment, rather than its severity, which acts as a deterrent to the public. Second, in terrorism cases, where offenders are normally motivated by religious or political goals, general deterrence is ineffective.

> **a.    Certainty of punishment, rather than severity, is what deters the general public**

A sentence of sixteen years would have an "adequate" deterrent effect on the general public. Determining the sentence that would "adequate[ly]" deter criminal conduct is appropriate because over a decade's worth of research consistently indicates that although the certainty of being caught and punished does have a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." Id; see also Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm:*

*Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."); Steven N. Durlauf & Daniel S. Nagin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y, 37 (2011)[29] ("The key empirical conclusions of our literature review are that at prevailing levels of certainty and severity, relatively little reliable evidence of variation in the severity of punishment having a substantial deterrent effect is available and that relatively strong evidence indicates that variation in the certainty of punishment has a large deterrent effect, particularly from the vantage point of specific programs that alter the use of police."); Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 818 (2010) (There is "no real evidence of a deterrent effect for severity...[I]n virtually every deterrence study to date, the perceived certainty of punishment was more important than the perceived severity.").

In sum, empirical studies have shown that longer sentences have minimal or no benefit on whether offenders or potential offenders commit crimes. The National Academy of Sciences (NAS) concluded that insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects, and has pointed out that all leading surveys of the deterrence research have reached the same conclusion: that "potential offenders

---

[29]Available at http://onlinelibrary.wiley.com/doi/10.1111/j.1745-9133.2010.00680.x/pdf.

may not accurately perceive, and may vastly underestimate, those risks and punishments" associated with committing a crime.[30]

Further, some researchers suggest that lengthy incarceration has even less of a deterrent effect for violent crimes. Unlike property crimes, which offer a financial incentive and can replace or supplement legal income, violent crimes are often crimes of passion, and are not premeditated.[31] Severe terms of incarceration may thus not affect an offender's immediate decision to engage in criminal behavior.

### b. There is no evidence that general deterrence works in terrorism cases

While the overall utility of general deterrence has been subject to some debate, there is no evidence that it works in terrorism cases. Without proof that a longer period of incarceration would actually prevent others from committing acts of terrorism, the Court should not factor a desire for general deterrence into its sentencing decision.

Although there appears to be a dearth of quantitative research as to whether future terrorists can be deterred by long prison sentences given to others, research on terrorism writ large, as well as common sense, suggests that they cannot. Punishing defendant number one to send a message to potential defendant number two through ten will only work if: 1) the message is heard; and 2) the recipient of the message is a rational actor. See *Deterrence in Counter Terrorism*, Benjamin Darnell, May 19, 2010 ("the threatened party must understand the (implicit or

---

[30] Brennan Center for Justice, What Caused the Crime Decline? 26 (Feb. 2015), available at: https://www.brennancenter.org/publication/what-caused-crime-decline.
[31] Id.

explicit) threat, and decision-making by the adversary must be sufficiently influenced by calculations of costs and benefits.").[32]

In modern criminology, this axiom is referred to as "the Rational Choice Theory," which posits that "potential criminals are best understood as rational actors who weigh the costs and risks involved in committing a crime against the potential benefits of the crime." *Rational Choice Deterrence and Israeli Counter-Terrorism*, Institute for the Study of Asymmetric Conflict.[33] Yet general deterrence based on Rational Choice theory is not likely to be effective in cases where the motives are irrational:

> Rational Choice is an essentially economic theory of criminal behavior; and unsurprisingly, it is most successful in dealing with economically-motivated crime. Truly irrational crimes…are beyond the effective scope of Rational Choice Theory; they are also notoriously difficult to deter.

Id. see also *The Viability of Deterring Terrorism*, Davis Allsop, Jun 11, 2010 ("general deterrence will not work…" to prevent terrorism).[34]

Terrorism, unlike white collar crime or even drug dealing, lacks an economic component. Instead, the actors tend to be motivated by some combination of political grievance, religious fervor or, in the case of the Defendant, psychological factors. While specific deterrence may work in the latter case, see Section III, *supra*, all three motivations common to most terrorism cases are resistant to Rational Choice theory either because the actor is irrational or the underlying motivations

---

[32] http://www.e-ir.info/2010/05/19/deterrence-in-counter-terrorism/
[33] http://www.asymmetricconflict.org/articles/rational-choice-deterrence-and-israeli-counter-terrorism/
[34] http://www.e-ir.info/2010/06/11/the-viability-of-deterring-terrorism/

are too compelling to justify giving up under any circumstances (i.e. territorial domination or, in some cases, martyrdom.)

In either event, general deterrence will not work. Instead, the punishment should fit the crime, as laid out in the remaining portion of § 3553. In sum, the Defendant should be sentenced based on what he did, not on some effort to prevent the next crime from happening untethered from evidence based decision-making.

### 4.   A sentence of sixteen years will avoid unwarranted sentencing disparities between similarly-situated defendants

Sentencing David Wright to greater than sixteen years would create unwarranted sentencing disparities between similarly-situated defendants. A review of prior terrorism prosecutions reveals that a life sentence is the distinct exception, and is reserved only for the worst of the worst. On the other hand, individuals who are substantially more culpable than Mr. Wright have received sentences far below life. Mr. Wright's sentence should fall more in line with the average;[35] a sixteen-year sentence is appropriate.

---

[35] The average sentence for a "terror charge conviction" out of 349 defendants between September 11, 2001 and September 11, 2011 was 16 years. See New York University School of Law, Center on Law and Security, Terrorist Trial Report Card: September 11, 2001 - September 11, 2011, at 8, attached as Exhibit C. The average sentence in cases charging Material Support were as follows: 12 years when Material Support was the top charge in the indictment, and 14 years when some other charge - such as Acts of Terrorism Transcending National Boundaries -was the top charge and Material Support was a lesser charge. *Id*. at 8. Only 44 of the 349 "jihadist defendants" convicted of terrorism charges received sentences greater than 20 years. *Id*. at 8. Only 25 of those 349 defendants received sentences greater than 30 years. *Id*. at 8.

46

### a. Life sentences in prior terrorism cases have been reserved for the most culpable defendants; most defendants receive less.

The first terrorism trial in this district was Richard Reid, colloquially known as "the shoe bomber," who attempted to detonate a bomb on a commercial airliner flying from Paris to Miami. *United States v. Richard Reid*, 02-CR-10013-WGY. Had Reid not been restrained by passengers and crew onboard, everyone on the plane likely would have died. As a result, Reid - who taunted this Court during his sentencing hearing[36] - was sentenced to life. Yet Reid's co-conspirator, Saajid Mohammed Badat - who may have attempted to withdraw from the conspiracy - was sentenced in Britain to only 13 years. *See Shoe Bomber Jailed for 13 Years*, CNN, April 22, 2005.[37]

Another example of a life sentence is Faisal Shahzad, also known as the "Times Square Bomber." *See United States v. Faisal Shahzad*, 10-CR-541-MGC. Shahzad was convicted of ten counts, including attempting to and conspiring to commit acts of terrorism transcending national boundaries, in violation of 18 U.S.C. § 2332b. After receiving training in Pakistan for bomb-making, Shahzad purchased a car, planted a bomb in it, and parked it in Times Square with the intention of detonating the explosive. After the foiled plot, Shahzad attempted to flee the country by boarding a flight to Dubai. *Id*. Like Reid, Shahzad taunted the Court during sentencing, describing himself as a proud terrorist, and warning of future

---

[36] After this Court announced his sentence, Reid stated: "That flag will be brought down on the day of judgment and you will see in front of your Lord and my Lord and then we will know."
[37] available at http://www.cnn.com/2005/WORLD/europe/04/22/uk.shoebomb.sentence/index.html.

attacks. *See Life Term for Failed Times Square Bomber*, Washington Post, October 6, 2010.[38]

Terry Nichols, who was Timothy McVeigh's accomplice in the Oklahoma City bombing, received several life sentences for his role in the plot. *See United States v. Timothy McVeigh*, 95-CR-110-RPM-2. The two stole explosives and purchased large quantities of ammonium nitrate fertilizer which was used to construct a truck bomb. McVeigh planted the truck in front of the Alfred P. Murrah Federal Building in Oklahoma City, and detonated it. The explosion killed 168 people, injured over 600 others, and damaged hundreds of buildings and cars in the area.

Ted Kacynski, also known as "the unabomber," received several life sentences for creating and attempting to detonate at least 16 bombs between 1978 and 1995. *See United States v. Theodore John Kaczynski*, 96-CR-259-GED. Each of the bombs targeted different victims. One of these bombs was placed in the cargo hold of a commercial jetliner. Fortunately, the bomb did not explode. Nonetheless, Kacynski was responsible for 3 deaths and 23 injuries.

Zacarias Moussaoui, also known as "the 20th Highjacker" of the September 11, 2001 terror attacks, received a life sentence for Conspiring to Commit Acts of Terrorism Transcending National Boundaries, Conspiracy to Commit Aircraft Piracy, Conspiracy to Destroy Aircraft, Conspiracy to Use Weapons of Mass Destruction, Conspiracy to Murder United States Employees, and Conspiracy to Destroy Property. *See United States v. Zacarias Moussaoui*, 01-CR-455-LMB.

---

[38] available at http://www.washingtonpost.com/wp-dyn/content/article/2010/10/05/AR2010100505683.html.

Moussaoui was convicted of conspiring with al Qaeda, Osama bin-Laden, and the 9/11 Hijackers to commandeer planes and crash them into targets in the United States. In furtherance of that conspiracy, Moussaoui flew to the United States, took flight classes, and purchased flight training equipment, among other things. Moussaoui ultimately did not participate in the actual hijackings. He was sentenced to life.

David Wright's culpability in the instant case is far less than any of the individuals discussed above. He did not create nor attempt to detonate any explosives. The object of the conspiracy was not mass destruction nor mass murder. There was no set time for this conspiracy to be carried out. And while one co-conspirator was killed, he was not an innocent target, but an agent of the plan, and this one death is certainly far fewer than the 168 killed pursuant to the McVeigh/Nichols conspiracy, and the thousands killed in the attacks on September 11. Therefore, a life sentence is inappropriate for Mr. Wright, as it would create unwarranted sentencing disparities.

> **b.**  **Individuals who are far more culpable than Mr. Wright have received sentences significantly shorter than life.**

As discussed above, life sentences in prior terrorism cases have been reserved for those individuals who can be considered the worst of the worst. Often, individuals who have been convicted of terrorism offenses which carry a possible life sentence have been sentenced much more leniently. While the individuals discussed below were not convicted of Acts of Terrorism Transcending National Boundaries, in

violation of 18 U.S.C. § 2332b, they were convicted of similar charges with different names that amount to the same culpability and guidelines range. Yet all were more culpable than Mr. Wright and each received less than the Government is recommending here.

### Tareek Mehanna

The most similar case in this district is *United States v. Tareek Mehanna*, 09-CR-10017-GAO, yet Mehanna is more culpable than Mr. Wright. Mehanna received 17.5 years after he was convicted of Conspiracy to Kill in a Foreign Country, 18 U.S.C. § 956, Conspiracy to Provide Material Support to a Designated Terrorist Organization, 18 U.S.C. § 2339B, Conspiracy to Provide Material Support to Terrorists, 18 U.S.C. § 2339A, Providing and Attempting to Provide Material Support to Terrorists, 18 U.S.C. § 2339A, Conspiracy, 18 U.S.C. § 371, and False Statements, 18 U.S.C. § 1001(a)(2). Not only did Mehanna travel overseas to attend a terrorist training camp, but he became a fairly sophisticated translator and publisher for al Qaeda, and was a substantial contributor to their propaganda campaign.

In the beginning, the conspirators were in contact with the "nephew of the founder of designated foreign terrorist organization Lashkar e Taiba" for assistance in joining the fight. *Exhibit A to Government's Sentencing Memorandum*, at 6. Co-conspirator Abousamra then travelled to Pakistan to receive training from al Qaeda. *Id*. at 6. Though he was unsuccessful, he made a contact who helped arrange for a subsequent trip overseas. *Id*. at 6. After he returned the second time, the group

discussed several possible domestic attacks, including on a shopping mall, Hanscom Airforce Base, and various buildings in Boston. *Id*. at 8. They also discussed plans to assassinate then-Attorney General John Ashcroft, and then-National Security Advisor Condoleeza Rice. *Id*. at 8. The men also acquired materials to make bombs. *Id*. at 8.

After abandoning those plans, Mehanna and Abousamra decided to travel overseas again to receive training. *Id*. at 10. They utilized another terrorist contact who arranged for their trip to Yemen. *Id*. at 10. They spent two weeks there trying to locate the appropriate cells, but abandoned their efforts once they were told that the training camps disappeared after 9/11. *Id*. at 10. When Mehanna returned home, he expressed that "[a]lthough he had failed, at least he was no longer 'sitting on my butt,' in front of his computer screen, engaged exclusively in online jihad." *Id*. at 11.

Since he had failed in his efforts to enter the battlefield, he decided to help the movement as much as he could from the United States. So he began to "translate, edit, and distribute jihad media for, as a service directed to, and on behalf of *al Qa'ida*." *Id*. at 12. His work "dramatically increased the accessibility of these materials." *Id*. at 12. So much so that, after his arrest, *Inspire* magazine - a magazine published by al Qaeda - mentioned him in a publication requesting his release from incarceration. *Id*. at 13. As an example of Mehana's immense contributions to the jihadi movement, he "translated and digitally edited a manual called *39 Ways to Participate in Jihad* ... which is one of the most influential jihad

recruitment materials over the last several years." *Id*. at 14. He also "engaged in

counter-surveillance," *Id*. at 16, "told individuals that he was being watched, and to

destroy materials that he had given them in the past, and he himself disposed of

evidence that he possessed prior to becoming certain that he was under FBI

scrutiny." *Id*. at 17. He also "repeatedly provided false information to law

enforcement that significantly obstructed and impeded international terrorism

investigations." *Id*. at 22-26. Mehanna's guidelines range was life imprisonment,

but he received 17.5 years with 7 years of supervised release.

Mehanna's contributions to the jihadi movement and his efforts at joining the

fighting far exceeded that of Mr. Wright. Mehanna's Conspiracy to Kill in a Foreign

Country conviction is similar to Mr. Wright's Conspiracy to Commit Acts of

Terrorism Transcending National Boundaries charge. Similarly, Mehanna's Making

False Statements Conviction - in tandem with his instruction to others to destroy

evidence - is similar in culpability to Mr. Wright's Obstruction of Justice

convictions. Yet Mehanna's actions were significantly more blameworthy than Mr.

Wright's.

While Mr. Wright may have discussed the notion of travelling overseas to join

ISIS, those discussions were far from ever becoming a reality. Mehanna, on the

other hand, actually flew overseas and would have joined al Qaeda had the training

camps not been removed. While the government did not attribute any death to the

conspiracy at Mehanna's trial, co-conspirator Daniel Maldonado did join the

fighting in Somalia, *Government Sentencing Memo*. at 5, and "Abousamra spent

52

approximately a week or more in Fallujah at a time when there was heavy fighting with U.S. and coalition forces." *Exhibit A to Government Sentencing Memo*, at 11. Further, Abousamra is still at-large and on the FBI's Most Wanted Terrorists List, believed to be living in Syria and possibly fighting for ISIS. *See Ahmad Abousamra*, FBI Most Wanted Terrorists List.[39] Thus, it is a fair inference to draw that at least one - if not numerous - deaths are attributable to the Mehanna conspiracy. Yet those deaths were likely to be U.S. or coalition soldiers, not a co-conspirator as with Mr. Wright. And while Mr. Wright may have possessed and shared some ISIS propaganda, Mehanna was a well-known translator whose work was "specifically consulted just before terrorist attacks." *Government Sentencing Memo*, at 4 n. 1. Therefore, it would be unjust and would create unwarranted sentencing disparities between similarly situated defendants for Mr. Wright's sentence to exceed Mehanna's.

### Chris Cornell

Chris Cornell received a sentence of 240 months after he was convicted of Attempted Murder of Government Employees, 18 U.S.C. § 1114, Possession of a Firearm in Furtherance of an Attempted Violent Crime, 18 U.S.C. § 924(c), and Providing Material Support to a Designated Foreign Terrorist Organization, 18 U.S.C. § 2339B. Cornell was a "sworn follower and supporter" of ISIS, who "made extensive plans ... to murder as many government employees as possible, including the President of the United States and members of Congress" during the January

---

[39] available at www.fbi.gov/wanted/wanted_terrorists/ahmad-abousamra.

20, 2015 State of the Union Address at the U.S. Capitol. *Government Sentencing Memo*, at 1. In furtherance of that plan, he "purchased two Model M-15 semi-automatic rifles and 600 pounds of ammunition." *Id*. at 1, 20. Prior to his arrest, Cornell used Twitter to support ISIS, communicated with ISIS members, including Junaid Hussain, and posted his "bai'ah" on Twitter. *Id*. at 1, 3-6, and n. 5. He worked closely with a confidential human source (CHS) in planning the massacre, and advised the CHS "to delete their message conversations off of his computer or phone." *Id*. at 10. Prior to settling on the plan to storm the U.S. Capitol, Cornell considered attacking the White House, a National Guard armory, the Supreme Court, and the Israeli Embassy. *Id*. at 13-14. Cornell was hopeful that the attack on the Capitol would be "major" and would "incite some brothers to do something," i.e. to launch further attacks. *Id*. at 20. Cornell was arrested in the parking lot of the gun shop after purchasing the rifles and ammunition on his way to the Capitol. *Id*. at 20.

Cornell was more culpable than Mr. Wright. There are some similarities between the two cases, such as the online presence and communication with Junaid Hussain,[40] yet Cornell went much further than Mr. Wright in his attempt to commit a terrorist act. Indeed, Cornell was en route to the Capitol when he was apprehended. While Cornell was not charged with Acts of Terrorism Transcending National Boundaries,[41] the Attempted Murder of Government Employees charge is

---

[40] Unlike Cornell, there was no evidence that Mr. Wright was ever personally in communication with Hussain.
[41] Yet he certainly could have been.

similar in culpability. Yet Cornell planned and attempted to murder as many people as he could, including the President of the United States. Unlike Cornell, the Wright conspiracy did not involve any firearms. While Cornell was not charged with obstruction of justice, he did destroy evidence and counsel others to do the same. Since Cornell was more culpable than Mr. Wright, it would be unjust for Mr. Wright's sentence to exceed Cornell's.

### Abdul Malik Abdul Kareem

Abdul Malik Abdul Kareem was sentenced to 30 years after being found guilty, after a jury trial, of Conspiracy, in violation of 18 U.S.C. § 371, Interstate Transportation of a Firearm with Intent to Commit a Felony, in violation of 18 U.S.C. § 924(b), False Statements, in violation of 18 U.S.C. § 1001, Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g), and Conspiracy to Provide Material Support, in violation of 18 U.S.C. § 2339B. *United States v. Abdul Malik Abdul Kareem*, 15-CR-707-SRB. Kareem conspired with Elton Simpson and Nadir Soofi to provide material support to ISIS, and to attack the prophet Mohammed cartoon drawing contest in Garland, Texas on May 3, 2015. *See Government's Sentencing Memorandum*, at 2.

While the attack in Garland "was the culmination of the conspiracy," the three "considered other targets along the way - including U.S. military service members, U.S. military bases, U.S. military recruitment centers, and a public mall." *Id.* at 2. "Kareem's role in the conspiracy included assisting the other two men with firearms training, providing money to purchase weapons and ammunition which

were used in the attack, instruction on how to care for and maintain their weapons, taking Simpson and Soofi shooting in the desert, hosting Simpson and Soofi in his home, and providing a meeting location to plan the attack." *Id*. at 2.

Prior to the attack, Kareem spoke heavily in support of ISIS, and discussed his desire to launch attacks in their name often, and to many different people. *Id*. at 3-7. While Kareem did not participate in the attempted mass murder in Garland, Simpson and Soofi were nearly successful in their efforts. Simpson and Soofi, while wearing tactical gear, gloves, and a bulletproof vest, "sprang from Soofi's sedan armed with over 1,500 rounds of ammunition and six firearms," which Kareem helped to purchase. *Id*. at 2-3. After shooting a security guard in the leg, police officers returned fire and killed both Soofi and Simpson. *Id*. at 3. Fortunately, Soofi and Simpson failed to reach the convention center and the roughly 200 people inside. *Id*.

Kareem's culpability was substantially greater than Mr. Wright's. While he was not charged with Conspiracy to Commit Acts of Terrorism Transcending National Boundaries - though it would have been a proper charge - his guidelines range was life. *Id*. at 10. The object of the conspiracy was mass murder, and the conspirators were very close to achieving their goal. Further, two conspirators were killed - not just one - a security guard was shot, and law enforcement was involved in a firefight with the conspirators. While Kareem was not present during the shootout, he armed and trained the two that were. Kareem, and the Kareem

conspiracy generally, was more culpable than the Wright conspiracy, and thus Mr. Wright's sentence should be substantially shorter than Kareem's.

### Jose Padilla, Adham Amin Hassoun, Kifah Wael Jayyous

Jose Padilla, Adham Amin Hassoun, and Kifah Wael Jayyous were convicted after a trial in the Southern District of Florida of Conspiracy to Kill, Kidnap, Maim, or Injure Persons or Damage Property of a Foreign Government, 18 U.S.C. § 956, Conspiracy to Defraud the United States, 18 U.S.C. § 371, and Providing Material Support to Terrorists, 18 U.S.C. § 2339A. *See United States v. Hassoun*, 04-CR-60001-MGC. Padilla was sentenced to 250 months, based in large part on his prior record, Hassoun received 203 months, and Jayyousi received 152 months.

These three "were part of a covert North American support cell that funded, recruited for, and supplied various mujahideen groups overseas with the intent to prepare for or carry out acts of murder, kidnapping, and maiming." *Government's Sentencing Memorandum*, at 27. Throughout the course of the eight-year conspiracy, the defendants "aided mujahideen fighters and organizations aligned with terrorists, claimed membership in terrorist groups, communicated with convicted terrorists, and attended terrorist training camps." *Id*. at 1-2. Padilla trained with al Qaeda for six weeks, which "consisted of weapons courses, explosives training, warfighting tactics instruction, and similar military-style courses." *Id*. at 31, 46. "Jayyousi founded the American Islamic Group, which he used as a cover to support violent jihad." *Id*. at 28. "Hassoun represented at least six (6) mujahideen organizations." *Id*. at 29.

The Conspiracy to Kill, Kidnap, Maim, or Injure Persons or Damage Property of a Foreign Government charge, 18 U.S.C. § 956, is similar in kind and degree to Conspiracy to Commit Acts of Terrorism Transcending Boundaries. Yet these three defendants should be considered more culpable than Mr. Wright, as they actually provided substantial support to terrorist organizations by founding, running, and otherwise supporting jihadi groups over the course of eight years. Further, Padilla actually trained with al Qaeda for six weeks. While Mr. Wright may have discussed the idea of training with ISIS, he never travelled overseas, nor did he actually receive such training. Moreover, his support was far more limited in scope.

### Mohamed Abdullah Warsame

Mohamed Abdullah Warsame received a sentence of 92 months after pleading guilty to conspiring to provide material support to a designated foreign terrorist organization, to wit, al Qaeda. Warsame "travel[led] to Afghanistan and attended an Al Qaeda training camp." *United States v. Warsame*, 651 F.Supp.2d 978, 979 (2009). After completion of the first training camp, he attended "an al Qaeda training camp led by Usama bin Laden." *Id.* at 980. He then "provided his services to al Qaeda as a security guard and by teaching English at a medical clinic for al Qaeda associates." *Id.* After returning home, Warsame "maintained channels of communication with al Qaeda associates he had met in Afghanistan and Pakistan." *Id.* He also solicited money for, and wired funds to one of the training camp commanders, which he knew "would be used to support members of al Qaeda." *Id.*

58

While Warsame was not convicted of Conspiring to Commit Acts of Terrorism Transcending National Boundaries, his support to al Qaeda far exceeded Mr. Wright's support to ISIS. Not only did Warsame travel overseas and receive training directly from bin Laden, but he also wired funds to al Qaeda to aid in its efforts. Mr. Wright never provided any funds to ISIS, nor did he travel overseas to receive terrorist training. Further, Mr. Wright was never employed by a terrorist organization, he never formally educated jihadists, nor did he ever personally communicate with ISIS members.

### Salim Ahmed Hamdan

Salim Ahmed Hamdan was sentenced to 66 months after being convicted, at a military commission, of providing material support to terrorists. Hamdan was a member of al Qaeda from at least February, 1996 to November, 2001. *Hamdan v. Rumsfeld*, 548 U.S. 557, 570 (2006). In this capacity, Hamdan "acted as Usama bin Laden's 'bodyguard and personal driver.'" *Id*. He brought bin Laden to "various al Qaida-sponsored training camps, press conferences, or lectures, at which bin Laden encouraged attacks against Americans." *Id*. In addition, "he arranged for transportation of, and actually transported, weapons used by al Qaeda members and by bin Laden's bodyguards (Hamdan among them)." *Id*. In addition to facilitating training sessions, he also received training himself from al Qaeda-sponsored camps. *Id*.

While Hamdan was only convicted of material support, his connection to terrorism plainly exceeded that of Mr. Wright. Hamdan facilitated Usama bin

Laden's capacity to operate al Qaeda and to train new fighters prior to, during, and after the time that the plans for the 9/11 terrorist attacks were formulated and executed. Mr. Wright's support was minimal in comparison. Not only was Mr. Wright not employed by ISIS, but he did not receive any terrorist training. He was not a close confidant and body guard for *any* ISIS member, let alone a leader such as Abu Bakr al-Baghdadi. Nor did he transport weapons for ISIS. So while Hamden was convicted of fewer crimes, Hamden's contribution to the jihadi movement far exceeded Mr. Wright's.

## Conclusion

America's War on Terror has, for nearly two decades, been routinely double cast as an armed conflict and as a War of Ideas. The sentence this Court imposes is an opportunity to demonstrate that for the United States, values like proportionality and redemption are preferable to those espoused by organizations like the Islamic State. Indeed, ISIS propaganda materials and pronouncements leave little doubt as to the extremes they favor in punishing those that have transgressed against them. A sentence of sixteen years reflects America's commitment to nuanced and individualized justice. It punishes, but it does not preclude all chance of redemption. It highlights the fact that the fundamental principles of fairness and equanimity – principles that the American justice system is built on -- are extended to all, even those who have been convicted of opposing them ardently.

Respectfully Submitted,
David Wright
By his attorneys:

/s/ Jessica Hedges
Jessica D. Hedges, BBO # 645847
Michael Tumposky BBO # 660618
Forest O'Neill-Greenberg BBO # 674760
Hedges & Tumposky, LLP
50 Congress St., Suite 600
Boston, MA 02109
T) 617/722-8220

## Certificate of Service

I, Jessica D. Hedges, hereby certify that, on this the 14th day of December, 2017, I have cause to serve a true and correct copy of the foregoing to all parties of record where otherwise unable to do so electronically.

/s/ Jessica D. Hedges
Jessica D. Hedges

61