UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                        )
UNITED STATES OF AMERICA,               )
                                        )
                                        )
        v.                              )          CRIMINAL ACTION
                                        )          NO. 15-10153-WGY
DAVID WRIGHT,                           )
                                        )
                Defendant.              )
_____)
```

YOUNG, D.J.                                         January 22, 2018

**MEMORANDUM OF DECISION**


        Let me explain this sentence to you, Mr. Wright.
In one sense this case follows a familiar arc --
they've got graphs of all these things, there was
superb law enforcement activity here to protect us
all, your case came on reasonably promptly for trial,
fair procedures throughout, a guilty verdict on
overwhelming evidence, and a severe sentence.  But if
I stop there, I have not fully explained the reason
for the sentence and we miss out on the larger issues,
and they seem to me to be these[:]
        You are not a monster, yet you embrace a
monstrous evil.  You stand before this Court a
convicted terrorist, no doubt in my mind about that.
You've got to live with the fact that you sent your
uncle out there to be killed, laughing and chortling
in the hope obviously that he would kill or maim
someone else.  That's on your conscience.
.  .  .
        [T]rials matter, and jury trials matter
especially, they really are both a test and a
celebration of a free people governing themselves.
Thomas Jefferson said, "The jury is the greatest

anchor humankind has ever conceived for holding the
government to the principles of its Constitution."
And so it is here.

For the first time I, as a presiding officer, as
a citizen, came to understand what it meant to be
"radicalized." A couple of clicks on the computer,
the dark web, and all this material is there. And
like the jurors -- and the government properly
provided me with the full record of the evidence and I
have reviewed all of it before this hearing, I have
sat and watched with horrified fascination, and I
admit it, the monstrous evil that you embraced.

Now ISIS is just about done, it's about to be
relegated to the dust bin of history, forgotten and
reviled, and whatever you say now that's what you
chose[.]

[A]t the same time we are a society awash in
vicarious violence and . . . the evidence here . . .
ha[s] the hideous attraction of a snuff video. And
there's [sic] always going to be restless young men in
search of a cause. You made the wrong choice, a
terrible choice, and in my mind you made it knowingly
and this sentence reflects it. But I cannot sentence
you without acknowledging that we're not going to
arrest our way out of this situation. There's [sic]
going to be other young men, restless, on the web --
ISIS will be gone -- looking for a cause.
. . .

I have searched my conscience as to what we do
about that, and the best I can come up with is . . .
the life's work of Justice Sandra Day O'Connor, who
challenges us to understand American democracy.
[T]hat's a challenge, that's where heroism and self-
sacrifice and struggling against the odds . . . goes
on day by day.

Court's Remarks, Transcript of David Wright's Sentencing Hearing

at 53:4-55:5, <u>United States</u> v. <u>Wright</u>, No. 15-cr-10153 (D. Mass.

Dec. 19, 2017), ECF No. 417.

On October 18, 2017, a jury convicted the defendant David

Wright ("Wright") of five counts including conspiracy to provide

material support to a designated foreign terrorist organization

and obstruction of justice. Wright moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. This Court DENIED Wright's motion on December 18, 2017. Electronic Order, ECF No. 407. This memorandum explains the Court's reasoning for that and other trial-related decisions.

## I.  BACKGROUND

On February 15, 2017, a federal grand jury charged Wright with conspiracy to provide material support to a designated foreign terrorist organization and aiding and abetting in violation of 18 U.S.C. § 2339B(a)(1) and 18 U.S.C. § 2 ("Count 1"); conspiracy to obstruct justice in violation of 18 U.S.C. § 371 ("Count 2"); obstruction of justice and aiding and abetting in violation of 18 U.S.C. § 1519 and 18 U.S.C. § 2 ("Count 3"); conspiracy to commit acts of terrorism transcending national boundaries in violation of 18 U.S.C. § 2332b(a)(2) and (c) ("Count 4"); and obstruction of justice in violation of 18 U.S.C. § 1519 ("Count 5"). See Second Superseding Indictment, ECF No. 171.

Wright's trial began on September 18, 2017 and ran until October 17, 2017. During the thirteen-day trial, the government presented evidence that Wright conspired with several individuals, including his uncle, Usaamah Abdullah Rahim ("Rahim"), co-defendant Nicholas Rovinski ("Rovinski"), and others to support the Islamic State of Iraq and Syria ("ISIS").

The government contended that Wright recruited Rahim and
Rovinski in efforts to organize a terrorist cell in
Massachusetts.  Evidence showed that the group initially planned
to join ISIS in Syria, but then changed course when ISIS issued
a fatwa against American journalist Pamela Geller ("Geller").
Rovinski testified that, at that point, Wright, Rahim, and
Rovinski conspired to behead Geller pursuant to that fatwa.
Much of their planning, communication, and recruiting efforts
took place via the internet, where Wright distributed ISIS
propaganda, researched various weapons, managed a Twitter
account advocating pro-ISIS beliefs, and chatted with other ISIS
supporters.  One of these individuals, Zulfi Hoxha ("Hoxha"),
was an individual living in the United States whom Wright
successfully encouraged to travel to Syria and join ISIS.  Other
individuals with whom Rahim communicated included an individual
seemingly located in Turkey whose online moniker was "abu3antar"
("Abu Antar"), as well as a shadowy individual who operated
numerous Twitter accounts under the name "Abu Hussain al-
Britani" ("Abu Hussain").  Evidence was presented showing that
this second individual was in fact Junaid Hussain, an ISIS
member in Syria.

On the morning of June 2, 2015, Rahim called Wright and
told him that he planned to attack law enforcement officers on
behalf of ISIS.  Wright encouraged Rahim to do so, instructing

him to destroy his electronic devices before the attack.
Shortly thereafter, Rahim attacked several police officers in a
Roslindale parking lot and was killed.  After learning of this
incident, Wright erased the data on his computer by restoring it
to its original factory settings.  Law enforcement officers
arrested Wright later that day, searched his home, and conducted
a lengthy interview with him.

The jury convicted Wright on all counts.  Wright moved to
set aside the verdict and ordered a new trial on November 2,
2017.  Def. Wright's Mot. New Trial ("Def.'s Mot."), ECF. No.
393.  The government opposed the motion.  Gov't Opp'n Def.'s
Mot. ("Gov't Opp'n"), ECF No. 395.  This Court DENIED the motion
on December 18, 2017.  Electronic Order, ECF No. 407.

**II. PRE-TRIAL RULING**

Prior to trial, the government sought to introduce the
certified conviction in a court of the United Kingdom (U.K.) of
one Junaid Hussain of "Causing [a] Computer to Perform [a]
Function with Intent to Secure Unauthorized Access" in the
United Kingdom to support the inference that this British
citizen is Abu Hussain, a U.K. born terrorist and "hacker," who
assisted Wright with the alleged terrorist plot, and the subject
of a telephone call between Wright and Rahim on May 26, 2015.
Gov't's Opp'n to Def.'s Mot. in Lim. Exclude Crim. Conviction of
Junaid Hussain 1 ("Gov't's Opp'n Mot. Lim."), ECF No. 260.

Wright moved in limine to exclude the criminal conviction of Junaid Hussain on the grounds that no exception to the rule against hearsay applied. Def.'s Mot. in Lim. Exclude Crim. Conviction of Junaid Hussain 1 ("Def.'s Mot. Lim."), ECF No. 250. Specifically, Wright contended: (i) Federal Rule of Evidence 803(22) is the only exception under which this Court could admit the foreign conviction of Junaid Hussain, and (ii) the foreign conviction of Junaid Hussain is not a public record within the meaning of Federal Rule of Evidence 803(8). Def.'s Mot. Lim. 2. In response, the government argued that the conviction of Junaid Hussain was admissible under either Rule 803(8) as a public record or Federal Rule of Evidence 807, the residual exception to the rule against hearsay. Gov't's Opp'n Mot. Lim. 1. There was no dispute that Junaid Hussain's conviction was properly authenticated. Def.'s Mot. Lim. 1.

This Court DENIED the motion on September 15, 2017, Electronic Order, ECF No. 318, and will explain its ruling below.

### A. Rule 803(22) is not a Rule of Exclusion

Rule 803(22) provides that "[e]vidence of a final judgment of conviction" is not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness, if, among other requirements, "(C) the evidence is admitted to prove any fact essential to the judgment; and (D) when offered

by the prosecutor in a criminal case for a purpose other than impeachment, the judgment was against the defendant."  Fed. R. Evid. 803(22).

Both parties appear to agree that Rule 803(22) does not apply here.  See Def.'s Mot. Lim. 1 (stating that the conviction is not against the defendant); Gov't's Opp'n Mot. Lim. 1 (implicitly conceding the inapplicability of Rule 803(22) by arguing that Rule 803(8) or Rule 807 applies instead). Therefore, the only issue left here is whether the inapplicability of Rule 803(22) excludes the application of other hearsay exceptions.

Without citing any authorities, Wright argues that Rule 803(22) is "[t]he only possible vehicle for the admission" of prior convictions and because Rule 803(22) "on its face excludes third party convictions," Junaid Hussain's conviction is inadmissible.  Def.'s Mot. Lim. 2.  This Court disagrees.

In Olsen v. Correiro, 189 F.3d 52 (1st Cir. 1999), the First Circuit refused to interpret Rule 803(22) as an affirmative bar of certain final judgments excepted from the rule.  Id. at 62-63 ("Evidence of a final judgment that does not fall within [Rule 803(22)] could still be admissible, either because it is not being offered for the truth of the matter asserted or because it falls within some other hearsay exception." (citing Hinshaw v. Keith, 645 F. Supp. 180, 182 (D.

Me. 1986) ("Rule 803(22) is not a rule of exclusion, but rather
an exception to the broad exclusionary rule known as the hearsay
rule.")); <u>Hancock</u> v. <u>Dodson</u>, 958 F.2d 1367, 1372 (6th Cir.
1992) (noting that guilty pleas inadmissible under Rule 803(22)
may still be admissible under other hearsay exceptions); <u>United
States</u> v. <u>Breitkreutz</u>, 977 F.2d 214, 221 (6th Cir. 1992)
(holding a judgment and commitment order admissible under Rule
803(8) as a public record even though it is inadmissible under
Rule 803(22)). In sum, this Court agrees with the government
that Rule 803(22) is not a rule of exclusion.

**B.    Applicability of Rule 803(8)**

Rule 803(8) provides that "[a] record or statement of a
public office" is not excluded by the rule against hearsay,
regardless of whether the declarant is available as a witness,
if "(A) it sets out: (i) the office's activities . . . or (iii)
in a civil case or against the government in a criminal case,
factual findings from a legally authorized investigation."  Fed.
R. Evid. 803(8).  Before the 2011 amendments restyling the
language of Rule 803,[1] Rule 803(8)(A) specified "the activities
of the office or agency," <u>United States</u> v. <u>Romero</u>, 32 F.3d 641,
650 (1st Cir. 1994), which is functionally equivalent to current

---

[1] Fed. R. Evid. 803 advisory committee's note to 2011
amendment ("These changes are intended to be stylistic only.
There is no intent to change any result in any ruling on
evidence admissibility.").

Rule 803(8)(A)(i).  The current Rule 803(8)(A)(iii) is
functionally equivalent to the provision formerly styled as Rule
803(8)(C), which applied to "factual findings resulting from an
investigation made pursuant to authority granted by law."
Nipper v. Snipes, 7 F.3d 415, 417 (4th Cir. 1993).

Wright alleges that Rule 803(8) does not apply for three
different reasons: (i) Rule 803(8) does not apply to foreign
convictions; (ii) convictions are not public records within the
meaning of Rule 803(8); and (iii) Rule 803(8) applies only if
convictions are offered "to prove facts such as dates or the
length of a criminal sentence."  Def.'s Mot. Lim. 2 (quoting
Breitkreutz, 977 F.2d at 221).

### 1.   Foreign Convictions

First, Wright incorrectly cites United States v.
$125,938.62, 537 F.3d 1287 (11th Cir. 2008), to support the
proposition that foreign convictions are not within the meaning
of public records under Rule 803(8).  Def.'s Mot. Lim. 2.  In
$125,938.62, the government introduced the defendants' prior
foreign conviction to show facts described in the conviction in
addition to the conviction itself.  537 F.3d at 1290.  The
Eleventh Circuit observed that while the foreign conviction was
admissible under Rule 803(22), the district court erred in
admitting the factual findings articulated in the foreign
judgment of conviction under what was then called Rule

803(8)(C).  Id. at 1292 (explaining that "Rule 803(8)(C), by its
plain language, does not apply to judicial findings of fact" and
thus "none of the relevant facts found in the judgment of
conviction were admissible").  The Eleventh Circuit did not
discuss the significance of a foreign conviction.  See id.  The
Court was also silent on whether the foreign conviction would be
admissible under Rule 803(8) as a public record if offered to
show only the fact of conviction.  See id.

The government correctly distinguishes $125,938.62 from the
case at issue because here, it introduced Junaid Hussain's
foreign conviction to show only the fact of conviction, not the
factual findings contained in the conviction.  Gov't's Opp'n
Mot. Lim. 4.  In addition, the foreign nature of the conviction
in $125,938.62 was not the reason that Rule 803(8) did not
apply.  537 F.3d at 1292.  Thus, Wright is incorrect to draw the
conclusion that Rule 803(8) does not apply to foreign
convictions.

### 2.  Office Activities and Factual Findings

Second, Wright argues that convictions are not public
records within the meaning of Rule 803(8) because Rule 803(8)
does not apply to judicial findings of fact.  Def.'s Mot. Lim.
2.  Rule 803(8) "draws a distinction" between a public office's
activities and "factual findings from a legally authorized

investigation." United States v. Murgio, No. 15-CR-769(AJN),
2017 WL 365496, at *7 (S.D.N.Y. Jan. 20, 2017).

In Olsen, the First Circuit ruled that a party's prior
manslaughter conviction was admissible under what was then
called Rule 803(8)(A) to show a sentence of time already served.
189 F.3d at 63 ("When offered to show the fact of conviction
rather than underlying guilt 'a judgment readily fits the public
records exception.'" (quoting 4 Mueller & Kirkpatrick, Federal
Evidence § 472, at 660 (2d ed. 1994))).  But cf. Nipper, 7 F.3d
at 417-18 (holding that "judicial findings of fact are not
public records within the meaning of Rule 803(8)(C)," noting
that "when the drafters of the Federal Rules of Evidence wanted
to allow the admission of judgments or their underlying facts,
they did so expressly").

Nipper is distinguishable from Olsen.  In Olsen, the First
Circuit ruled a prior conviction was admissible to prove a
sentence of time already served as a public record for office or
agency activities under the old Rule 803(8)(A).  189 F.3d at 63.
In Nipper, the Fourth Circuit ruled a prior court order
inadmissible to prove a party's prior wrongdoings under the old
Rule 803(8)(C) because that subsection does not apply to
judicial fact finding.  7 F.3d at 418.  Because these two cases
reached different results based on different grounds, Olsen is
not contradictory with Nipper.

Wright fails to recognize that <u>Nipper</u> and <u>Olsen</u> concern different evidentiary rules.  Def.'s Mot. Lim. 2.  <u>Olsen</u> does not stand for the proposition that judicial determinations are not public records under what was then called Rule 803(8)(C).  Rule 803(8)(C) is immaterial here.  <u>Olsen</u>'s holding is under what was then called Rule 803(8)(A).[2]  Accordingly, this Court follows <u>Olsen</u> to rule that the certified foreign conviction of Junaid Hussain is admissible within the meaning of public records under Rule 803(8)(A)(i).

### 3. Facts that Can Be Proved Under Rule 803(8)

Finally, Wright alleges that "convictions are admissible under Rule 803(8) as public records only if offered 'to prove facts such as dates or the length of a criminal sentence.'"  Def.'s Mot. Lim. 2 (quoting <u>Breitkreutz</u>, 977 F.2d at 221).  In <u>Breitkreutz</u>, the government introduced a judgment and commitment order of a third party to bolster the credibility of a witness.  977 F.2d at 215.  The Sixth Circuit affirmed the district court's decision to admit the judgment and commitment order

---

[2] The government, however, misconstrues <u>United States</u> v. <u>Romero</u>, 32 F.3d 641 (1st Cir. 1994), to stand for the proposition that the conviction is a statement of the public agency.  Gov't's Opp'n Mot. Lim. 3.  <u>Romero</u> did not involve a criminal conviction; rather, it involved the State Department's declaration that a vessel was stateless.  <u>Romero</u>, 32 F.3d at 649-50.  What <u>Romero</u> does stand for, is that the old Rule 803(8)(A) applies to "a statement by a public agency setting forth a routine activity of that agency."  <u>Id.</u> at 650.

under Rule 803(8) as a public record.  Id. at 221 (holding that
"the admission of the judgment and commitment order for purposes
of establishing the date and length of [a third party's]
sentence was entirely proper and resulted in no unfair prejudice
to the defendant").  In United States v. Wilson, 690 F.2d 1267
(9th Cir. 1982), the Ninth Circuit noted that an "adequately
authenticated" judgment and commitment order is admissible "in
its entirety" under Rule 803(8) as a public record.  Id. at 1275
n.2.  The judgment and commitment order was inadmissible under
Rule 803(22) in both Breitkreutz and Wilson, though for
different reasons.  Compare Breitkreutz, 977 F.2d at 221 (Rule
803(22) not applicable because the previous conviction of a
third party was "not offered to prove a fact essential to
sustain the judgment"), with Wilson, 690 F.2d at 1275 (Rule
803(22) not applicable because the conviction was related to a
misdemeanor instead of a felony).  The Sixth Circuit noted that
with respect to the admissibility of a prior conviction
"introduced to prove facts such as dates or the length of a
criminal sentence," there was "no meaningful distinction"
between the judgment and commitment orders in Breitkreutz and
Wilson under Rule 803(8).  Breitkreutz, 77 F.2d at 221.

    Breitkreutz does not stand for, as construed by Wright, the
proposition that "convictions are admissible under Rule 803(8)
as public records only if offered 'to prove facts such as dates

or the length of a criminal sentence.'" Def.'s Mot. Lim. 2

(quoting Breitkreutz, 977 F.2d at 221) (emphasis added).

Breitkreutz does not include any language indicating that Court

intended to limit the admissibility of prior convictions under

Rule 803(8) to show only dates or the length of a criminal

sentence. As correctly argued by the government, the term "such

as" means that convictions may be admitted to prove facts

including, but not limited to, dates and the length of a

sentence. Gov't's Opp'n Mot. Lim. 3.

Here, the government introduced Junaid Hussain's prior

conviction solely to prove the fact that this individual was

previously convicted in the United Kingdom for the offense of

"Causing [a] Computer to Perform [a] Function with Intent to

Secure Unauthorized Access." That's all. The fact of that

conviction, standing alone, was competent circumstantial

evidence from which others might think that individual was a

computer facile "hacker." This, coupled with evidence that

Junaid Hussain had fled the United Kingdom and Abu Hussain's

full moniker was Abu Hussain al Britani is enough for the jury

reasonably to conclude they were hearing about one and the same

individual.

**III. MOTION FOR A NEW TRIAL**

Under Rule 33 of the Federal Rules of Criminal Procedure, a

trial court "may vacate any judgment and grant a new trial if

the interest of justice so requires." Fed. R. Crim. P. 33(a).

A new trial is warranted "only where there would be a

miscarriage of justice" or "where the evidence preponderates

heavily against the verdict." United States v. Merlino, 592

F.3d 22, 32 (1st Cir. 2010) (quoting United States v. Wilkerson,

251 F.3d 273, 278 (1st Cir. 2001)). "[T]he decision to grant or

deny a new trial is committed to the sound discretion of the

district court." United States v. Andrade, 94 F.3d 9, 14 (1st

Cir. 1996) (quoting United States v. Soto-Alvarez, 958 F.2d 473,

479 (1st Cir. 1992)).

Wright advanced three arguments in support of his motion:

(i) the Court erred in admitting various statements as

nonhearsay coconspirator statements under Rule 801(d)(2)(E) of

the Federal Rules of Evidence, (ii) the Court's jury

instructions on material support, intent, and transcending

national boundaries were incorrect, and (iii) the verdict on

Count 4 was against the weight of the evidence. Def.'s Mot. 1.

This Court addresses each argument in turn.

### A. Coconspirator Statements

Rule 801(d)(2)(E) provides that statements "made by the

party's coconspirator during and in furtherance of the

conspiracy" are not hearsay and are thus admissible against that

party. Fed. R. Evid. 801(d)(2)(E). "The proponent of such a

statement must prove, by a preponderance of the evidence, that

the declarant and the defendant were members of a conspiracy when the statement was made, and that the statement was made in furtherance of the conspiracy." United States v. Ciresi, 697 F.3d 19, 25 (1st Cir. 2012). A court's determination of whether this burden has been met "is known in this circuit as a Petrozziello ruling." United States v. Mitchell, 596 F.3d 18, 23 (1st Cir. 2010). In making its determination, the Court may consider "hearsay and other inadmissible evidence, including perhaps the very statement seeking admission." United States v. Drougas, 748 F.2d 8, 29 (1st Cir. 1984) (quoting United States v. Martorano, 557 F.2d 1, 11 (1st Cir. 1977)). The First Circuit has held that a trial court may conditionally admit the co-conspirator statements and make its final Petrozziello determination that a conspiracy existed after the government rests. United States v. Ciampaglia, 628 F.2d 632, 638 (1st Cir. 1980). This Court concluded that the various alleged and overlapping conspiracies were proved by a preponderance of the evidence.

Wright contended that the Court erred in admitting certain statements made by Abu Hussain, Abu Antar, and Hoxha, arguing that the statements do not qualify as coconspirator statements under Rule 801(d)(2)(E) and thus constitute inadmissible hearsay. Wright cited four bases for his claim of error, and the Court considered each of them.

Wright first argued that the "independent, non-hearsay" evidence was insufficient to establish the existence of a conspiracy between Wright and the various declarants. Def.'s Mot. 3. As noted above, the Court may indeed consider hearsay and in fact "any evidence whatsoever." Bourjaily v. United States, 483 U.S. 171, 178 (1987). Such evidence was sufficient for the Court to conclude that Wright more likely than not participated in a conspiracy to provide material support to ISIS with Abu Hussain, Abu Antar, and Hoxha. For example, the government presented evidence that Wright, Rahim, and Rovinski planned to kill Geller in allegiance to ISIS, see 9/21/17 Trial Tr. at 10:7-16, 17:9-21:23, and encouraged and assisted Hoxha's travel to Syria, id. at 37:14-39:5, Exs. 57, 317, 379. The evidence also showed that Rahim communicated with and received assistance from Abu Hussain and Abu Antar in connection with the plot to kill Geller and in traveling to Syria. See Exs. 57, 57A, 356. Though Wright claims that "undisputed" evidence showed that he had never personally met or spoken to Abu Hussain and Abu Antar, Def.'s Mot. 2-3, the fact that Wright may not personally have known these individuals does not compel the conclusion that no conspiracy existed. Knowledge of every other coconspirator and every detail of the conspiracy is not a prerequisite to coconspirator statement admissibility. See United States v. Cruz-Rodriguez, 541 F.3d 19, 28 (1st Cir. 2008)

(observing that conspiracy may be proven "<u>without</u> showing that (1) each conspirator knew of or had contact with all other members; (2) each conspirator knew of all the details of the conspiracy or participated in every act in furtherance of it; or (3) the conspiratorial 'cast of characters' remained intact throughout the duration of the entire enterprise").

Second, Wright claims that many of the Rule 801(d)(2)(E) statements regarding travel to Syria were inadmissible because they were "untethered" to the specific conspiracies charged or "suggested" by the government, which (as Wright asserts) relate only to activities planned within the borders of the United States. Def.'s Mot. 5-6. Wright relies on <u>United States</u> v. <u>Piper</u>, 298 F.3d 47 (1st Cir. 2002), in which the First Circuit held that certain statements should not have been admitted under Rule 801(d)(2)(E) because they did not further the conspiracy. <u>Id.</u> at 56. In <u>Piper</u>, the charged conspiracy involved an agreement to distribute drugs supplied by the defendant. In this context, the First Circuit explained, a conversation between the distributor and an undercover agent indicating "an attempt to persuade [the agent] to purchase drugs from a source other than the [defendant]" was not in furtherance of and in fact was "antithetic to" the charged conspiracy. <u>Id.</u> at 55. Wright argues that any plan to travel to Syria is likewise "an unrelated venture" that is separate from the charged

conspiracies and thus cannot support the statements'
admissibility. Def.'s Mot. 6. The Court disagreed.

Though the Court notes that statements may be admissible
under Rule 801(d)(2)(E) "regardless of whether the conspiracy
furthered is charged or uncharged," United States v. Lara, 181
F.3d 183, 196 (1st Cir. 1999), it need not address any potential
uncharged conspiracy because the statements here were clearly
related to and in furtherance of the conspiracies charged.
Statements relating to the planned travel to Syria, unlike the
inadmissible statements in Piper, were not "designed to
frustrate" the conspiracy to provide material support to ISIS.
Piper, 298 F.3d at 55. On the contrary, traveling to Syria to
join ISIS quite naturally advances such a conspiracy. Further,
the First Circuit has explained that the "essential purpose" of
a conspiracy may encompass different means and methods over
time. United States v. Mehanna, 735 F.3d 32, 56 (1st Cir. 2013)
(concluding that a conspiracy's shift in focus "from Pakistan to
domestic attacks and then to Yemen did not rob it of its
essential purpose: waging jihad against the United States").
Here, the "essential purpose" of Wright's agreement with his co-
conspirators -- to provide material support to ISIS -- remained
the same, even if the means of providing that support changed
over time. Whether the conspirators were planning to travel
overseas to join ISIS, or plotting to commit an attack on Geller

in the United States, they were serving the same basic purpose
of providing material support to ISIS.  Thus, the statements
about traveling to Syria are admissible nonhearsay.

Third, Wright argued that the statements offered by the
government and admitted under Rule 801(d)(2)(E) all occurred
outside of the conspiracy's duration.  According to Wright, the
conspiracy began "for purposes of Rule 801" on May 6, 2015, when
ISIS issued the order to kill Geller, and ended on June 2, 2015,
the day he was arrested and spoke with the FBI.  Def.'s Mot. 6.
Any statements made before or after that time period, Wright
claims, could therefore not have been made "during" the
conspiracy and are inadmissible.  Id. at 7.

The argument as to statements made prior to May 2015 has no
merit for the same reasons as those stated above.  Evidence at
trial showed that Wright and Rahim had discussed providing
support to ISIS as early as June 2014, see Ex. 5, and though the
means of that support may have evolved over time, these
statements related to the same "essential purpose" as later
statements -- providing aid to ISIS.  They accordingly do not
"predate the formation of the relevant conspiracy" and are
admissible.  Mehanna, 735 F.3d at 57.

Statements made after June 2, 2015 were also admissible
because the mere facts of Wright's arrest and confession of
certain activities to the FBI did not terminate the conspiracy.

Once a conspiracy's existence has been established, "the law presumes that the conspiracy continued, and that [a conspirator] continued to participate, unless he makes 'an affirmative showing' that the conspiracy was abandoned or terminated, or that he withdrew from it." United States v. Mangual-Santiago, 562 F.3d 411, 422 (1st Cir. 2009) (quoting Piper, 298 F.3d at 53). "Typically, there must be evidence either of a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals." United States v. Juodakis, 834 F.2d 1099, 1102 (1st Cir. 1987). Wright's own testimony disputing that he made incriminating statements to the FBI on that date indicates that he did not make a full confession during his June 2015 interview. See 10/11/17 Trial Tr. at 105:17-108:10. Further, the government introduced prison letters sent to Wright by Rovinski in August 2015, the contents of which tend to show that Wright had not communicated his affirmative disavowal of the conspiracy. See 9/21/17 Trial Tr. at 62, Exs. 73-74. Though Wright argues that he "neither spoke nor acted in furtherance of the conspiracy after the date of his arrest," Def.'s Mot. 7, that lack of action does not suffice. As a result, statements made through August 2015 were made during the course of the conspiracy and were admissible under Rule 801(d)(2)(E).

Fourth and lastly, Wright argued that none of the Rule 801(d)(2)(E) statements were made in furtherance of the conspiracy because the statements failed to "advance the objectives of the charged conspiracy to kill in the United States." Def.'s Mot. 8. In particular, Wright points to several of Abu Hussain's Twitter postings, such as those in which Abu Hussain refers to a "CyberCaliphate" and a potential drone strike, one statement in which he announces, "I'm back again Obama," <u>see</u> Ex. 400, and his statements commenting on Rahim's death, <u>see</u> Ex. 119.

The determination of whether a coconspirator's statement is in furtherance of the conspiracy is, like the determination of the existence of a conspiracy, a "preliminary question of fact . . . resolved by the trial judge" who must apply a preponderance-of-the-evidence standard. <u>Piper</u>, 298 F.3d at 54. While "there is no precise formula for determining whether a coconspirator statement advances a conspiracy," a statement generally "is considered to be in furtherance of the conspiracy as long as it tends to promote one or more of the objects of the conspiracy." <u>Id.</u> It "need not be necessary or even important to the conspiracy . . . as long as it can be said to advance the goals of the conspiracy in some way." <u>Id.</u> (quoting <u>United States</u> v. <u>Martinez-Medina</u>, 279 F.3d 105, 117 (1st Cir. 2002)).

[22]

Applying a preponderance-of-the-evidence test, Abu Hussain's statements on Twitter were more likely than not made in furtherance of the conspiracy. The First Circuit has affirmed this finding where the statements at issue "were seemingly made for such purposes as recruiting new members into the conspiracy or passing information between conspirators." United States v. Shea, 211 F.3d 658, 668 (1st Cir. 2000). Here, Abu Hussain's Twitter postings all appear designed to advance the conspiracy's objectives, recruit new members, or promote the Twitter account itself (which in turn helps to promote the conspiracy and recruit members). These goals are particularly apparent in the statements posted after Rahim's death, in which Abu Hussain explains that Rahim's plan was to behead Geller, wishes for his martyrdom, and provides an address for Geller along with the direction to "GoForth." See Exs. 119-20. As a result, the statements were nonhearsay and admissible as coconspirator statements under Rule 801(d)(2)(E).

**B. Jury Instructions**

Wright argued that the Court committed three errors in its instructions to the jury. First, he argued that the Court erred "when it instructed the jury that coordination with the tactics and strategy of ISIS was sufficient and when it refused to instruct the jury on [Wright's] requested instruction limiting the concept of material support," in connection with Count 1.

Def.'s Mot. at 13. Second, he argued that the Court erred when it instructed the jury that it could infer Wright intended "'the natural and probable consequences' of his words," also in connection with Count 1. Id. at 17. Third, he argued that the Court erred when "it instructed the jury that overseas 'conduct' can mean mere communication and when it refused to instruct the jury that the Defendant needed to intend that the killing involve overseas conduct to support a conviction," with regards to Count 4. Id. at 9.

The Court will address each argument in turn.

### 1. Definition of Material Support

As part of the jury instructions for Count 1, conspiracy to provide material support, this Court instructed the jury as follows:

> Under the law there's two ways you can provide such support, either through services or through personnel, and the way the government has framed this case, and they're going to argue to you, that the conspiracy here was to provide personnel, people. What people? Well, at a minimum the three conspirators, Mr. Wright, Mr. Rahim, and Mr. Rovinski. To provide themselves as personnel to support a foreign terrorist organization, specifically ISIS. And the government alleges that the support is planning to murder Pamela Geller, murder police officers and other people, constitute themselves as a martyrdom cell and a conspiratorial cell within our society. But the specific support is providing themselves, the three of them, and seeking to recruit others for -- in order to provide this support to a foreign terrorist organization.
> The support must be "material," which means it's got to make some sort of difference, not a major coup

necessarily, but it's got to make some difference to the goals, plans, strategy, tactics of this foreign terrorist organization, in this case it's ISIS. And there's got to be -- what they do -- and again this is all part of this terrorist connection, what they plan to do has -- the specific language I want to use is that it has to be "conduct done in coordination with or at the direction of the foreign terrorist organization."

Now the coordination -- and the reason that the government has to prove that is to prevent, um, the law from applying some random act, just a random act of violence and then ISIS latches onto that and says, "Oh, yeah, those were our soldiers," or something like that. They have to -- the conspiracy has got to be, um, cognizant of and acting in coordination -- it doesn't have to be direct orders, but in coordination with the strategy, the tactics of the foreign terrorist organization, in this case ISIS. Well, that's the first question.

10/17/17 Trial Tr. at 28:12-29:24.

Wright argued that this Court "erred when it instructed the jury that coordination with the tactics and strategy of ISIS was sufficient" to prove Wright provided material support "and when it refused to instruct the jury on [Wright's] requested instruction limiting the concept of material support." Def.'s Mot. 13.

Section 2339B makes it unlawful to "knowingly provide[] material support or resources to a foreign terrorist organization, or attempt[] or conspire[] to do so." 18 U.S.C. § 2339B(a)(1). "[T]he term 'material support or resources' has the same meaning given that term in section 2339A . . . ." Id. at § 2339B(g)(4). Under section 2339A, "'material support or

resources' means any property, tangible or intangible, or service . . . ."  18 U.S.C. § 2339A(b)(1).  "[A]dvocacy performed in coordination with, or at the direction of" a foreign terrorist organization is a form of "service" and a violation of section 2339B.  Mehanna, 735 F.3d at 49 (quoting Holder v. Humanitarian Law Project, 561 U.S. 1, 24 (2010)).  "[I]n coordination with, or at the direction of" does not require a "direct link" to the foreign terrorist organization.  Mehanna, 735 F.3d at 50.

Wright argued that "the notion that mere awareness of the desires of the terrorist organization, delivered indirectly, is sufficient to show coordination or direction, is simply incorrect."  Def.'s Mot. 14-15.

The Court disagreed.  The Court's instructions were proper.  It correctly instructed the jury that the government had the burden of proving that Wright and his coconspirators acted "in coordination with or at the direction of the foreign terrorist organization."  10/17/17 Trial Tr. at 28-29; see Holder, 561 U.S. at 25-33; Mehanna, 735 F.3d at 50.  Here, the government proved that Wright and his coconspirators pledged their allegiance to ISIS and were working under its direction and control to pursue its objectives.  See, e.g., 9/20/17 Trial Tr. at 122-24; 9/21/17 Trial Tr. at 20-22, 32.  The evidence showed that Wright, Rahim, and Rovinski followed ISIS's instructions

and conspired to kill Geller in the United States.  See Exs.

118, 119, 246-47, 303, 310; 9/20/17 Trial Tr. at 122-24; 9/21/17

Trial Tr. at 20-22, 32.  In addition, during his interview on

June 2, 2015, Wright admitted that "he agreed with ISIS" and

believed "they were justified in what they were doing" and was

aware of ISIS's instructions and intended to follow them.

9/22/17 Trial Tr. at 124-27.  The evidence also showed that on

the morning of June 2, 2015, Wright encouraged Rahim to pursue

martyrdom as instructed by ISIS' statements.  See Exs. 5, 5A.

The evidence meets the coordination element as required under

Section 2339B.

**2.   Inference of "Natural and Probable Consequences"**

As part of its instructions to Count 1, the Court explained

that:

> [T]he law provides that you may infer that a person
> intends the natural and probable consequences of what
> they say and do.  Now when I say you may infer it,
> what that means is you could draw that conclusion, but
> you need not, that's left to you as the jury.  You
> look at all the evidence to see whether the
> government, because they've got to prove this -- this
> essential, Mr. Wright's intent beyond a reasonable
> doubt.

10/17/17 Trial Tr. at 27:18-28:1.

Wright argued that the Court erred in instructing the jury

that it could infer that Wright intended the "natural and

probable consequences" of his words because in doing so, the

Court "invaded the province of the jury to determine what inferences are reasonable." Def.'s Mot. 17.

The Court's instruction did not invade the province of the jury or shift the burden of proof to the defendant because the Court reminded the jury that it was up to them to evaluate the evidence of intent. 10/17/17 Trial Tr. at 27-28. The Court instructed that the jury could "infer that a person intends the natural and probable consequences of what they say and do," but that they need not. Id.; see Ulster County Court v. Allen, 442 U.S. 140, 156 (1979); Hardy v. United States, 691 F.2d 39, 42 (1st Cir. 1982). "[T]he instruction does no more than pose a permissive inference." Hardy, 691 F.2d at 42.

### 3. Definition of "Conduct"

Regarding Count 4, the Court instructed the jury as follows:

> Now the second question is different, it sounds
> similar, but it's different and it requires the
> government to prove different things, and that is
> conspiracy to commit acts of terrorism transcending
> national boundaries.
> Well, the first two steps are exactly the same,
> the government has to prove that Mr. Wright was part
> of a conspiracy, as I have defined that to you.
> Second, they have to prove -- and the specific intent
> here, the specific intent is different, but they've
> got to prove specific intent, they've got to prove it
> beyond a reasonable doubt. Here the specific intent
> has got to be to commit acts of terrorism transcending
> national boundaries.
> Now the government has additional things to prove
> in this Number 2 and here's what they are. It's not

just some general crime that could perhaps help ISIS, its [sic] specific crimes and here they are.

Under the law the plan has got to be, um, it punishes someone who kills, kidnaps, maims, commits an assault resulting in serious bodily injury or assaults with a dangerous weapon to any person within the United States, those are the crimes.  Now of course conspiracy doesn't mean that the people did those things, the conspiracy means that they've got to be planning to do one or more of those specific crimes.

Second, because it requires, um, transcending national boundaries, in this one there has to be conduct that they're planning within the United States, the conspirators, and there also has to be conduct outside the United States, somewhere, anywhere outside the national boundaries of the United States.  The conduct?  Now the conduct can be communication of some sort, encouragement, direction, but it's got to be conduct outside the United States.

Third -- and so you see for this one somebody in connection with ISIS has got to know something about these three folks or this cell and there has to be some sort of connection there, the government's got to prove, because, as Congress used the language, this has to be the type of terrorism that transcends national boundaries.

Now one or more members of the conspiracy, and the government says the conspiracy is at least Wright, Rahim, and Rovinski, they've got to know about the foreign, um, communication, or direction, or encouragement, or the foreign conduct related to what they're doing, and it doesn't mean that Wright has to know specifically because you see if one is a conspirator, not every conspirator has to know everything every other conspirator is doing.  Conspiracy is like a partnership and if one of the -- once they're a partnership, the things that the partners do in furtherance of the conspiracy is attributed to all the partners.  But at least they've got to show that Wright was -- that Wright himself, the person who's on trial here, that he reasonably understood that he was engaged in a conspiracy to do conduct that transcends national boundaries, that has this terrorist connection as I've just defined it to you.

And then lastly for this one, not for Question 1, which only requires the conspiracy, the plotting, but

> for Question 2, the government has to prove that one
> of the conspirators, at least one of the conspirators,
> actually did something, did something to make the
> conspiracy come about. We call it the "overt act,"
> but that's legal talk. You don't need that. You just
> need to know it's not enough that they plot it, it's
> not enough that they conspired in all the manner that
> I've described, but then one of the conspirators, at
> least one has to do something to make the conspiracy
> come about. That's Question 2.

10/17/2017 Trial Tr. at 29:25-32:21.

Wright argues that mere communications are not sufficient to constitute overseas conduct, but rather that "the conduct must be, in some way, criminal." Def.'s Mot. 10.

The Court disagreed. Title 18 of the United States Code, section 2332b(g) defines "conduct transcending national boundaries" as "conduct occurring outside of the United States in addition to the conduct occurring in the United States." 18 U.S.C. § 2332b(g). As such, the conduct that occurred overseas is not required to be criminal. Here, there was evidence to show that Rahim communicated with Abu Hussain, an ISIS member located in Syria, about killing Geller. During trial, Wright admitted that Abu Hussain gave Rahim an encrypted document related to Geller's beheading. 10/12/17 Trial Tr. at 49-50. Therefore, the government proved that there was conduct transcending national boundaries, as defined in section 2332b(g).

In addition, Wright argued that the instructions did not properly reflect the government's burden of proving that Wright intended that the killing involve overseas conduct to support a conviction under Count 4, in accordance with section 2332b. See Def.'s Mot. 11. The Court did in fact instruct the jury that the government had the burden of proving that the conspirators specifically intended to "commit acts of terrorism transcending national boundaries" and that Wright "reasonably understood that he was engaged in a conspiracy to do conduct that transcends national boundaries." 10/17/17 Trial Tr. at 30-32.

Nevertheless, a plain reading of the statute suggests that there is no mens rea requirement for the government to prove. The phrase "involving conduct transcending national boundaries" is a jurisdictional element that makes the defendant liable under the specific statute, as opposed to any other criminal statute. Furthermore, an analysis of the legislative history of section 2332b also supports the notion that the phrase is a jurisdictional element, rather than a substantive conduct element with a mens rea. The Conference Report on the Antiterrorism and Effective Death Penalty Act of 1996, which enacted section 2332b, states in relevant part that "[t]here will be federal jurisdiction [if]. . . at least part of the conduct occurred outside of the United States." H.R. Rep. No.

104-518, at 120 (1996) (Conf. Rep.), <u>as reprinted in</u> 1996
U.S.C.C.A.N. 944, 953.

The Court's instructions on Count 4 were proper.

**C.   Sufficiency of the Evidence**

Wright argued that the evidence was insufficient to support
his conviction on Count 4.  <u>See</u> Def.'s Mot. 20.  He claimed that
"the evidence that the agreed-upon killing involved overseas
conduct lacked probative force."  <u>Id.</u>  This argument lacked
merit.  The evidence presented at trial showed that Wright and
his coconspirators knew that the conspiracy involved conduct
that transcended national boundaries.  The government proved
that Wright and his coconspirators were in communication with
multiple people overseas who were part of ISIS.

**1. Evidence that Wright Spoke to the "Mujahideen"**

The government presented substantial evidence that Wright
and his coconspirators were in communication with people
overseas.  Wright admitted to an FBI cooperator that he and his
coconspirators had spoken to ISIS fighters in Syria, otherwise
known as the "Mujahideen."  <u>See</u> Ex. 51.  Wright told the FBI
cooperator that the "Mujahideen" in Syria had told them that
they could not release the names and addresses of other ISIS
fighters located in the United States.  <u>Id.</u>

**2. Rahim's Contacts Abroad**

Wright also acknowledged to the FBI that "Rahim did in fact have a contact overseas following his pledging bayah to the Islamic State or allegiance to the Islamic State." 9/25/17 Trial Tr. at 16. The evidence showed that Rahim had been in contact with people located overseas -- Abu Antar and Abu Hussain. See Exs. 356, 377-79. According to the messages between Abu Antar and Rahim, Rahim asked Abu Antar for help traveling overseas and joining ISIS. See Ex. 356, 9/28/17 Trial Tr. at 32-33. Abu Antar gave Rahim a phone number with a Turkey country code to call. Id. Rahim contacted Abu Hussain directly at around the same time as he communicated with Abu Antar. 9/28/17 Trial Tr. at 30-34.

Based on an ISIS book that Wright, Rovinski, and Rahim shared with each other, the person who used Abu Hussain's Twitter account lived overseas "in the Islamic State." See Ex. 214 at 98. The postings on the account and other evidence confirmed that Abu Hussain talked to Rahim about beheading Geller in May 2015. See Exs. 57A, 119.

Lastly, the evidence at trial also permitted the reasonable inference that Junaid Hussain, a citizen of the United Kingdom who traveled to Syria in August of 2013 and became a member of ISIS, was also Abu Hussain. Rahim had informed Wright that he had been in contact with a person named "Mr. Hussain" and had received encrypted files from this person regarding Geller's

beheading.  Ex. 57A at 3-4.  Twitter accounts linked to Junaid

Hussain were also linked to Abu Hussain.  10/10/17 Trial Tr. at

12, 15-16, 18-21; Exs. 119, 367, 378, 400.

Based on these communications, a jury could properly infer

(i) that Rahim was communicating with Abu Hussain and Abu Antar,

who were located overseas near Turkey; (ii) that Junaid Hussain

and Abu Hussain were the same person; (iii) that Junaid Hussain

was also located overseas; (iv) that Rahim communicated with

these individuals about joining ISIS and beheading Geller; and

(v) that Wright was made aware of these communications.

## IV.  SENTENCING

At the close of a lengthy sentencing hearing on December

19, 2017, this Court sentenced Wright to 28 years in custody.

Electronic Clerk's Notes, ECF No.409.  Brief mention ought be

made of two aspects of the sentencing.

### A. Applying the Advisory Sentencing Guidelines

Because this court varied downward from the Sentencing

Guideline range, it failed rigorously to focus on the (higher)

advisory range and adopted a guideline range of 30 years to life

in its Judgment and Commitment Order.  The government, however,

had argued for an unequivocal guideline of life imprisonment.

> The government believes that the applicable
> guideline for a "conspiracy to kill persons" in
> violation of 18 U.S.C. § 2332b(a)(2) is USSG § 2A1.5
> (Conspiracy or Solicitation to Commit Murder), not §
> 2A6.1, which only pertains to "Threatening or

Harassing Communications; Hoaxes; False Liens."
Section 2332b(a)(2) criminalizes three types of
offenses -- "threats, attempts, and conspiracies."
While the Guidelines do list 2A6.1 as the statutory
reference for Section 2332b(a)(2), that guideline
provision appears only to refer to "threats" and not
to conspiracies or attempts to kill, assault, kidnap,
or damage real or personal property.  See USSG § 2A6.1
(repeated use of term "threats" but no references to
conspiracies or attempts to kill or commit serious
assault).  Indeed, the very last sentence of Section
2A6.1 makes clear that it is designed only to cover
conduct related to threats; it states that the
seriousness of the offense "depends upon the
defendant's intent and the likelihood that the
defendant would carry out the threat." See §2A6.1
(Background paragraph).  Nowhere in the discussion of
the punishment is there any discussion about the harm
caused by a conspiracy or attempt to kill a person.

     The defendant was not convicted of making threats
or communicating threats to an intended victim.  Thus,
the government requests that the Court apply the
guideline that best fits the conviction, which charged
the defendant with conspiracy "to kill and maim
persons within the United States in violation of the
laws of Massachusetts and New York."  See United
States v. Almeida, 710 F.3d 437, 441 (1st Cir. 2013)
(applicable guideline should be based "on conduct
charged in the indictment.").  The most analogous
guideline is Section 2A1.5 (Conspiracy or Solicitation
to Commit Murder). In accordance with USSG §2A1.5 the
base offense level is 33.  There are no specific
enhancements in Section 2A1.5 but the terrorism
enhancement would then increase the offense level to
45 and defendant's criminal history category to
category VI resulting in a guideline range of life.

     Alternatively, because Wright is charged with
conspiring to kill persons and 18 U.S.C. § 2332b
indicates that the punishment for conspiracies shall
be the same as the amount of imprisonment that would
have applied had the offense been completed, Section
2X1.1 could also be used.  Indeed, the Guidelines
appear to require this in cases like these where the
offenses involved a conspiracy.  USSG § 1B1.2(a) ("If

the offense involved a conspiracy, attempt, or
solicitation, refer to § 2X1.1 (Attempt, Solicitation,
or Conspiracy) as well as the guideline referenced in
the Statutory Index for the substantive offense.").
Section 2X1.1 provides that the base offense for Count
4 shall be the same as the base offense level from the
guideline for the substantive offense (first degree
murder guideline - USSG § 2A1.1) where violations of
18 U.S.C. § 2332b are charged.  If Section 2A1.1 is
used, the defendant's base offense level would be 43
and the terrorism enhancement would increase his
offense level by twelve levels.  Accordingly,
defendant's maximum sentence under Section 2A1.1 would
also be life.

Gov't's Sentencing Mem. 9–11, ECF. No. 399 (footnote omitted).

In retrospect, the Court concludes that the government's

guideline analysis is correct.  It's too late to correct the

Judgment of course, see Fed. R. Crim. P. 35(a), and it makes

little practical difference as the Court varied downward (and

would have to the same degree even had it adopted the

government's guideline analysis before imposing sentence).

Still, a decent respect for the careful arguments of counsel

deserves this acknowledgment.  Moreover, should the sentence

become the subject of further proceedings, I need acknowledge

that the extent of the variance ought to be measured from the

advised life term, not from a 30 year low-end advisory sentence.

**B. "Our society is not afraid of ideas, we're committed to
the belief that we have better ideas."**

No judge is ever satisfied that he or she has done

"justice."  This is especially true when sentencing another

human being.  Justice is a goal for which we constantly strive.
All we can say is that we conscientiously reach out for justice.

Here, as the remarks leading off this opinion demonstrate,
I was at pains to explain that Wright's sentence was but a small
piece of a larger societal problem and that Wright -- misguided
and dangerous as he was -- required a severe but nuanced penal
sentence.  I cannot definitively say that Wright's sentence was
"just," but this much I know to be true.  Whatever the advisory
Sentencing Guidelines may say, reflexively to "lock-em-up" -- a
life sentence for every properly convicted terrorist is not
just.  It's not even a strategy.  It reflects fear more than
justice.

"We are not afraid," Court's Remarks, Transcript of Richard
Reid's Sentencing Hearing, <u>United States</u> v. <u>Reid</u>, No. 1:02-cr-
10013 (D. Mass. Jan. 30, 2003), ECF No. 191, yet we surely
recognize that "[t]errorist speech on the internet poses a
threat worldwide," Alexander Tsesis, Foreword, <u>Terrorist</u>
<u>Incitement on the Internet</u>, 86 Fordham L. Rev. 367, 367 (2017).
Sadly, it poses an equal threat to cherished First Amendment
values.  <u>Compare</u> Raphael Cohen-Almagor, <u>The Role of Internet</u>
<u>Intermediaries in Tackling Terrorism Online</u>, 86 Fordham L. Rev.
425 (2017); Alexander Tsesis, <u>Social Media Accountability for</u>
<u>Terrorist Propaganda</u>, 86 Fordham L. Rev. 605 (2017) <u>with</u> David
S. Han, <u>Terrorist Advocacy and Exceptional Circumstances</u>, 86

Fordham L. Rev. 487 (2017); Andrew Koppelman, <u>Entertaining</u>

<u>Satan: Why We Tolerate Terrorist Incitement</u>, 86 Fordham L. Rev.

535, 542 (2017).[3]

Sensitive to these concerns, I posed to Wright the

alternative course – the road not taken:

> Have you ever heard of Humayun Khan, Captain
> Humayun Khan, First Infantry Division, fought and
> died for the men he marched among?  You come from
> Everett.  Have you ever heard of the 54th
> Massachusetts?  A young man from Everett served in
> that regiment.  Or the 9th?  The 10th Cavalry?
> The 24th Infantry?[4]  And I don't need military
> examples, there's heroism throughout this society,
> building, shaping American democracy.
> Have you ever heard of Crispus Attucks?
>
> THE DEFENDANT: No.
>
> THE COURT: Have you heard of Frederick Douglass?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Harriet Tubman?  Leila Robinson?
> Martin Luther King?  Thurgood Marshall?  And I
> don't have to go back to history.  And you've
> acknowledged it -- you know you have acknowledged
> it, everyone has treated you with the utmost
> fairness, and you're right to acknowledge it.
> There's [sic] heroes right here in this
> courtroom, I can name them for you, people who
> love this country, not in some sort of blind
> authoritarian way, but who look at that flag and
> have an understanding, a nuanced understanding of
> the republic for which it stands.  Ms. Seigmann.
> Mr. Gonzalez. [the prosecutors]  Mr. Tumposky.
> Ms. Hedges. [defense counsel]  And every single

---

[3] "Any citizen of a liberal society might have a legitimate
reason to read the recruitment literature of ISIS.  No one can
think intelligently about the challenge of Islamic radicalism,
or of any other illiberal ideology, without spending at least a
little time thinking about it from the inside.  More generally,
one cannot think intelligently about evil without entertaining
evil points of view.  The fearless, open character that liberal
society seeks to cultivate cannot worry about whether one is
permitted to look at this or that." <u>Ibid.</u> (footnote omitted).

[4] The "Buffalo Soldiers."

one of the jury that carefully considered this
evidence and convicted you. Those are the heroes.
    . . .
     Think about this.  Two days from now everyone
will have forgotten about this. There's going to
be other things on the news. It will all be
forgotten. But some things endure. 28 years from
now -- I'll be gone, but there'll be a judge
sitting here in this courtroom and we won't care
about her faith or lack of faith, we won't care
what race she is, but she'll be younger than I am
and she'll be stronger than I am and she'll be so
much smarter than I am, and she will sit here and
reach out for justice.  That flag will still fly
here and we will yet be free.
    [And] in the hearts of all Americans, all
Americans who know the story, [there] will shine
the name of Humayun Khan, combat infantryman.
Think about that.  That's the sentence of the
court.  Stand him down, Mr. Officer.

Transcript of David Wright's Sentencing Hearing at 55:6-57:4.

The next day, pursuant to one of the rare ''C'' pleas
afforded to an individual in this District, <u>see</u> <u>United States</u> v.
<u>Aegerion Pharm., Inc.</u>, No. CR 17-10288-WGY, 2017 WL 5586728 (D.
Mass. Nov. 20, 2017), I imposed the agreed-upon 15 year sentence
on Rovinski, Wright's co-conspirator (who had testified against
him).  During the course of that hearing, Rovinski's counsel,
William W. Fick, neatly summed up the issue:

> [T]he government and law enforcement face a very
> vexing problem today about what to do about online
> radicalization, young people looking for a cause,
> and what happens when they [latch] onto an odious
> and dangerous and violent cause, and, you know,
> one can certainly understand, stepping back, that
> it's very difficult for the government and law
> enforcement to know both who might go operational,
> who might stay within the realm of ideas.
> . . .
> I recognize the challenge that law enforcement
> faces, these are very serious crimes, these are
> very dangerous ideas, and so some measure of
> punishment is necessary here.

[39]

Transcript of Nicholas Rovinski's Sentencing Hearing at 10:2-10:10, 12:16-12:19, <u>United States</u> v. <u>Rovinski</u>, No. 1:15-cr-10153 (D. Mass. Dec. 20, 2017), ECF No. 418.

The Court responded:

> I tried to say yesterday, and I did so inartfully, what you, Mr. Fick, have managed to say more succinctly and more accurately, that this is a problem beyond individual defendants who seek to put these ideas into action. Our society is not afraid of ideas, we're committed to the belief that we have better ideas, ideas that allow all people the chance both to participate and realize their full potential and, um, have an equal and just and respectful place in society, and the one thing -- and I'm sure I did not do this well yesterday, but I did try to address what you raised, that outside the law enforcement, which has been superb here in this case, . . . we need something, something that's internet-attractive to young people to convey those ideas and to convey the self-sacrifice, the heroism, the daily requirement of what it means to be a citizen in a republic . . . . [I]t is all of our responsibility as Americans to see that the truly magnificent system that we have, a system that is borne out in this proceeding in so many ways, um, resonates in the hearts and minds of . . . ''restless young people.''

<u>Id.</u> at 16:19-17:18.

Just as the men of the 54th Massachusetts stormed Fort Wagner to strike down the abomination of slavery, so today countless Americans from all walks of life live and breathe and bring to radiant reality the core ideas of the founders. These folks all have a dream -- a dream worth celebrating. Will we do it?

_/s/ William G. Young____
WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE