UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Crim. No. 15-10153-DPW |
| DAVID WRIGHT, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S RE-SENTENCING MEMORANDUM

In 2015, the defendant, David Wright ("Wright"), became a soldier of the Islamic State of

Iraq and Syria ("ISIS") who disavowed his own country, pledged his allegiance to ISIS's leader

Abu Bakr al-Baghdadi, and heeded the call of ISIS to carry out attacks in the United States.  The

defendant took numerous steps in furtherance of his plan to wage war on the United States.  He

manipulated people, including his own uncle, Usaamah Rahim ("Rahim"), into believing that

they needed to support ISIS and kill U.S. citizens.  He encouraged one person to travel to Syria

to join, and fight for, ISIS.  He created an ISIS jihadist cell in Massachusetts consisting of

himself, Rahim, and Nicholas Rovinski ("Rovinski") and identified Pamela Geller as their first

target for assassination by beheading.  They planned to kill her in July 2015.  This coincided

with other U.S. based ISIS jihadists who were also planning "attacks tied to the July Fourth

holiday."  *See* July 9, 2015 testimony of FBI Director James Comey testimony before Senate

Judiciary Committee summarized in www.cbsnews.com/news/fbi-director-we-disrupted -efforts-

to-kill-people-around-july-4-holiday/.  Further, the defendant created a Twitter page for ISIS

recruitment and even published a spine-chilling document on the Internet that warned Americans

that Muslims who lived among them and had "remained dormant" were intending to attack them

to seek "victory or martyrdom" and would thereby bring America's "darkest fears to fruition."

*See* Ex. 336 attached hereto as Attachment 1.

Most significantly, on the morning of June 2, 2015, the defendant convinced Rahim to attack "the boys in blue" on behalf of ISIS.  Less than two hours later, Rahim lunged at police officers with a large fighting knife -- one of the three knives which he had procured for their ISIS martyrdom operation.  *See* Ex. 13 attached hereto as Attachment 2.  Police officers and FBI Special Agents repeatedly requested Rahim to drop his weapon, but he refused resulting in his death. Wright's actions caused the death of one person and gravely threatened the lives of police officers and civilians.

The defendant's commitment to, and support of, ISIS has not waned despite the passage of time.  The defendant displayed photocopies of an ISIS flag and an emblem of the ISIS morality police, one of the most lethal and feared branches of ISIS, on a bulletin board in his prison cell in FCI Terre Haute.  Prison officials found these pictures in Wright's cell during a search in June 2018 and removed them.  The defendant was so upset by the removal of his ISIS materials from his cell that he appealed this administrative action three times, most recently in April 2019 when he appealed this action to the Central Office Administrative Remedy Appeal Unit of the Bureau of Prisons in Washington, D.C., claiming that he had the religious right to display materials relating to ISIS, a foreign terrorist organization ("FTO").

During the original sentencing hearing on December 19, 2017, the defendant stated:

> I reject everything ISIS stands for and represents.  And as I said during the trial,
> their actions of senseless violence against innocent people are disgusting and it's
> reprehensible, it's cruel and I in no way, shape, or form, support that type of
> behavior.

Sent. Tr. at 50.  This was a lie as was his testimony at trial.  After causing the death of Rahim, and faced with the prospect of going to jail, the defendant concocted a story for the jury that he never intended to hurt anyone, did not support ISIS, and was merely "role playing" being a terrorist.  The jury rejected this defense as did Judge Young.  *Id.* at 27 ("I reject his testimony …

He didn't imagine these were knives …").  The evidence at trial clearly refuted the defendant's claims.  The defendant's actions in jail clearly demonstrate his intent to support ISIS and that he harbors the same radicalized views as he had in 2015.  In April and May 2015, the defendant confided to a cooperating witness about his plans.  He was not content in planning a single attack against our Homeland.  Rather, he wanted to conduct attacks in ten states because in his words the harm caused by the Boston Marathon bombings were not "sufficient." Exs. 51 and 51A (attached hereto as Attachment 3) at 3.[1]  He intended to "strike fear" in the "hearts" of Americans.  *See id.* at 1-2.  Consequently, the defendant is extremely dangerous and poses a serious threat to the United States.

Unlike many defendants convicted of terrorist offenses in the United States, the defendant was convicted of conspiring to commit acts of terrorism transcending national boundaries, in violation of 18 U.S.C. § 2332b(a)(2), based upon the fact that his cell or group was in direct communication with, and had conspired with, Junaid Hussain, an ISIS leader and recruiter located in Syria who was killed by an airstrike on August 24, 2015.  Accordingly, unlike the material support violations (18 U.S.C. § 2339A and 18 U.S.C. § 2339B),[2] violations

---

[1] In these chats that were exchanged using an encrypted internet platform between the defendant and Yusef Ali, a FBI cooperating witness, testified at trial that the defendant used the name "Shadowcloak (Umar)" while the cooperator used the name "Samikareem."  The only difference between exhibits 51 and 51A is that Arabic terms are translated into English in exhibit 51A.  The English translations appear in red.

[2] The material support statutes carry a maximum penalty of 20 years and do not require evidence that a defendant was in direct contact with a foreign terrorist organization (although that was proved here).  Nor do they require any proof of overseas conduct.  Thus, the evidentiary threshold for violations of Section 2339B is far easier to meet than Section 2332b.  Indeed, the First Circuit rejected "Wright's contention that there was insufficient evidence for a rational jury to find beyond a reasonable doubt that Wright conspired to carry out a plot to kill Geller and others 'in coordination with' ISIS."  *United States v. Wright*, 937 F.3d 8, 24 (1st Cir. 2019).  It nevertheless vacated the conviction of Count 1 (material support) due to one sentence of the jury instructions regarding the degree of coordination required to establish material support.

of Section 2332b(a)(2) carry a far more serious penalty commensurate with the offense of conspiring to commit acts of terrorism transcending national boundaries – a statutory maximum of life in prison.  For the reasons set forth herein and the original sentencing proceedings, and the facts demonstrated at trial and contained in the government's statements of offense and relevant conduct in the defendant's Pre-Sentence Report, the United States urges this Court to sentence the defendant to a term of life imprisonment consistent with correctly calculated U.S. Sentencing Guideline's advisory range.

## I.      FACTUAL BACKGROUND

### A.  <u>Convictions</u>

On October 18, 2017, after a 16-day trial, the jury convicted Wright on all five counts in the Second Superseding Indictment: (1) conspiracy to provide material support to ISIS, a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1) (Count 1); (2) conspiracy to obstruct justice by instructing Rahim to destroy a laptop computer and mobile phone, in violation of 18 U.S.C. § 1519 (Count 2); (3) obstruction of justice by causing Rahim to destroy his computer, in violation of 18 U.S.C. § 1519 (Count 3); (4) conspiracy to commit acts of terrorism transcending national boundaries, in violation of 18 U.S.C. § 2332b(a)(2) & (c) (Count 4); and (5) obstruction of justice by deleting data from his own computer minutes after learning that his uncle and co-conspirator (Rahim) had been killed by law enforcement after he attempted to attack police officers with a knife in Roslindale, Massachusetts on June 2, 2015, in violation of 18 U.S.C. § 1519 (Count 5).

As noted above, on August 29, 2019, the First Circuit vacated his conviction for conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B (Count 1).  *See* Parties Joint Status Report Regarding Re-Sentencing, Doc. #435.

Wright remains convicted of the most serious terrorism charge -- conspiring to commit acts of terrorism transcending national boundaries, in violation of 18 U.S.C. § 2332b(a)(2) & (c) (Count 4), which carries a statutory maximum penalty of life.  Any sentence imposed on Count 4 also must run consecutive to the sentence imposed for Counts 2, 3, and 5 (obstruction and conspiracy to obstruct justice).  *See id.*

B. <u>ISIS</u>

As the parties stipulated at trial (Ex. 1), the United States Government designated ISIS as a FTO and it remains a designated FTO.  This designation is based upon ISIS's extremely brutal tactics and systematic abuses of human rights and violations of international law, including indiscriminate killing and deliberate targeting of civilians, mass executions and extrajudicial killings, persecution of individuals and communities on the basis of their identity, kidnapping of civilians, forced displacement of Shia communities and minority groups, killing and maiming of children, rape, and other forms of sexual violence.  ISIS has recruited thousands of foreign fighters and has used technology to spread its violent extremist ideology and to incite others to commit terrorist acts.

Beginning in 2014, using social media, ISIS has called for attacks against citizens—civilian and military—of the countries participating in the United States-led coalition against ISIS.  For instance, on September 21, 2014, ISIS released a speech of Abu Muhammed Al-Adnani, a former senior leader and official spokesman of ISIS.[3]  In this speech, entitled "Indeed Your Lord is Ever Watchful," Al-Adnani called on Muslims who support ISIS from around the world to "defend the Islamic State" and exhorted its supporters to "rise and defend your state

_____

[3]On August 30, 2016, Adnani was killed by an airstrike in Syria.

5

from your place wherever you may be" killing disbelievers by any accessible means (e.g., using a knife, vehicle, rock, poison, etc.). The defendant had copies of this speech on his thumb-drive and laptop computer and quoted extensively to Al-Adnani in his electronic communications. *See, e.g.*, Ex. 310 (written excerpt of Al-Adnani's speech in ISIS book entitled, Lone Wolves); Exs. 246-247 (discs containing excerpt and entirety of Al-Adnani's speech entitled "Indeed Your Lord is Ever Watchful" urging ISIS supporters to commit attacks in the United States); Ex. 51 at 4 (chats with cooperating witness discussing Adnani's view that United States waged war on Islam and that civilians are legitimate targets); Ex. 122 at 10 (Facebook conversation with Yusha Abdullah quoting Al-Adnani regarding the killing of soldiers and civilians). Further, like Al-Adnani, Wright advised Yusha Abdullah that the "killing of women, children, and elderly of America" was justified in retaliation for America's military operations. *See* Ex. 122 at 66.

Since in or about June 2014, ISIS has been distributing beheading videos to demonstrate, among other things, an acceptable method of killing people who are believed to be non-believers, or infidels. For instance, in August 2014, ISIS released the video of the beheading of U.S. journalist James Foley. In February 2015, ISIS released a video showing the mass beheading of 21 Egyptian Christians on a beach in Libya. This five-minute video was found on Wright's thumb-drive.[4] Similarly, the defendant boasted that he had watched ISIS's video of a Jordanian pilot being burned alive five times. Ex. 59A at 6; *see* Ex. 246A (video recovered from defendant's thumbdrive).

---

[4]FBI Special Agent Michael Laurence testified that Wright had 92 ISIS-related videos on this thumb-drive, the majority of which showed brutal, cold-blooded executions by ISIS members. *See* 9/29/17 Tr., Vol. 1 at 65-66; *see also* 10/11/17 Tr., Vol. 2 at 125-128 (Wright admitted that he had 92 ISIS videos; "almost all of them showing killings;" and one of them showed "U.S. soldiers singing 'Amazing Grace' before they were killed by ISIS.").

Additionally, since late 2014, using social media, ISIS have encouraged its supporters to kill specific persons or groups of persons such as members of the military and law enforcement within the United States.  For example, in March 2015, ISIS posted the names and addresses of 100 U.S. military service members on the internet and instructed their supporters to "kill them in their own lands, behead them in their own homes, stab them to death as they walk their streets thinking they are safe …"  Wright had a copy of this kill list (with photographs of U.S. military members with their addresses and contact information) published by ISIS's Hacking Division on his laptop computer.  *See* Ex. 343 attached hereto as Attachment 4.  In May 2015, ISIS had issued a fatwa, or religious decree, to its supporters to kill Pamela Geller ("Geller"), a New York woman.  As described below, Geller had organized a Muhammad Art Exhibit and Contest at the Curtis Culwell Center in Garland, Texas on May 3, 2015, which included cartoons depicting the Prophet Mohammad.  With full knowledge of ISIS's brutal activities, Wright pledged his allegiance to ISIS.  He decided to wage war against the United States on ISIS's behalf, and plotted to behead people in the United States to support ISIS, an organization that has called for the overthrow of the United States government and the imposition of worldwide sharia law.

The threat posed by ISIS has not been eliminated.  ISIS still remains a serious threat to the United States, its allies, and countries throughout the world.  Neither ISIS's loss of territory nor the death of its leader, Abu Bakr al-Baghdadi, has destroyed this terrorist group.  Indeed, FBI Director Christopher Wray made the following statement before the House of Representatives, Homeland Security Committee on October 30, 2019:

> Despite their territorial defeat in Iraq and Syria, ISIS remains relentless and ruthless in its campaign of violence against the West and has aggressively promoted its hateful message, attracting like-minded violent extremists. The message is not tailored solely to those who overtly express signs of radicalization. It is seen by many who enter messaging apps and participate in social networks. Ultimately, many of the individuals drawn to ISIS seek a sense of belonging.

> Echoing other terrorist groups, ISIS has advocated for lone offender attacks in Western countries. Recent ISIS videos and propaganda have specifically advocated for attacks against soldiers, law enforcement, and intelligence community personnel.
>
> Many foreign terrorist organizations use various digital communication platforms to reach individuals they believe may be susceptible and sympathetic to violent terrorist messages. However, no group has been as successful at drawing people into its perverse ideology as ISIS, which has proven dangerously competent at employing such tools. ISIS uses traditional media platforms as well as widespread social media campaigns to propagate its ideology. With the broad distribution of social media, terrorists can spot, assess, recruit, and radicalize vulnerable persons of all ages in the U.S. either to travel to foreign lands or to conduct an attack on the homeland. Through the Internet, terrorists anywhere overseas now have direct access to our local communities to target and recruit our citizens and spread their message faster than was imagined just a few years ago.

*See* Statement for the Record of FBI Director Wray before the House Homeland Security Committee, Washington, D.C., Oct. 30, 2019, *available at* https://www.fbi.gov/news/testimony/global-terrorism-threats-to-the-homeland-103019.  Of particular significant here, is the fact that the defendant's conduct in directing and encouraging Rahim to attack law enforcement on the morning of June 2, 2015 has been used as a recruitment tool.  As described below, ISIS used Rahim's death during his attack on law enforcement to inspire others to engage in violent jihad.  *See infra* at 29-30.

        C.   The Plot to Support ISIS

As detailed in the PSR, in or about June 2014, Wright introduced his uncle Rahim to ISIS.  According to Wright's own admissions, Rahim was apprehensive of supporting ISIS at first.  Using ISIS videos, however, Wright convinced Rahim that they should support ISIS.  9/25/17 Tr., Vol. 1 at 13-14 (Chief James Bailey, CBP, summarizing statements made by Wright during the law enforcement interview on June 2, 2015); 10/11/17 Tr., Vol. 2 at 104 (Wright).  Approximately six months later, in December 2014, Wright met Rovinski on Facebook and they began communicating online.  In December 2014, Wright and Rovinski began discussing their

mutual support of ISIS.  Wright, Rovinski, and Rahim shared a common goal to support ISIS.  *See generally* testimony of Rovinski at transcripts of 9/20/17-9/22/17.

By at least February 2015, Wright and Rahim had heeded the call of ISIS to attack non-believers in the United States and began plotting and recruiting members for their "martyrdom" operation.  For this initiative, in March 2015, Wright obtained and studied a jihadist manual, entitled "How to Survive in the West," which details "how to become a Sleeper-cell" in the West until ordered to attack.  On March 19, 2015, Wright forwarded a link to this document to Rahim and advised Rahim to study it as it was "perfect for the initiative."  *See* Ex. 105 attached hereto as Attachment 5.

By April 2015, Wright, Rahim, and Rovinski had agreed to commit attacks and kill persons inside the United States, which they believed would support ISIS's objectives.  Wright was the leader of this group and cell and took steps to recruit other members to assist them in conducting attacks in the United States.  *See* 9/21/17 Tr., Vol. 2 at 117-22 (Rovinski); 9/22/17 Tr., Vol. 1 at 29, 32-34 (Rovinski); Exs. 5A and 57A attached hereto as Attachments 6 and 7 respectively.  For instance, on March 17, 2015, Wright and Rahim discussed recruiting a person named "Sidiqi" for their operation.  *See* Ex. 103.

Wright's cell had ISIS contacts overseas.  Indeed, Wright confided to the FBI Cooperator that his group had been in contact with "Mujahideen [fighters] in Syria."  *See* Exs. 51 and 51A at 2; *see also* Ex. 7 (translation of Arabic terms).  Rahim had numerous conversations with ISIS members located overseas beginning in at least February 2015 and continuing until his death in June 2015.  *See, e.g.*, Exs. 356, 377-79.  One of the ISIS members with whom he communicated was Junaid Hussain ("Hussain"), a British born and English speaking ISIS leader who used the *nom de guerre* or *kunya* Abu Hussain al-Britani.  *See* Ex. 57 and 57A at 2-6 (Rahim telling

Wright about his conversations with Hussain and excitedly discussing the prospect of beheading Geller with a carving tool he recently obtained).  Hussain used Twitter to encourage terrorist attacks in the United States and Europe against persons whom ISIS believed should be targeted for execution, including Pamela Geller.  On August 24, 2015, Hussain was killed in an airstrike in Raqqah, Syria, a city in which ISIS considered to be its capital until recently.  Prior to his death, Hussain was a central figure in ISIS's online recruitment campaign and hacking activities.

On May 3, 2015, two armed men, Elton Simpson and Nadir Soofi, attacked the Muhammad Art Exhibit and Contest in Garland, Texas, which Gellar had organized and was attending.  During this attack, Simpson and Soofi wounded a security guard before law enforcement shot and killed them.  Shortly before the attack, Simpson issued a tweet in which he proclaimed his allegiance to Abu Bakr al-Baghdadi, the leader of ISIS, and asked that "Allah accept us [Simpson and Soofi] as mujahideen [those engaged in violent jihad]."  This tweet was reproduced in Issue 9 of ISIS's Dabiq magazine, which was in Wright's possession and he admitted that he read.  *See* Ex. 303; 10/12/17 Tr., Vol. 1 at 41-42 (Wright).

Minutes after the thwarted Garland attack on May 3, 2015, Hussain, using Twitter, stated that "2 of our brothers just opened fire at the Prophet Mohammad … art exhibition in texas!" and instructed ISIS's supporters to "Kill Those That Insult the Prophet - #GarlandShooting."  After the Garland attack, in May 2015, Wright identified Geller as the first beheading target for his group, which consisted of himself, Rahim, and Rovinski.  Wright believed that his group could do a better job than the Garland attackers in fulfilling ISIS's order to kill her.  9/20/17, Vol. 2 at 116-17, 122-24.  Wright, Rahim, and Rovinski each took steps in furtherance of this plan.  *See* PSR at ¶¶ 33-37.

D.  <u>Attack on the Boys in Blue on June 2, 2015</u>

During a telephone conversation on the morning of June 2, 2015, Rahim sought the guidance and advice of Wright because he could not wait until July 4th to go after their target and wanted to "go after" the "boys in blue" (a slang term used to describe police officers) in Massachusetts.  *See* Ex. 5 (audio recording of telephone conversation between Wright and Rahim) and 5A (transcript of conversation).  In response, Wright encouraged Rahim to attack the police and die as a martyr.  Wright instructed Rahim to pursue martyrdom, remain firm, and not to let anything deter him.  10/11/17 Tr., Vol. 2 at 134-136 (Wright).  Wright also instructed Rahim to destroy his phone and wipe all the data off his laptop computer by restoring it to its original factory settings.  Ex. 5 and 5A.

After speaking with Wright, Rahim did exactly as Wright had instructed and restored his (Rahim's) computer to its original factory settings.  As a result, all of the user data on Rahim's computer was destroyed and completely overwritten.  The FBI was unable to recover any information -- not even a single line of text -- from Rahim's computer.  *See* Testimony of retired SA James Scripture, 9/25/17 Tr., Vol. 1 at 49-62.

Less than 2 hours after Wright encouraged and directed Rahim to attack police officers in Massachusetts, Rahim was killed when he lunged towards police officers and FBI special agents with a large fighting knife in a parking lot in Roslindale and refused to drop his weapon despite numerous requests to do so.  *See* Testimony of SA Patrick Maloney, 9/22/17 Tr., Vol. 1 at 62-64 & 9/22/17 Tr., Vol. 2 at 70-73; Exs. 6 (audio recording), 6A, 12 (audio and video overlay showing interaction between law enforcement and Rahim), and 13 (recovered knife).  Wright's actions caused this terrorist attack and endangered the lives of numerous law enforcement members and the public.

Shortly after Rahim attacked law enforcement, a family member informed Wright that Rahim had been shot and asked Wright whether he knew anything about this.  Ex. 62A.  In response, the defendant lied.  He claimed that he knew nothing about Rahim's plans to attack the police and hadn't spoken to Rahim in days.  *See id*. at 2.  After being informed that Rahim had attacked law enforcement, Wright deleted data on his own computer by restoring his laptop to its original factory settings.  9/29/17 Tr., Vol. 2 at 138-142 (Computer Scientist Nicholas Nathans).

## II.    ADVISORY SENTENCING GUIDELINES

The government disagrees with, and objects to, the Probation Office's Guideline calculations regarding the calculation of the guidelines applicable to Count 4.  As described below, the Government contends that the adjusted offense level for that count is 43.  The government also disagrees with, and objects to, the Probation Office's Guideline calculations for the obstruction counts.  Below are the guideline calculations for each count and a description of applicable enhancements.

### A.  Count Four – Conspiracy to Commit Acts of Terrorism Transcending National Boundaries in violation of 18 U.S.C. § 2332b

As U.S. District Court Judge Young recognized and the Government contended at the original sentencing hearing, the Sentencing Guidelines applicable to Count 4 is either Level 45 under USSG § 2A1.5 or Level 43 under USSG § 2X1.1 with a criminal history category of VI resulting in sentencing guideline range of life.  *See U.S. v. Wright*, 285 F.Supp.3d 443, 461-62 (D. Mass. Jan. 22, 2018) .  The government believes that the applicable guideline for a "conspiracy to kill persons" in violation of 18 U.S.C. § 2332b(a)(2) is USSG § 2A1.5 (Conspiracy or Solicitation to Commit Murder), not § 2A6.1, which only pertains to "Threatening or Harassing Communications; Hoaxes; False Liens."  Section 2332b(a)(2) criminalizes three types of offenses -- "threats, attempts, and conspiracies."  While the

Guidelines do list 2A6.1 as the statutory reference for Section 2332b(a)(2), that guideline provision appears only to refer to "threats" and not to conspiracies or attempts to kill, assault, kidnap, or damage real or personal property.  *See* USSG § 2A6.1 (repeated use of term "threats" but no references to conspiracies or attempts to kill or commit serious assault).  Indeed, the very last sentence of Section 2A6.1 makes clear that it is designed only to cover conduct related to threats; it states that the seriousness of the offense "depends upon the defendant's intent and the likelihood that the defendant would carry out the threat."  *See* § 2A6.1 (Background paragraph). Nowhere in the discussion of the punishment is there any discussion about the harm caused by a conspiracy or attempt to kill a person.

The defendant was not convicted of making threats or communicating threats to an intended victim.  Thus, the government requests that the Court apply the guideline that best fits the conviction, which charged the defendant with conspiracy "to kill and maim persons within the United States in violation of the laws of Massachusetts and New York."  *See United States v. Almeida*, 710 F.3d 437, 441 (1st Cir. 2013) (applicable guideline should be based "on conduct charged in the indictment.").  The most analogous guideline is Section 2A1.5 (Conspiracy or Solicitation to Commit Murder). [5]   In accordance with USSG § 2A1.5 the base offense level is 33.  There are no specific enhancements in Section 2A1.5 but the terrorism enhancement would then increase the offense level to 45 and defendant's criminal history category to category VI resulting in a guideline range of life.

Alternatively, because Wright is charged with conspiring to kill persons and 18 U.S.C. § 2332b indicates that the punishment for conspiracies shall be the same as the amount of

_____

[5]This is the same position the government took in the plea agreement with Wright's co-defendant Rovinski.

imprisonment that would have applied had the offense been completed, Section 2X1.1 could also be used. Indeed, the Guidelines appear to require this in cases like these where the offenses involved a conspiracy. USSG § 1B1.2(a) ("If the offense involved a conspiracy, attempt, or solicitation, refer to § 2X1.1 (Attempt, Solicitation, or Conspiracy) as well as the guideline referenced in the Statutory Index for the substantive offense."). Section 2X1.1 provides that the base offense for Count 4 shall be the same as the base offense level from the guideline for the substantive offense (first degree murder guideline - USSG § 2A1.1) where violations of 18 U.S.C. § 2332b are charged. If Section 2A1.1 is used, the defendant's base offense level would be 43 and the terrorism enhancement would increase his offense level by twelve levels. Accordingly, defendant's maximum sentence under Section 2A1.1 would also be life. Thus, regardless of which guideline section of the USSG is used, the advisory sentencing guideline range for Count Four is life.

    B. Counts Two, Three, and Five – Conspiracy to Obstruct Justice and Obstruction of Justice in violation of 18 U.S.C. §§ 371 and 1519

As described by the Probation Office at PSR ¶ 56, under USSG § 2J1.2, Guideline § 2X1.3 (Accessory After the Fact) applies to cases involving obstruction of an investigation or prosecution for a criminal offense. The government objects to, and disagrees with, Probation's revised calculation of the guidelines applicable to the Counts 2, 3, and 5. The government believes that the total offense level for Counts 2, 3, and 5 is level 39 with a criminal history category of VI (360-life) under either cross reference USSG § 2X3.1 (with the correctly calculated base offense level for Count 4) or under 2J1.2 (if the Court chooses to use Probation's calculation of BOL 12 for Count 4, then the resulting offense level under 2J1.2 would be greater and the cross reference should not be applied).

Pursuant to Section 2X3.1, the base offense level is 6 levels lower than the offense level

for the underlying offense.  Here, as discussed above, the underlying offense is conspiracy to kill and maim persons in the United States, which has a base offense level of 33.  Thus, the base offense level for the obstruction counts will be 27, the higher of the two potential offense levels if the defendant is convicted of both Counts One and Four.  The terrorism enhancement, USSG § 3A1.4, would then increase the offense level by 12 levels resulting in a total offense level of 39.  Wright's criminal history category would also be increased to Category VI resulting in a guideline range of 360 months to life for the obstruction offenses.

Even if the Court were inclined to adopt Probation's calculation of the guidelines regarding Count 4, USSG § 2J1.2 would yield an offense level of 39.  Thus, the cross reference of USSG § 2X3.1 would not apply.  *See* 2J1.2(c)(1) (only use Section 2X3.1 cross reference "if the resulting offense level is greater than that determined above.").  Under Section 2J1.2, the base offense is 14 and then several specific characteristics apply.  The offense level is increased by 8 levels because the offense caused property damage that obstructed justice (2J1.2(b)(2)); the offense resulted in the substantial interference with the administration of justice as Rahim's computer was completed wiped of all data so the level is increased by 3 levels (2J1.2(b)(2); and the offense involved the destruction of a substantial number of records and was otherwise extensive in scope, planning, or preparation so the level is increased by 2 levels (2J1.2(b)(3).  The total offense level under 2J1.2 would thus be $14 + 8 + 3 + 2 = 27$.  The terrorism enhancement under Section 3A1.4 would then increase the offense level by 12 levels resulting in a total offense level of 39.

C.  Grouping principles do not apply to Count 4.

Because any term of imprisonment imposed for violations of 18 U.S.C. § 2332b must run consecutively to any other term of imprisonment for other convictions, the grouping principles

do not apply to Count 4 and the sentence imposed for that count must be imposed independently. *See* USSG § 3D1.1(b)(1); USSG § 5G1.2(a).  The government therefore objects to, and disagrees with, Probation's determination that Count 4 is grouped with Counts 2, 3, and 5.  *See* Second Addendum to PSR at ¶ 7.

     D.  Terrorism Enhancement under Section 3A1.4 Applies to this Case.

     District courts may impose sentencing enhancements based upon facts it determines are proven by a preponderance of the evidence.  *See, e.g., United States v. George*, 761 F.3d 42, 60 (1st Cir. 2014) ("Our caselaw clearly holds that the preponderance standard applies" to Guidelines issues, not the beyond-a-reasonable doubt or clear-and-convincing standard.).  The Supreme Court has "long recognized that broad sentencing discretion, informed by judicial factfinding does not violate the Sixth Amendment."  *United States v. Alleyne*, 133 S.Ct. 2151, 2163 (U.S. 2013).  Because the application of the terrorism enhancement does not result in an imposition of a mandatory minimum sentence, the judge may impose this enhancement based upon its own evaluation of facts if it believes the convictions alone do not establish the requisite elements of USSG § 3A1.4.  *See United States v. Ramirez-Negron*, 751 F.3d 42, 48 (1st Cir. 2014).  Here, this Court may rely upon Judge Young's determination as the judge that presided over the trial that "the terrorism enhancement properly applies in this case."  *See* Sent. Tr. at 16.

     Section 3A1.4(a) states that if "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than 32, increase to level 32."  Additionally, under the terrorism enhancement, the defendant's criminal history category is also increased to Category VI.  *Id.* at § 3A1.4(b).

Conspiring to commit acts of terrorism transcending national boundaries (charged in Count 4) constitutes a federal crime of terrorism and is so identified in 18 U.S.C. § 2332b(g)(5) (defining federal crimes of terrorism). A federal crime of terrorism is defined as an offense that "(A) is calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct;" and "(B) is a violation of … section 2332b (relating to acts of terrorism transcending national boundaries) …" 18 U.S.C. § 2332b(g)(5). Therefore, this Court should find that the Section 3A1.4 enhancement applies here. *See United States v. Ali*, 799 F.3d 1008, 1030-31 (8th Cir. 2015) (concluding that Section 3A1.4 terrorism enhancement may be imposed on a defendant convicted of providing material support to a designated FTO and such an enhancement does not violate a defendant's due process rights because Congress has concluded "that terrorists and their supporters should be incapacitated for a longer period of time" due to the "dangerousness of the crime and the difficulty of deterring and rehabilitating" these types of criminals).

Similarly, the terrorism enhancement also applies to the obstruction counts -- Counts Two, Three, and Five. As described in Application Note 2 to the USSG 3A1.4, "an offense that involved . . . obstructing an investigation of a federal crime of terrorism . . . shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism." USSG 3A1.4 at App. Note 2; *see United States v. Benkahla*, 530 F.3d 300, 313 (4th Cir. 2008) (upholding application of § 3A1.4 enhancement where evidence established defendant actually obstructed a terrorism investigation); *United States v. Fidse*, 862 F.3d 516, 524-26 (5th Cir. 2017) (finding terrorism enhancement applied where defendant made false statements to federal agents who were conducting an investigation of the defendant for conspiring to provide material support to a designated foreign terrorist organization and requested the assistance of others in destroying

evidence); *United States v. Ashqar*, 582 F.3d 819, 825-26 (7th Cir. 2009) (affirming application

of enhancement based on defendant's refusal to testify because defendant intended to obstruct an

investigation into a federal crime of terrorism).  Indeed, this very Court has applied the terrorism

enhancement in two cases involving the obstruction of the investigation of the Boston Marathon

bombings – *U.S. v. Dias Kadyrbayev and Azamat Tazhayakov*, Crim. Action No. 13-10238-

DPW, and another case involving a defendant who made false statements during that same

investigation – *U.S. v. Robel Phillipos*, Crim. Action No. 13-10238-DPW.

Prior to the original sentencing in 2017, the defendant had objected to the application of

the terrorism enhancement on the grounds that the jury was not asked to find beyond a

reasonable doubt that the defendant's offenses were "calculated to influence or affect the conduct

of government by intimidation or coercion, or to retaliate against government conduct."   At no

time did the defendant request in its proposed jury instructions, at the charging conference, or

after the Court had instructed the jury that the jury be required to find any elements of any

sentencing enhancements, including the terrorism enhancement.  Nor did the defense object to

the instructions on this basis.  Accordingly, this argument has been waived or, at a minimum,

forfeited.  *See United States v. Hansen*, 434 F.3d 92, 101 (1st Cir. 2006) (defendant waived

objection to issue where it failed to timely object and indicated it was "content" after court had

instructed jury); *United States v. Corbett*, 870 F.3d 21, 30-31 (1st Cir. 2017) (distinguishing

waiver and forfeiture).  Further, as described above, this issue is not one for the jury but rather

for this Court to conclude using a preponderance of the evidence standard.

Even if this Court were to conclude that this issue was one for the jury, the jury has

already made such a finding by virtue of its conviction of Count 4.  Implicit in the conviction of

the defendant for conspiring to commit acts of terrorism, that is, acts of violence and beheadings

within the United States, is the fact that the defendant and his conspirators' actions were being done at the direction of their co-conspirator, Junaid Hussain in Syria, and were calculated to influence or affect the conduct of the U.S. government and retaliate against the U.S. government for its actions in the Middle East.  As Aaron Zelin testified: the objective of ISIS is "to create a worldwide caliphate where they conquer all territory and, therefore, then implement their version or interpretations of Islamic law."  9/28/17 Tr., Vol. 2 at 171.  In other words, ISIS intends to "control all territory all over the world" and require "everybody" to "submit to their will."  *Id.* Indeed, the ISIS speeches that the defendant admitted to possessing declare war on the United States and call for attacks in our homeland.  10/12/17 Tr., Vol. 1 at 19-24; *see* 9/22/17 Tr., Vol. 2 at 124-126 (Chief James Bailey, CBP, testified that during the June 2, 2015 interview Wright told him that "he agreed with ISIS and that they were justified in what they were doing;" "the terror they used was justified;" ISIS's spokesman, Abu Muhamad al-Adnani, had issued different fatwas directing its supporters to "carry out attacks in the homeland, meaning in the United States;" "the fatwa indicated it was justified to attack law enforcement in the U.S." because law enforcement in the United States supported the U.S. Government [and] the U.S. Government had soldiers overseas fighting.").

There is overwhelming evidence in the record that Wright's motive in the terrorism conspiracy was to influence, or retaliate against the conduct of, the United States government. All of the ISIS materials that Wright collected show this to be true, including the anti-U.S. "Flames of War" video that Wright himself distributed in an attempt to recruit others to assist him in his martyrdom operation efforts.  *See, e.g.*, Exs. 246-b (Flames of War), 247-b (Excerpt of Flames of War), 183 ("Message to America"); 297 (ISIS's Dabiq Magazine Issue 3 containing images of beheading of James Foley); 303 (ISIS's Dabiq Magazine Issue 9); 308 ("How to

Survive in the West"); 310 (Lone Wolves).  Indeed, Wright told the FBI cooperator during a chat

conversation on April 14, 2015, that his "desire was to obey the Khilafah [Islamic State] and

fight against the Taghut [Devil] here."  *See* Ex. 51 & 51A and 9/26/17 Tr. at 44-63.  The

defendant also described himself as one of ISIS's fighters in the United States who was awaiting

his orders from ISIS.  (*see* Exs. 51 & 51A and 9/26/17 Tr. at 44-63: in chats with FBI cooperator,

defendant stated on May 17, 2015, "2 Mujahids were martyred in Texas for attempting to kill

everyone at the 'Draw Muhammad' cartoon contest held by the New Yorkian Jew, Pamela

Geller, the Islamic State confirmed and approved of them and said that they have 71 more

trained Mujahid fighters in 15 other states ready to act as soon as the order is given[.]  I don't

know who they are and they don't know about me for security reasons.").

What makes this conclusion -- that Wright's offenses were calculated to influence, or

retaliate against, the United States -- indisputable is the document Wright admitted to posting on

the internet, "Internal Conquest."  *See* Ex. 336.  Wright conceded during cross-examination that

through this document, he sought to increase support for the Islamic State and encouraged

violent attacks against the United States.  *See* 10/12/17 Tr., Vol. 2 at 90; 10/11/17 Tr., Vol. 2 at

112-113, 115.  In pertinent part, Wright stated the following in his "Internal Conquest"

manifesto:

> O America!  Indeed the Lions of Allah have awoken and heard the words of our
> Khilafah Amir Ul Mu'minin Abu Bakr al-Baghdadi.  We rejoice in the prospect
> of living under an Islamic State which is governed completely by the Shari'ah of
> Allah Almighty….
>
> O America!  We have remained dormant and have watched the atrocities
> committed by the U.S. led coalition against the Islamic State….
>
> O America! Your sins are countless but Your days are numbered.  We shall
> resonate the roars of our brothers in the Islamic State of Iraq & Syria and Nigeria.
> We will bring your deepest lies ("Terrorism") and darkest fears ("Terrorist") to
> fruition.  We have began plotting and working and there is no forewarning which

can prepare you for this reality.  We live among you, travel with you on public transit, walk beside you on the streets, shop with you in the supermarkets and clothing stores, we eat with you at local restaurants, and some of us even attend your movie theaters….

O America…This is the time which you feared, the time you would witness true 'Terrorism,' the time you would witness true 'Terrorist,' the day the American people will never forget… This will be your final crusade.  We fear none but Allah Almighty.  You cannot defeat the Lions of Allah.  If we overcome you and are successful then it is due to Allah Almighty and we will be rewarded by His permission in this life and the hereafter.  If we lose our lives then we die as martyrs by His Permission and Paradise awaits us. We seek victory or martyrdom …

In this document, Wright also instructed "Moderate Muslims" to support ISIS and Al-Baghdadi rather than the United States and its President or risk retribution from ISIS supporters.

Similarly, in his chat conversations with the FBI cooperating witness, Wright makes clear that his attack plans and conspiratorial activities were calculated to retaliate against the conduct of the United States Government.  For instance, he states that he intends "to wage war on these kuffar here in America" because he had "seen the statements of our brothers in the Islamic State and they say that we are in the heart of the kuffar who are bombing the Muslims and leading the coalition against the Islamic State …"  Ex. 51 at 1.  Wright concluded that "[h]ere in America there are no borders, no drones, apart from the Police and National Guard and stationed military there is no serious threat which can't be stopped."  *Id.*  As a result, Wright believed his attack plans against the United States, which he referred to as the "Taghut," an Arabic word meaning the devil, were wise and could succeed.  *Id.*  His objective in carrying out these attacks was to "strike fear in the … hearts" of Americans.  *Id.* at 2.

Accordingly, there is a sufficient and compelling factual basis to find that the defendant was convicted of a federal crime of terrorism.  USSG § 3A1.4.  First, conspiring to commit acts of terrorism transcending national boundaries, in violation of 18 U.S.C. § 2332b is explicitly

identified as a federal crime of terrorism in 18 U.S.C. § 2332b(g)(5)(B).  Second, this offense, which involved plots to murder Geller and members of law enforcement, was calculated to influence, or retaliate against the United States government.  *See United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) ("commission of crimes listed § 2332b(g)(5)(B) satisfies the "involved" prong of the terrorism enhancement so long as the government shows by a preponderance of the evidence that the [defendant] had the 'specific intent,' to commit an offense that was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'") (citations omitted).

     E.   Adjustment for Obstruction of Justice also Applies.

     Because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offenses of conviction and the obstructive conduct related to the defendant's offenses of conviction, the Probation Office properly added two levels to the defendant's adjusted offense level pursuant to USSG § 3C1.1 (Obstructing or Impeding the Administration of Justice).  This adjustment is based upon the defendant's instructions to Rahim to destroy his phone and computer as well as the defendant's deletion of data on his own computer.  It is also based upon the defendant's perjury at trial.  When Wright testified at trial on October 11-12, 2017, he repeatedly lied to the Court and jury and committed perjury.  For example, he lied about at least four separate subjects.  During his testimony, Wright repeatedly claimed that he did not support ISIS in 2014-2015 despite having made numerous statements that demonstrated his support for the terrorist group in communications with Rovinski, Rahim, the FBI Cooperator, Janee Williams, Yusha Abdullah a/k/a Joshua Whitmore, Jacob Perez, David Andrews, and even his own mother (Shahidah Muhammad).  In finding the defendant guilty, the jury must have

concluded that Wright lied regarding his intent to support ISIS.  Among other things, Wright also

falsely claimed that: (1) he did not know that Zulfi Hoxha had traveled to Syria to join ISIS (*see*

*supra* at 24-25); (2) he did not believe Rahim was indeed going to attack law enforcement; and

(3) he believed the document Rahim obtained from Mr. Hussain was not a real document.

Because Wright instructed Rahim to wipe his computer and destroy the document that

Rahim had received from Hussain during their conversation on June 2, 2015 at 5:18 a.m., Rahim

restored his computer to its original factory settings.  *See* PSR at ¶¶ 30-31; Ex. 5 (audio

recording of telephone call) and 5A (transcript) at 10 (Wright instructed Rahim to destroy the

document he obtained from ISIS because "CSI" would be looking for it); Ex. 57 (audio recording

of telephone call) and 57A (transcript) at 3-4 (Rahim tells Wright he had received a document

from Hussain with all of the details regarding Pamela Geller).  As a result, all of the user data on

Rahim's computer was destroyed and completely overwritten by the factory re-setting process.[6]

Consequently, the FBI was unable to obtain any of Rahim's communications with Hussain or the

document Hussain had sent Rahim.  This severely hampered the FBI's investigation.  When the

FBI seized Rahim's electronic devices, Hussain was still operating in Syria and posed a grave

threat to the United States as he was actively recruiting people to commit attacks in the United

States and in Europe.

**Total Offense Level**:  Accordingly, the defendant's adjusted offense level is 43 (BOL of

33 + 12 under § 3A1.4 + 2 for obstruction = 47, which is capped at level 43) and criminal history

category is VI.

---

[6]It is unclear why the factory resetting process completely erased all of the data on Rahim's computer
while the FBI was able to obtain some data from Wright's computer.  One of the possible reasons for this
difference is that Rahim was running a newer Windows Operating System so the factory resetting process
may have been more thorough.

### III.    SECTION 3553(a) FACTORS

After calculating the appropriate Guidelines range and determining whether to apply any departures, the court must consider the factors set forth in Section 3553(a) so as to impose a sentence that is "sufficient, but not greater than necessary."  *United States v. Dixon*, 449 F.3d 194, 203-04 (1ˢᵗ Cir. 2006); *see United States v. Villanueva Lorenzo*, 802 F.3d 182, 184-85 (1ˢᵗ Cir. 2015).  The most salient Section 3553(a) factors here are: "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the need for the sentence imposed (A) to reflect the seriousness of the offense, . . .; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant."  18 U.S.C. §§ 3553(a)(1) and 3553(a)(2).  These factors demonstrate the need for a lengthy sentence of imprisonment.

### A.  History and Characteristics of the Defendant

More than five years after causing the death of his own uncle and endangering lives of innocent Americans, the defendant still has not accepted responsibility for his own actions.  Even now, after the jury rejected his claims, Wright still incredibly maintains that he was only playing some kind of terrorist role playing game with his uncle.  Wright is seeking to deceive this court into believing that he never actually supported ISIS and did not intend to cause any harm.  Yet, the truth is clear.  Wright is a terrorist.

The defendant urged Rahim to become a martyr on June 2, 2015.  *See* Exs. 5 and 5A. Wright could not hide his excitement at the prospect of Rahim attaining "martyrdom" in support of ISIS.  During his conversation with Rahim, Wright repeatedly referred to that morning as a "beautiful moment" and rejoiced at the thought of the "juicy necks" of beheaded police officers. *See* Ex. 5A at 5 ("Dang those juicy necks is intense [sic]!  Dang … Dang it, I feel, I feel so – I

feel so left out.").  Wright further instructed Rahim that "he must pursue … this reality" and complete this attack as this was something that they had been talking about and planning for "almost a year."  *Id.* at 7-8.

Although Wright had planned to conduct numerous terrorist attacks in the United States, once he heard the news that Rahim had been killed, Wright did his best to conceal his connections to Rahim's terrorist attack.  He deleted data on his computer in precisely the same way as he had instructed Rahim to do – by re-setting his computer to its original factory settings. He lied to his family about his knowledge of Rahim's plan.  He lied to the FBI on June 2, 2015. He also lied to the jury and this Court when he testified on October 11 and 12, 2017.

Additionally, at trial, the defendant sought to diminish his culpability by claiming he suffers from an unspecified personality disorder.  This claim is specious.  His own psychologist, Dr. Robert Mendoza, Psy.D, did not make such a diagnosis until he testified in Court on October 13, 2017, more than 11 months since he started meeting with him.  10/12/17 Tr., Vol. 2 at 124-25; *but see* 10/16/17 Tr., Vol. 1 at 88-89 (as late as July 2017, Dr. Mendoza had not diagnosed Wright with a personality order and didn't know "precisely when [he] had formulated and arrived at a diagnosis."); 10/16/17 Tr., Vol. 1 at 48 (in report July 25, 2017, Dr. Mendoza did not state that he diagnosed the defendant with an "unspecified personality disorder."  Nor do those words appear in that report.); *see also* 10/16/17 Tr., Vol. 1 at 64 (in his first undated report, Dr. Mendoza wrote the defendant was "well-adapted and he didn't suffer from any mental disorder."); 10/16/17 Tr., Vol. 1 at 32 (in undated report that must have been done after his last interview of the defendant on July 15, 2017, Dr. Mendoza stated "there are no clinical indications of a major mental disorder, no indication of affective behavioral or cognitive instability.").  To the contrary, Dr. Martin Kelly, M.D., concluded Wright does not suffer from a

personality disorder and "gamed" the test (Personality Assessment Inventory) upon which Dr. Mendoza's diagnosis was based. *See* 10/16/17 Tr., Vol. 2, at 108-112. There is, however, one aspect of the defendant's personality on which the government and the defense both agree, that is, Wright manipulated others. *See* 10/16/17 Tr., Vol. 1 at 51 (During cross-examination, Dr. Mendoza acknowledged there was evidence that Wright manipulated others.). Wright manipulated Rahim into believing ISIS was a legitimate Islamic group, which they were obligated to support by engaging in violent jihad.

Furthermore, the defendant still harbors the same extremist views as he did in 2015 and continues to support ISIS. He has not reformed or rejected ISIS as suggested by the defense during the original sentencing in 2017. To the contrary, the defendant still poses a significant threat to public safety. During a search of Wright's cell at FCI Terre Haute on June 28, 2018, prison officials found ISIS materials hanging on his bulletin board, specifically, copies of an ISIS flag and an emblem of the ISIS Morality Police -- an Enforcement Fleet Plate found outside an ISIS police station in Mosul, Iraq. According to the report provided by FCI Terre Haute, the Enforcement Fleet is associated with Hisba, the Islamic State Morality Police, which is the most feared branches of ISIS because "their officers 'roam the streets looking for violations of the group's religious codes." Wright was so upset by the removal of these materials from his cell that he filed three appeals to the Bureau of Prisons challenging the removal of these materials from his cell and fought for the right to display them on his bulletin board. Wright's filed his most recent appeal of this matter in April 2019 to the National Inmate Review Board in Washington, D.C. *See* Attachments 8-9 containing the report regarding the ISIS materials found in Wright's cell and copies of Wright's handwritten appeals to BOP.

Additionally, on September 20, 2019, the defendant assaulted another inmate at FCI Terre Haute.  The defendant closed fist punched an inmate in the face.  The inmate fell to the ground and the defendant pushed and kicked him while on the ground.  The inmate ran away. Wright did not follow him.  He walked in the opposite direction down a set of stairs.  Shortly thereafter, the defendant was confronted by a prison guard and he admitted to assaulting the other inmate.  The defendant claimed that he had assaulted the inmate because the inmate had been threatening his life and the lives of Muslims in the Communications Management Unit ("CMU") at Terre Haute.  After a Disciplinary Hearing, the prison determined that the defendant had committed a violation of its code of conduct -- Assault without Serious Injury -- for which he received the loss of 27 days in good conduct time, loss of phone privileges for 90 days, and a fine of $50.

B.  Seriousness of offense

During the spring and summer of 2015 -- at the time of the defendant's offenses, the FBI was gravely concerned that ISIS was going to carry out attacks in the United States and about the recruitment efforts of Hussain, ISIS's "No. 3 leader."   As John Carlin, a former Assistant Attorney General for National Security explained:

> Nearly every week of 2015 brought a new Hussain-inspired plot against the United States; FBI surveillance teams were exhausted, chasing dozens of would-be terrorists at once. We'd pulled agents from criminal assignments to supplement the counterterrorism squads. Within the government, alarm bells rang daily, but we attempted to downplay the threat publicly. We didn't want to elevate Hussain to another global figurehead like Osama bin Laden, standing for the twisted ideology of Islamic jihad. We wouldn't even really talk about him publicly until he was dead.
>
> *****
> Hussain was in steady contact with dozens of would-be ISIS recruits and adherents the world over through his main Twitter account, @AbuHussain_16. His online encouragement touched off a violent – and, to his recruits, deadly – spree in 2015, one that overwhelmed FBI agents as they chased ISIS recruits

across the country….For those on the front lines of counterterrorism, it marked one of the darkest periods since the 9/11 attacks themselves.

John P. Carlin, *Inside the Hunt for the World's Most Dangerous Terrorist: How a British Hacker joined ISIS's Top Ranks and Launched a Deadly Global Cyber Plot*, Politico Magazine, Nov. 21, 2018, available at https://www.politico.com/magazine/story/2018/11/21/junaid-hussain-most-dangerous-terrorist-cyber-hacking-222643 (copy attached hereto as Attachment 10).  Even the defendant had conducted research regarding the threat posed by ISIS.  On May 31, 2015, the defendant viewed an article entitled, "FBI Warns Something Big About ISIS That Has U.S. Military Bases on High Alert" that warned of a "potential attack on U.S. military bases and other strategic locations in the near future" and "a large number of social media postings by supporters of the ISIS terror group."  *See* Ex. 317 at 88; 10/12/17 Tr., Vol. 1 at 51-53 (cross-examination of Wright regarding this article and knowledge of threat posed by ISIS).  Indeed, at the time of the defendant's arrest the FBI had thwarted "attacks tied to the July Fourth holiday," including that of Rahim and "arrested more than 10 people inspired by online recruiting by the Islamic State of Iraq and Syria (ISIS)."  *See* July 9, 2015 testimony of FBI Director James Comey testimony before Senate Judiciary Committee summarized in www.cbsnews.com/news/fbi-director-we-disrupted -efforts-to-kill-people-around-july-4-holiday/.

As noted above, and as demonstrated by ISIS's ability to carry out attacks within the United States in 2017, the threat posed by ISIS has not abated.  Earlier this year, FBI Director Wray testified:

> We remain concerned that groups such as ISIS and al Qaeda have the intent to carry out large-scale attacks in the U.S… Echoing other terrorist groups, ISIS has advocated for lone offender attacks in Western countries.  Recent ISIS videos and propaganda have specifically advocated for attacks against soldiers, law enforcement, and intelligence community personnel.

Statement for the Record of FBI Director Wray before the House Judiciary Committee,

Washington, D.C, Feb. 5, 2020, *available at* https://www.fbi.gov/news/testimony/fbi-oversight-020520.  Thus, ISIS and homegrown violent extremists remain one of the highest priorities for

law enforcement.

In addition to causing the death of Rahim, Wright's actions have assisted ISIS.  ISIS has

used Rahim's death, precipitated by Wright's instructions to seek martyrdom, to inspire other

ISIS supporters to commit terrorist attacks against the United States.  Indeed, within days of

Rahim's death, on June 12, 2015, Hussain publicly and openly described "Usaamah Rahim" as a

martyr in Boston who was involved in a plan "to behead pamela gellar" on Twitter.  Ex. 119.

Hussain further acknowledged that he had spoken to Rahim and during their last conversation,

Hussain had instructed Rahim to carry a knife in case the "feds" tried to arrest him.  *Id.*

"[B]ecause of that knife," Hussain explained on Twitter, Rahim became a martyr rather than

being arrested.  *Id.*  On June 12, 2015, Hussain also instructed his followers using Twitter to

"#Go Forth" and kill Ms. Geller.  *See* Ex. 120.

Rahim's photograph and name have appeared in ISIS's Dabiq magazine in calls to

engage in violent jihad.  In Issue Number 10 of Dabiq, which was published in July 2015,

Rahim's photograph appeared in a photographic array with other ISIS supporters who were

killed conducting attacks in the United States and Europe (including Elton Simpson and Nadir

Soofi, the two attackers who unsuccessfully attempted to kill Ms. Geller in Garland, Texas) in a

solicitation to join the Islamic State and commit attacks in "the land of the crusaders."  *See*

Attachment 11 (excerpt of Issue 10).  ISIS uses the word "crusaders" to describe the United

States and the governments of Western Europe.  In Issue 13 of Dabiq, which was published in

January 2016, ISIS again referred to Rahim as a martyr in an attempt to inspire others to follow

his example.  The following passage appeared at page 46 of that magazine:

> # IN THE WORDS OF THE ENEMY
>
> In an issue of "TIME" magazine released shortly after the blessed attacks in Paris, Michael Morell – former deputy director of the CIA who also served twice as its acting director – wrote an article titled "What Comes Next, And How Do We Handle It? – ISIS Will Strike America." Despite a fatal flaw in its title – as Islamic State knights have struck in America on numerous occasions before the magazine's release including the attacks executed by the martyrs Usaama Rahim, Zale Thompson, Elton Simpson, Nadir Soofi, and others, may Allah accept them all – we present this article below. Morell's preposition was emphasized swiftly by two brave heroes of the Khilāfah: the martyred husband and wife, Syed Rizwan Farook and Tashfeen Malik, may Allah accept them both. Yes indeed, the Islamic State had struck once again in the American homeland.

*See* Attachment 12 (excerpt of Issue 13).

In addition, between December 2014 and April 2015, Wright encouraged Zulfi Hoxha to fight for ISIS overseas.  *See* Ex. 317 at 6.  Wright and Rahim also assisted Hoxha in traveling overseas.  *See* Ex. 57A; 10/12/17 Tr., Vol. 1 at 32-33.[7]  In April 2015, Hoxha joined ISIS and has become a senior ISIS commander.  *See* Exs. 48 and 112.  Indeed, he appears in a video that was released by ISIS in May 2017 entitled "We Will Surely Guide Them to Our Ways."

---

[7]Despite the defendant's claims to the contrary, it is clear that the defendant knew Hoxha traveled overseas to fight for ISIS.  *See* Ex. 51 at 5; Ex. 50 at 24-26; Ex. 112; 9/25/17 Tr., Vol. 1 at 6.  Indeed, he encouraged him to do so.

In this video, Hoxha, using the name Abu Hamza al-Amriki, urges lone wolf attacks against the United States.

While it is true that Wright had not purchased any weapons himself, he was nonetheless operating as a soldier of ISIS.  Prior to his arrest, he was organizing violent attacks in the United States and had recruited others to assist him in terrorizing this country.  He identified Pamela Geller as his group's first beheading victim.  His actions have "terrorized" and tormented Ms. Geller and her family and caused them "physical and emotional distress as well as crippling financial costs" associated with security measures.  *See* Sent. Tr. at 6-7.

As demonstrated at trial, Wright was committed to ISIS and wanted to cause more harm to the United States than the Boston Marathon bombings.  Wright conducted extensive research regarding ISIS and weapons.  He conducted searches regarding knives, machetes, guns, swords, flammable chemicals, bomb making components (including tannerite), the dark web, tranquilizers, police and military training, and serial killers.  For instance, he conducted google searches on "how to create a secret militia in the United States" and "what tranquilizer puts humans to sleep instantly."

 On the morning of June 2, 2015, after Wright knew Rahim had purchased three knives (one for each of the three co-conspirators located in the United States) for the group to use to decapitate Ms. Geller (*see* Exs. 13 and 30), Wright encouraged Rahim to attack the police and die as a martyr.  Wright instructed Rahim to pursue martyrdom, to prepare for victory or martyrdom, remain firm, and not to let anything deter him.   *See* Exs. 5 and 5A.  His actions threatened the lives of the police and innocent civilians.  Wright also obstructed justice, which impaired law enforcement's ability to investigate a terrorism network operating on U.S. soil with direct connections to an ISIS leader and recruiter in Syria.

C.  Comparable Cases

As the government noted at the original sentencing, the average term of imprisonment for defendants convicted of terrorism offenses related to ISIS are longer than other terrorist groups. On average, defendants have received a term of imprisonment of 32.2 years after trial.  As noted above, defendants are typically charged with one of the two material support statutes – 18 U.S.C. §§ 2339A and 2339B, which each carry a statutory maximum of 20 years' imprisonment.  Those offenses do not require an international nexus to be established by the government.  Thus, the resulting sentences imposed against defendants convicted of material support offenses do not fully capture the conduct here.  This case presents the rare circumstances of a U.S. based group of conspirators who received direct assistance and guidance from a notorious ISIS leader in Syria to carry out a terrorist attack in the United States.  Wright was therefore charged with conspiring to commit acts of terrorism transcending national boundaries.  There have only been two other ISIS-related cases that have charged the same offense, Section 2332b(a)(2) – Abdulrahman El Bahnasawy and Justin Nolan Sullivan.  In *U.S. v. Bahnasawy*, 813 Fed. Appx. 721 (2d Cir. 2020) (unpub.), the defendant, a twenty-year old Canadian national, plotted with two foreign conspirators (one from Pakistan and the other from the Philippines) to carry out terrorist attacks in New York City on behalf of ISIS in the summer of 2016.  He pled guilty to a six-count indictment charging him with conspiring to use weapons of mass destruction, conspiring to commit acts of terrorism transcending national boundaries, conspiring to bomb a place of public use and a public transportation system, conspiring to provide material support and resources to terrorists, conspiring to provide material support and resources to a designated FTO, and providing material support and resources to a designated FTO.  He was sentenced to 40 years' imprisonment.  *Id.* at *723.  Bahnasawy planned to detonate bombs in Times Square and the

New York City subway system, and to shoot civilians at concert venues.  He acquired bomb making materials and secured a cabin within driving distance of New York City to use to build the improvised explosive devices and stage the attack.  He was arrested after he traveled to New York in preparation for the attacks.  In *U.S. v. Sullivan*, the Court imposed an agreed-upon sentence of life imprisonment pursuant to the plea agreement (Sullivan had also been charged by the state with homicide of a neighbor).  Like Wright and his conspirators, Sullivan conspired with Junaid Hussain to commit acts of terrorism transcending national boundaries,[8] including a mass shooting attack at a bar or nightclub on behalf of ISIS.  Sullivan planned to videotape the attack, at Hussain's request, to give ISIS a propaganda victory.  Sullivan further planned, similarly to Wright, to start a new branch of ISIS in the United States.  Sullivan also acquired weapons and used facilities of interstate commerce in an attempt to have his parents murdered. *See Saleh*, 946 F.3d at 105 n.26 (describing facts underlying Sullivan prosecution).

While not charged with conspiring to commit an act(s) of terrorism transcending national boundaries, one of the three defendants in *U.S. v. Farah,* 899 F.3d 608, 611-613 (8th Cir. 2018), bears a striking similarity to the defendant -- Guled Ali Omar -- was convicted after trial of conspiring to commit murder abroad on behalf of ISIS, conspiring to provide material support to ISIS, and financial aid fraud.  Omar was charged with eight other men in Minnesota of conspiring to travel to Syria to fight for ISIS.  The members of the group attempted on several occasions to travel to Syria but failed.  Like Wright, Omar was the charismatic leader of his group and was sentenced to 35 years' imprisonment.

---

[8]In calculating the guidelines for 2332b(a)(2), the U.S. District Court in Sullivan applied the attempted murder sentencing guideline -- USSG § 2A2.1.

At the original sentencing, the defense argued for a sentence of 16 years.  The Court should flatly reject any defense argument to impose such a low sentence here, as this would represent a substantial, and unwarranted, downward departure from the guidelines recommendation of life imprisonment.  Such a sentence is patently unreasonable based upon the charges for which Wright was convicted.  Indeed, the Second Circuit Court of Appeals recently determined that a district court judge had abused her discretion when she imposed a sentence of a 17-year sentence in a terrorism case in which the defendant's advisory sentencing guideline range was life imprisonment.  *See Saleh*, 946 F.3d at 101.  As a result the Second Circuit vacated the sentence, which represented an 80% downward variance from the Guideline range.  *See id.* Saleh pled guilty to conspiring and attempting to provide material support to ISIS, conspiring to attack federal officers, attempted murder of federal officers, and assault of a federal officer with a dangerous or deadly weapon.  *Id.*

      D.  <u>Need for Specific and General Deterrence</u>

The defendant has failed to recognize the gravity of his offenses or accept responsibility for his actions.  He was the mastermind behind the plot to behead Pamela Geller pursuant to ISIS's fatwa to kill her.  As demonstrated by his statements during recorded telephone conversations and electronic communications, the defendant approved of beheadings to kill enemies of ISIS.  He was committed to causing serious harm to the United States and, in coordination with ISIS, he posted a document (Internal Conquest) he wrote on the Internet that was intended to cause others to kill Americans.  *See* Ex. 336.  Wright motivated Rahim to become a martyr and thereby caused Rahim to attack police officers on the morning of June 2, 2015, resulting in Rahim's death.  Wright also obstructed justice.

After being convicted, the defendant claimed that he believed ISIS was "disgusting." PSR ¶ 92. As demonstrated by his actions in prison, the defendant remains an ISIS supporter and cannot be trusted. Further, he is not de-radicalized as the defense had previously claimed. The defendant simply was doing what he learned from ISIS's jihadist handbook, "How to Survive in the West." This book, which the defendant studied (*see* Ex. 360 at 7 and Ex. 308), provides tips on how to conceal one's true extremist views from people in the West until completing an attack. 10/11/17 Tr., Vol. 2 at 110-12. Further, Wright lied to his own family about his knowledge of Rahim's activities and then sought to deceive the jury about his role in this offense. *See* 10/12/17 Tr., Vol. 1 at 57-59 (Wright admitted that he had lied to his family).

Individuals like the defendant "are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *See United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003). Those who commit crimes of terrorism are more likely to re-offend. "[T]errorism represents a particularly grave threat because of the dangerous of the crime and the difficulty of deterring and rehabilitating the criminal." *United States v. Mumuni Saleh*, 946 F.3d 97, 112-13 (2d Cir. 2019) (quoting *Meskini*, 319 F.3d at 92). The terrorism sentencing enhancement, USSG § 3A1.4, recognizes the significant threat posed by terrorists as well as the requirement that courts impose sentences that both deter future terrorism offenses and incapacitate those who seek to cause harm to our country.

Additionally, the defendant's actions obstructed a terrorism investigation. Rahim's computer may have revealed the names of other ISIS supporters plotting attacks in the United States or the names of other ISIS recruiters. Thus, among the most important functions served by sentencing this defendant is the deterrent message the sentence will convey to those who might consider impeding a law enforcement investigation into ongoing conduct that presents a

35

public danger.  *See United States v. Flores-Machicote*, 706 F.3d 16, 23 (1st Cir. 2013) ("Deterrence is widely recognized as an important factor in the sentencing calculus.") (*citing* 18 U.S.C. § 3553(a)(2)(B)).  Through its sentence, the Court has the ability to demonstrate that there is no tolerance for the obstruction of terrorism investigations and that such conduct will be severely punished.

Few cases better illustrate the importance of deterrence than this one.  A group of homegrown violent extremists who supported ISIS were in communication with an ISIS leader in Syria.  At the urging of the defendant, this group was planning to kill Americans and purchased weapons to carry out their attack.  Rahim, manipulated by the words of the defendant, attacked the police and was killed.  But for the actions of the FBI and the Boston Joint Terrorism Task Force, innocent lives would likely have been lost on June 2, 2015.

Homegrown violent extremists represent one of the most serious threats to America.  For instance, since the defendant was convicted on October 18, 2017, two ISIS attacks were committed in New York.  On October 31, 2017, after pledging his allegiance to Abu Bakr al-Baghdadi, Sayfullo Saipov plowed a rented truck into people walking and cycling on a New York City bike path killing eight people.  Like Wright, Saipov had been radicalized over the internet by watching ISIS videos and heeded ISIS's calls to retaliate against the United States and kill disbelievers.  On December 11, 2017, an ISIS supporter, Akayed Ullah, detonated a homemade pipe bomb in the New York City subway in retaliation for America's bomb strikes against ISIS.  Thus, the sentence imposed by the Court should send a clear and unequivocal message:  if you directly conspire with a notorious overseas terrorist in a plot to kill Americans on behalf of a foreign terrorist organization, you will receive the maximum sentence available under the law.

**Conclusion**

For the foregoing reasons, the Court should sentence the defendant to term of life

imprisonment.

                            Respectfully submitted,

                            ANDREW LELLING
                            United States Attorney

By:      */s/ B. Stephanie Siegmann*
                            B. STEPHANIE SIEGMANN
                            Assistant U.S. Attorney

Certificate of Service

I do hereby certify that a copy of foregoing was served upon the counsel of record for the defendant by electronic notice on this 18th day of September 2020.

                            */s/ B. Stephanie Siegmann*
                            B. Stephanie Siegmann