UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA    )
    )
    )
v.    )        Crim. No. 15-cr-10153-DPW
    )
DAVID WRIGHT    )
    Defendant.    )
    )

_____

## DEFENDANT DAVID WRIGHT'S AMENDED RE-SENTENCING MEMORANDUM

## Introduction

Mr. Wright stands before this Court for resentencing. In explaining how he came to the original twenty-eight-year sentence, Judge Young noted why he varied downward from the Sentencing Guidelines range: "[w]hatever the advisory Sentencing Guidelines may say, reflexively to 'lock-em-up' – a life sentence for every properly convicted terrorist is not just. It's not even a strategy. It reflects fear more than justice."[1]

Yet nearly three years later, the Government stands before this Court again seeking life, ignoring both that its request was draconian in 2017, and that circumstances have changed significantly since. These new developments justify a thorough re-evaluation of Judge Young's findings and his ultimate decision to impose twenty-eight years, which, though short of life, is a substantial prison term for a young man with no criminal record.

---

[1] *United States v. Wright*, 285 F. Supp. 3d 443, 462–63 (D. Mass. 2018), *aff'd in part*, 937 F.3d 8 (1st Cir. 2019).

Although there is no basis to increase the original sentence – and in fact doing so would amount to punishing Mr. Wright for exercising his constitutional right to appeal – there are myriad reasons to impose something far less. A lower applicable Guideline range, the conditions of confinement endured by Mr. Wright, the decline and fall of ISIS, and, of course, the COVID-19 pandemic, which has changed the trajectory of prison life for all inmates – but *particularly* for those with Mr. Wright's health conditions, are among the many justifications for a significantly reduced prison term.

This Court has both the power and the obligation to ensure that justice is done in this case. Though Judge Young's sentence represented his considered judgment at the time, since then the landscape has changed. This Court has the responsibility to analyze the case as it appears today, with the benefit of an additional three years of data, and to reach its own reasoned conclusion about the appropriate punishment. Considering all the factors outlined below, as well as those previously briefed in his original Sentencing Memorandum,[2] Mr. Wright asks for a sentence of fourteen years to be followed by fourteen years of supervised release.[3]

---

[2] Def.'s Sentencing Mem., ECF No. 401.

[3] Lifetime supervised release is inappropriate and excessive in comparison to similar cases. For example, John Walker Lindh was sentenced to 240 months (20 years) incarceration to be followed by only three years supervised release (3 years on each count, but to run concurrently with one another). *United States v. Lindh*, 227 F. Supp. 2d 565, 572 (E.D. Va. 2002); Mustafa Muhammad Mufta Al-Imam was convicted of conspiracy to provide material support to terrorists and maliciously destroying property at the US diplomatic compound, having played a "significant role" the attack in Benghazi, Libya). *GW Extremism Tracker: Terrorism in the United States, January 2020*, PROGRAM ON EXTREMISM, https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/Jan%202018%20Tracker.pdf (last accessed Sept. 17, 2020). Al-Imam was sentenced to 236 months (19 years and 6 months) incarceration to be followed by only three years supervised release. Judgment in a Criminal Case, doc. No. 281 at 4, *United States v. Al-Imam*, no. 17-cr-213 (CRC) (Feb. 7, 2020). Said Azzam Mohamad Rahim was sentenced to 30 years incarceration followed by only 2 years of supervised release (2 years on each count to run concurrently). Electronic Minute Entry, docket no. 155, *United*

## Procedural History

On June 3, 2015, a criminal complaint was filed charging Mr. David Wright with Conspiracy to Obstruct Justice. (ECF No. 1). On June 18, 2015, Mr. Wright was named in a three-count indictment charging him with 1) conspiracy to provide material support to ISIS, a designated foreign terrorist organization, in violation of 18 U.S.C. §2339B(a)(1) and aiding and abetting – 18 U.S.C. §2 (Count One); 2) Conspiracy to Obstruct Justice - 18 U.S.C. §371 (Count Two); and 3) Obstruction of Justice - 18 U.S.C. §1519 and Aiding and Abetting– 18 U.S.C. §2 (Count Three).

On April 21, 2016, the Government superseded the indictment, charging Mr. Wright with an additional count for Conspiracy to Commit Acts of Terrorism Transcending National Boundaries – 18 U.S.C. §2332b(a)(2) & (c) (Count Four). (Doc. 60). On February 15, 2017, the Government superseded the indictment for a second time, charging Mr. Wright in a five-count indictment, adding an additional count of obstruction of justice for allegedly deleting data from his own computer in violation of 18 U.S.C. §1519 (Count Five). (ECF No. 60).

---

*States v. Rahim*, no. 3:17-CR-0169-B (Dec. 11, 2019). He was convicted of conspiring and attempting to provide material support to ISIS and making false statements involving international terrorism to federal authorities. He made multiple statements in online forums promoting violence on behalf of ISIS and was arrested trying to travel to join ISIS). *GW Extremism Tracker: Terrorism in the United States, December 2019*, PROGRAM ON EXTREMISM, https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/Dec19%20Tracker.pdf (last accessed Sept. 17, 2020). Finally, Mohamed Rafik Naji was sentenced to 20 years incarceration followed by just 5 years supervised release. Judgment in a Criminal Case, doc. no. 25 at 2-3, *United States v. Rafik Naji*, no. 1:16-cr-00653-FB (June 27, 2019). He was convicted of attempting to provide material support to ISIS; was active online in support of ISIS; initiated contact with an FBI confidential source to provide advice on how to join ISIS; flew to Yemen to join ISIS and then returned; tried and failed five times to enter ISIS territory; after return, exchanged communications with an FBI confidential source expressing continued support for ISIS and interest in committing an attack on Times Square. *GW Extremism Tracker: Terrorism in the United States, June 2019*, PROGRAM ON EXTREMISM, https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/Jun19%20Tracker.pdf (last accessed Sept. 17, 2020).

On October 18, 2017, after a seventeen-day trial before Judge Young, Mr. Wright was convicted on all counts. (ECF No. 353). On December 19, 2017, the judge sentenced Wright to twenty-eight years imprisonment. (ECF Nos. 409, 410). On October 16, 2017, Wright, who had moved for judgment of acquittal at the close of the Government's case, filed a timely Rule 29 motion at the close of all the evidence. (Trial Tr. vol.2,159:3-4, Oct. 16, 2017, ECF No. 385). On the same day, the judge denied this motion. On November 2, 2017, Wright filed a Rule 33 motion for a new trial. (ECF No. 393). On December 18, 2017 the court denied this motion as well. (ECF No. 407).

Mr. Wright filed a timely notice of appeal on January 2, 2018 (ECF No. 415), and the case was docketed in the First Circuit on January 11. (ECF No. 420). On August 28, 2019, the First Circuit affirmed in part and reversed in part.[4] It overturned the conviction on Count 1, conspiracy to provide material support, affirmed the other four convictions, and remanded the matter for resentencing.[5]

## Argument

## I.   The Guideline Range is 262 to 327 months because the court has no choice but to observe the statutory cross-reference for Section 2A6.1

At the first sentencing, the Government argued that the Guideline range was life, contending that U.S.S.G. § 2A1.5 (conspiracy to commit murder) provided the Base Offense Level for Count 4. With enhancements, this resulted in a Total Offense Level of (at least) 43. Mr. Wright and Probation argued that the range for

---

[4] *United States v. Wright*, 937 F.3d 8, 37 (1st Cir. 2019), *cert. denied*, 140 S. Ct. 1283 (2020).
[5] *Id.*

4

Count 4 was 262 to 327 months because § 2A6.1 governed. With enhancements for terrorism[6] and obstruction, the TOL for that charge would instead be 34. Thus, the defense argued, the now-dismissed Count 1 provided the highest Guideline range of 360-life, based on a TOL of 42. Judge Young agreed with the Government.[7]

The Government continues to press this argument, even though Probation correctly calculated the Guideline Range for Count 4 as 262 to 327 months. Because § 2A6.1 is the only Guideline cross-referenced with the crime of conviction, 18 U.S.C. § 2332b(a)(2), the Court must rely on it in its calculations.[8] Because Count 1 is no longer operative, Count 4 now provides the governing sentencing range.

Section 1B1.2 instructs courts on how to select the appropriate offense level. It first directs courts to "[d]etermine the offense guideline section in Chapter Two (Offense Conduct) applicable to the offense of conviction…" *Id*. The Court does so by "[r]efer[ing] to the Statutory Index (Appendix A)…" *Id*.

Because the statutory reference at issue here does not appear in more than one Guideline, the Court may not "determine which of the referenced guideline sections is most appropriate for the offense conduct charged." *Id*., Application Notes. Moreover, only where a statute is "not listed in the Statutory Index," should the Court "use the most analogous guideline." *Id*.; *see also id.*, Application Notes ("The

---

[6] The defense continues to press its objections to that enhancement that were raised in the initial sentencing.

[7] Judge Young initially indicated at the sentencing that he agreed with Probation and the defense, but subsequently stated, in the memo denying Mr. Wright's motion for new trial, that he had changed his mind.

[8] Counts 2, 3 and 5 yield a TOL of 32. Since they are grouped with Count 4, Count 4's TOL of 34 controls.

court **is** to use the Chapter Two guideline section referenced in the Statutory Index (Appendix A) for the offense of conviction.") (emphasis added).

In this case, the statute of conviction, 18 U.S.C. § 2332b, has two subsections. One deals with substantive offenses: (a)(1), and one with conspiracies: (a)(2). The statutory cross-reference dictates that, for substantive offenses, the Court may choose among various Guidelines dealing primarily with homicide and assault, sections "2A1.1, 2A1.2, 2A1.3, 2A1.4, 2A2.1, 2A2.2, 2A4.1, [and] 2B1.1." See Guidelines Manual, Appendix A. But for the offense of conviction here, conspiracy to commit an act of terrorism transcending national boundaries, in violation of 18 U.S.C. § 2332b(a)(2),[9] the only cross-reference is § 2A6.1. This Court does not have the discretion to apply a different Guideline of its choosing.

The Government argues that § 2A6.1 is inapplicable because its title is "Threatening or Harassing Communications; Hoaxes; False Liens" and Mr. Wright was accused of conspiring to kill someone. But a deeper analysis of the other statutes covered by the Guideline show that it deals with crimes far more severe than just generic threats, including several related to terrorism. For example, § 2A6.1 applies to convictions under 18 U.S.C. § 1038, which punishes, among other things, threats to use bombs, chemical weapons, and biological weapons. That statute also carries the potential for life imprisonment. *Id.* Section 2A6.1 also covers conspiracies to commit terrorist attacks on railroads and other forms of mass

---

[9] See Second Superseding Indictment, ECF No. 171.

transportation, in violation of 18 U.S.C. § 1992. This statute likewise provides for a potential life sentence.

Based on a straightforward reading of the Guidelines, the Court must calculate the sentencing range with § 2A6.1 as the starting point. Pursuant to that provision, the Base Offense Level is 12. Per § 2A6.1(b)(1), 6 points are added "since the offense involved conduct evidencing an intent to carry out such threat." Pursuant to § 3A1.4(a), the Terrorism Enhancement, the Base Offense Level is increased to 32. Per § 3C1.2, 2 more points are added for obstruction of justice, yielding a Total Offense Level of 34, a CHC of VI, and a Guideline range of 262 to 327 months.

## II.   The requested fourteen-year sentence is sufficient and appropriate under the factors identified in 18 U.S.C. § 3553(a).

Mr. Wright's crime is serious. However, a sentence of fourteen years is "sufficient" within the meaning of § 3553(a). In addition to the factors raised in his original sentencing memorandum (see pages 29-46),[10] the Court should consider the following factors outlined below.

### A.   In evaluating what is "just punishment" under 18 U.S.C. § 3553(a)(2)(A), this Court should consider the conditions under which Mr. Wright has been held over the last five years

Mr. Wright's conditions of confinement (which have been exceptionally restrictive) make the time he has served far more punitive compared to the experience of the average inmate, rendering the requested sentence sufficient to

---

[10] ECF No. 401.

"reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" under 18 U.S.C. § 3553(a)(2)(A).

Mr. Wright had never been in custody before his arrest for this offense on June 2, 2015. Despite this, his conditions of confinement have been, and will likely remain, more punitive than those experienced by even the most seasoned of inmates. He has been held in four locations. From arrest through sentencing, Mr. Wright was detained at Plymouth House of Corrections in what was effectively solitary confinement for over two-and-a-half years. Once in Bureau of Prisons ("BOP") Custody, he was temporarily held at the Metropolitan Detention Center for several months, awaiting designation. Then, he was held in the Communications Management Unit ("CMU") in Terre Haute Indiana for approximately two years, where his privileges and privacy were dramatically more restricted than the average federal detainee. Finally, he has been held for approximately eight months at Wyatt Detention facility. Notably, while at Wyatt, he has been held in general population without any disciplinary or communications related incidents and has taken advantage of the available educational programming there.

   i.   *Plymouth House of Correction*

On June 2, 2015, Wright was arrested and subsequently detained in federal custody at the Plymouth House of Corrections. While there, he was held in administrative segregation the entire time.[11] For two years, six months, and seventeen days, Mr. Wright was held in what was effectively solitary confinement

---

[11] See Original PSR at ¶3.

within unit G, the "jail within a jail."[12] For twenty-three hours a day, Mr. Wright lived locked in an 8-by-12-foot concrete cell, a space that is smaller than a standard parking spot. He had one hour and fifteen minutes of time out of this cell, five days a week, in the confines of a small metal cage. The other two days, he was not let out of his cell at all. Notably, despite being held in these unusually strict and austere conditions for over two and a half years, he did not receive a single disciplinary report.

### ii.   *The Communications Management Unit at Terre Haute Indiana*

After a short stay in the Metropolitan Detention Center in Brooklyn (where he also received no incident reports) Mr. Wright arrived – 1,012 miles from the only home and family he ever knew – at the Communications Management Unit in Terre Haute, Indiana on February 26, 2018. The BOP describes CMUs as follows:

> The purpose of CMUs is to provide an inmate housing unit environment that enables staff to more effectively monitor communication between inmates in CMUs and persons in the community. [...] The volume, frequency, and methods, of CMU inmate contact with persons in the community may be limited as necessary to achieve the goal of total monitoring, consistent with this subpart.

See Ex 1, BOP Policy on Communication Management Units at §540.200(c).

Mr. Wright's designation to the CMU was apparently solely based upon his convictions, as there was no disciplinary history to otherwise justify this assignment at the time.[13] Here, he was housed with approximately forty other individuals,

---

[12] *See* Maureen Boyle, *Behind the Walls of Unit G at the Plymouth Jail*, Patriot Ledger (May 17, 2009), http://www.patriotledger.com/x1655274832/Behind-the-walls-of-Unit-G-at-the-Plymouth-jail.
[13] Pursuant to the BOP Program Statement, the Designation Criteria are as follows:
      Inmates may be designated to a CMU if evidence of the following criteria exists:

many of them with significant disciplinary histories, and many who had been

affiliated with extremist groups ranging from white supremacists to radical

Islamists. While it was initially an improvement to be around *any* other humans

after over two years of solitary confinement, these were not easy people to be

around, and it was a fraught and byzantine environment to navigate, particularly

for someone unfamiliar with the federal prison system and its culture.

The CMU is a highly restrictive environment where one's contact with the

outside world – including one's closest family – is dramatically circumscribed:

> [I]nmates have access to more limited and less private communications
> compared to general population inmates. All visits—aside from attorney
> visits—must be "non-contact," meaning a glass wall separates the inmate and
> visitor and communication takes place via a microphone. *See* 28 C.F.R §
> 540.205(a). All visits must be conducted in English, live-monitored, and
> recorded by BOP. *See id.* Although BOP regulations allow visitation to be
> restricted to four one-hour visits each month, *id.*, BOP currently permits up
> to eight hours a month. CMU inmates are also restricted in the frequency
> and length of their written correspondence, which is subject to inspection. *See
> id.* § 540.203. Finally, except for unmonitored attorney calls, CMU inmates
> can telephone only immediate family members, and the calls are
> monitored. *Id.* § 540.204. Under the regulation, telephonic communication
> can be limited to no more than three fifteen-minute calls per month, *id.*, but

---

(a) The inmate's current offense(s) of conviction, or offense conduct, included
association, communication, or involvement, related to international or domestic
terrorism;
(b) The inmate's current offense(s) of conviction, offense conduct, or activity
while incarcerated, indicates a substantial likelihood that the inmate will
encourage, coordinate, facilitate, or otherwise act in furtherance of illegal activity
through communication with persons in the community;
(c) The inmate has attempted, or indicates a substantial likelihood that the
inmate will contact victims of the inmate's current offense(s) of conviction;
(d) The inmate committed prohibited activity related to misuse or abuse of
approved communication methods while incarcerated; or
(e) There is any other substantiated/credible evidence of a potential threat to the safe,
secure, and orderly operation of prison facilities, or protection of the public, as a result
of the inmate's communication with persons in the community. See Ex 1, at § 540.201.

BOP currently allows inmates two fifteen-minute calls per week.[14]
*Aref v. Lynch,* 833 F.3d 242, 247 (D.C. Cir. 2016).

Conditions at the CMU at Terre Haute have been the subject of close scrutiny
and harsh rebuke from numerous civil rights groups.[15] Access to educational
programming is also quite limited. The CMU Policy statement provides that
"national educational policy shall be implemented." Ex. 1, at § 540.201(5)(a)(7). In
practice, at least in Mr. Wright's time there, educational programming – which can
be quite robust elsewhere in the BOP[16] – consisted of a fellow inmate placing CDs
such as "the Great Courses" on for inmates to watch several times a week.[17]

---

[14] All other prisoners in the federal system receive up to 300 minutes of telephone time per month to
call anyone on a list of 30 approved names. "BOP prisoners housed in the general population are
typically allowed 300 phone minutes per month" *Aref v. Holder*, 774 F. Supp. 2d 147, 165 (D.D.C.
2011), *aff'd in part*, 883 F.3d 242 (D.C. Cir. 2016); *See also* Center for Constitutional Rights, Public
Comments Re: BOP Docket No. 1148-P Communication Management Units 9 (June 2, 2010),
https://ccrjustice.org/files/CCR%20comments%20(2).pdf.

[15] *See generally, e.g.*, Center for Constitutional Rights, Public Comments Re: BOP Docket No. 1148-P
Communication Management Units (June 2, 2010),
https://ccrjustice.org/files/CCR%20comments%20(2).pdf; *see also Letter to Bureau of Prisons
Regarding Communication Management Units*, Brennan Ctr. for Just. (June 2, 2010),
https://casetext.com/analysis/letter-to-bureau-of-prisons-regarding-communication-management-
units?q=441%20U.S.%20520&sort=relevance&p=1&type=analysis&claims=10g,3o ; *see also
Prisoners Unfairly Assigned To Draconian And Unconstitutional Units*, ACLU (June 2, 2010),
https://www.aclu.org/press-releases/bureau-prisons-should-shutter-secretive-and-isolated-
communications-management-units; *see also* California Prison Watch, *Stand in Solidarity with
Marion-CMU Prison Hunger Strikers*, Prison Watch Network (June 3, 2012),
https://prisonwatchnetwork.org/2012/06/03/stand-in-solidarity-with-marion-cmu-prison-hunger-
strikers/.

[16] *See Education Programs*, Fed. Bureau of Prisons,
https://www.bop.gov/inmates/custody_and_care/education.jsp (last accessed Sept. 18, 2020); *see also*,
Federal Bureau of Prisons, Program statement on Education, Training and Leisure Time Program
Standards (Feb. 18, 2002), https://www.bop.gov/policy/progstat/5300_021.pdf.

[17] This issue has been previously litigated, in the context of the sole other CMU Unit at USP-Marion.
The Court in that matter acknowledged these complaints:

> Amawi notes in his complaint that the overall conditions in the CMU were more restrictive
> than the conditions in general population. For instance, CMU inmates are provided fewer job
> opportunities and not allowed to have [prison industries] or trade type jobs. Moreover, the
> jobs available to CMU inmates pay less than those available in general population. *Id*.
> Amawi also states in his complaint that inmates in the CMU are not allowed access to the

The length of Mr. Wright's designation to the CMU is unclear but, given that his initial classification was based on a static factor – the offenses for which he was tried and convicted – it could be a significant period and potentially the duration of his sentence. Although the CMU Program Statement Provides for "regularly scheduled program reviews," here – like other areas of the actual administration of the CMU – actual practice deviates from official policy. In fact, Mr. Wright's very first "review" occurred on August 8, 2019, approximately 15 months after he arrived at the facility. See Ex. 2, Review for Continued Designation, dated August 8, 2019.

### iii.    Wyatt Detention Center

Mr. Wright arrived at Wyatt Detention Center on January 16, 2020 awaiting re-sentencing. Notably, this is his first instance of living in general population since his arrest five years ago. To be sure, his time there has been challenging since mid-March due to the unique circumstances of the COVID-19 pandemic. Significantly, however, while there he has finally been given the opportunity for some meaningful programming and has used that opportunity to the fullest. He completed "Adjustment to Incarceration Program" which is based on the BOP BRAVE program.[18] See Ex. 3, Certificate of Completion. In addition to completing that program, he signed up for an independently offered Paralegal certificate program through the Blackstone Career Institute (start date June 25, 2020 – scheduled end

---

mailroom and that they only interact with executive staff members once per week.

*Amawi v. Walton*, No. 313-CV-00866-JPG-RJD, 2016 WL 7364768, at *3 (S.D. Ill. Nov. 17, 2016), *report and recommendations adopted*, No. 13-CV-866-JPG-RJD, 2016 WL 7337948 (S.D. Ill. Dec. 19, 2016) (internal citations omitted).

[18] This program appears to be based on the BOP "Brave Program," a cognitive behavioral program encouraging self-improvement, pro-social activities and problem-solving skills.

date June 25, 2022). See Ex. 4, Blackstone Career Institute, Unofficial Student Transcript of David D. Wright.

During his time at Wyatt, he has had no disciplinary issues, or communication management related issues.

iv.   *The Conditions Described Above Are Relevant to Determining a Just Sentence*

In evaluating "what is just punishment" under 18 USC §3553(a)(2)(A) this Court should consider the conditions under which Mr. Wright has been held over the last five years. The Court may also consider that there is little indication that the restrictive nature of his incarceration will change any time soon. Mr. Wright has been held, and will likely continue to be held, in conditions rivaled only by federal Supermax prisons.

Mr. Wright is over one thousand miles from home. The distance precludes family visits, as his family is of limited means. If he remains at the CMU, when (and if) he ever does have a visit it will be non-contact – through a plexiglass window, and far from private. Excluding the two existing CMUs, there is not a single general population unit in the federal system with a blanket ban on contact visitation.[19] As described above, his phone contact is also severely limited – both with respect to whom he can call and how often.

In the touchstone case regarding CMUs, the D.C. Circuit acknowledged that conditions were harsh enough to satisfy due process interest thresholds:

---

[19] *See* Center for Constitutional Rights, Public Comments Re: BOP Docket No. 1148-P Communication Management Units (June 2, 2010), https://ccrjustice.org/files/CCR%20comments%20(2).pdf.

Although CMU designation seems analogous to a classification, it is exercised selectively; the duration is indefinite and could be permanent; the deprivations - while not extreme - necessarily increase in severity over time. An inmate placed in administrative segregation may be wholly unable to communicate with his family or the outside world, but that restriction will generally only last for a few weeks. Inmates housed in CMUs, by contrast, may spend years denied contact with their loved ones and with diminished ability to communicate with them. The harms of these deprivations are heightened over time, as children grow older and relationships with the outside become more difficult to maintain… ("With each passing day its effects are exponentially increased, just as surely as a single drop of water repeated endlessly will eventually bore through the hardest of stones.") *(internal citations omitted)*

*Aref v. Lynch*, 833 F.3d 242, 257 (D.C. Cir. 2016). Mr. Wright is currently

facing just such an indefinite CMU designation. Fourteen years subjected to

CMU strictures and administrative segregation amounts to severe

punishment.

The CMU also presents a uniquely punitive situation for Mr. Wright given

the practical limitations on educational experiences and vocational training. First,

it is difficult in this context to demonstrate and effectuate one's commitment to

rehabilitation. As noted, educational opportunities are virtually meaningless within

the CMU units. In other federal units, the BOP provides robust programming.

Participation in these programs creates a record of good conduct and positive

personal growth and provides individuals with experience which can benefit them

post-incarceration. Save for his time at Wyatt, Mr. Wright has not had access to

substantively meaningful programming. Where programs have been available to

him (over the last eight months), he has enthusiastically participated. But now, he

faces this resentencing hearing at a disadvantage compared to similarly situated

inmates who would be able to present substantial evidence of commitment to bettering themselves.

Moreover, an individual in Mr. Wright's situation has precious little to look forward to. The prospect of being able to work towards educational goals provides something invaluable to a man facing an extremely long sentence: hope. Aside from the legal implications of being unable to demonstrate his commitment to rehabilitation, programs that help to rehabilitate or teach prisoners new skills have an incalculable effect on the mental well-being of a long-term prisoner. Mr. Wright's time has been and will likely continue to be absent the most basic and humane of opportunities; the chance to keep one's mind challenged and to better oneself in structured ways.

## B. Mr. Wright's disciplinary post-sentencing conduct does not support the requested sentence

The Government points to two post-sentencing incidents to support its request for a life sentence: 1) a single jail fight for which Mr. Wright received an internal administrative sanction; and 2) and an incident involving the hanging of images on a bulletin board for which he received no institutional sanction at all. Neither of these incidents justifies an increased sentence, and certainly not life.

### i. *The Jail Fight*

Over a span of over five years, in the custodial conditions described above, Mr. Wright has received a single disciplinary report. This incident involved him hitting another inmate who was said to have knives and who threatened to stab

(and possibly behead) Muslims in the unit.[20] This altercation was handled internally and administratively; no criminal charges were filed – and Mr. Wright received a disciplinary sanction of 27 days loss of good time, 90 days without phone privileges, and a 50 dollar fine.

No disciplinary incidents would of course be better than one. But given that Mr. Wright is serving his first sentence in exceptionally challenging custodial settings, a brief fight with someone 1) who had made threats previously; 2) who was not seriously injured; and 3) which was addressed through a relatively mild administrative remedy, is of very limited relevance. To the contrary, the court might consider how difficult it must have been – in the exceptionally violent[21] and often toxically masculine environment of prison, and these prisons in particular, to – but for this single incident – avoid violence, or discipline of any kind, for over five years.

---

[20] The BOP Investigated and confirmed the allegations regarding Leon Davis's prior threats. The following is an excerpt written by the BOP investigator:

> Inmate Davis, Leon…was placed in the Communications Management Unit (CMU) Special Housing Unit on July 3, 2019, for threatening another with bodily harm. Specifically, SIS Lieutenant Baker was notified that Davis had two knives in his cell and while in the inmate kitchen area he had threatened to kill another inmate. A review of Nice Vision Video Surveillance revealed on July 3, 2019, at approximately 6:42 a.m., in the inmate kitchen area, Davis was speaking with two inmate(s) identified as Said, Mohamed…and Tounisi, Abdella….During this conversation, Davis could be heard stating, "I'm going to stab him until they come and get me off. You just tell him if he opens his mouth again, one time, I don't give a fuck who he got coming, I am going to disconnect his head from his shoulders. I don't give a fuck if it is all six of you. I will kill him." The "six of you" is referring to the remainder of the Muslim community in CMU…

See Ex. 5, SIS Report, Dated July 3, 2018, at 3.
[21] For instance, in November 2018, another inmate on the unit was killed by another inmate four cells down from Mr. Wright (approximately 15 feet away). Mr. Wright reports seeing the body of the inmate, with whom he was friendly, being carried out of the unit, and feeling quite frightened by the incident.

*ii.    The Bulletin Board Graphics*

Mr. Wright contests the Government's suggestion that two images he placed on his cell's bulletin board confirm that he remains radicalized and/or an ISIS supporter. While the images were read as such by the BOP, the images lend themselves to multiple interpretations. Moreover, in the context of Mr. Wright's other communications while at the facility – the suggestion that two graphics on a bulletin board, without more, confirm that he is still an ISIS supporter, is unwarranted.

*a.  Image of Arabic Writing Taken from a Bulletin Board*

The first image, (hereinafter, "Image 1") consists of Arabic writing. It appears to be a copy of an image from another source. It was removed from a bulletin board in the open area of Mr. Wright's cell. The BOP asserted – only after sending it to a Senior Intelligence Analyst employed by the Department of Justice – that it was associated with the ISIS Morality Police. According to the Warden's response to Mr. Wright's Administrative remedy, the words on the image are associated with "Hisba or the Islamic Morality Police."[22] The BOP sent this image to a (presumably) highly trained "Senior Intelligence Analyst"[23] from the Department of Justice's Counter Terrorism Unit for interpretation. David Wright is far from an intelligence analyst. He was raised in the United States, and his knowledge of Arabic is very basic. As

---

[22] In fact, "Hisbah" is not only the name co-opted by the ISIS Morality Police, but also a basic Islamic doctrine which says that a Muslim should encourage good behavior and forbid wrong behavior. *See Hisbah*, Oxford Islamic Studies Online, http://www.oxfordislamicstudies.com/article/opr/t125/e851 (last accessed Sept. 18, 2020).
[23] See Ex. 6, CTU unit report.

will be discussed further below, he was of course raised as an American Muslim, and is eager to grapple with, absorb, and understand all sorts of Muslim teachings – but conflating cut-outs on a bulletin board with something more sinister, without more, is misplaced – particularly where the implications of doing so are so serious.

      b.   *The Alleged (and Un-Photographed) "Flag" Taken from a Bulletin Board*

The second image (hereinafter, "Image 2") was apparently not even preserved by the BOP. The BOP, and now the Government claim, however, that it was an "ISIS flag" or banner of some sort. The failure to preserve the evidence that the Government now argues provides support for a sentence of life in prison is particularly problematic given the nuances of the image associated with "the ISIS" flag. The connotations of a black flag incorporating the "Shahadah"[24] are far from straightforward and are rooted in the unfortunate intersection of legitimate Islamic sacred symbols and the violent jihadist organizations which use those symbols to enhance their legitimacy. Because of the ubiquity of these flags in media coverage regarding jihadi organizations, there is a tendency to assume that any black flag incorporating white Arabic writing is a symbol of ISIS, or whatever group happens

---

[24] As explained by the Georgetown University, Berkley Center for Religion, Peace and World Affairs:

> The Shahada is the creed of Islam. The Arabic creed translates to: There is no god but Allah, and Muhammad is his messenger."[...] Muslims consider reciting the Shahada to be the first and most important of the Five Pillars of Islam, since understanding and accepting it means that one understands and accepts the essence of the entire faith."

*Shahada*, Georgetown Univ. Berkley Ctr. for Religion, Peace & World Aff, https://berkleycenter.georgetown.edu/essays/shahada (last accessed Sept. 18, 2020).

to be the jihadist flavor of the month.[25] However, this is inaccurate. Without the exact image it is impossible to do the more nuanced analysis necessary. Nevertheless, even in the Warden's response[26] to Mr. Wright's Administrative appeal, he notes that the "black flag or banner is noted to be ***a variation*** of the original black flag or Tawid.[27]" *(emphasis added).*

      c.  *The Bulletin Board Cut-Outs, Viewed in the Context of Wright's Institutional Record Do Not Support the Government's Assertion That He Is Radicalized*

The Government wants this court to believe that these two cut outs on a bulletin board – only one of which was preserved – allows this Court to draw the very serious conclusion that Mr. Wright is still, or is again, a radicalized ISIS supporter. This leap – especially given the backdrop of his overall institutional record since trial – goes too far.

First, the images were not hidden away or secretly passed from one inmate to another. They were on a bulletin board with other personal and religious items. Where Wright has not been accused of any other instances of brazen support for ISIS during his entire incarceration, his display of these images suggest that he saw no need to hide them, as he believed them to be uncontroversial and religious in

---

[25] "The power of the flag comes from the fact that the word 'Allah' is on it. The word itself is seen as sacred by Muslims and hence it becomes sacrilegious to desecrate the flag," explains Hayder al Khoei, an associate fellow of the Middle East and North Africa Program at Chatham House in London [...]"The words are what makes the flag so powerful," al Khoei says. "It is a very weird and awkward situation for Muslims because ISIS is an evil terrorist organization with an actual holy flag." Ilene Prusher,, *What the ISIS Flag Says About the Militant Group* (Sept. 9, 2014), https://time.com/3311665/isis-flag-iraq-syria/.

[26] Ex. 7, Warden Bell Response to Administrative Remedy.

[27] Tawhid is simply the "Muslim doctrine of the oneness of God." *Tawhid*, Merriam-Webster, https://www.merriam-webster.com/dictionary/tawhid (last accessed Sept. 18, 2020).

nature. Second, when the images were removed, Mr. Wright acted appropriately –
using legitimate BOP channels to appeal the removal of what he described as
"religious articles." He did not describe them as political symbols. He did not defend
ISIS or proceed on a First Amendment claim of right to hang ISIS specific symbols.
If it were ISIS he was defending – consistent with the unrelentingly vocal and
unapologetically doctrinaire nature of the organization – he would have certainly
maintained his right to do so and said as much without reserve. Instead, he refers
to the "believed connotations" behind the symbols at issue, and repeatedly alludes
to them as "religious" in nature.[28]

 Moreover, there is nothing else in Mr. Wright's institutional record
suggesting that that he maintains fidelity to ISIS. There are no allegations that he
is proselytizing for the organization, no suggestion that he is celebrating ISIS, and
no indication that he is seeking out ISIS followers with whom to collude. To the
contrary, there are very clear indications in the record that he continues to grapple
with how to be a devout Muslim. The apparent re-appropriation of historically
relevant, but co-opted symbols found on his bulletin board is consistent with this
grappling.

Importantly, there are clear indications in the institutional record that Mr.
Wright continues to renounce ISIS and radicalism, and that he seeks to educate
others about the destructiveness of radicalism. For instance, on multiple occasions
throughout his incarceration he sought out materials that explicitly renounce

---

[28] See Ex. 8, Administrative Remedy, dated November 16, 2018.

20

radicalism, so that he could better explain to others why these beliefs are misguided.

For instance, on more than one occasion he sought out a copy of the now well-known, "Open Letter to Al Baghdadi." In it, over 120 prominent Muslim Scholars from around the globe denounced the Islamic State and encouraged others to do so. "You have misinterpreted Islam into a religion of harshness, brutality, torture and murder," the letter said. "This is a great wrong and an offense to Islam, to Muslims and to the entire world."[29] Unlike the Government's invitation to speculate about the intention behind the bulletin board cut-outs, Wright was clear about his objective in seeking this information out:

> I'm a Muslim currently incarcerated in the FBOP (Federal Bureau of Prisons) and I wanted a more thorough understanding of proper creed and methodology as, sad to say, some people (Nationwide) are plagued with corrupted views of Islam leaning more to radical extremist ideologues that I would like more clarification on to expose the weak elements of these views. Would you mind sending me some "printed material"? Some good brothers have informed me of a very informational document titled: "OPEN MESSAGE TO AL-BAGHDADI" which was drafted and signed by leading Muslim scholarship around the world in a very clear and concise attempt to combat the modern attempts of radicalization that seem to be infecting the young Muslims on social media and otherwise. I'm always seeking sound knowledge from brothers upon the correct creed and methodology and I was told to contact you guys as you "call to the correct views of Islam" and not the fringe elements which continue to be popularized in the media as well as a "fraction" of the Muslim Ummah! Your efforts in this regard would be greatly appreciated.

See Ex. 9, September 3, 2018, email from David Wright.

---

[29] *See* Tom Henegan, *Muslim scholars present religious rebuttal to Islamic State*, Reuters (Sept. 25, 20140, https://www.reuters.com/article/us-syria-crisis-islam-scholars/muslim-scholars-present-religious-rebuttal-to-islamic-state-idUSKCN0HK23120140925.

When the organization from which he requested the letter did not reply, Mr. Wright tried again. He again makes it clear that his intention is to seek "clarity on moderation in Islam," which he states is "vital for those seeking how to prevent and avoid views which are subsequently causing damage to the Muslim world in more ways than one." See Ex. 10, October 17, 2018 email from David Wright. Mr. Wright renewed his attempt several months later, requesting the document, describing it as one:

> which has been drafted by leading Islamic scholarship in an attempt to
> combat the readily available content online that sadly has been a
> means of families being destroyed, and public well-being being placed
> in potential jeopardy. In short, those of us who are ready to be
> reintegrated into society and are good hearted and wholesome Muslims
> are in need of such information so that we can be ever prepared
> against the misguidance that is all to [sic] existent in today's world.

Ex. 11, January 12, 2019 email from David Wright. He goes on acknowledging his own prior receptivity to destructive on-line propaganda, but also hoping to help others avoid the mistakes for which he and his family have paid dearly:

> I am therefore requesting that you would provide me with a printed version
> of the "Open Message to Al Baghdadi" (full-version) so that I can benefit from
> the much needed Islamic scholarship (that I was unable to view due to my
> incarceration), that has truly championed an agreed upon message that
> speaks not only to those who have been directly affected by online
> propaganda, but also those who are new to the faith who could be guided into
> correct beliefs and valued principles and not to the overwhelming nonsensical
> heretical views that are widely circulated as "truth" in our day and age.

Id.

The bulletin board cut-outs are capable of many interpretations – ignorance, religious grappling, and most likely a desire to re-appropriate and unearth the true historical meanings of symbols that have been co-opted by the organizations which

had, very personally to him, "been a means of families being destroyed." Id. The full institutional record, with its dearth of other indicators of radicalization, and his explicit repeated desire to obtain and share these anti-extremist materials, suggests that he has, in fact, rejected radicalization. ISIS supporters, like the supporters of other extremist view-points, are rarely shy or subtle about it; if Mr. Wright were indeed still radicalized, the Government would not need to guess at the meanings of bulletin board cut-outs to advance this theory. Overt proselytizing and explicit proclamations are the *sine qua non* of radicalism of all types, and perhaps particularly of ISIS.

The Government asks this Court to impose an extraordinary penalty on Mr. Wright. It should have to support that claim with evidence of more compelling quality than it has offered. Where nothing in the institutional record – aside from this single and ambiguous instance – indicates that Mr. Wright's renunciation of ISIS and extremism is anything other than genuine, this Court should deny the Government's request.

### C. The COVID-19 pandemic has made prison life significantly more difficult, particularly for a man with health conditions that make him highly susceptible to dying from the disease.

To determine what "just punishment" is for Mr. Wright under 18 U.S.C. § 3553(a), the Court must consider how Mr. Wright has served and will serve his prison time, regardless of his classification. The COVID-19 pandemic must be addressed as a factor influencing what "just punishment" is for sentencing purposes.

  i. *Conditions of Confinement During the COVID-19 Pandemic Make Time*
     *Served During the Foreseeable Future Much Harder than Normal*

The onset of the Coronavirus pandemic has altered the landscape of "just

punishment" comprehensively. Mr. Wright, in light of his health conditions, is left

with the constant fear that he will contract, and die from, this disease. For as long

as this pandemic lasts, Mr. Wright will serve harder time as he is subjected to

random lockdowns coupled with a constant state of fear.

On March 13, 2020, BOP modified its operations in response to the COVID-

19 pandemic.[30] All inmates were put on lockdown.[31] Visitations were suspended.[32]

Most programming was suspended.[33] A full lockdown began on April 1, 2020,[34] and

was extended twice through June 30, 2020.[35] There are countless horrific depictions

of life on the inside during these early stages of the pandemic.[36]

---

[30] *See Federal Bureau of Prisons COVID-19 Action Plan,* Fed. Bureau of Prisons (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp.

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *See* Fed. Bureau of Prisons, Bureau of Prisons COVID-19 Action Plan: Phase Five (Mar. 31, 2020), https://www.bop.gov/resources/news/pdfs/20200331_press_release_action_plan_5.pdf.

[35] *See* Fed. Bureau of Prisons, Bureau of Prisons COVID-19 Action Plan: Phase Six (Apr. 14, 2020), https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf; and *COVID-19 Action Plan: Phase Seven*, Fed. Bureau of Prisons (May 20, 2020), https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp.

[36] See, for example, Mem. From B. von Blanckensee, Acting Complex Warden FCC Lompoc, to All Staff at FCC Lompoc (Apr. 17, 2020) ("no phone or computer access"), https://bit.ly/3cdgA8H; *Hallinan v. Scarantino*, No. 20-hc- 2088-FL (E.D.N.C. May 26, 2020), ECF No. 1-4, at 3-4 (Declaration of Roger Duane Goodwin) ("Our unit [in FCI Butner Medium] remains locked down. . . except for about 1 hour on weekdays, when we are allowed to take a walk outside of our unit."); *Torres v. Milusnic*, No. 20-cv-04450 (C.D. Cal. May 16, 2020), ECF No. 1, at 22-28 (describing crowded, unsanitary conditions); *Torres*, at 56 (Declaration of Joanna Perales) ("prisoners were not allowed to shower" and "once [prisoners] run out of soap, they cannot purchase any more because the commissary is closed"); *Torres*, at 59-60 (Declaration of Graciela Zavala-Garcia) ("my son was denied all access to telephones, email and commissary" and "my son has not been able to shower or change into clean clothes"); Class Action Complaint, *Wilson v. Ponce*, No. 20-cv- 04451 (C.D. Cal. May 16, 2020), ECF No. 1, at 82-83 (Declaration of Jackeline Vazquez) (describing crowded and unsanitary living conditions at FCI Terminal Island and declaring that "my brother was told that prisoners would not be able to use phones and computers until further notice"); Emergency Petition for Writ of

Inmate movement and social visits remain suspended as of September 10, 2020.[37] Social visits are expected to resume by October 3, 2020, though that presumes no further spikes in case count.[38] However, with the fall and winter quickly approaching, further case increases are likely. It is unclear precisely how the BOP will respond to further spikes, but it stands to reason that additional lockdowns and suspensions of visitation and programming will occur once again.

Not only is it questionable whether Mr. Wright will be on lockdown or have access to visitation and programming, but he will remain at substantial risk of death or serious illness from COVID-19 for the foreseeable future. This is particularly true where it is impossible for inmates to abide by the CDC's social distancing guidelines. When not in lockdown, Mr. Wright will be sharing common areas and showers with other inmates. Even though he is in the CMU, he is nonetheless in regular close contact with other inmates. Given the nature of incarceration, social distancing is impossible.[39]

Due to the impossibility of engaging in social distancing, COVID-19 has spread through the BOP at significantly higher rates compared to the general population. Indeed, the rate of infected inmates per 1,000 inmates is more than five

---

Habeas Corpus, *Wilson v. Williams*, No. 20-cv-794 (N.D. Ohio Apr. 13, 2020), ECF No. 1-5, at 3-4 (Declaration of Kendal Nelson) ("[At FCI Elkton] They are not allowing us to go outside and get fresh air, and we're not allowed into the law library.").

[37] *See* https://www.bop.gov/coronavirus/covid19_status.jsp.

[38] *See* https://www.bop.gov/resources/news/20200902_visitation.jsp

[39] *See, e.g.*, Ctrs. for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://bit.ly/2M9IF6a (last visited May 28, 2020) (recognizing that correctional and detention facilities present "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments").

times greater than the rate of infected individuals in the U.S. population per 1,000

people, as reflected in the chart[40] below:



As of September 10, 2020, a total of 12,927 BOP inmates and 1,646 staff members

have contracted COVID-19.[41] 1,772 inmates and 645 staff members have active

infections. *Id*. 118 inmates and 2 staff members have died from the disease. *Id*.

As a result of this rampant spread of a deadly disease, not only have the last

several months been harder-than-usual time for Mr. Wright, but the time he serves

for the foreseeable future will be more difficult than normal. Not only do the BOP's

efforts to curtail the spread of the virus make prison more difficult, but so too does

the ever-present fear of dying from this disease. As discussed in the section below,

Mr. Wright is at a greater-than-average risk of serious illness or death from

---

[40] Chart Available at https://federaldefendersny.org/.
[41] *See COVID-19 Coronavirus*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/ (last
accessed Sept. 18, 2020).

COVID-19 due to his preexisting medical conditions. Being fully aware of these risks, and his relative inability to protect himself from the disease's spread, it is no surprise that Mr. Wright would have an inordinate fear of death, making his time in custody significantly more difficult. This Court should account for the increased difficulty of serving a sentence in these times when fashioning a sentence for Mr. Wright.

> ii. *Mr. Wright Is Particularly Susceptible to Dying From COVID-19, Making Any Time He Serves in The Foreseeable Future More Difficult.*

Mr. Wright suffers from a number of serious medical conditions, including morbid obesity, essential hypertension, and G6PD deficiency.[42] His obesity, hypertension, and G6PD all place him at higher risk of severe complications or death if he contracts COVID-19. Centers for Disease Control and Prevention ("CDC") guidance notes that individuals with a body mass index ("BMI") of 30 or higher are at increased risk of severe illness from COVID-19.[43] Those same guidelines warn that individuals with hypertension may be at increased risk of severe illness from COVID-19.[44] According to a CDC study, 48.3% of patients hospitalized with COVID-19 were obese.[45] Among patients in Mr. Wright's age bracket, obesity was the most prevalent underlying condition of those hospitalized

---

[42] See Ex. 12 (Wyatt medical records – excerpt); Ex. 13 (Doctor declaration). With a height of 6'7" and a recorded weight of 347 pounds, Mr. Wright has a BMI of 39.1 kg/m².
[43] *People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (updated Aug. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.
[44] *Id.*
[45] *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 – COVID-NET, 14 States, March 1-30, 2020*, 69 MMWR 458 (2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm?s_cid=mm6915e3_w.

due to COVID-19.[46] Other large studies show that obesity is a significant independent risk factor increasing mortality rates from COVID-19, with one such study finding that obesity doubles the COVID-19 mortality rate.[47]

Hypertension may also increase Mr. Wright's risk of severe disease, as it has also been one of the most common comorbidities in COVID-19 patients.[48] In a meta-analysis of nineteen studies with 15,302 cases, "hypertension was significantly associated with the increased risk of adverse outcomes in COVID-19 patients."[49] Recent statistics from New York also show that hypertension is the leading "top 10" co-morbidity by age group – by a considerable margin – and an alarmingly high number of people who have died from COVID-19 in New York have had hypertension.[50] Although significantly less studied, there is evidence that G6PD

---

[46] *Id.*

[47] Sébastien Czernichow et al., *Obesity Doubles Mortality for SARS-CoV-2*, Obesity (Aug. 20, 2020), https://doi.org/10.1002/oby.23014 (in a study of 5,795 COVID-19 patients in France, obesity doubled the mortality rate); Sara Y. Tartof et al., *Obesity and Mortality Among Patients Diagnosed with COVID-19: Results from an Integrated Health Care Organization*, Annals of Internal Med. (Aug. 12, 2020), https://www.acpjournals.org/doi/10.7326/M20-3742 (a study of nearly 7,000 COVID-19 patients in California showed "[o]besity plays a profound role in risk for death from COVID-19, particularly in male patients and younger populations . . . independent of obesity-related comorbidities and other potential confounders.").

[48] A study of 5,700 patients hospitalized with COVID-19, published in the Journal of the American Medical Association, showed that hypertension was one of the "most common comorbidities" of COVID-19. Safiya Richardson, et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area*, J. Am. Med. Ass'n (Apr. 22, 2020), https://bit.ly/3auhLzS.

[49] Xuan Liang et al., *The Association of Hypertension with the Severity and Mortality of COVID-19 Patients: Evidence Based on Adjusted Effect Estimates*, 81 J. Infection e44, e44 (2020).

[50] *COVID-19 Tracker*, N.Y. State, https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n (last accessed Sept. 13, 2020).

deficiency may also increase susceptibility to COVID-19 and risk of a more severe disease course.[51]

Mr. Wright's incarceration makes him significantly more likely to contract COVID-19, and if he does, his health conditions put him at a greater risk of severe illness or death. As discussed above, incarcerated individuals, without taking into account any pre-existing conditions, have at least a 550% greater chance of contracting COVID-19 than the U.S. population at large; they are also 300% more likely to die from the virus.[52] Therefore, due to his incarceration and his multiple pre-existing health conditions, Mr. Wright must live every day worrying that his incarceration will become a death sentence.

Courts around the country are reducing sentences and granting compassionate release based on the increased risk that COVID-19 poses to inmates

---

[51] Sameer Al-Abdi & Maryam Al-Aamri, *G6PD Deficiency in the COVID-19 Pandemic: Ghost Within Ghost*, Hematology/Oncology & Stem Cell Therapy (Apr. 18, 2020), https://doi.org/10.1016/j.hemonc.2020.04.002.

[52] Brendan Saloner et al., *COVID-19 Cases and Deaths in Federal and State Prisons* E1, J. Am. Med. Ass'n (July 8, 2020), https://bit.ly/3a4604x; Alexandra Sternlicht, *Prisoners 550% More Likely to Get Covid-19, 300% More Likely to Die, New Study Shows*, Forbes (last accessed August 12, 2020), https://www.forbes.com/sites/alexandrasternlicht/2020/07/08/prisoners-550-more-likely-to-get-covid-19-300-more-likely-to-die-new-study-shows/#64d17a173a72. There is also concern that the prisons will not be able to provide the ventilators and other specialized medical care that will be needed – and that, given his pre-existing health conditions, Mr. Wright is highly likely to need should he contract COVID-19 – as more and more inmates get seriously ill from the virus. *See* Danielle Ivory, *"We Are Not a Hospital": A Prison Braces for the Coronavirus*, N.Y. Times (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html (quoting federal prison medical worker stating that medical supplies and staff were short, even without an outbreak, and acknowledged that the prison simply would not be able to handle a COVID-19 surge as, "We don't have ventilators on hand at all. We are not a hospital. We don't have the medical staff."); see generally U.S. Dep't of Justice, Office of the Inspector General, Review of the Federal Bureau of Prisons' Medical Staffing Challenges (Mar. 2016) (finding pre-COVID-19 that BOP experienced chronic medical staff shortages, leading to problems meeting the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of institutions).

with pre-existing health conditions such as obesity and hypertension.[53] Further, the Department of Justice has conceded – including in a case in the District of Massachusetts – that, pursuant to CDC guidance, a "body mass index ('BMI') above 30 constitutes an 'extraordinary and compelling reason' warranting a sentence reduction."[54]

In granting a defendant's motion for compassionate release, a judge recently observed that there can be no "just punishment where there is a real risk that [a sentence of incarceration] could be transformed into a death sentence."[55] Because of COVID-19, Mr. Wright must live every day in conditions of incarceration that are significantly more severe than they would ordinarily be and in the very reasonable fear that his incarceration will soon "be transformed into a death sentence." These circumstances render Mr. Wright's time served more punitive than it ordinarily would be. Thus, the Court should find that varying below the guidelines range and imposing a sentence of fourteen years is sufficient under 18 U.S.C. § 3553(a).[56]

---

[53] *E.g.*, *U.S. v. Michael Browne*, Crim. No. 14-10369-LTS, 2020 WL 3618689 (D. Mass. July 2, 2020); *United States v. Pena*, No. CR 16-10236-MLW, 2020 WL 2798259 (D. Mass. May 29, 2020); *United States v. Young*, No. CR 4:16-40036-TSH, 2020 WL 2514673 (D. Mass. May 15, 2020); *United States v. Ramirez*, No. CR 17-10328-WGY, 2020 WL 2404858, at *4 (D. Mass. May 12, 2020); *United States v. El-Hanafi*, No. 10-CR-162 (KMW), 2020 WL 2538384 (S.D.N.Y. May 19, 2020); *United States v. Hossain*, No. 1:04-CR-402 (TJM), 2020 WL 3265001 (N.D.N.Y. June 8, 2020); *United States v. Jenkins*, Crim. No. 99-cr-00439-JLK-1, 2020 WL 2466911 (D. Colo. May 8, 2020).

[54] *E.g.*, Correspondence from Assistance United States Attorney's Office to the Honorable William G. Young, *United States v. Lebron*, Crim. No. 18-cr-10422-WGY (D. Mass. Aug. 6, 2020); Correspondence from Assistant United States Attorney's Office to the Honorable Ellen L. Hollander, *United States v. Steven Cole*, Crim. No. ELH-18-167 (D. Md. July 30, 2020).

[55] *United States v. El-Hanafi*, No. 10-CR-162 (KMW), 2020 WL 2538384, at *5 (S.D.N.Y. May 19, 2020).

[56] Other district courts have recently cited the harsh prison conditions and lack of programming opportunities due to the coronavirus as reasons to vary downward in imposing sentence. *See, e.g.*, *United States v. William White*, 19-cr-325 (D.D.C. Aug. 5, 2020) (referring to more punitive and less rehabilitative conditions at the jail due to COVID-19); *United States v. Antonio Cox*, 19-cr-235 (D.D.C. July 29, 2020) (acknowledging lack of programming due to COVID-19); *United States v. Zuniga-Lopez*, 19-cr-123 (E.D. Wash. Aug. 25, 2020) (imposing a time served sentence and

### D. The co-defendant in this matter had his sentence reduced to time served and home confinement due to concerns from COVID-19

The considerations addressed above are hardly too abstract or too general to be applicable to Mr. Wright's sentencing. Though the posture is different between sentencing and compassionate release, the trial judge has already recognized the extraordinary and compelling circumstances the pandemic creates and the appropriateness of revisiting prior sentencing decisions in the case of Mr. Wright's co-defendant, Nicholas Rovinski. The same considerations that Judge Young applied to Mr. Rovinski's compassionate release decision are salient here.

On June 11, 2015, Mr. Rovinksi was arrested in connection with this matter.[57] Mr. Rovinski participated in the early stages of litigation, but eventually changed his plea, agreed to cooperate with the Government, and testified at Mr. Wright's trial.[58] On December 20, 2017, Mr. Rovinski was sentenced to 180 months in prison followed by lifetime supervised release.[59] *Id.* at 412-14.

In late April of this year, as the scope of the pandemic became more apparent, Mr. Rovinski, through his counsel, requested that the BOP consider Mr. Rovinski for transfer to home confinement pursuant to the CARES Act and Attorney General Barr's Memoranda, or alternatively, that he be considered for

---

acknowledging that COVID-19 is a concern for the defendant, his guideline range is low, and he is not a danger to the community); *United States v. Chavol*, 19-cr-572 (C.D. Cal. July 27, 2020) (imposing a sentence of time served).

[57] *United States v. Rovinski*, 1:15CR10153-WGY-2, ECF No. 1.

[58] Pursuant to a Fed. R. Crim. P. 11(c)(1)(C) plea agreement, Mr. Rovinski pled guilty to conspiracy to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1), and conspiracy to commit acts of terrorism transcending national boundaries, in violation of 18 U.S.C. § 2332b(a)(2).

[59] *United States v. Rovinski*, 1:15CR10153-WGY-2, ECF Nos. 412–414 (Sentencing, Judgment, Statement of Reasons).

BOP initiated compassionate release. Thereafter, in early June, Rovinski moved

this court to reduce his sentence to time-served on compassionate release grounds.[60]

As grounds, counsel explained that Mr. Rovinski – though only 29 – suffered from a

variety of physical and mental health disorders – including cerebral palsy,

hypertension[61], and depression – which placed him both at direct risk of severe

complications if Rovinski contracted the disease, and also reduced his ability to

engage in the kinds of prophylactic hygiene necessary to avoid or limit exposure.[62]

Mr. Rovinski, at the time of moving the court, had approximately 94 months left on

his 180-month sentence, and was serving his time at FCI-Danbury.[63]

Over the Government's objection, this Court granted Mr. Rovinski's motion

on August 11, amending his sentence to time served with his first ten years of

lifetime supervised release to be served in home confinement.[64] The Court further

ordered that the first six months be served on "strict home confinement" but left

open the possibility that Mr. Rovinski may petition the Court thereafter for further

---

[60] Motion for Compassionate Release, *United States v. Rovinski*, 1:15CR10153-WGY-2, ECF No. 458.
[61] Mr. Wright, as noted above, also suffers from hypertension, a condition which several federal courts recognize as a serious COVID-19 risk enhancer. *See United States v. Salvagno*, No. 5:02-CR-51-LEK, 2020 WL 3410601, at *12-14 (N.D.N.Y. Apr. 23, 2020) (granting compassionate release to FCI Danbury inmate with hypertension and no other health factor and collecting resources regarding the COVID-19 risks associated with hypertension); *United States v. Sawicz*, No. 08-cr-287-ARR, 2020 WL 1815851, at *5-6 (E.D.N.Y. Apr. 10, 2020) (granting release to FCI Danbury inmate whose only risk factor was hypertension); *United States v. Hilow*, No. 15-cr-170-JD, 2020 WL 2851086, at *4 (D.N.H. June 2, 2020) ("even controlled hypertension in conjunction with COVID-19 is a health risk")
[62] *United States v. Rovinski*, 1:15CR10153-WGY-2, ECF No. 458 at 10-14.
[63] At the time the motion was filed, FCI-Danbury had taken an early lead in outbreak severity within the BOP. For further detail on the conditions at the facility at the time in question, see Memorandum in Support of Class Action Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241, *Martinez-Brooks v. Easter*, 20-cv-00569-MPS (D. Conn. Apr. 30, 2020).
[64] Order on Motion for Compassionate Release, *United States v. Rovinski*, 1:15CR10153-WGY-2, ECF No. 470.

modification and reduction.[65] On August 16, the Court denied the Government's
motion to reconsider the resentencing.[66]

Judge Young's compassionate release decision in Mr. Rovinski's case, and
notably his willingness to assess the continuing fairness of its sentence in the future
– within the larger, mutable context of the pandemic and Rovinski's rehabilitation –
provides a useful framework for this court in its resentencing of Wright. Many of
the same considerations apply for Mr. Wright – his health conditions substantially
increase his risk of death from COVID-19 – as they did for Mr. Rovinski. The risks
of incarceration has been ratcheted up significantly by the pandemic and the
qualitative hardship of the experience is enhanced by both the threat of the disease
and the BOP's efforts to contain its spread within the facilities. If these
considerations were meaningful to Judge Young, fairness dictates that they should
receive the same weight here.

### E. The demise of ISIS reduces the risk of re-offense and ameliorates concerns about general deterrence

*"Now ISIS is just about done, it's about to be relegated to the dust bin of history, forgotten and reviled..."*

Sentencing Transcript, *United States v. Wright*, Dec. 19, 2017 (Young, J.), pg. 54.[67]

On October 27, 2019, as U.S. Special Forces were closing in, Abu Bakr al-
Baghdadi detonated the suicide vest that was strapped to his chest. His death

---

[65] *Id.* The Court also imposed several special conditions, including drug and alcohol testing, mental health counseling, and that the client stay away from and have no contact with Pamela Geller. Amended Judgment 5, *United States v. Rovinski*, 1:15CR10153-WGY-2, ECF No. 475.
[66] A full decision on the denial is pending, though the Government has filed notice of its appeal. *United States v. Rovinski*, 1:15CR10153-WGY-2, ECF Nos. 477, 479.
[67] ECF No. 417.

ended a six-year stint atop the organization that at one point controlled large swaths of Iraq and Syria, including major cities like Aleppo, Raqqa and Ramadi.

But by 2019, ISIS had fallen far from the lofty heights of just years earlier. In 2014, it controlled more than 34,000 square miles in Syria and Iraq, from the Mediterranean coast to south of Baghdad.[68] But by early 2016, the United States calculated that ISIS had lost 40% of its territory.[69] And in March of 2019, six months prior to Baghdadi's death, ISIS lost its last stronghold—the town of Baghouz, Syria—and with it any claim that it was a "caliphate," or a nation state headed by a descendant of the Prophet Muhammad.[70]

ISIS' troop levels have also significantly declined since their height in 2014 and 2015. While the group once boasted an army of up to 100,000 soldiers,[71] by 2019 there were closer to 20,000;[72] this year, the number has shrunk to as little as 14,000.[73] Similarly, U.S. troop levels have declined from 2000 in 2018, to 400 as of 2019.[74] Just last month, the president promised to pull all U.S. troops out of the Middle East.[75]

---

[68] CNN Editorial Research, *ISIS Fast Facts*, CNN (updated Sept. 6, 2020, 11:03 AM), https://www.cnn.com/2014/08/08/world/isis-fast-facts/index.html.
[69] *Id.*
[70] *Id.*
[71] Kyle Rempfer, *Low Aim or Intel Failure? ISIS' Last Stand Shows the Difficulty in Estimating Enemy Manpower*, Military Times (Mar. 27, 2019), https://www.militarytimes.com/news/your-military/2019/03/27/low-aim-or-intel-failure-isis-last-stand-shows-the-difficulty-in-estimating-enemy-manpower/.
[72] Joseph Hincks, *ISIS Is Still Active in Iraq, Syria and Beyond. This Is What the Threat Looks Like Now*, Time (Jan. 18, 2019), https://time.com/5506007/trump-isis-victory-islamic-state/.
[73] Mike Giglio & Kathy Gilsinan, *The Inconvenient Truth About ISIS*, Atlantic (Feb. 14, 2020), https://www.theatlantic.com/politics/archive/2020/02/kurdish-leader-isis-conflict-iraq-iran/606502/.
[74] *Timeline: The Rise, Spread, and Fall of the Islamic State*, Wilson Ctr. (Oct. 28, 2019), https://www.wilsoncenter.org/article/timeline-the-rise-spread-and-fall-the-islamic-state.
[75] Deb Riechmann, *Trump Reaffirms Plan to Withdraw All US Troops from Iraq*, AP News (Aug. 20, 2020), https://apnews.com/35581f7ecfed0bbea789ee47e1658929.

But in 2015, when Mr. Wright was arrested after the supposed plot to kill law enforcement and Pamela Gellar, the group was on the march. Not only had ISIS claimed significant territory in the Middle East, but numerous plots in the United States were purportedly linked to the organization. In June of 2015, the month of Mr. Wright's arrest, the Government indicted fourteen people for providing material support to ISIS, the same number it charged in all of 2014 and just two fewer than all of 2016.[76] In the spring of 2015, thirty-five defendants were accused of supporting ISIS, more than the rest of 2015, plus all of 2014 and 2016 combined.[77] Of the 208 ISIS cases prosecuted as of July, 2020, more than one third were from 2015 and more than half were in 2016 or earlier.[78]

While it is true that, at the time of the Mr. Wright's original sentencing, ISIS was "just about done," since then the organization has gone from "just about" to nearly completely decimated. Although the group is still capable of launching attacks, its loss of territory and now vanished claim to statehood has deprived ISIS of much of its cache. In fact, from January to June of this year, the Government charged just four defendants with ISIS-inspired crimes.

The Government disputes that ISIS is in full retreat. But the only evidence that it cites is a statement by the FBI director Christopher Wray made to the House

---

[76] Center On National Security At Fordham Law, Case by Case: ISIS Prosecutions in the United States March 1, 2014 – June 30, 2016 (2016), https://static1.squarespace.com/static/55dc76f7e4b013c872183fea/t/577c5b43197aea832bd486c0/1467767622315/ISIS+Report+-+Case+by+Case+-+July2016.pdf.

[77] *Id.*

[78] *GW Extremism Tracker: Terrorism in the United States, December 2016*, Program on Extremism, https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/downloads/Dec.%202016%20Update.pdf (last accessed Sept. 12, 2020).

Homeland Security Committee. In it, Wray runs through a litany of concerns that the Bureau faces, from foreign groups like ISIS and Al Qaeda, to right-wing domestic terrorism, cyber-attacks, and state-sponsored intelligence operations from hostile foreign powers.[79] In Wray's view, each of these areas raise potential concerns for violence and instability. That ISIS was among the many potential threats cited hardly supports the notion that the group remains the potent force it was five years ago.[80]

The marked decline and fall of ISIS are relevant to both specific and general deterrence. As to specific deterrence, the group's demise makes it far less likely that Mr. Wright would join – or rejoin – its ranks upon release. While a drug dealer sentenced to prison is unlikely to be returned to a world where drugs do not exist, by the time Mr. Wright is released, ISIS may have the gone the way of the Weather Underground, a group that had its moment in the limelight, but is now relegated to the history books. It is highly unlikely that a man who is said to have sworn allegiance to one group in his twenties would, in his forties, decide that another terrorist organization was now worthy of his fealty.

Similarly with general deterrence, the collapse of the caliphate and the repeated military failures have dampened the group's appeal.[81] Gone are the heady

[79] Christopher Wray, Statement Before the House Homeland Security Committee on Global Terrorism: Threats to the Homeland (Oct. 30, 2019), https://www.fbi.gov/news/testimony/global-terrorism-threats-to-the-homeland-103019.
[80] *GW Extremism Tracker: Terrorism in the United States,* *https://extremism.gwu.edu/gw-extremism-tracker, last accessed Sept. 18, 2020*
[81] *How the Islamic State Rose, Fell and Could Rise Again in the Baghreb*, Int'l Crisis Group (July 24, 2017), https://www.crisisgroup.org/middle-east-north-africa/north-africa/178-how-islamic-state-rose-fell-and-could-rise-again-maghreb ("ISIS' military reversals in the Levant and in Libya have also dampened the aura of invincibility that was an essential part of its appeal in 2014-2015.").

days of 2014 and 2015, when ISIS could recruit new soldiers over the internet faster

than they could be killed or captured. Deterring American citizens from joining

groups like ISIS is just not as pressing as it once was.

### F. The requested sentence of fourteen years would avoid sentencing disparities between Wright and others convicted of terrorist activities of similar character.

   *i.  A 14-Year Sentence Avoids Disparities in Sentences Between Wright and Other Individuals Convicted of Similar Foreign Terrorism-Related Offenses.*

Mr. Wright first raised the concern that an excessive sentence would create a

significant disparity between him and other – often more culpable – defendants

convicted of supporting and engaging in foreign terrorism-related offenses when the

Government sought a life sentence in 2017. Though the issue was extensively

briefed in Mr. Wright's original sentencing memorandum,[82] three examples – all

available for consideration at the time of the first sentencing – further suggest

themselves.

Mohamed Khwies, in mid-December of 2015, successfully traveled to Syria

and formally became a member of ISIS – even obtaining an official ISIS

membership card – before being "forward deployed" by ISIS to fight in Iraq.[83]

Khweis remained in ISIS-controlled territory for several months, before

surrendering to Peshmerga military forces in March of 2016; at the time of his

---

[82] In the interest of brevity, Wright incorporates those prior arguments by reference. See Def.'s Sentencing Mem. 46–60, ECF No. 401.
[83] Aff. in Support of Criminal Complaint and Arrest Warrant at 8-9, *United States v. Mohamed Khweis*, 1:16-mj-00213, ECF No. 2 (E.D. Va. May 11, 2016).

capture, Khweis was carrying his Virginia driver's license.[84] Though Khweis

initially gave false information to the FBI about his involvement, it eventually

emerged – as the government noted in its sentencing memo – that Khweis trained

with conscripts, provided money and logistical support to other fighters, and had

gone so far as to volunteer as a suicide bomber. Khweis went to trial in June of 2017

and – according to the Government – offered false or misleading testimony on the

stand to "minimize the numerous ways in which he provided and conspired to

provide material support to ISIS."[85] The Government – at roughly the same time

that Wright's trial was underway – sought a sentence of 420 months. On October

27th, the court imposed a sentence of 20 years. Both the sentence sought and

ultimately imposed on Khweis were significantly shorter than that sought and

imposed on Wright, despite the fact that Wright's behavior never left the computer

screen.[86]

Co-defendants Ehsanul Sadequee and Syed Ahmed also received significantly

lower sentences than Mr. Wright – 17 years and 13 years, respectively – for

comparable – at least – and possibly significantly greater involvement with terrorist

---

[84] *Id.* at 5.

[85] U.S. Mem. In Aid of Sentencing at 2, *United States v. Mohamed Khweis*, 1:16-cr-00143, (E.D. Va. Oct. 20, 2017), ECF No. 237.

[86] Office of Public Affairs, *American Sentenced to 20 Years for Joining ISIS*, Dep't Just. (Oct. 27, 2017), https://www.justice.gov/opa/pr/american-sentenced-20-years-joining-isis. *See also* Matthew Barakat, *New Sentencing Ordered for American Who Joined Islamic State*, AP News (Aug. 11, 2020), https://apnews.com/article/sentencing-richmond-islamic-state-group-iraq-virginia-176263d3a593b25e4fb7727330a122b9 (noting that, at time of sentencing, "Khweis was the only American citizen to be convicted in a U.S. jury trial of successfully joining the Islamic State overseas").

organizations.[87] According to the superseding indictment, filed in August 2006, Sadequee and Ahmed engaged in paramilitary training, traveled to Canada to meet with other supporters of "violent jihad," and developed "casing" video clips on "symbolic and infrastructure targets of potential terrorist attacks" to establish "credentials."[88] Though some of these activities consisted of online-posturing and may have been rather fantastical in nature – or exaggerated by law enforcement[89] – the pair's commitment extended at least to travelling to Bangladesh and Pakistan, respectively, to join Lashkar-e-Taiba for religious education and military training.[90] This was a considerable step further than that taken by Wright or any of his conspirators.

Ahmed was convicted, on June 10, 2009, following a five-day bench trial of a single count of conspiring to provide material support to terrorists.[91] Sadequee was convicted, following a seven day trial,[92] in August of 2009 of conspiring to provide material support to terrorists, providing and attempting to provide material support to terrorists, conspiring to provide material support to a designated foreign terrorist

---

[87] Office of Public Affairs, *Terrorism Defendants Sentenced in Atlanta*, Dep't Just. (Dec. 14, 2009), https://www.justice.gov/opa/pr/terrorism-defendants-sentenced-atlanta. Sadequee and Ahmed both traveled abroad to meet with co-conspirators, share information about planned U.S. targets, and attempt to attend a terrorist training camp. *Id.*

[88] Superseding Indictment at 2-10, *United States v. Ehsanul Sadequee*,1:06-cr-00147, (N.D. Ga. July 19, 2006) ECF No. 39.

[89] The indictment somewhat breathlessly recounts that Sadequee and Ahmed "explored how they might disrupt the world-wide Global Positioning System". Id. at 5. In less hyperbolic terms, the pair apparently discussed trying to shoot down GPS satellites in orbit. The likelihood of Sadequee and Ahmed accomplishing this was probably on par with the chances of success of Wright, Rahim, and Rovisnki's plan to overtake and commandeer a US Navy battleship.

[90] It is unclear from available court records whether they ever made contact with the terrorist group.

[91] Verdict, *United States v. Syed Ahmed*, 1:06-cr-00147, (N.D. Ga. June 10, 2009), ECF No. 509.

[92] Ahmed cooperated and gave testimony against Sadequee at trial.

organization, and attempting to provide material support to a designated foreign terrorist organization.[93]

Both Ahmed and Sadequee's guideline sentencing ranges exposed them to a life sentence (though the statutory maximum capped the sentence at 60 years for Sadequee and 15 years for Ahmed). The Government sought a 15 year sentence for Ahmed[94] and a 20 year sentence for Sadequee.[95] It argued 20 years for Sadequee was appropriate – as compared to the lesser sentence it sought against Ahmed – because Sadequee, "since age 14, sought to join the armed struggle waged by violent jihadists against American and allied interests around the world [. . .] forged close relationships with several now-convicted terrorists that Ahmed knew only indirectly, if at all [and with] these jihadist colleagues, Younis Tsouli and Mirsad Bektasevic,[96] Sadequee sought to establish his very own terrorist organization, Al

---

[93] Jury Verdict, *United States v. Ehsanul Sadequee*, No. 1:06-cr-00147,  (N.D. Ga. Aug. 12, 2009), ECF No. 588.

[94] Gov.'s Sentencing Mem. at 3, *United States v. Syed Ahmed*, 1:06-cr-00147-ELR-GGB-1 (N.D. Ga. Dec. 9, 2009), ECF No. 616.

[95] Gov.'s Sentencing Mem. at 3, *United States v. Ehsanul Sadequee*, no. 1:06-cr-147-WSD (N.D. Ga. Dec. 9, 2009), ECF No. 617.

[96] Neither of these men are American and were not sentenced in American court, but their sentences are at least worthy of passing note. Younis Tsouli was arrested in October of 2005 at the age of 22 and charged in British court with conspiracy to murder and possess articles for the purposes of terrorism. Tsouli was charged along with two codefendants, Waseem Mughal who was 22 at the time of arrest and Tariq Al-Dour who was 19 at the time of arrest. Tsouli received a sentence of ten years which was later increased to sixteen years after he was found guilty in 2007. Gordon Corera, *The World's Most Wanted Cyber-Jihadist*, BBC News (Jan. 16, 2008), http://news.bbc.co.uk/2/hi/americas/7191248.stm. Mughal and Al-Dour were sentenced to six and a half and seven and a half years respectively. *Men Jailed for Inciting Terrorism on the Internet,* Register (July 9, 2007), http://www.theregister.co.uk/2007/07/09/internet_terror_incitement_sentence/. Bektasavic – a Swede - was also arrested in October 2005 and was convicted in Bosnia of planning an actual terrorist attack against an unknown target. He was arrested in possession of multiple weapons, including over 40 pounds of C4 explosives and detonators. Bektasavic and two codefendants were sentenced in January of 2007. One co-defendant received thirteen years, one received eight years, the third received two and a half years. Mr. Bektasavic was originally sentenced to fifteen years and four months but this was reduced upon appeal to eight years and four

Qaeda in Northern Europe."[97] Sadequee, the Government noted, was also a recruiter and "an administrator on Tibyan Publications [where he] exposed his views, his breadth of knowledge, and his connections to the hundreds of members of that radical on-line forum."[98] In that role as a recruiter, Sadequee encouraged another American citizen, Martin Sharp, who – at Sadequee's urging and counsel – travelled abroad and eventually "moved to Somalia, where Sharp joined a jihadist militia and was never heard from again."[99] Given "the nature and extent of Defendant Sadequee's involvement in several conspiracies to promote, support, and commit acts of terrorism" the Government urged the court that 20 years was "an appropriate and reasonable sentence."[100] Sadequee sought a sentence of 15 years, making many of the same arguments Wright urged (and continues to urge) upon this court – that he was young, socially awkward, and living in a "video game like fantasy world."[101] Ahmed received 13 years – he was released from BOP custody in August of 2017; Sadequee received a sentence of 17 years – he is at a residential reentry management facility, and expected to be released from BOP custody in less than a month.[102]

---

months in June of 2007. *See* Mirsad Bektašević, Abdulkadir Cesur, Bajro Ikanović, Senad Hasanović, ICD, http://www.internationalcrimesdatabase.org/Case/942/Bekta%C5%A1evi%C4%87-et-al/ (last accessed Sept. 18, 2020); *Terror Swede to Finish Jail Time in Sweden*, Local (Mar. 26, 2009), https://www.thelocal.se/20090326/18458/.

[97] Government's Sentencing Mem. at 15, *United States v. Ehsanul Sadequee*, no. 1:06-cr-147-WSD (N.D. Ga. Dec. 9, 2009), ECF No. 617.

[98] *Id.* at 15-16

[99] *Id.* at 16.

[100] *Id.*

[101] Def.'s Sentencing Mem. at 10, *United States v. Ehsanul Sadequee,* No. 1:06-cr-147-WSD-GGB-2 (N.D. Ga. Dec. 9, 2009), ECF No. 615.

[102] *Find an Inmate*, Fed. Bureau of Prisons, https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results (both inmate statuses last checked on September 16th, 2020).

The concern about unwarranted sentencing disparities remains as valid today as it was in 2017. As of August 2020, the average sentence imposed on individuals convicted of offenses related to the Islamic State is 13.2 years,[103] down from an average of 13.9 years in December 2017 when Mr. Wright was first sentenced.[104] Further, since Mr. Wright's sentencing, numerous individuals convicted of providing more substantial support to ISIS have received sentences significantly lower than Mr. Wright's original 28-year sentence.[105] Of particular note, Erick Jamal Hendricks received a fifteen-year sentence after trial for communicating both on social media and in-person with individuals attempting to recruit them "to create U.S.-based sleeper cells of IS supporters and sympathizers

---

[103] *GW Extremism Tracker: Terrorism in the United States, August 2020*, Program on Extremism, https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/Aug2020%20Tracker.pdf (last accessed Sept. 15, 2020).

[104] *GW Extremism Tracker: Terrorism in the United States, December 2017*, Program on Extremism, https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/Dec%202017%20Tracker.pdf (last accessed Sept. 15, 2020).

[105] Nihad Rosic received an eight-year sentence for providing and conspiring to provide material support to ISIS, where he sent $500 to a co-conspirator that was used to purchase and send tactical military combat supplies overseas and he unsuccessfully attempted to travel to Syria to join ISIS fighters. *GW Extremism Tracker: Terrorism in the United States, July 2020*, Program on Extremism, https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/Jul2020%20Tracker.pdf (last accessed Sept. 15, 2020). Hasher Jallal Taheb received a fifteen-year sentence for plotting numerous attacks on U.S. targets, including planning an attack on the White House involving "semi-automatic weapons, an anti-tank weapon, hand grenades, and other explosive devices," and taking possession of "some of these attack materials from undercover FBI agents." *Id.* Asia Siddiqui received a fifteen-year sentence for plotting to construct a bomb to be used in a U.S. terrorist attack; Siddiqui was arrested "in possession of propane tanks, car bomb instructions, and other jihadist literature." *GW Extremism Tracker: Terrorism in the United States, January 2020*, Program on Extremism, https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/Jan20%20Tracker.pdf (last accessed Sept. 15, 2020). Ahmed Mohammed El Gammal received a twelve-year sentence for recruiting an individual and helping him travel to Syria where he fought with ISIS. *GW Extremism Tracker: Terrorism in the United States, December 2018*, Program on Extremism, https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/December%202018%20Tracker.pdf (last accessed Sept. 15, 2020).

who could be trained to carry out domestic attacks."[106] There are numerous parallels between Wright and Hendricks' respective offenses.

In imposing a sentence on Hendricks that deviated significantly below the guidelines, the court noted that, prior to the relevant charges Hendricks "had no prior criminal history as an adult."[107] Wright's criminal record, prior to the instant offense was minimal. Like Wright, Hendricks desired to form an ISIS cell in the United States, attempted to accomplish this primarily through social media and online platforms, and sought out those with similar ideologies and attempted to band them together.[108] Like Wright, Hendricks was provoked by the Draw the Prophet Muhammad contest and made clear that one of his targets would remain anyone involved with the contest.[109]

From there, however, the Court took the step of assessing Hendricks *actual ability* to realize any of these goals, finding that he never "had the wherewithal to complete any of his plans. In other words, Hendricks talked a good game in his online interactions, but there appears to be very little substance behind his talk."[110] This observation applies very aptly to David Wright. Like Wright, "Hendricks discussed some form of clandestine training of this terror cell" but the court found "there is nothing to indicate that he had any of the knowledge or skill required to lead such training."[111] As in Wright's case, "the Government was able to quickly

---

[106] *GW Extremism Tracker: Terrorism in the United States, February 2019*, Program on Extremism, https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/Feb19%20Update.pdf.
[107] *United States v. Hendricks*, No. 1:16-cr-265, 2019 WL 1282222, at *4 (Mar. 19, 2019).
[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] *Id.*

infiltrate Hendricks' circle of online confidants and monitor his activity."[112] Though Hendricks was in direct contact with one of the perpetrators of the attack on the "First Annual Muhammad Art Exhibit and Contest" in Garland, Texas, where the perpetrators fired on police and were subsequently killed – which has some parallels with Wright's failure to discourage his uncle's misguided and fatal spontaneous plan to attack law enforcement officers – the Court nonetheless found that "the record does not reflect that [he] was an imminent threat to life and property within the United States."[113]

In summarizing the decision to impose a 15-year sentence, the Court reasoned:

> Hendricks may have held genuine aspirations of becoming some type of ISIS leader in the United States. Those aspirations led him to contact others. However, he also had very little in the way of concrete plans to put together this group. He did not have a place to house them. He did not have weapons to provide them. He did not have monetary resources to utilize. Instead, he had what the Government presented during its case – much talk. Make no mistake, Hendricks' ability to convince others to join him in his quest to form a terror cell warrants significant prison time. It does not, however, warrant a sentence that would ensure Hendricks is a senior citizen when he exits prison.[114]

The same reasoning applies to Wright. He held similar aspirations and pursued them in a comparable fashion, but any sober assessment of Wright's capabilities ought to also place him in the same league as Hendricks. Like Hendricks, his aspirations and ability to inspire others to join him warrants

---

[112] *Id.*
[113] *Id.*
[114] *Id.* at 5.

significant prison time, but the sentence should not be one that sees him leaving prison in his late middle age.

Given the numerous examples of lower sentences imposed on similarly situated defendants such as Hendricks, Khweis, and Sadequee – as well as the cases cited in Mr. Wright's original sentencing memo – a sentence of fourteen years followed by fourteen years of supervised release avoids sentencing disparities.

> ii.  *A-14 Year Sentence Also Avoids Perpetuating Increasingly Grave Disparities in Sentences Between Individuals Convicted of Foreign Terrorism-Related Offenses and Individuals Sentenced for White Supremacist Domestic Terrorism Encompassing Virtually Identical Conduct.*

In addition to avoiding disparities in sentencing between defendants convicted of 18 U.S.C. § 2332b and other similar offenses, this Court should also consider how to reconcile Mr. Wright's sentence to avoid enlarging further the considerable disparity that exists between federal prosecution of foreign terrorism matters and sentences for "domestic" terrorists engaged in white-supremacist conduct. Despite often engaging in identical, or nearly identical conduct, defendants aligned with white nationalist, anti-government groups in recent years have received sentences that are a fraction of those imposed in "foreign" terrorism matters.

The dichotomy is both stark and – when one begins to scratch beneath the surface – hollow. It is pointlessly speculative to argue the respective threat posed by "homegrown" ISIS supporters versus committed white extremists on an individual basis, but the scales tip dramatically when weighed collectively. Undeniably, there

have been deadly Islamic extremist attacks in the United States; post-9/11, however, white identity extremism is, pound for pound, the most lethal and prominent terrorist threat that the United States faces, both at home and abroad.[115] Distinctions on the basis of domestic versus international scope also fail. Historically, white extremism was viewed through the lens of "domestic" terrorism – as a regionally specific, parochial phenomenon distinguishable from the activities of American citizens who take up a foreign cause like the Islamic State. But that view is anachronistic and incorrect; white identity extremists are militarizing, training, organizing, recruiting, information-sharing, embracing violent tactics, and forming global networks of membership in a way consistent with foreign Islamic extremists both prior to and following September 11, 2001. Further, like American Muslims who travel abroad to support jihad in Syria and Afghanistan, American white extremists gravitate to the Ukraine conflict[116] in order to train with, fight alongside, and develop international networks with far-right, ethnic extremist

---

[115] *See* Domestic Terrorism Prevention Act of 2020, H.R. 5602, 116th Cong. § 2 (2d Sess. 2020) (citations omitted) ("[F]atalities resulting from attacks by far right wing violent extremists have exceeded those caused by radical Islamist violent extremists in 10 of the 15 years, and were the same in [three] of the years since September 12, 2001."); *Confronting the Rise of Domestic Terrorism in the Homeland: Hearing Before the H. Comm. on Homeland Security*, 116th Cong. (2019) ("[From 2009 to 2018,] 73.3 percent [of extremist-related killings in the United States] were committed by right-wing extremists . . . [and three out of four of this number] were committed by [w]hite supremacists.") *FBI Oversight: Hearing Before the H. Judiciary Comm.*, 116th Cong. (Feb. 5, 2020) (statement of Christopher Wray, Director, Federal Bureau of Investigation); Jerome P. Bjelopera, Cong. Research Serv., R42536, The Domestic Terrorist Threat: Background And Issues For Congress (2013); Department of Homeland Security Strategic Framework for Countering Terrorism and Targeted Violence, Dep't of Homeland Sec. (Sept. 2019), https://www.dhs.gov/sites/default/files/publications/19_0920_plcy_strategic-framework-countering-terrorism-targeted-violence.pdf ("White supremacist violent extremism . . . is one of the most potent forces driving domestic terrorism. Lone attackers . . . generally perpetrate these kinds of attacks. But they are also part of a broader movement.").
[116] *Global Conflict Tracker,* Council on Foreign Relations (updated Sept. 18, 2020), https://www.cfr.org/global-conflict-tracker/conflict/conflict-ukraine.

paramilitaries like the Azov Battalion and Russian Imperial Movement.[117]

Similarly, while the trend is to portray white extremists as "lone wolf" bad actors

whose actions reflect some twisted personal crusade, the kinds of online

recruitment, activism, and propaganda mechanisms used by ISIS (and described at

length in Wright's trial) are also widely employed in the context of white extremism,

providing the same sort of online platforms to "serve as non-stop, virtual white

supremacist rallies where coordination can happen in real-time, regardless of

location."[118] If the ideals and complexion of American white extremism differs from

its Islamic counterparts in the specifics, their general goals and methods are

increasingly indistinguishable.[119] Despite this, the U.S. government's approach to

white extremist terrorism has led commentators to observe that "the United States

---

[117] Soufan Center, White Supremacy Extremism: The Transnational Rise of the Violent White Supremacist Movement 31-36 (Sept. 2019), https://thesoufancenter.org/wp-content/uploads/2019/09/Report-by-The-Soufan-Center-White-Supremacy-Extremism-TheTransnational-Rise-of-The-Violent-White-Supremacist-Movement.pdf. As the report notes, this practice of white American extremists traveling abroad is incorrectly viewed as a relatively new development. In fact, several thousand Americans – including Neo-Nazis and John Birch Society members – traveled to Rhodesia (now Zimbabwe) between the mid-1960s and 1980s to fight for the white minority rule. *Id*. at 31.

[118] Jon Lewis et al., GWU Program on Extremism, White Supremacist Terror: Modernizing Our Approach to Today's Threat 7 (2020), https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/White%20Supremacist%20Terror%20final.pdf. *See also*, Network Contagion Research Institute and Anti-Defamation League's Center on Extremism, *Gab and 8chan: Home to Terrorist Plots Hiding in Plain Sight*, ADL, https://www.adl.org/resources/reports/gab-and-8chan-home-to-terrorist-plots-hiding-in-plain-sight (last accessed Sept. 18, 2020).

[119] *See* Soufan Center, White Supremacy Extremism: The Transnational Rise of the Violent White Supremacist Movement 6, 28 (Sept. 2019), https://thesoufancenter.org/wpcontent/uploads/2019/09/Report-by-The-Soufan-Center-White-Supremacy-Extremism-TheTransnational-Rise-of-The-Violent-White-Supremacist-Movement.pdf. [hereinafter Transnational Rise of the Violent White Supremacist Movement]; see also Jon Lewis et al., GWU Program on Extremism, White Supremacist Terror: Modernizing Our Approach to Today's Threat 4 (April 6, 2020), https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/White%20Supremacist%20Terror%20final.pdf ("This issue, in many respects, has become transanational in nature."))

is treating similar terrorist threats differently based solely on the motivating ideology."[120]

A full review of the disparate treatment is outside the scope of this sentencing memo, but consideration of the Federal government's response to the activities of Brandon Russell, the founder of the Atomwaffen Division (hereafter "AWD") provides a useful point of comparison. There are notable similarities between Mr. Wright's case and that of Brandon Russell, though in virtually all of them, Mr. Russell's conduct arguably exceeds that of Mr. Wright's. The charges brought against Russell and the sentence he received, however, do not reflect that.

The AWD is a neo-Nazi group based in the United States since at least 2015.[121] AWD draws inspiration and ideological foundations from a slumgullion of far-right and white supremacist forbears, including James Mason, Charles Manson, William Pierce, and Adolf Hitler.[122] As the criminal complaint against one of its members notes, "AWD membership consists of mostly white males between the ages of approximately 16 to 30 years of age who all believe in the superiority of the white race," and who organize in small, semi-autonomous groups in order to, "achieve a

---

[120] Amy Collins, GWU Program On Extremism, Confronting Racially and Ethnically Motivated Terrorism: A Call to Designate Foreign White Identity Extremist Groups Under U.S. Federal Law 8-9 (September, 2020), https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/Confronting%20Racially%20and%20Ethnically%20Motivated%20Terrorism.pdf.
[121] *Atomwaffen Division (AWD)*, ADL, https://www.adl.org/resources/backgrounders/atomwaffen-division-awd (last accessed Sept. 18, 2020); Jonah Engel Bromwich, *What is Atomwaffen, A Neo-Nazi Group, Linked to Multiple Murders*, N.Y. Times, (Feb. 12, 2018), https://www.nytimes.com/2018/02/12/us/what-is-atomwaffen.html.
[122] Jacob Ware, *Siege: The Atomwaffen Division and Rising Far-Right Terrorism in the United States.* Int'l Ctr. for Counter-Terrorism (July 1, 2019), www.jstor.org/stable/resrep19615.

common goal of challenging the established laws, social order, and government via terrorism and violent acts."[123] The complaint further notes:

> AWD encourages attacks on the federal government, including critical infrastructure, minorities, homosexuals, and Jews. AWD works to recruit like-minded members to the organization, train them in military tactics, hand to hand combat, bomb making, and other techniques in preparation for an "ultimate and uncompromising victory" in a race war. Because one of AWD's goals is to maintain anonymity, members primarily communicate using online encrypted chat applications, such as Wire and Discord.[124]

Although the group originated in the United States, it is reported to have a presence overseas with branches in Canada[125], the United Kingdom[126], and Germany[127].

In May 2017, two AWD members in Tampa Palms, Florida, were killed by their roommate, an AWD member who had converted to Islam and renounced his affiliation with the group.[128] Brandon Russell, AWD's founder, also lived at the home and was interviewed by the officers who responded to the murder. Law enforcement, however, allowed Russell to leave the scene of the double-murder after

---

[123] *United States v. Conor Climo*, 2:19-CR-00232 (D. Nev) ECF No. 1 at 2-3.

[124] *Id.* at 3.

[125] Mack Lamoureux and Ben Makuch, *An American Neo-Nazi Group Has Dark Plans for Canada*, Vice, (July 10, 2018). https://www.vice.com/en_us/article/ev847a/an-american-neo-nazigroup-has-dark-plans-for-canada

[126] Paul Jackson, *Transnational Neo-Nazism In The USA, United Kingdom and Australia*, The Program on Extremism at The George Washington University, (February 2020). https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/Jackson%20-%20Transnational%20neo%20Nazism%20in%20the%20USA%2C%20United%20Kingdom%20and%20 Australia.pdf;

[127] *Neo-Nazi 'Atomwaffen Division' Spreads Fear in Germany*, Spiegel International, (November 13, 2019)

[128] A.C. Thompson, *An Atomwaffen Member Sketched a Map to Take the Neo-Nazis Down. What Path Officials Took Is a Mystery*, ProPublica, (November 20, 2018). https://www.propublica.org/article/an-atomwaffen-member-sketched-a-map-to-take-the-neonazis-down-what-path-officials-took-is-a-mystery.

he claimed he was going to stay at his father's nearby home.[129] Russell, instead, fled

to the residence of another AWD member – who promptly quit his job, emptied his

bank account, and left Tampa with Russell.[130] In the meantime, investigators

continued examining the crime scene and made several unsettling discoveries: Neo-

Nazi paraphernalia, a framed photo of Timothy McVeigh in Russell's bedroom,

guns, homemade detonators, explosives[131], and chemical precursors for

manufacturing explosives.[132] Russell's garage was later described as a "mini-lab" for

manufacturing explosives, and "[a]ccording to trained agents, the HMTD combined

with the amount of ammonium nitrate and nitro methane found in the garage

would create a bomb that could easily cause a vehicle to explode, killing all of the

occupants and causing grave damage within a large distance around the explosion

site."[133] Based on the amount and kind of explosives found, the FBI sought an arrest

warrant. Russell and his AWD colleague were arrested the following day in Key

West. Their car contained no personal belongings or luggage but did contain "two

---

[129] Janet Reitman, "All-American Nazis: Inside the Rise of Fascist Youth in the U.S.," Rolling Stone, (May 2, 2018). https://www.rollingstone.com/politics/politics-news/all-american-nazis-628023/
[130] *Id.*
[131] It appears that investigators found the explosives *prior* to allowing Mr. Russell to leave. When asked about the quantity of Hexamethylene Triperoxide Diamine (HMTD) located in a cooler in Russell's garage, he admitted to possessing it, but explained that he used it as part of his model rocket hobby. *United States v. Brandon Russell*, 8:17-CR-00283 (M.D. Fla. Jan. 7, 2018), ECF No. 71.
[132] Niraj *Chokshi, Neo-Nazi Leader in Florida Sentenced to 5 Years Over Homemade Explosives, New York Times (January 10, 2018). https://www.nytimes.com/2018/01/10/us/brandon-russell-sentenced-neo-nazi.html. Tamara Lush, Neo-Nazi Leader Gets 5 Years for Having Explosive Material, Associated Press (January 9, 2018). https://apnews.com/6380120849a4470f9e569676718889c9.* David Goodhue, *FBI busts 'Atomwaffen' Neo-Nazi in Florida for making explosives — and finds radiation materials,* Miami Herald ((May 22, 2017).
https://www.miamiherald.com/news/local/community/florida-keys/article151953257.html
[133] *United States v. Brandon Russell*, 8:17-CR-00283 (M.D. Fla. Jan. 7, 2018), ECF No. 71.

long rifles and ammunition that he had purchased after leaving the Tampa area".[134] Arresting officers later told PBS that "when we found the weapons, we were convinced we had just stopped a mass shooting."[135]

Mr. Russell was subsequently charged with unlawfully receiving an unregistered destructive device, in violation of 26 USC § 5861(d), and unlawful storage of explosive materials, in violation of 18 USC § 842(j).[136] The unregistered destructive device offense carries a 10-year maximum sentence, the improper storage has a maximum sentence of one year.[137] On September 27, 2017, Russell pleaded guilty, without an agreement, to both counts.[138] According to Russell's sentencing memorandum, the recommended guideline range was 24-30 months.[139] The Government sought the maximum on both counts, to be served consecutively.[140] On January 9th, 2018, Russell received a sentence of 60 months on the firearms charge, a sentence of 12 months on the explosives charge – run concurrent – and a period of three years supervised release.[141] Russell is scheduled for release in slightly less than a year from FCI-Terre Haute.[142]

---

[134] Office of Public Affairs, *Neo-Nazi Leader Sentenced to Five Years in Federal Prison for Explosives Charges*, Dep't Just. (Jan. 9, 2018), https://www.justice.gov/opa/pr/neo-nazi-leader-sentenced-five-years-federal-prison-explosives-charges.
[135] *Documenting Hate: New American Nazis*, PBS Frontline, (Nov. 12, 2018). https://www.pbs.org/wgbh/frontline/film/documenting-hate-new-american-nazis.
[136] *United States v. Brandon Russell*, 8:17-CR-00283 (M.D. Fla.).
[137] 26 U.S.C. §5871; 18 U.S.C. § 844(b).
[138] *United States v. Brandon Russell*, 8:17-CR-00283 (M.D. Fla.), ECF Nos.. 58-61
[139] *Id*. at ECF No. 66 at 1.
[140] *Id*. at ECF No. 71.
[141] *Id*. at ECF No. 78.
[142] Based upon a search of the Bureau of Prisons Inmate locator on September 11, 2020. *See Find an Inmate*, Fed. Bureau of Prisons, https://www.bop.gov/mobile/find_inmate/byname.jsp (last accessed Sept. 11, 2020).

Russell's[143] case provides an interesting point of comparison and contrast to Wright's. Similarities are obvious. Mr. Wright and Mr. Russell were both involved in extremist movements. Though they differ in particulars, ISIS and AWD's strain of Neo-Nazism are characterized by violent intolerance, antipathy towards the United States, and calls for violent action against American citizens within America's borders. ISIS supporters and AWD members are both responsible for murders in the United States. Mr. Wright attempted to found an independent organization, the Lions of Allah/Lions of America, though the efforts never reached beyond the aspirational phase of online posting, and the recruitment of his two co-conspirators. Mr. Russell was the founder of the AWD which was estimated to have – at its apex – approximately 80 American members, with more adherents abroad.[144] Both sought to stockpile weapons in support of their aims – Wright's co-conspirator and uncle, Usaamah Rahim, purchased several knives on Amazon. Russell, as noted above, had acquired or fabricated explosives and detonators, and was arrested in possession of two rifles and hundreds of rounds of ammunition. Both were apparently plotting actions at the time of their arrest. In Wright's case, there was the nascent plot to kidnap and execute Gellar; in Russell's, there does not appear to have been a specific objective, but the presence of bomb making materials and explosives – to say nothing of the framed photo of McVeigh – points toward a

---

[143] Of note, is the fact that Mr. Wright was housed in the same unit as Mr. Russell, who reportedly continues to espouse supremacist views, and has a photo of Hitler prominently displayed in his cell.
[144] A.C. Thompson, *California Murder Suspect Said to Have Trained with Extremist Hate Group,* ProPublica (Jan. 26, 2018), https://www.propublica.org/article/california-murder-suspect-atomwaffen-division-extremist-hate-group.

bomb plot, and the rifles and ammunition in Russell's possession at arrest suggest similarly sinister intent. Both men's plans were interrupted after members of their respective cells acted unexpectedly, and in a fatal fashion for members of their group, though Rahim was killed by law enforcement, while Russell's compatriots were killed by their own estranged former-AWD member. Both, upon appreciating the exposure of their activities, compounded their legal problems; Wright attempted to wipe the contents of his computer – unsuccessfully; Russell lied to law enforcement about his intended whereabouts, enlisted an AWD compatriot to acquire guns and ammunition, and then fled.

The distinctions, however, are also obvious. Though both men were active online in support of their respective causes, Mr. Wright and his co-conspirators were the subject of months of surveillance; Wright was targeted by a confidential informant, and the co-conspirators' meeting on Rhode Island beach was monitored by a drone. Russell and his housemates appear to have taken law enforcement off-guard and might have remained under the radar but for the double-homicide. Wright, throughout the period of his radicalization and until his arrest, was morbidly obese and – despite his online-intellectual posturing – had little success in academics and no experience in soldiering or combat. Russell was a student of nuclear physics at the University of South Florida and was an active member of the National Guard at the time of his arrest. Law enforcement executing the search warrant on Wright's apartment knocked the door off its hinges, employed flash-bang grenades, and then interviewed Wright under effectively custodial conditions

for nearly 12 hours. Russell was allowed to leave a murder scene full of his home-made explosives after telling investigators he would be at his father's nearby home. Wright elected to go to trial, while Russell, looking at a GSR of less than three years, opted for an open plea and advocated for a below-guidelines-range sentence. At sentencing, the Government sought maximum sentences against both men, but the range between those options – life for Wright, and 11 years for Russell – speaks for itself. In both matters, the Court handed out a considerable sentence – nearly 30 years in Wright, and twice the maximum GSR in Russell – but, again, the comparative durations of the sentences are plain on their face.

Lest Mr. Wright be accused of cherry-picking a convenient case for comparison, it should be noted that Mr. Russell's outcome is not an outlier in the prosecutions of AWD defendants – if anything, it is a typical result. Conor Climo, the Las Vegas AWD member whose complaint was quoted above, was arrested after he expressed interest in setting fire to a synagogue and his plans for so doing, detailed IED-making methods to an FBI informant, told the informant that he had identified the local office of the Anti-Defamation League, and boasted that he was "interested in action [other] than online shit."[145] When federal agents searched Climo's house, they found bomb making chemicals and IED schematics, an AR-15,[146] and a rifle.[147] Climo was charged with possession of an unregistered firearm in violation of 18 U.S.C. 5861(d) – again, a 10 year maximum sentence. His

[145] *United States v. Conor Climo*, 2:19-CR-00232 (D. Nev) ECF No. 1, at 3-8.
[146] Climo posted Youtube videos of himself "patrolling" his neighborhood in tactical clothing with his AR-15.
[147] *United States v. Conor Climo*, 2:19-CR-00232 (D. Nev) ECF No. 1, at 7-8.

sentencing is scheduled for later this month; according to his plea agreement, his adjusted offense level – accounting for a three-point reduction for pleading – is 17.[148] For a Level 1 criminal history score, Climo would fall in the same 24-30 month range as Russell.

On September 19, 2019, police arrested Andrew Thomasberg at his McClean, VA, home for illegal firearms sales.[149] Law enforcement discovered 20 guns in the house; six in Thomasberg's room and a pistol in his car. Most were loaded. Thomasberg joined AWD following the "Unite the Right" rally in Charlottesville, but previously supported Vanguard America, a Neo-Nazi group. In chat logs uncovered during the ensuing investigation, Thomasberg praised the Poway synagogue shooting, and expressed admiration for Pittsburgh synagogue shooter Robert Bowers and the Christchurch, New Zealand, mosque shooter Brenton Tarrant, calling both "saints." He also bragged to a cooperating witness (for whom he'd purchased an AK-47) that he routinely carried "enough gear and supplies to set the new high score and wouldn't want to have to explain that to a cop." Thomasberg also bragged of having previously engaged in a racially motivated shooting.[150] On

---

[148] *United States v. Conor Climo*, 2:19-CR-00232 (D. Nev) ECF No. 25, at 9-10.
[149] Thomasberg, who worked at a Virginia gun store, allegedly conducted a strawman purchase of an AK-47 for the man who later became a cooperating witness. Thomasberg recorded the cost of the sale as $14.14, a reference to the white supremacist "14 Words" credo. Rachel Weiner, *Prosecutors Say an Alleged Member of a White-Supremacist Group Was Involved with Illegal Guns, Drugs* (Sept. 20, 2019), https://www.washingtonpost.com/local/public-safety/psychedelic-nazis-prosecutors-say-member-of-white-supremacist-group-involved-with-illegal-guns-drugs/2019/09/20/8a41c880-dbbf-11e9-a688-303693fb4b0b_story.html. Thomasberg was charged with making a material false statement in relation to the purchase of a firearm, in violation of Title 18, United States Code, Section 922(a)(6) (Count One), and with possession of a firearm by a controlled substance abuser, in violation of Title 18, United States Code, Section 922(g)Q) (Count Two).
[150] Rachel Weiner, *Prosecutors Say an Alleged Member of a White-Supremacist Group Was Involved with Illegal Guns, Drugs* (Sept. 20, 2019), https://www.washingtonpost.com/local/public-

November 12, 2019, Thomasberg pleaded guilty. On February 28, 2020,
Thomasberg was sentenced to 12-months-and-a-day (the shortest sentence possible
under federal sentencing that allows a defendant to earn good time), to be followed
by three years supervised release. He was released from custody at the end of July,
2020.[151]

Russell, Climo, and Thomasberg are examples of a trend[152] of individuals
engaging in behaviors as odious and terroristic as Wright's conduct but nonetheless
receiving sentences that are a fraction of the time imposed in the context of Islamic
State-related prosecutions,[153] and are well below the sentence sought by the
government in this matter. The discrepancy is, in part, a product of the current
state of federal law, which treats terrorism as a foreign-linked danger. If a
defendant's activities are carried out in support of a Foreign Terror Organization
("FTO") or Specially Designated Global Terrorist, as designated by the State

safety/psychedelic-nazis-prosecutors-say-member-of-white-supremacist-group-involved-with-illegal-guns-drugs/2019/09/20/8a41c880-dbbf-11e9-a688-303693fb4b0b_story.html.
[151] https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results
[152] See, e.g., Aiden Bruce-Umbaugh, another AWD member who received 30 months on federal gun charges. Umbaugh was arrested while dressed in tactical gear and driving in a car with another suspected AWD member, an AR-15, two AK-47s, and a pistol. U.S. Attorney's Office Northern District of Texas, *Suspected Neo-Nazi Sentenced to 2.5 Years for Gun Crime*, Dep't Just. (Apr. 28, 2020), https://www.justice.gov/usao-ndtx/pr/suspected-neo-nazi-sentenced-25-years-gun-crime. Similarly, last month Jarrett William Smith, a Private in the U.S. Army, received a 30-month sentence after pleading guilty to two counts of illegal distribution of information related to explosives. Smith told an FBI informant that he sought to overthrow the US Government, intended to attack media organizations, and aspired to travel to the Ukraine to fight with the Azov Battalion. John Hanna, *'Satanist' Ex-Soldier Sentenced to 2 ½ Years in Bomb Plot*, Army Times (Aug. 19, 2020), https://www.armytimes.com/news/your-army/2020/08/19/satanist-ex-soldier-sentenced-to-2-years-in-bomb-plot/.
[153] The most recent average sentence figure, compiled by the George Washington University Program on Extremism, is 13.2 years. *GW Extremism Tracker: Terrorism in the United States, August 2020*, Program on Extremism, https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/Aug2020%20Tracker.pdf (last accessed Sept. 18, 2020).

Department, then federal law enforcement has considerable prosecutorial power and enhanced sentencing consequences at its disposal; lacking a FTO toe-hold, prosecutors are left cobbling together charges based on firearms and explosive storage violations. Defendants like Russell and Climo have benefitted from this, as none of the 69 currently designated FTOs is a white supremacist organization.[154] Though there has been recent congressional activity to address this – in October of 2019, 40 members of Congress wrote to Secretary of State Pompeo questioning "why the State Department has failed to include certain overseas violent white supremacist extremist groups on the Foreign Terrorist Organization (FTO) list" and this March Congressman Max Rose (D-NY) introduced a House Resolution calling on the Administration to designate foreign violent white supremacist groups (including Atomwaffen Division) as Foreign Terrorist Organizations[155] – at present the gap in federal law creates a double standard that "fails [to] account for the moral equivalency of killing innocents based on a desire to create a white ethno-state and killing innocents in furtherance of Islamist jihad" and also "leaves law enforcement without important tools for integrating the investigation and prosecution of "domestic" terrorism into the national counterterrorism program."[156]

---

[154] Bureau of Counterterrorism, *Foreign Terrorist Organizations*, U.S. Dep't of State, https://www.state.gov/foreign-terrorist-organizations/ (last accessed Sept. 18, 2020).
[155] Congressman Max Rose Et al., Letter to The Honorable Michael Pompeo, (Oct. 16, 2019). https://maxrose.house.gov/uploadedfiles/2019.10.16_rose_fto_letter_to_state.pdf; H.R. Res. 884, 116th Cong. (2020), https://www.congress.gov/bill/116th-congress/house-resolution/884/text.
[156] Mary McCord, GWU Program on Extremism, Filling the Gap in Our Terrorism Statutes (Aug. 2019), https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/Filling%20The%20Gap%20in%20Our%20Terrorism%20Statutes.pdf.

While this Court is unable to address the statutory dynamic at play, it does have the power to avoid perpetuating the sentencing disparities detailed above, or at least to reconcile the starker inequalities the statutory gap creates. Mr. Wright and Mr. Russell's respective wrongdoings are of a piece; both men espoused and supported noxious causes; both aspired to further their causes' goals via violent action; both are – at least indirectly – responsible for deaths. That Russell received a sentence of five years, while Wright faces exposure to decades of incarceration should not boil down to a simple question of whether one supported Abu Bakr al Baghdadi while the other favored Adolf Hitler. If a Florida court found that five years was a sufficiently punitive sentence for Russell's conduct, this Court can similarly impose a sentence of fourteen years for Wright.

## Conclusion

Judge Young's previous sentencing eschewed both the mechanical application of the Guidelines as well as the ironhanded urgings of the Government, and sought to craft a sentence which was nuanced, individualized, and reflected the values of fairness and equanimity that the American justice system considers fundamental. This Court should adopt those same guideposts and careful rationale as it reweighs Mr. Wright's sentence. While some aspects of the case concededly remain untouched, the matter has not been frozen in amber for the past three years, and this Court should embrace the opportunity to revisit important factors which have changed, or have become apparent since December 2017. A just sentence will account for specific considerations like the lower applicable Guideline range

following Wright's appeal, and what we now can confidently state about the rigorous austerity of Mr. Wright's conditions of confinement. It will also give due weight to broader developments, such as the declining relevance of ISIS – which has hemorrhaged virtually its entire territory and seen its once-vocal leadership killed or driven into hiding – since Wright's first sentencing, and, of course, the COVID-19 pandemic, which has significantly worsened the quality and increased the risk of prison life for all inmates, but particularly those with Mr. Wright's health conditions. A sentence of fourteen years followed by fourteen years supervised release is appropriate and sensible: it preserves the overall duration of punishment previously imposed while countenancing important changes that have occurred in the interim, it avoids sentencing disparities, and it punishes without precluding all chance of rehabilitation. Most importantly, it does not elevate fear above justice.

<div style="margin-left: 40%;">

Respectfully Submitted,
David Wright
By his attorneys:


/s/ Jessica Hedges
Jessica D. Hedges, BBO # 645847
/s/ Michael Tumposky
Michael Tumposky BBO # 660618
Hedges & Tumposky, LLP
50 Congress St., Suite 600
Boston, MA 02109
T) 617/722-8220

</div>

## Certificate of Service

I, Michael Tumposky, hereby certify that, on this the 21st day of September, 2020, I have cause to serve a true and correct copy of the foregoing to all parties of record, where otherwise unable to do so electronically.


/s/ Michael Tumposky
Michael Tumposky