**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**DAVID DAOUD WRIGHT,**<br><br>**Defendant.** | **Case No. 15-cr-10153-DJC** |

**MEMORANDUM AND ORDER**

**CASPER, C.J.** **September 3, 2026**

## I. Introduction

Petitioner David Daoud Wright ("Wright") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255 (the "Petition"), raising four grounds to challenge his conviction: (1) that the government failed to disclose exculpatory evidence as required by Brady v. Maryland, 373 U.S. 83 (1963); (2) that the government failed to disclose impeachment evidence as required by Giglio v. United States, 405 U.S. 150 (1972); (3) that Wright received ineffective assistance of counsel; and (4) that the prior failure to disclose exculpatory evidence now requires that his convictions be vacated. D. 535. For the reasons discussed below, the Court DENIES the Petition.

## II. Standard of Review

An incarcerated person may seek post-conviction relief under § 2255 if his sentence "(1) was imposed in violation of the Constitution, or (2) was imposed by a court that lacked jurisdiction, or (3) exceeded the statutory maximum, or (4) was otherwise subject to collateral attack." David v. United States, 134 F.3d 470, 474 (1st Cir. 1998). It is the petitioner's burden to

make out a claim for such relief. Id. "To be entitled to relief under § 2255, the petitioner must present 'exceptional circumstances' that make the need for redress 'evident.'" United States v. Weed, 775 F. Supp. 3d 520, 529 (D. Mass. 2025) (quoting David, 134 F.3d at 474).

## III. Relevant Factual and Procedural Background

In 2014, Wright began sharing content online associated with the Islamic State of Iraq and Syria ("ISIS"). See, e.g., D. 364 at 6-14; D. 369 at 20-25; D. 374 at 42-49; D. 381 at 8, 39-45; D. 382 at 9-14. ISIS is a foreign terrorist organization. D. 362 at 4-5. In late 2014, Wright began discussing ISIS with his uncle Usaamah Rahim ("Rahim"), whom Wright eventually persuaded to feel "inspired . . . by ISIS." D. 367 at 13-14. In the fall of 2014, Wright also started speaking about ISIS online with Nicholas Rovinski ("Rovinski"), a Rhode Island man. D. 362 at 25-30. By early 2015, Wright, Rahim, and Rovinski were regularly discussing how they might lend support to ISIS. See, e.g., D. 362 at 53-56; D. 363 at 8-9; D. 368 at 62-63; D. 369 at 49-50; D. 373 at 29-34. While Rahim and Rovinski were interested in travelling to the Middle East to fight for ISIS, see D. 362 at 30-34; D. 363 at 8-9, Wright told them that they could better support the terrorist organization from inside the United States, see D. 369 at 49-50.

On May 10, 2025, Wright and Rovinski met in-person to discuss a plan to attack Pamela Geller ("Geller"), an American journalist. D. 362 at 56-62. ISIS had recently issued a "fatwa," or decree, calling for Geller to be beheaded for perceived insults against the Prophet Mohammed. Id. at 64-65. Wright and Rahim discussed the same plan online, see D. 368 at 23-25, and Rahim ordered several, large hunting knives in late May, id. at 35. The three men met on May 31, 2015, to further discuss the attack on Geller, which Wright proposed take place in the fall when Geller would be in New York for an event. D. 363 at 15-23. Rovinski later testified that the three men

anticipated that they would be killed during the attack but that they hoped to achieve "martyrdom." Id. at 21.

### A. The June 2 Shooting

Two days later, on the morning of June 2, 2015, Rahim and Wright spoke by phone. D. 365 at 40-41. Rahim told Wright that he could not wait to act any longer and that he wanted to go after "those boys in blue." See D. 365 at 43; Trial Exh. 5a at 2-4. Wright responded by telling Rahim this was a "beautiful moment in time," that Wright felt "left out," and that Rahim should "remain firm." Trial Exh. 5a, at 5-6, 8. Wright further told Rahim to draft a will and "wipe" everything on his computer. See id. at 6-7.

An agent with the Federal Bureau of Investigation ("FBI") was listening to this call and immediately relayed the information to the case agent, as well as other law enforcement. D. 365 at 38-43, 47. Federal agents were assigned to surveil Rahim together with local police, with the expectation that "activity [would] occur," and ultimately approached Rahim at a bus stop. Id. at 48, 53-55, 62. When a Boston Police officer identified himself to Rahim as law enforcement, id. at 62-63, Rahim drew a "large black knife," id. at 64, which he "pointed" at the officer, id. at 63. Law enforcement repeatedly ordered Rahim to drop the knife, which he did not. Id. at 63; D. 366 at 6-8, 9-11; Trial Exh. 12. Instead, Rahim advanced towards the officers. D. 365 at 63-64. Ultimately, two agents shot Rahim, D. 366 at 5-8, who later died of his injuries, id. at 21-22.

On the day of the shooting, law enforcement agents interviewed Wright at his residence for approximately six hours. Id. at 41-45, 49-50, 52. During the interview, Wright confirmed that: he believed ISIS's actions to be justified, see id. at 59-60; D. 367 at 13, he agreed with the fatwa issued against Geller, D. 366 at 60-62, he had introduced Rahim to ISIS, D. 367 at 13-14, he had met with Rovinski and Rahim to discuss the plot against Geller, id. at 17, and he had talked to

Rahim that morning and "did not try to stop him . . . or try to talk him out of [his plan]," id. at 19. Investigators conducted a search of Wright's apartment which yielded, among other things, a laptop. Id. at 74. Forensic analysis indicated that the laptop had been reset to its factory settings on the morning of June 2, 2015, approximately twelve minutes after Wright learned by phone that Rahim had been shot. D. 376 at 60-64; D. 377 at 5-6. The laptop's reset had not overwritten the data it contained, D. 376 at 58-60, and numerous files were discovered, including pro-ISIS materials and Wright's communication history, D. 371 at 19, 23-68.

### B. The Investigative Report

After the shooting death of Rahim on June 2, 2015, the Suffolk District Attorney's Office opened an investigation, which produced a detailed report (the "Investigative Report"). See D. 544-3 at 2. The Investigative Report, excerpts of which were attached as Exhibits C through F to Wright's Reply, begins with a summary of the investigation. Id. at 2-11. Specific to the shooting, the Investigative Report provided that a forensic examination of the scene, including the knife from the parking lot and its sheath (found inside the ambulance transporting Rahim), yielded no latent fingerprints. Id. at 6, 10.

The Investigative Report also included transcripts of police interviews with various eyewitnesses of the shooting. D. 544-4; D. 544-5; D. 544-6. One eyewitness, looking out onto the scene from a second-floor office, recounted the following series of events:

> "It looks like [the officers] approached [Rahim] and, you know, asked him to put his hands up. We don't know, again, I'm on the inside. Then guns were drawn. The individual turned towards them. I don't have the best eyesight so I didn't know if he had—at the time if he had something in his hands or anything else . . . He was walking towards the officers. He constantly kept approaching them and I'm assuming they were telling him to go down . . . Then he turned towards one officer . . . After we saw him go down, we did notice that something was tossed to the side or that it was away from him . . . Whether it was a knife, gun, bat, my eyesight couldn't see exactly what it was."

D. 544-4 at 5-6. The other eyewitnesses reported a similar progression of events. See, e.g., D. 544-5 at 4-16; D. 544-6 at 4-15. None of the eyewitnesses were close enough to identify what, if anything, Rahim had been holding in his hand. D. 544-4 at 12-13, 15; D. 544-5 at 4; D. 544-6 at 11.

On June 18, 2015, a federal grand jury sitting in Boston returned an indictment charging Wright with three counts: conspiracy to provide material support to a designated terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1), and aiding and abetting the same under 18 U.S.C. § 2 (Count One), D. 13 at 5; conspiracy to obstruct justice, in violation of 18 U.S.C. § 371 (Count Two), id. at 6-7; and obstruction of justice, in violation of 18 U.S.C. § 1519, and aiding and abetting the same under 18 U.S.C. § 2 (Count Three), id. at 8. On April 21, 2016, the grand jury issued a superseding indictment adding a fourth count: conspiracy to commit an act of terrorism transcending national boundaries, in violation of 18 U.S.C. § 2332b(a)(2) and (c) (Count Four). D. 60 at 12-15. Finally, on February 15, 2017, the grand jury issued a second superseding indictment adding a fifth count: an additional count of obstruction of justice, in violation of 18 U.S.C. § 1519 (Count Five). D. 171 at 18.

### C. Wright Learns of the Investigative Report

While Wright's criminal case was pending, Rahim's family initiated civil litigation regarding Rahim's death. D. 544 at 67-68. According to Wright's amended affidavit,[1] in July 2016, Wright's mother visited him while he was in pre-trial custody. Id. at 67. During this visit, Wright's mother told him that an employee of the Suffolk District Attorney's Office had provided the family, as part of civil discovery, with a copy of a 793-page report, the Investigative Report,

[1] Wright submitted an original affidavit, DPA-1, D. 535-3, and an amended affidavit, DPA-2, D. 544 at 64-80, both of which the Court has considered.

detailing the findings from the office's investigation of the incident on June 2, 2015. Id. at 67-68. Wright's mother told Wright that the report described "[w]itnesses who were there that day [who] didn't see [Rahim] lunge with a knife." Id. at 68. Wright's mother also advised him that the report found "there [were] no fingerprints of [Rahim] on [the] knife." Id. Wright's mother told Wright that "she believed that she may have had a copy of the report sent to [Wright's attorneys] on a CD or in paper form," but assured Wright that she would "double-check." Id.

In August 2016, Wright met with his attorneys, who told him they had not received any report from his family members. Id. Wright then called his mother, who told him that she "thought that it was taken care of already." Id. In October 2016, during Wright's next attorney visit, he again raised the Investigative Report and told his attorneys about the information "in the report regarding [Rahim] 'lunging' and '[n]o fingerprints found on the knife or sheath.'" Id. His attorneys assured him they had "not received anything like that." Id. His attorneys also told him that they, together with Wright, "really need[ed] to focus on [his] case right now." Id.

**D. Wright's Trial**

In September 2017, Wright's case proceeded to a jury trial, which took place over the course of fourteen days. United States v. Wright ("Wright I"), 937 F.3d 8, 13 (1st Cir. 2019). The government introduced testimony from Rovinski, D. 363 at 5-46; D. 364 at 4-24, other lay witnesses including law enforcement agents involved in the investigation and the evidence, including electronic and documentary evidence, e.g. D. 365 at 37-42, 48-64; D. 366 at 5-14, 17-37, 40-65; D. 376 at 54-71. Wright testified in his own defense, stating that he saw his outward support of ISIS as part of "a role-playing fantasy world" that he used "to escape [his] real life." D. 380 at 7. Wright testified that he had not been successful academically and that he frequently acted out to get attention, id. at 35, and characterized his interest in ISIS as provocative for the

sake of attention, id. at 63. Wright testified that he chose to reset his computer out of fear for what his family and law enforcement would think about his interest in ISIS. Id. at 25-26. In closing, Wright's defense counsel argued that Wright may have had "deep failings," but that he was not a terrorist, D. 387 at 73-74, and emphasized the "fantastical" nature of Wright's planning with Rovinski and Rahim, arguing that the jury could properly find that Wright did not have the mental state necessary to commit the charged crimes, id. at 83-86; 94-97.

On October 18, 2017, the jury convicted Wright on all counts. D. 388 at 5-6. On December 19, 2017, the Court (Young, J.) sentenced Wright to 28 years' imprisonment and lifetime supervised release. D. 409; United States v. Wright ("Wright II"), 101 F.4th 109, 112-13 (1st Cir. 2024).

Wright appealed his conviction on various grounds, including the denial of his motions to suppress, treatment of juror misconduct, jury instructions, as well as the sufficiency of the evidence for each charge. See Wright I, 937 F.3d at 13-37. The First Circuit affirmed Counts Two through Five, vacated the conviction on Count One and remanded the case for resentencing. Id. at 31, 37. The government did not seek retrial of Count One and the resentencing went forward on the remaining convictions. Wright II, 101 F.4th at 112. On remand, the Court (Woodlock, J.) sentenced Wright to 30 years' imprisonment and lifetime supervised release. Id. at 114. Wright again appealed, arguing that his sentence was procedurally and substantively unreasonable. Id. at 111. The First Circuit affirmed the judgment on May 10, 2024. Id. Subsequently, Wright filed this Petition. D. 535.

## IV. Discussion

As a preliminary matter, Wright did not raise either Brady or Giglio claims in either direct appeal. Wright I, 937 F.3d at 13-37; Wright II, 101 F.4th at 114-120; see also D. 535 at 4-8. In

the government's response, it does not argue that Wright's Brady or Giglio claims are procedurally barred. D. 542. A petitioner raising claims of error for the first time in a § 2255 petition must show both "cause" excusing his procedural default in not raising the issue on direct appeal and "actual prejudice" resulting from the alleged error. Bousley v. United States, 523 U.S. 614, 622 (1998); United States v. Frady, 456 U.S. 152, 167-68 (1982). Given that the government did not address this issue in its opposition, see Sotirion v. United States, 617 F.3d 27, 32 (1st Cir. 2010), the Court proceeds to the merits of the Brady and Giglio claims in the Petition.

### A. Grounds I, II and IV: *Brady* and *Giglio* Violations[2]

Wright alleges that the government failed to provide him with the Investigative Report prepared by the Suffolk District Attorney's Office in response to the shooting death of Rahim on June 2, 2015. D. 535 at 4-5. Wright argues that because the government made the shooting an integral part of its case at trial, the failure to turn over the Investigative Report (which Wright characterizes as contradicting the government's version of the shooting) prevented him from presenting his defense. D. 544 at 20-30. Wright contends that the government's actions violated his Fifth Amendment rights and caused prejudice at trial, requiring that his conviction be vacated. Id. at 2.

Brady requires that the government disclose "evidence that is both favorable to the accused and material to guilt or innocence." United States v. Raymundí-Hernández, 984 F.3d 127, 159 (1st Cir. 2020) (internal quotation marks omitted) (quoting Moreno-Morales v. United States, 334 F.3d 140, 145 (1st Cir. 2003)). Under Giglio, the government's disclosure obligations "also extend to evidence that the defense could have used to impeach the prosecution's key witnesses." Id. at

[2] Since the fourth ground Wright advances in support of the Petition is largely duplicative of the Brady and Giglio allegations set out in grounds I and II, the Court considers it alongside those contentions.

159 (citing Moreno-Morales, 334 F.3d at 145). To succeed on a Brady or Giglio claim, the petitioner "must establish three conditions: '[t]he evidence at issue must be favorable to the accused, either because it is exculpatory[] or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" Id. at 159-60 (alterations in original) (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)); see Weed, 775 F. Supp. 3d at 529-30 (applying same standard to claims under § 2255). When a petitioner's claim "is based on newly discovered Brady or Giglio material, he must also establish that it 'was unknown or unavailable to him at the time of trial.'" Raymundí-Hernández, 984 F.3d at 160 (quoting United States v. Peake, 874 F.3d 65, 69 (1st Cir. 2017)). In other words, "[e]vidence is not suppressed if the defendant either knew, or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." Ellsworth v. Warden, 333 F.3d 1, 6 (1st Cir. 2003) (alteration in original) (internal quotation marks omitted) (quoting United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982)). Furthermore, "evidence is prejudicial only if there is a reasonable probability 'that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.'" Watkins v. Medeiros, 36 F.4th 373, 384 (1st Cir. 2022) (quoting Conley v. United States, 415 F.3d 183, 188 (1st Cir. 2005)).

*1. Wright Has Failed to Establish that the Government Did Not Disclose Exculpatory and Impeaching Evidence in Violation of Brady or Giglio*

Wright's claim fails for two reasons. First, Wright's own affidavit reveals that he was aware of the Investigative Report, and the key facts contained within, at the time of trial. In July 2016, Wright was aware that his family members had "a copy of approximately 793 pages of investigative data," that it contained statements from "[w]itnesses who were there that day [that] didn't see [Rahim] lunge with a knife," and that "there [were] no fingerprints of [Rahim] on [the] knife." D. 544 at 67-68. Wright also shared this information with his attorneys at an October 2016

meeting and told them that either his mother or grandmother had at least attempted to send the materials to the attorneys' office. Id. at 68. In short, Wright and his attorneys were aware of "the essential facts permitting [them] to take advantage of" the report's evidence at least eleven months before trial began in September 2017. Ellsworth, 333 F.3d at 6 (internal quotation marks omitted) (quoting LeRoy, 687 F.2d at 618); D. 328. Thus, any failure to disclose the Investigative Report cannot sustain a Brady or Giglio challenge, as Wright had knowledge of the report before trial. Raymundí-Hernández, 984 F.3d at 160 (requiring that petitioner "establish that [newly discovered evidence] 'was unknown or unavailable to him at the time of trial'" (quoting Peake, 874 F.3d at 69)); see also United States v. Bender, 304 F.3d 161, 164 (1st Cir. 2002) (noting that "Brady applies to material that was known to the prosecution but unknown to the defense").

Second, even if Wright were able to show that the evidence had not been discovered until after trial, the Brady and Giglio claims fail the prejudice requirement of Strickler, which requires that Wright show "a reasonable probability 'that the result of the trial would have been different.'" Watkins, 36 F.4th at 384 (quoting Conley, 415 F.3d at 188). The evidence contained within the report supported two inferences: (1) that non-law enforcement eyewitnesses to the shooting of Rahim were far away and could neither tell what Rahim had in his hand nor remember seeing Rahim lunge at the officers, see D. 544-4 at 7, 12-13, 15; D. 544-5 at 4; D. 544-6 at 10-11; and (2) that Rahim's fingerprints were not found on the knife or sheath recovered by agents, D. 544-3 at 10. This evidence would have been unlikely to sway the jury's interpretation of events surrounding the shooting, particularly where the evidence that Rahim had drawn a knife during the encounter was strong. Special Agent Patrick Maloney, who was present that morning, testified in detail at Wright's trial to the same, see D. 365 at 63-64, a knife was recovered at the scene, D. 366 at 20, and audio from Rahim's phone memorialized law enforcement officers repeatedly

asking Rahim to drop what he was holding, D. 365 at 63; Trial Exh. 12. The government also presented evidence that Rahim wanted to go after "the boys in blue" that day. D. 365 at 43; Trial Exh. 5a at 4. Wright has not shown that the Investigative Report would have, by "a reasonable probability," caused the jury to view the shooting differently. Watkins, 36 F.4th at 384.

Even assuming *arguendo* that this evidence could have raised doubts as to the government's version of events, Wright fails to explain how "the result of the trial would have been different" given that it was Wright's conduct, not Rahim's, that was the focus at his trial. Watkins, 36 F.4th at 384 (internal quotation marks omitted) (quoting Conley, 415 F.3d at 188). The government's closing argument asked the jury to focus on Wright's complicit conduct and look beyond the fact that Wright was not present when the attack occurred. See D. 387 at 48-50. The Investigative Report did not cast doubt upon Wright's own statement that Rahim had told Wright he planned to attack the police and become a martyr, made during an interview on June 2, 2015. See D. 367 at 18-19. Nor did it cast doubt on Wright's statements encouraging Rahim to go ahead with his plans during a phone call the morning of the shooting. See D. 365 at 40-41; Trial Exh. 5a, at 4-5, 7-8. Where the information that Wright references in the Investigative Report would have been of minimal impact to the "result of the trial," the Brady and Giglio claims must fail under the prejudice requirement of Strickler. Watkins, 36 F.4th at 384 (internal quotation marks omitted) (quoting Conley, 415 F.3d at 188); see United States v. Mehanna, No. 09-cr-10017-GAO, 2018 WL 3084057, at *4 (D. Mass. June 21, 2018) (denying § 2255 habeas petition where "no reasonable probability that the result of the trial would have been different if the [undisclosed information] had been disclosed to the defense" because it "would have done nothing to weaken [the] case" against defendant).

Accordingly, Wright has failed to establish that either Brady or Giglio require that his conviction be vacated. The Court denies the Petition on these grounds.

**B. Ground III: Ineffective Assistance of Counsel**

Wright next argues that his conviction must be vacated because his attorneys failed to: (1) secure and use the Investigative Report; (2) present evidence at trial supporting the theory that Wright intended to enroll at a university in Saudi Arabia; and (3) present evidence at trial supporting the theory that Wright had good relationships with those in law enforcement and the military. D. 535 at 7; D. 544 at 3. Wright alleges that his attorneys' strategic choices at trial violated his Sixth Amendment rights and resulted in prejudice. D. 544 at 48-52.

While "[p]revailing on a claim of ineffective assistance of counsel under the Sixth Amendment to the U.S. Constitution may provide a basis for habeas relief," the "Strickland test is formidable." Weed, 775 F. Supp. 3d at 530. To demonstrate ineffective assistance of counsel, a petitioner must show that: "(1) 'counsel's representation fell below an objective standard of reasonableness,' and (2) 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" United States v. Constant, 814 F.3d 570, 578 (1st Cir. 2016) (quoting Strickland v. Washington, 466 U.S. 668, 688, 694 (1984)). The reasonableness of the attorney's representation is "viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690. Judicial scrutiny of counsel's representation and performance must be "highly deferential" and the Court should make "every effort . . . to eliminate the distorting effects of hindsight." Id. at 689. There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. Thus, a petitioner must show that "given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it." Tevlin v. Spencer, 621 F.3d 59, 66 (1st Cir.

2010) (internal quotation marks omitted) (quoting Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006)). To demonstrate prejudice, the petitioner "must show that there is a reasonable probability that," but for the attorney's deficient performance, there would have been a different outcome. Strickland, 466 U.S. at 694. "A reasonable probability is one sufficient to undermine confidence in the outcome." Johnston v. Mitchell, 871 F.3d 52, 64 (1st Cir. 2017) (internal quotation marks omitted) (quoting González-Soberal v. United States, 244 F.3d 273, 278 (1st Cir. 2001)). "[I]t is not enough to show that the errors had 'some conceivable effect on the outcome.'" González-Soberal, 244 F.3d at 278 (quoting Strickland, 466 U.S. at 693).

*1. Wright Has Failed to Establish Ineffective Assistance of Counsel as to the Investigative Report*

Wright claims that he received ineffective assistance of counsel because his attorneys failed to secure the Investigative Report before trial, or, in the alternative, failed to use the Investigative Report at trial to contest the government's description of the shooting on June 2, 2015. See D. 535 at 7.

Wright's first argument, that defense counsel's failure to "secure discoverable exculpatory and impeaching evidence before and during trial and throughout sentencing, direct appeal(s) and re-sentencing," id., fails the unreasonableness requirement of Strickland, 466 U.S. at 688-89 (requiring a showing that "counsel's representation fell below an objective standard of reasonableness"). Wright's attorneys took reasonable steps to secure exculpatory evidence during discovery, requesting "[a]ll documents and photo/audio/video materials concerning the stop and shooting death of [Rahim] and investigation of those events by any law enforcement, prosecution, or government agencies, state and/or federal." D. 542-1 at 2. Even as contended by Wright, he made his counsel aware of the Investigative Report prior to his trial. D. 544 at 32. Further, and more importantly, the Investigative Report did not provide information that would have proved

consequential for the resolution of charges against Wright.[3] The evidence that Rahim had brandished a knife was strong, see D. 365 at 63-64 (providing direct testimony from Special Agent Patrick Maloney); D. 366 at 20 (providing testimony that knife was found at the scene); D. 365 at 43 (describing surveillance of Rahim's phone), and there were potential strategic downsides to calling eyewitnesses who may have only elevated the significance of the encounter. Moreover, Wright's attorneys requested and received discovery, including surveillance video and audio of the Rahim shooting and even while the government objected to producing broader discovery than it provided the defense, see D. 542-2 at 3 (providing that "[t]he government objects to this request as overbroad and exceeding the scope of the government's discovery obligations"), his counsel's actions regarding discovery was not "patently unreasonable." Tevlin, 621 F.3d at 66; see Weed, 775 F. Supp. 3d at 534 (explaining that "[d]ecisions on how to structure a defense . . . are generally strategic in nature and thus entitled to a presumption of reasonableness"); see also D. 387 at 74 (defending Wright as "living in a fantasy land" which was consistent with the evidence at trial including Wright's own trial testimony); cf. United States v. Georgiadis, 419 F. Supp. 3d 226, 231 (D. Mass. 2019) (finding that "[c]ounsel's failure to object to the withholding of immaterial documents was objectively reasonable").

Even assuming *arguendo* that Wright had met his burden under the first prong, his claim fails the "prejudice" requirement as well. Strickland, 466 U.S. at 694. For the same reasons that Wright's Brady and Giglio claims fail to show "that the result of the trial would have been different" had the Investigative Report been disclosed, Watkins, 36 F.4th at 384 (internal quotation

[3] It is for this reason (and the lack of prejudice discussed above and below) that any dispute about whether Wright's counsel received the Investigative Report, in whole or in part, from Wright's mother or otherwise, D. 544 at 32-34 & n.1, before trial is not a material dispute that needs to be resolved for determination of the grounds raised in the Petition.

marks omitted) (quoting Conley, 415 F.3d at 188), Wright here fails to show that "there is a reasonable probability" the result at trial would have been different had his attorneys secured and/or used the Investigative Report, Strickland, 466 U.S. at 694.

To the extent that Wright also argues that his counsel failed to mobilize the Investigative Report on his behalf, Wright's claim also fails. Defense counsel's decision not to contest the government's version of events surrounding the Rahim shooting was reasonable. Again, the government's evidence that Rahim had advanced toward agents while wielding a knife was strong. D. 365 at 43, 63-64; D. 366 at 6, 20. Similarly, while the Investigative Report revealed that several witnesses (who were far away at the time of encounter) could not see what Rahim was holding in his hand, D. 544-4 at 7, 12-13, 15; D. 544-5 at 4; D. 544-6 at 11, and that lab tests revealed no latent prints on the knife or sheath, D. 544-3 at 10, contesting these issues may have led to the loss of credibility in the eyes of the jury, see Dunn v. Reeves, 594 U.S. 731, 739 (2021) (explaining that counsel "must choose from among countless strategic options," some of which "carry the risk of . . . undermining credibility with the jury or distracting from more important issues" (internal citations and quotation marks omitted)), particularly given the nature of the charges against Wright and the strength of the evidence, largely Wright's own words and deeds, supporting same. Wright has failed to meet the "patently unreasonable" standard required by Strickland. Tevlin, 621 F.3d at 66.

Wright's claim that his attorneys failed to use the evidence contained within the Investigative Report at trial similarly fails the second prong of Strickland, 466 U.S. at 694. For the reasons discussed, Wright has failed to show that presenting additional witness testimony or the lack of latent prints on the knife seized at the scene of Rahim's shooting would have, by a "reasonable probability," led to a different outcome. Id. Regardless of whether Wright's attorneys

indeed secured the Investigative Report, their actions did not violate Wright's Sixth Amendment rights. The Court denies the Petition on this ground.

*2. Wright Has Failed to Establish Ineffective Assistance of Counsel in His Attorneys' Treatment of Wright's Future Schooling Plans*

Wright also claims that his counsel was deficient in failing to present evidence of his plan to enroll at the University of Medinah in Saudi Arabia. D. 544 at 54. Wright argues that presenting this evidence would have provided the jury with an alternative theory for why Wright left home on June 2, 2015 (that he was meeting Rahim to receive agreed-upon money to pay for his flight rather than participate in a plan to attack law enforcement), id., as well as his decision to deactivate or delete his social media accounts and erase his laptop (in preparation for schooling rather than destroying evidence), id. at 7. Wright, however, fails to show as a factual matter that the jury did not hear this evidence, as Wright himself testified on direct examination about his interest in attending the University and that he had been accepted to attend. D. 380 at 40-42. Nonetheless, to the extent that Wright argues his counsel was ineffective for not presenting evidence that substantiated his plans to enroll, the Court reviews the alleged failure under Strickland.

Wright's argument fails the first prong of Strickland, 466 U.S. at 688. "[T]he failure to present a viable theory, without more, does not amount to ineffective assistance of counsel." Smith v. Dickhaut, No. 12-cv-30120-MGM, 2015 WL 12856458, at *13 n.23 (D. Mass. May 28, 2015). Even assuming that evidence of his plans to attend an university in Saudia Arabia was part of a viable defense, there were reasonable strategic considerations for Wright's attorneys to avoid introduction of further evidence of Wright's planned education. Arguing that Wright's departure to the Middle East for education was imminent may have undermined the "role-play[ing]" defense theory, consistent with the evidence including Wright's own testimony, that defense counsel adopted during closing arguments. D. 387 at 79-80, 95 (describing Wright as a mere "fan-boy"

and that despite Wright's messages discussing getting married and moving to the Middle East, "[t]here was no marriage, there was no Syria, there was no anything, there was Mr. Wright talking from behind his screen"). It also may have contradicted other evidence presented at trial, such as Wright's own statements in early 2015 that "I don't care about Madinah now. It's not on my mind anymore. I got my eyes set on bigger and better things." D. 368 at 63; see United States v. Carter, No. 19-cr-10104-ADB, 2025 WL 713532, at *6 (D. Mass. Mar. 5, 2025) (determining petitioner "ha[d] not demonstrated that his counsel was unreasonable in failing" to present evidence where it "would have been affirmatively harmful to [p]etitioner's case, rather than helpful"). Defense counsel's strategic decision to avoid focusing on Wright's desire to travel to the Middle East was not "patently unreasonable." Tevlin, 621 F.3d at 66.

Wright's argument also fails the prejudice requirement of Strickland, 466 U.S. at 694. Given Wright's trial testimony about his interest in attending and his acceptance to the University of Medinah, D. 380 at 40-42, it is unlikely that the presentation of corroborating evidence (such as through character witnesses as Wright's petition suggests, D. 535 at 7) would have led to a different result. As for the connection between Wright's education and his attempted reset of his laptop, Wright testified at trial that he had told law enforcement agents that that he reset his computer the morning of June 2 because he was afraid of his family finding out about the ISIS propaganda and because he did not want to get in trouble in connection to Rahim's actions, directly refuting the theory he now presents in the Petition. Contrast D. 380 at 25-26 (testifying at trial that "[b]ecause I was afraid of my family, that they would find out about all this ISIS-related propaganda that I've been collecting and storing, and the other part of me was afraid of law enforcement"), with D. 544 at 54 (explaining that Wright "completely erased his computer (. . . or attempted to) in preparation

for the [university]”). On this record, any avoidance of an educational defense by counsel did not prejudice Wright.

Accordingly, Wright has failed to show that it was deficient for his counsel not to elicit further evidence of Wright’s educational plans at trial or that the choice to do so prejudiced him. The Court denies the Petition on this ground.

### *3. Wright Has Failed to Establish Ineffective Assistance of Counsel in His Attorneys’ Presentation of Character Evidence*

Wright also claims that his counsel was deficient in failing to present evidence of favorable interactions with law enforcement and military personnel. D. 544 at 53. In his amended affidavit, Wright recounts several such instances, including encounters during an afterschool program at the Salvation Army when Wright was nine years old and during Wright’s security work in Boston when Wright was in his early twenties. Id. at 74-75. Wright also argues that his attorneys “failed to develop” the evidence that Wright had relatives in law enforcement and the military at trial. Id. at 60.

Wright’s claim fails the first prong of Strickland, 466 U.S. at 688. There were reasonable explanations for his attorneys’ choice to refrain from presenting this evidence, even assuming that it would have admissible. Wright’s positive relationships with law enforcement and military members were almost exclusively from before the time he began sharing ISIS-related content and thus may have shed little light on Wright’s beliefs during the relevant period. See D. 544 at 71-75. Wright’s attorneys could have reasonably decided to avoid presenting this evidence, since it may have distracted from their other arguments, or since it could have caused the defense to lose credibility in the eyes of the jury. See Dunn, 594 U.S. at 739. These strategic decisions were not “patently unreasonable” and so Wright’s claim must fail. Tevlin, 621 F.3d at 66.

Wright's claim also fails the second prong of Strickland, 466 U.S. at 694. The government presented significant evidence at trial of Wright's beliefs and his intent, including through Wright's own words and messages. See, e.g., D. 364 at 6-14; D. 369 at 20-25; D. 374 at 42-49; D. 381 at 8, 39-45; D. 382 at 9-14. The presentation of favorable interactions with police at younger ages would likely not have refuted Wright's own verbal encouragement of Rahim's desire to attack "the boys in blue" on the day of the attack. D. 365 at 43; Trial Exh. 5a at 4. Thus, Wright has failed to show that this strategic decision rises to the level of "undermin[ing] confidence in the outcome" at trial. Johnston, 871 F.3d at 64 (internal quotation marks omitted) (quoting González–Soberal, 244 F.3d at 278).

Accordingly, the Court also denies the Petition on this ground.[4]

## V. Conclusion and Certificate of Appealability

For the foregoing reasons, the Court DENIES the Petition, D. 535.

A petitioner may receive a certificate of appealability only if he has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). Such a showing is made when "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S.

[4] Wright seeks an evidentiary hearing, D. 535 at 4, but such a hearing is not warranted here. A habeas petitioner is not entitled to an evidentiary hearing as a matter of right, and "a district court properly may forgo [such a hearing] when (1) the motion is inadequate on its face, or (2) the movant's allegations, even if true, do not entitle him to relief, or (3) the movant's allegations 'need not be accepted as true because they state conclusions instead of facts, contradict the record, or are inherently incredible.'" David, 134 F.3d at 477 (quoting United States v. McGill, 11 F.3d 223, 226 (1st Cir. 1993)). The Petition does not warrant an evidentiary hearing as the allegations are deficient for all the reasons addressed above. See United States v. Jones, No. 07-cr-10339-MLW, 2014 WL 1093132, at *6 (D. Mass. Mar. 14, 2014) (providing that an evidentiary hearing is unnecessary "'when a § 2255 motion (1) is inadequate on its face, or (2) although facially adequate is conclusively refuted as to the alleged facts by the files and records of the case'" (quoting Moran v. Hogan, 494 F.2d 1220, 1222 (1st Cir. 1974)). Thus, the Court denies the request for an evidentiary hearing.

473, 484 (2000). Based upon its analysis of the record and the applicable law, this Court does not, at this time, conclude that "reasonable jurists" could debate this Court's conclusion. Id. Accordingly, the Court is not inclined to issue a certificate of appealability but will give Petitioner until October 1, 2026 to file a memorandum if he desires to address the issue of whether a certificate of appealability is warranted as to the Petition.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge